```
 1                IN THE DISTRICT COURT OF THE UNITED STATES
                    FOR THE NORTHERN DISTRICT OF OHIO
 2                            EASTERN DIVISION

 3      UNITED STATES OF AMERICA,      )
                                       )
 4                 Plaintiff,          )    Judge Boyko
                                       )    Cleveland, Ohio
 5            vs.                       )
                                       )    Number 1:16CR260
 6      RUSSELL DAVIS,                 )
                                       )
 7                 Defendant.          )

 8                             - - - - -
                      TRANSCRIPT OF PROCEEDINGS HAD BEFORE
 9
                    THE HONORABLE CHRISTOPHER A. BOYKO
10
                          JUDGE OF SAID COURT,
11
                      ON TUESDAY, MAY 1, 2018
12
                             VOLUME 6
13                           - - - - -
        APPEARANCES
14      For the Government:            ROBERT E. CORTS,
                                       VASILE KATSAROS,
15                                     Assistant U.S. Attorneys
                                       801 West Superior Avenue
16                                     Cleveland, OH 44113
                                       (216) 622-3600
17
        For the Defendant:            EDWARD G. BRYAN,
18                                     DARIN THOMPSON,
                                       Federal Public Defender's
19                                     Office - Cleveland
                                       750 Skylight Office Tower
20                                     1660 West Second Street
                                       Cleveland, OH 44113
21                                     (216) 522-4856

22      Official Court Reporter:       Shirle M. Perkins, RDR, CRR
                                       U.S. District Court
23                                     801 West Superior, #7-189
                                       Cleveland, OH 44113-1829
24                                     (216) 357-7106

25      Proceedings recorded by mechanical stenography; transcript
        produced by computer-aided transcription.
```

1    TUESDAY SESSION, MAY 1, 2018, AT 9:12 A.M.

2                     THE COURT:  Good morning, everyone.

3                     THE JURY:  Good morning.

4                     THE COURT:  Mr. Bryan, we're on cross.

09:16:22 5              MR. BRYAN:  Thank you, your Honor.

6                     CROSS-EXAMINATION OF CASEY CARTY

7    BY MR. BRYAN:

8    **Q.**   Good morning, Special Agent Carty.

9    **A.**   Good morning.

09:16:58 10   **Q.**   Would you agree with me that when you're investigating

11   a case generally, you sort of start with the event and you

12   try to gather as much information as you can about that

13   event, working backwards?

14   **A.**   Yeah, I think that's fair.

09:17:14 15   **Q.**   And it's -- would you also agree that the more pieces

16   of this puzzle, so to speak, that you have, the better

17   you're able to assess what actually occurred?

18   **A.**   I'd agree.

19   **Q.**   And that's -- you can determine whether or not

09:17:31 20   something's relevant, correct, to your investigation when

21   you look at multiple piece of evidence?

22   **A.**   Yeah, I'd say so, yeah.

23   **Q.**   And then sometimes you can rule out evidence based

24   upon other evidence that you're receiving, correct?

09:17:46 25   **A.**   Sure.

Carty - Cross/Bryan

1    **Q.**    And it's important to gather evidence as soon as

2    possible because evidence over time can become tainted,

3    correct?

4    **A.**    It can.

09:17:57 5    **Q.**    It could become lost, right?

6    **A.**    It could.

7    **Q.**    And it can even become purposefully destroyed, right?

8    **A.**    Yes.

9    **Q.**    Okay.

09:18:09 10    Now, it's important -- it's important to all of your

11    investigations, would you agree with me that a case that

12    involves a death of another person is probably one of the

13    more -- the most important investigation you could have?

14    MR. CORTS:  Objection, your Honor.

09:18:28 15    THE COURT:  He can answer that.  Go ahead,

16    Agent.

17    THE WITNESS:  If there's a death involved,

18    yes, that's very -- that's on the more important, I guess

19    you could say.

09:18:36 20    **Q.**    Death is different, right?

21    **A.**    It is.

22    **Q.**    Okay.

23    A drug case standing by itself is serious but a

24    seriousness increases exponentially when you're saying that

09:18:48 25    drug transaction led to the death of another, correct?

1        MR. CORTS:  Objection, your Honor.

2        THE COURT:  I'll sustain that.

3        MR. BRYAN:  Okay.

4    Q.   When you took over this case -- well, strike that.

09:19:04 5   When did you take over this case?

6    A.   I didn't take over the case.  It doesn't work like

7    that.  We work as partners, so I --

8    Q.   So were you part of the case from the very beginning?

9    A.   I was not, no.

09:19:14 10  Q.   When did you become part of the case?

11   A.   About mid April, roughly mid April of '16.

12   Q.   Okay.

13        So around the time that Detective Sivert testified

14   they had already arrested Mr. Davis and interviewed him?

09:19:26 15  A.   Yes, it was after he had been arrested and been

16   interviewed.

17   Q.   So it's after Mr. Davis had already been targeted by

18   local law enforcement and subjected him to interrogation,

19   and he was arrested, right?

09:19:38 20  A.   It was after he was identified as a suspect, yes.

21   Q.   Okay.

22        Well, he wasn't just identified as a suspect at that

23   time; they'd actually charged him in state court, correct?

24   A.   Correct.

09:19:47 25  Q.   So they charged him with what, involuntary

1    manslaughter and something about drugs to somebody?

2    **A.**    Something to that effect, yeah.  It was involuntary

3    manslaughter.  I don't recall what the other charge was.

4    **Q.**    There was some type of drug offense checked to it,

09:20:00 5    correct?

6    **A.**    Correct.

7    **Q.**    And that case stayed in state court for a little

8    period of time before you then brought it to the Federal

9    Court, correct?

09:20:10 10    **A.**    Yes, I'm not sure what this case was -- how that case

11    was resolved or dismissed.

12    **Q.**    That's not important, but what's important is that up

13    until mid April, you weren't part of this case?

14    **A.**    Correct.

09:20:20 15    **Q.**    So what you did at that time, and you -- even to this

16    day, you continue to work with Detective Sivert, right?

17    **A.**    Yes.

18    **Q.**    So you want to consider that he stopped working on a

19    case and then you just started it, took it over from there,

09:20:32 20    right?

21    **A.**    Yes.

22    **Q.**    But up until that point in time, there are certain

23    things that had been accomplished but not everything had

24    been accomplished, correct?

09:20:41 25    **A.**    Up until the time I got involved?

1    **Q.**    Up until the time you got involved.

2    **A.**    Yeah, I'd agree with that, yeah.

3    **Q.**    Okay.

4          And one of the things that had been accomplished is

09:20:49  5    that Detective Sivert had collected three days worth of

6    Jacob Castro-White's text messages, correct?

7    **A.**    That's correct.

8    **Q.**    And he did that through preservation letter, correct?

9    **A.**    Correct.

09:21:02  10    **Q.**    Would you agree with me that those text messages are

11    some of the most important evidence in this case?

12    **A.**    I would.

13    **Q.**    They give a really good picture of what's going on in

14    those three days that we have them, right?

09:21:14  15    **A.**    They do, yes.

16    **Q.**    And you can see Jake's, basically through his text

17    messages, you can see how he's living his life at that point

18    in time, right?

19    **A.**    You can.

09:21:22  20    **Q.**    Okay.

21          You said that not all the text messages that he

22    reviewed from Jake during that time are included in our

23    exhibits, right?

24    **A.**    That's correct.

09:21:30  25    **Q.**    And that's because they aren't, quote, relevant to the

Carty - Cross/Bryan

1    case, correct?

2    **A.**    I'd agree with that, yeah.

3    **Q.**    You said something about you found text messages

4    between him and Donny Buchs just talking about friend

09:21:44  5    things?

6    **A.**    Yes.

7    **Q.**    You remember they were planning to go to like BPR

8    competition in Columbus, something like that?

9    **A.**    Yeah, there was some reference to that, yeah.

09:21:51 10    **Q.**    And that's a big body building competition that's held

11    every spring down in Columbus, Ohio?

12    **A.**    Right.

13    **Q.**    Called the Arnold Classic?

14    **A.**    Yeah.

09:21:59 15    **Q.**    And Arnold used to come every year, too.  I don't know

16    if he comes anymore, but if you know?

17    **A.**    Yeah, I think so, something like that.

18    **Q.**    Okay.

19         And they were pretty excited about that, right?

09:22:11 20    **A.**    I don't know how excited they were.  I presume.

21    **Q.**    You recall them also talking about steroids as well in

22    some of those text messages?

23    **A.**    I don't recall them talking about steroids, no.

24    **Q.**    You recall other kinds of pills, like selling Viagra?

09:22:24 25    You recall that?

1    **A.**    I don't recall a reference to Viagra.  Not saying it's

2    not there.  I just don't recall that.

3    **Q.**    Just something you don't have a memory of at this

4    time?

09:22:33 5    **A.**    Correct.

6    **Q.**    What you did have, though, you had what was important

7    to you is you saw the interactions between Mr. Castro-White

8    and other individuals who were involved in him getting drugs

9    during that time period, right?

09:22:48 10    **A.**    Yes.

11    **Q.**    And obviously, one of the persons that became most

12    interesting to law enforcement at that time, and this is

13    before even your involvement, but to Detective Sivert was

14    Corey Stock, right?

09:23:02 15    **A.**    He was -- he was important to law enforcement?  I'm

16    sorry.  What was the question?

17    **Q.**    Corey Stock -- in that relevant texting information

18    about drugs, one of the obviously a relevant participate in

19    all of that was Corey Stock, correct?

09:23:16 20    **A.**    Yes.

21    **Q.**    And you can even tell from that three-day period of

22    time of text messages that Corey Stock was acting as sort of

23    a facilitator, correct?

24    **A.**    I would agree with that, yeah.

09:23:27 25    **Q.**    When I say facilitator, I'm talking about someone

1    who's assisting others in getting drugs, right?

2    **A.**    Yes.

3    **Q.**    While he's assisting himself in getting drugs,

4    correct?

09:23:36 5    **A.**    Correct.

6    **Q.**    And you saw also in that three-day window of time

7    Harry Karaplis was sort of a facilitator, too, if Corey

8    wasn't a facilitator, correct?

9    **A.**    To a lesser degree, but I think that's accurate.

09:23:51 10   **Q.**    To a lesser degree during that time period, right?

11   **A.**    Right.

12   **Q.**    You also saw during that three-day window of time, a

13   short -- excuse me -- references to a person you refer to as

14   Red, correct?

09:24:03 15   **A.**    Correct.

16   **Q.**    And you referred -- you also saw references to an

17   Erika, correct?

18   **A.**    Saw one reference to an Erika.

19   **Q.**    In that period of time, correct?

09:24:13 20   **A.**    Yes.

21   **Q.**    And you saw -- you saw a reference to a guy named A?

22   **A.**    I did.

23   **Q.**    Right?  And although nobody else is named by name,

24   they -- they do appear to be talking about sources of drugs

09:24:28 25   from someone else?

850

Carty - Cross/Bryan

1    **A.**    I'd have to see specifically which one you're talking

2    about.  A and Erika were referenced but --

3    **Q.**    Talking about somebody's stuff being better than most?

4    **A.**    Yeah, that general line of discussion in the case,

09:24:45 5    there are multiple people out there supplying drugs.

6    **Q.**    We know from Corey that there were multiple people he

7    was using.  As a facilitator, there were multiple people he

8    was using to grab from, correct?

9    **A.**    Correct.

09:24:58 10   **Q.**    But early on, there was sort of a main focus and that

11   was -- that was the person named Red, correct?

12   **A.**    Early on.

13   **Q.**    In Sivert's investigation, correct?

14   **A.**    Yes.

09:25:09 15   **Q.**    And, in fact, by the time you started working on it,

16   Mr. Davis had already been arrested and charged, correct?

17   **A.**    That's correct.

18   **Q.**    Okay.

19          Now the other information that Sivert had when you

09:25:23 20   started working on the case were cell phone records of those

21   four individuals involved from the -- from his standpoint of

22   the investigation, correct?

23   **A.**    I don't recall if he had Mr. Davis' records, yet,

24   specifically.  I know he had Castro-White's, I think he had

09:25:41 25   some tolls from Harry and Corey as well.

**Q.**   And the tolls that he had were just for those sort of relevant time periods, right?

**A.**   That's correct.

**Q.**   They weren't -- they weren't like for months of records or anything like that?

**A.**   Correct.

**Q.**   They were just sort of zeroed in near that time of death area, right?

**A.**   Correct.

**Q.**   Okay.

And then from those tolls, then you were starting to put some more of the puzzle pieces together, correct?

**A.**   Correct.

**Q.**   Seeing who's calling whom, when they're calling them, maybe in relation to text messages, right?

**A.**   Correct.

**Q.**   All right.

Now this chart that you prepared, Government's Exhibit 14, was that something that was being prepared from the very beginning of this investigation or is that something that was prepared in preparing for trial?

**A.**   I think I started working on that, maybe in the summer of '16, 2016.

**Q.**   Okay.

**A.**   Roughly.  It wasn't prepared just in advance of trial

1  specifically for trial.  It was prepared in advance of that.

2  **Q.**  Okay.

3  And that's actually a very good tool, right?

4  **A.**  I'd say so.

09:26:45 5  **Q.**  And it's a good tool because these telephone records

6  are really kind of difficult to follow when you're looking

7  at one record and you're running over and looking at another

8  record and trying to match up what's going on amongst the

9  parties, correct?

09:26:59 10  **A.**  Yes.

11  **Q.**  And so when you put it in chart form, you can sort of

12  put everything in one place, right?

13  **A.**  Right, I think it helps.

14  **Q.**  And that's what you were doing with the chart, right?

09:27:10 15  **A.**  Right.

16  **Q.**  But that wasn't the only evidence that existed -- not

17  the chart, but the telephone records, but that wasn't the

18  only evidence that existed when you got involved in the

19  case?

09:27:21 20  **A.**  Correct.

21  **Q.**  There was also -- there were also pictures taken at

22  the scene, right?

23  **A.**  Right.

24  **Q.**  And so you -- you had all the scene of the death

09:27:33 25  photos that you were able to review as well, correct?

Carty - Cross/Bryan

**A.**    Correct.

**Q.**    If we could -- and we've seen a lot of these photos, but I don't think we've seen these two yet.

If we could see Government's Exhibit R -- I'm sorry. Numbers are Defendants.  I should know that by now.  Can we see Defendant's Exhibit R, please?

You see Defendant's Exhibit R for identification purposes?

**A.**    I do.

**Q.**    Okay.

We've already seen the pictures that were taken of the heroin that was over on his dresser, correct?

**A.**    Yes.

**Q.**    Have you seen this picture before as well?

**A.**    I believe I have.  I don't specifically remember this one.

**Q.**    Okay.

But, there appear to be other types of substances in these drawers as well; there's one that says 3CC's or something?

**A.**    Yes.

**Q.**    The bottles over here?

**A.**    Yes.

**Q.**    And these actually look like supplements of some kind up here?

1    **A.**    They're pill bottles.  I can't tell what they are.

2    **Q.**    Okay.  Could we now bring up Defendant's Exhibit U?

3          And that appears to be some sort of a cabinet next to

4    Jacob's bed?

09:30:13  5    **A.**    Yes.

6    **Q.**    And again, there appear to be other types of pill

7    bottles and things of that nature in there?

8                  THE COURT:  Mr. Bryan, could we go back to

9    Exhibit R?  Whose room are we talking about?

09:30:25  10    **Q.**    This is Jacob Castro-White's room, correct?

11    **A.**    That's my understanding of it, yes.

12                  THE COURT:  Thank you.

13    **Q.**    Although you may not have a specific memory, you've

14    seen these photographs before?

09:30:34  15    **A.**    I don't remember seeing this shot.

16    **Q.**    Okay.

17          Well that does appear to be his bed to the left of the

18    cabinet?

19    **A.**    It does.

09:30:41  20    **Q.**    Okay.  You can take that down, Shelly.

21          The other evidence that you had at the time that you

22    began the case were interviews of witnesses, right?

23    **A.**    Right.

24    **Q.**    And they were even videotaped interview, right?

09:31:00  25    **A.**    Yes.

1  **Q.**    There were three videotape interviews of Harry

2  Karaplis?

3  **A.**    Yes.

4  **Q.**    And there was one videotaped interview of Corey Stock?

09:31:10  5  **A.**    Yes.

6  **Q.**    And then there was a videotaped interview of

7  Mr. Davis?

8  **A.**    Yes.

9  **Q.**    Okay.

09:31:16 10    And just while I have Mr. Davis on my mind, you also

11  had a controlled telephone call that was made between Mr. --

12  or made between Mr. Karaplis and Mr. Davis as well, correct?

13  **A.**    Yes.

14  **Q.**    Okay.

09:31:28 15    And that's all evidence that we've already heard in

16  this case today, correct?

17  **A.**    Yes.

18  **Q.**    And so -- but you knew from that evidence that, you

19  know, as many witnesses can be from time to time, depending

09:31:41 20  upon the nature of the case, the witnesses weren't always

21  truthful in their interviews, correct?

22  **A.**    Correct.

23  **Q.**    You learned from the first Harry Karaplis interview

24  that he wasn't being truthful, right?

09:31:53 25  **A.**    Correct.

Carty - Cross/Bryan

**Q.**     And he gave a story that later contradicted the other

evidence that Detective Sivert started to receive at that

time, correct?

**A.**     That's correct.

09:32:05  **Q.**     So initially, he told a story that was believable to

law enforcement, right?

**A.**     I'm not sure how much stock, no pun intended,

Detective Sivert put in that interview.

**Q.**     Only he could tell us that?

09:32:21  **A.**     Correct.

**Q.**     But, the point is that when Detective Sivert -- at the

time, he never secured -- Harry Karaplis was thought to be

the last person to see Jacob Castro-White alive, correct?

**A.**     Correct.

09:32:36  **Q.**     Okay.

       Probably the most critical witness in the case,

correct?

**A.**     An important witness in the case, yes.

**Q.**     In a homicide case, the last person to see someone

09:32:49  alive, the last known person to see someone alive is very

important, right?

**A.**     Yes.

**Q.**     Okay.

       And basically at that time, he didn't secure his cell

09:33:00  phone or anything like that, right?

Carty - Cross/Bryan

1   **A.**   That's correct.

2   **Q.**   Okay.

3        Something that could maybe contain additional puzzle

4   pieces, right?

09:33:09 5   **A.**   It could have.

6   **Q.**   Okay.

7        Now, he also, when he started receiving Jake's text

8   messages, he saw that what Harry told him earlier didn't

9   make sense because it looked like Harry was going to grab

09:33:25 10   with Jake, right?

11   **A.**   Right.

12   **Q.**   So he brought Harry in for a second interview,

13   correct?

14   **A.**   Correct.

09:33:30 15   **Q.**   Okay.

16        And that interview took place on the 18th, I believe,

17   of March?

18   **A.**   I think that was the date of the second interview.

19   That sounds right, the 18th.

09:33:40 20   **Q.**   And he started confronting him with this information,

21   right?

22   **A.**   Right.

23   **Q.**   But at the time, you're still trying to figure out how

24   all of these things match up, right?

09:33:49 25   **A.**   Right.

1    **Q.**    And you saw again conversations about how this guy

2    Red, but it wasn't -- he didn't know enough to know exactly

3    what happened at that time, correct?

4    **A.**    That's correct.

09:34:00  5    **Q.**    But, he was clearly telling Harry at the time he

6    wanted to know who this Red guy was?

7    **A.**    Right.  He wanted to know who the dealer was that sold

8    the drugs.

9    **Q.**    Okay.

09:34:13  10    And Harry at that time, he's already testified he

11    didn't feel comfortable, he asked to not continue the

12    interview and went and got a lawyer, right?

13    **A.**    Yes, at some point in that interview at the end, he

14    said he wanted a lawyer.

09:34:28  15    **Q.**    And so then moving forward, Detective Sivert, because

16    Corey was all over the text messages as well, went to make

17    arrangements to interview Corey as well, correct?

18    **A.**    Correct.

19    **Q.**    We already know from the evidence in this case that

09:34:44  20    that happened on the 18th as well, that he went to Corey's

21    house, right?

22    **A.**    I'm not sure what day he went to his house, but it

23    was at that time frame roughly, yeah.

24    **Q.**    He wanted Corey to come to the police station where he

09:34:58  25    could interview him in a better spot rather than his home?

Carty - Cross/Bryan

1    **A.**    Correct.

2    **Q.**    Where he had the texts available to him and he had his

3    office available to him, and he could conduct an effective

4    interview, right?

09:35:07  5    **A.**    That's right.

6    **Q.**    Okay.  And when he did that, Corey didn't come until

7    like four days later, right?

8    **A.**    I think the 22nd, I think that's --

9    **Q.**    He was interviewed on the 22nd?

09:35:19  10   **A.**    You have to refresh my memory on the specific dates,

11   but that sounds right.

12   **Q.**    That's fine.

13        He comes on the 22nd and Corey's interviewed, and

14   again, we already know he wasn't completely honest in his

09:35:32  15   interview, right?

16   **A.**    Correct.

17   **Q.**    But he was also at the same time very helpful to

18   Detective Sivert because he kind of helped him interpret the

19   text messages a little bit, right?

09:35:41  20   **A.**    He did, yeah.

21   **Q.**    Because Detective Sivert actually thought they were

22   going to grab from Corey that night, based upon their

23   communications?  Okay.  He thought -- he was the target of

24   who they were going to go grab from, right?

09:35:55  25   **A.**    That's correct.

Carty - Cross/Bryan

1    **Q.**    And Corey very quickly showed him no, no, no, I've

2    seen Harry's text messages?

3                    MR. CORTS:  Your Honor, I'm going to object to

4    the hearsay nature.

09:36:07 5                    THE COURT:  Approach for a second.

6          (The following proceedings were held at side bar:)

7                    MR. BRYAN:  Obviously it's not offered for the

8    truth of matter.  It's offered for how he conducted the

9    investigation.

09:36:23 10                    THE COURT:  Okay.

11         Heres's my problem.  You're going over things with him

12   that are not related to what he did in this case.

13   Everything else --

14                    MR. BRYAN:  He's reviewing the evidence in the

09:36:32 15   case and where he is going to take that from there.  You

16   know, he's been the main investigator from mid April on.  So

17   he's absorbing the information and then --

18                    THE COURT:  I know, but you're asking him for

19   his critique on what happened before on multiple occasions.

09:36:46 20   So.

21                    MR. BRYAN:  All right.

22                    THE COURT:  All right.

23         (Proceedings resumed within the hearing of the jury:)

24   BY MR. BRYAN:

09:37:03 25   **Q.**    Anyway -- so at that time, Corey Stock's phone wasn't

Carty - Cross/Bryan

1       seized at that time, either, correct?

2       **A.**    Correct.

3       **Q.**    And he was allowed to leave?

4       **A.**    Yes.

09:37:13 5    **Q.**    The interview?

6       **A.**    Yes.

7       **Q.**    And then it went forward from there and then we have

8       the final interview with Harry on April 1st, right?

9       **A.**    The interview with his attorney, is that what you're

09:37:25 10   referring to?

11      **Q.**    On April 1st.

12      **A.**    April 1st sounds right.

13      **Q.**    April Fool's Day, correct?

14      **A.**    Okay, yeah.

09:37:32 15   **Q.**    So he was interviewed on that day, and that's when,

16      "Okay, it's Red," right?  That was -- the gist of that

17      interview was identifying who he says he got drugs from that

18      night, correct?

19      **A.**    Correct.

09:37:46 20   **Q.**    And by that point in time, the name Red was a major

21      focus in all these interviews, correct?

22      **A.**    I think that's fair to say, yeah.

23      **Q.**    Okay.

24            Now, other evidence that had already been collected

09:38:01 25   when you came into this case, well, just -- just to fast

1    forward, then they did go and arrest Mr. Davis, correct?

2    A.    They did a few things before that, but yeah,

3    eventually about two weeks later.

4    Q.    Yeah.  I'm trying to speed this up a little bit.  But

09:38:16 5    the first thing they did was a control call?

6    A.    A photo lineup first.

7    Q.    So they did the photo lineup and then the controlled

8    call?

9    A.    A little surveillance, the controlled call.

09:38:26 10    Q.    And the photo lineup is kind of meaningless because if

11    you know someone for a period of time, it's not like picking

12    up a stranger, correct?

13                THE COURT:  Is that a statement?

14                MR. BRYAN:  Well -- it is, your Honor.  I'll

09:38:37 15    withdraw the statement.

16                THE COURT:  Okay.

17    Q.    Anyway, the point is that Mr. Davis was targeted in a

18    number of ways, including the control call, right?

19    A.    Yes.

09:38:46 20    Q.    And then he was brought in and was interviewed and

21    we've seen that interview, right?

22    A.    We have, yeah.

23    Q.    So that's most of the evidence existing at the point

24    in the case when you got involved, right?

09:38:59 25    A.    Right.

Carty - Cross/Bryan

1   **Q.**   And when you got involved, there was other evidence,

2   there was scientific evidence, right?

3   **A.**   Yes.

4   **Q.**   The forensics of the fact that the drugs were

5   determined to be a mixture of heroin and fentanyl in the

6   packet, correct?

7   **A.**   I have to look at the dates of the lab report.  I

8   don't know if they had been generated at that point.  They

9   may have well been.  If they weren't, they were soon

10   thereafter.

11   **Q.**   But they were in the process?

12   **A.**   Yes.

13   **Q.**   And then there was also the toxicology reports about

14   the fentanyl in the blood and all that?

15   **A.**   Yes.  Again, without seeing the dates of the reports

16   they were either generated by that point or they were in the

17   process of being generated.

18   **Q.**   And then there's a death certificate, right?

19   **A.**   Yes.

20   **Q.**   Which summarizes some sort of medical findings into a

21   Coroner's opinion on how Jake died, right?

22   **A.**   Same caveat.  I'm not sure the date the Coroner's

23   report was issued, but it wasn't issued at that point.  It

24   was issued soon after I got involved.

25   **Q.**   Well, if he was already -- if he was already charged

1    in state court and was with manslaughter, it was probably

2    something that had already happened right before you got

3    involved?

4    **A.**    Probably, yeah, but the Coroner's verdict was probably

09:40:16   5    issued.

6    **Q.**    Okay.

7        But when you took over the case, that wasn't the only

8    evidence you wanted to collect, right?

9    **A.**    Right.

09:40:23   10   **Q.**    What you were -- what you wanted to do was you wanted

11   to find additional evidence to try to either support or

12   maybe even show that initial suspicions could be wrong,

13   right?

14   **A.**    Yes.

09:40:35   15   **Q.**    And you -- you're doing that basically always, right?

16   **A.**    Right.

17   **Q.**    And would it be the first time that you've -- the

18   evidence took you in one direction initially, and then when

19   you started getting other evidence, it may have caused you

09:40:50   20   to change directions, right?

21   **A.**    Correct.

22   **Q.**    Okay.

23       And so one of the things that you did is you wanted to

24   conduct a CAST analysis of basically three people's cell

09:41:04   25   phones, correct?

Carty - Cross/Bryan

1    **A.**    Correct.

2    **Q.**    And that was in an effort to try to determine where

3    individuals went generally on the night in question, right?

4    **A.**    Right.

09:41:15  5    **Q.**    Because we can't say specific because this CAST

6    analysis wasn't like GPS, but it is relevant if they were

7    in, you know, a sector where Mr. -- in an area where

8    Mr. Davis lived, correct?

9    **A.**    I agree, yes.

09:41:30 10    **Q.**    Okay.

11    And it's relevant if they say they're at a certain

12    place when they're doing certain things like either using

13    drugs or making telephone calls, it would help corroborate

14    the witnesses in that respect as well, too, correct?

09:41:45 15    **A.**    Correct.

16    **Q.**    Or it may, unfortunately, show that what the witnesses

17    told you earlier may not actually be correct, right?

18    **A.**    Correct.

19    **Q.**    Because if the cell phone towers that are being

09:41:57 20    activated are in a place that isn't near where they said

21    they were at the time, then you may have to start

22    questioning the witnesses a little bit more, right?

23    **A.**    Correct.

24    **Q.**    Okay.

09:42:12 25    One of the things that you knew is that Harry Karaplis

1    had said that Jacob Castro-White picked him up at his

2    mother's condo shortly before they went to purchase drugs

3    from Mr. Davis, correct?

4    **A.**   Correct.

09:42:29 5    **Q.**   Okay.

6        And so one of the things you wanted to see was if

7    there was evidence to support that they were in those areas

8    when he said they were doing it, correct?

9    **A.**   Correct.

09:42:39 10   **Q.**   Okay.  If we could go to Government's Exhibit 13, Page

11   15.

12       And we heard from Agent Kunkle yesterday that these --

13   the cell phone sectors and who they belong to, depending

14   upon the individual's phones, correct?

09:43:09 15   **A.**   We heard from him -- say that again.  I'm sorry.

16   **Q.**   Well, these colors represent different individuals'

17   phones, right?

18   **A.**   Yes.

19   **Q.**   The red represents Mr. Davis' phone, correct?

09:43:22 20   **A.**   Yes.

21   **Q.**   The green represents the victim, Jacob Castro-White's

22   phone, correct?

23   **A.**   Correct.

24   **Q.**   And the blue represents Harry Karaplis's phone,

09:43:33 25   correct?

Carty - Cross/Bryan

1    **A.**    Correct.

2    **Q.**    And so these are -- let me ask you, when was the CAST

3    report done, if you recall?

4    **A.**    I don't recall specifically.

09:43:42  5    **Q.**    Okay.

6          Was that -- was that before the Cellebrite on

7    Mr. Davis' phone or after?

8    **A.**    I think it was after.

9    **Q.**    Okay.

09:43:52 10          So that came after, then I'm a little out of order

11    then, but we'll get to the Cellebrite in a minute.

12          But, anyway, so when you got this report and you

13    started interpreting the data from this report, it seems to

14    you that it sort of supported your theory that they at least

09:44:11 15    went from southwest Lorain to northeast Lorain, correct?

16    **A.**    Correct.

17    **Q.**    Okay.

18          And your witness' testimony of Harry Karaplis was that

19    he was located at his home here before Jacob Castro-White

09:44:33 20    picked him up, right?

21    **A.**    Correct.

22    **Q.**    Okay.

23          And that if you know from the evidence, when Donny

24    Buchs testified, do you recall him being somewhere in the

09:44:42 25    neighborhood over his home being in that general vicinity,

1    closer to the lake?

2    **A.**    In that general area, yes.

3    **Q.**    In that general area?  And Harry says it only took

4    Jake literally a minute to get to his house after he decided

09:44:56  5    to go to his house, correct?

6    **A.**    Something like that.

7    **Q.**    Okay.

8         But we also know from the evidence that it only

9    supposedly would take no less than ten minutes to drive from

09:45:06 10    that location to Mr. Davis' house, correct?

11    **A.**    Something like that, yeah.

12    **Q.**    Okay.

13         But, at 12:09 A.M., in that general are or that

14    general time frame, where they're heading -- well, actually,

09:45:25 15    before I guess Castro-White even picks up Karaplis, Harry

16    Karaplis is actually still somewhere, he's still in a home

17    somewhere, right?

18              MR. CORTS:  Your Honor, I'm --

19              THE COURT:  Sustained.

09:45:48 20              MR. CORTS:  I would object.

21              MR. BRYAN:  Okay.

22    **Q.**    Harry Karaplis said he was at his mother's condo,

23    which is represented by the blue dot?

24              MR. CORTS:  Objection.

09:46:00 25              THE COURT:  Do you recall that's what he said,

1    Agent?

2            THE WITNESS:  I don't specifically recall.

3            THE COURT:  Okay.

4    BY MR. BRYAN:

09:46:08  5    **Q.**    Well, the reason this blue house is right here in this

6    map is because that's where it was represented to you Harry

7    Karaplis was the night that Jacob Castro-White picked him

8    up, correct?

9    **A.**    Yeah, that blue square denotes Harry Karaplis'

09:46:24 10    mother's condo.

11    **Q.**    And that's where he said he was the night Jacob

12    Castro-White picked him up, correct?

13    **A.**    He was there at some point, yes.

14            MR. CORTS:  Your Honor, I object.  May we

09:46:33 15    approach?

16        (The following proceedings were held at side bar:)

17            MR. CORTS:  Your Honor, I think this is

18    improper cross-examination.  I mean basically what he's

19    doing is he's regurgitating an old case with this witness,

09:46:53 20    and he's not asking him questions that actually bring out

21    what he did.  He's asking questions to review the entire

22    case, and I suppose he's going to maybe show inconsistencies

23    or say you should have done this, you didn't do that, and I

24    think it's improper for him just to say this person said

09:47:16 25    that, that person said that.  First of all, it's hearsay.

1    And second of all, he's critiquing things that have already

2    been done.  He can't -- he can't necessarily testify to

3    Government's Exhibit 13, Page 15.  That's what the other

4    witness testified to.  He had an ample opportunity to

09:47:38  5    cross-examine that witness.  I object to this whole line of

6    questioning.

7               MR. BRYAN:  Judge, he's the main investigating

8    agent in the case who's getting the evidence and

9    interpreting the evidence and making decisions based upon

09:47:49 10    the evidence that he's reviewing.

11        He had this CAST report, you know, quite awhile ago,

12    and he used it, and they used it in their case to show that

13    they generally went over to Red's -- I have a right to

14    cross-examine the main investigative agent in this case to

09:48:06 15    show him that their interpretation of their own report

16    suggests that their witnesses weren't where they said they

17    were at the time that they said they were at certain places.

18    This is critical cross-examination and it goes to the

19    investigative nature, what the main investigator after mid

09:48:27 20    April was doing on this case and why he didn't do certain

21    things.  It goes to me challenging their case.  That's what

22    cross-examination's all about to challenge the

23    investigation.

24               THE COURT:  How much longer you think you'll

09:48:40 25    be?

Carty - Cross/Bryan

1          MR. BRYAN:  A half hour.

2          THE COURT:  Okay.  You want to go over it

3    again?  Okay.  Just -- let's try and minimize,

4    regurgitating.

09:48:55  5          MR. BRYAN:  If I'm not being objected to, I

6    can sort of march right through what I'm trying to do.  All

7    right.

8          MR. CORTS:  I only objected four times.

9          THE COURT:  Okay.  Let's go.

09:49:04  10         (Proceedings resumed within the hearing of the jury:)

11   BY MR. BRYAN:

12   Q.   So when these boxes denote a communication, correct,

13   like a -- something that's activating a cell tower

14   somewhere?

09:49:24  15   A.   Correct.

16   Q.   Okay.

17        So at 12:08 and 12:09 when the cell tower is being

18   activated, the blue cell towers show this tower being used,

19   and this tower being used down here, correct?  The -- this

09:49:42  20   tower and this tower, correct?

21   A.   Correct.

22   Q.   So this 12:11 A.M. actually shows the tower in

23   southeast, in the southeast from the home is the tower

24   that's being activated, correct?

09:49:58  25   A.   Correct.

Carty - Cross/Bryan

1   **Q.**     If we -- and that was a critical time period in the

2   case because that's when they were setting off to go to

3   northeast Lorain to try to purchase drugs, right?

4   **A.**     Correct.

09:50:17   5   **Q.**     If we could go to Government's Exhibit 13, Page 17,

6   please.  Another critical time period in the case is the

7   period of time where Harry Karaplis says he was calling

8   Jacob Castro-White, correct?

9   **A.**     Correct.

09:50:43  10   **Q.**     And that's the period of time that's denoted by the

11   telephone calls that Harry Karaplis makes to Jacob

12   Castro-White, correct?

13   **A.**     Correct.

14   **Q.**     And the cell tower that's being activated at that time

09:50:57  15   is the one down by his father's house, correct?

16   **A.**     Yes, there's activity on that tower.

17   **Q.**     There's activity on that tower and there's no activity

18   on the towers near his mother's home, correct?

19   **A.**     There's none shown on this chart, correct.

09:51:11  20   **Q.**     Okay.

21         Now, the other thing -- you can take that down,

22   Shelly.

23         The other thing you did is, you did on Mr. Davis'

24   phone, you did a Cellebrite extraction, right?

09:51:26  25   **A.**     Correct.

1    **Q.**    And it's already been testified but that basically is

2    a forensic computer review of his phone?

3    **A.**    Yes.

4    **Q.**    Okay.

09:51:33   5         And you -- you can't recover everything because some

6    things get written over and things like that, but you can

7    cover quite a bit, right?

8    **A.**    Yes, you can.

9    **Q.**    In fact, you recovered cell -- excuse me, text

09:51:45  10   messages in Mr. Davis' phones that went back months, right?

11   **A.**    Right.

12   **Q.**    And you were able to zero in on those certain periods

13   of time that were important to your investigation as well,

14   correct?

09:51:56  15   **A.**    Correct.

16   **Q.**    Okay.

17        You didn't have Jacob Castro-White's cell phone,

18   correct?

19   **A.**    Correct.

09:52:06  20   **Q.**    And the decision to return that to his mother was made

21   before you were a part of the case, correct?

22   **A.**    Correct.

23   **Q.**    You wouldn't have returned his cell phone to his

24   mother, would you?

09:52:16  25   **A.**    I'm not sure.

Carty - Cross/Bryan

1    **Q.**    Okay.

2    **A.**    I can't say for sure.

3    **Q.**    You can hold on to it for a longer period of time than

4    just a few weeks, right?

09:52:25 5    **A.**    You can.

6    **Q.**    I mean it's critical evidence in the case, right?

7    **A.**    Right.

8    **Q.**    In fact, it's probably the most critical evidence in

9    this case, right?

09:52:32 10    **A.**    That's your opinion.

11    **Q.**    Well, before you even know who the suspects are, you

12    know that that information concerning that suspect could be

13    in that young man's phone, correct?

14    **A.**    Correct, but we had it from another source.

09:52:47 15    **Q.**    Okay.

16          Well, from the three days worth of his texts?

17    **A.**    Yes.

18    **Q.**    Okay.

19          But, you don't have the three days before that, right?

09:52:55 20    **A.**    Correct.

21    **Q.**    And you don't have the -- you don't have his -- don't

22    have his web-based communications, right?

23    **A.**    Correct.

24    **Q.**    And when I say that, I'm talking about telephone

09:53:06 25    records don't tell us everything, right?

Carty - Cross/Bryan

1    **A.**    Could you be more specific?

2    **Q.**    They don't say everything that happens on a person's

3    telephone, on someone's telephone?

4    **A.**    Correct.

09:53:19 5    **Q.**    The telephone records themselves are records of calls

6    and texts, right?

7    **A.**    A record of network -- of cell network activity, yeah.

8    **Q.**    If you get the real big records, they could show you

9    what towers are being hit and everything like -- that's how

09:53:34 10    we have a CAST report, right?

11    **A.**    Correct.

12    **Q.**    But they can't tell you contents of communications,

13    right?

14    **A.**    That's right.

09:53:40 15    **Q.**    So if there's a text message, you'll see that a text

16    message happened but there'll be, quote, no content

17    available on that, right?

18    **A.**    That's right.

19    **Q.**    But the phone itself will have not only when text

09:53:53 20    messages were made, but the content of the text messages,

21    right?

22    **A.**    That's right.

23    **Q.**    As in Mr. Davis' phone, right?

24    **A.**    Right.

09:54:00 25    **Q.**    And if you have the victim's phone, you don't really

1    have three days worth of his activity, right?

2    **A.**    Right.

3    **Q.**    You have all of his activity during that period of

4    time, right?

09:54:11  5    **A.**    That's right.

6    **Q.**    And also we don't know from phone records whether or

7    not people are communicating through the web?

8    **A.**    Correct.

9    **Q.**    Okay.

09:54:22 10          In fact, if they're communicating through the web, and

11   they're not using their data, like when they're away from

12   the -- a web source, you won't even know if they're

13   communicating through the web, right?

14   **A.**    That's right.

09:54:36 15   **Q.**    And that's because it's not -- it doesn't bounce off

16   any towers, right?

17   **A.**    Right.

18   **Q.**    When you use the web through a cell provider, it

19   bounces off their towers, right?

09:54:47 20   **A.**    Yes, it -- I believe that's how it works, yeah.

21   **Q.**    When you use the web from your home Internet or from

22   Starbuck's or something like that, it doesn't bounce off any

23   towers, right?

24   **A.**    Right.

09:54:58 25   **Q.**    Okay.  But, when you use the web on your phone,

1    there's a record of it on your phone, right?

2    **A.**    There usually is, yes.

3    **Q.**    And not only that, but the content of that

4    communication -- if there are communications, can be seen,

09:55:13 5    right, they're on the phone, right?

6    **A.**    They can be.

7    **Q.**    Like you showed Mr. Davis' pictures, right?

8    **A.**    Right.

9    **Q.**    Or some of them, right?

09:55:21 10    **A.**    Some of them.

11    **Q.**    But you said there were hundreds of pictures on his

12    phone, right?

13    **A.**    Right.

14    **Q.**    And family pictures and things like that, right?

09:55:28 15    **A.**    Right.

16    **Q.**    So you -- you would have been able to see Jacob's

17    pictures, too, right?

18    **A.**    Right.

19    **Q.**    And maybe, you know, see who he's in pictures with?

09:55:41 20    **A.**    Yes, if there are pictures.

21    **Q.**    He took selfies with other suspects, anything like

22    that, that would be really important to your investigation,

23    right?

24    **A.**    It could be.

09:55:50 25    **Q.**    Okay.

1        Well, especially if someone said they'd never been

2   with someone before, right?

3   **A.**   If someone said they never been with someone before.

4   **Q.**   Said they never been with the victim before and

09:56:04  5   there's a picture of them with the victim, then that would

6   kind of undermine the suspect's story, right?

7   **A.**   It would, yeah.

8   **Q.**   Or the suspect says they never snap chat, there's not

9   a record of that, but they never communicated through

09:56:19 10   Facebook Messenger or something like that, and there's a

11   record of them communicating through Facebook Messenger,

12   they would show the suspect was -- wasn't telling the truth?

13   **A.**   That would undermine it, that line, yes.

14   **Q.**   So I mean modern cell phones are a treasure trove to

09:56:37 15   law enforcement, are they not, Agent Carty?

16   **A.**   That's fair, yes.

17   **Q.**   Okay.

18        And in this death investigation, the initial

19   investigative officers, after making whatever attempts they

09:56:47 20   did on Castro-White's phone, just gave it back to the

21   mother?

22   **A.**   They did.

23   **Q.**   Okay.

24        Now, when you were going through and creating your

09:57:11 25   chart, you were working with four persons only, right?

1    **A.**    Right.

2    **Q.**    And you were not -- and we came through and we added

3    to that chart, correct?

4    **A.**    That's correct.

09:57:24    5    **Q.**    Okay.

6          And we added information concerning Erika Matus,

7    right?

8    **A.**    That's right.

9    **Q.**    We didn't add information concerning just anybody,

09:57:32    10    right, just one person?

11    **A.**    Well, you added information for a couple people.

12    **Q.**    Well, you're right, Brian Stoll and Amanda ^

13    Giovannaza?

14    **A.**    Yes.

09:57:45    15    **Q.**    And that was to show sort of the pattern, context of

16    what was going on that day, correct?

17    **A.**    Correct.

18    **Q.**    But when it comes to other suspects, there was

19    information that -- just about Erika Matus, correct?

09:57:55    20    **A.**    I don't consider her a suspect.  There was information

21    on Erika Matus.

22    **Q.**    Well -- anyway, you -- you didn't consider her a

23    suspect, right?

24    **A.**    Correct.

09:58:05    25    **Q.**    And that's why you never investigated her either,

Carty - Cross/Bryan

1    correct?

2    **A.**    Correct.

3    **Q.**    Even though you saw that her name was in a text

4    message, that was within that three-day period as being a

09:58:14 5    potential source of supply?

6    **A.**    Correct.

7    **Q.**    Okay.

8         Even though the very night that Jacob died and Corey

9    said, "I could see if Erika has any more to sell to you,"

09:58:29 10    she was a potential suspect that night to sort of be a fall

11    back plan, right?

12    **A.**    That was refuted by the very next tech, so, no.

13    **Q.**    Refuted by the very next text because he says I'll

14    just wait for Red, right?

09:58:41 15    **A.**    Right.

16    **Q.**    We'll get to what happened after that.  But, if Red's

17    not available, there's no guarantee they're going to get

18    from Red, there is a fall back position, right?

19    **A.**    I don't think that was represented.

09:58:55 20         MR. CORTS:  Objection, your Honor.

21    **Q.**    These --

22         THE COURT:  Overruled.  Go ahead.

23    **Q.**    These people have other sources of supply, right?

24    **A.**    They have other sources that supply.

09:59:04 25    **Q.**    In fact, Harry characterized A as his last resort,

Carty - Cross/Bryan

1    right?

2    **A.**    I believe it was Harry who said A was the last resort.

3    Might have been Corey.

4    **Q.**    Okay.

09:59:14  5          But, there's not just one source of supply and that

6    was clear from the evidence in this case, right?

7    **A.**    Correct.

8    **Q.**    Okay.

9          And you never conducted an investigation into Erika

09:59:27 10   Matus' phone records or anything like that, right?

11   **A.**    Correct.

12   **Q.**    In fact, we're the ones that investigate, conduct an

13   investigation into her phone records, correct?

14   **A.**    Correct.

09:59:35 15   **Q.**    And we put it all in that chart, right?

16   **A.**    Yes, a good deal of it, yes.

17   **Q.**    Okay.

18         And the first time you interviewed Erika Matus was

19   when she appeared on our -- after she appeared on our

09:59:46 20   witness list for this CAST, right?

21   **A.**    Correct.

22   **Q.**    And that was this past Saturday, right?  Not --

23   **A.**    Two Saturday's ago.

24   **Q.**    A couple Saturday's ago.  And when you interviewed

09:59:58 25   her, she was sitting there with her boyfriend, right?

Carty - Cross/Bryan

1    **A.**    Right.

2    **Q.**    Did you know at the time she was sitting there with

3    her boyfriend that he, too, back in 2016, was somebody who

4    was abusing heroin?

10:00:08 5    **A.**    Yes.

6    **Q.**    Okay.

7         So he admitted to you that they were using heroin and

8    she was using heroin at a clip of $300 a day, right?

9    **A.**    He did not mention any dollar figures, but they both

10:00:20 10    said they were -- they had formally abused heroin and were

11    both clean now.

12    **Q.**    Okay.

13         And so then they denied that they saw those guys that

14    night, right?

10:00:29 15    **A.**    Correct.

16    **Q.**    And that was enough, and then you left, right?

17    **A.**    That was the day that I didn't walk right out then,

18    but yeah, somewhere thereabouts.

19    **Q.**    But just enough to get the denial in this case so that

10:00:44 20    you could take the stand and say that she didn't provide to

21    those people, right?

22    **A.**    She denied that she sold to those people, yes.

23    **Q.**    And you know that lots of people, especially when it

24    looks like their own interests may be at stake, right?

10:01:00 25    **A.**    Sure.

1 **Q.** You know that from your experience as an FBI agent?

2 **A.** Right.

3 **Q.** But you were satisfied with her response without any

4 further investigation, correct?

10:01:08 5 **A.** I was satisfied with her response in the context of

6 all the other evidence that we have.

7 **Q.** Okay.  In the con -- okay.

8   Now you testified yesterday, as it related to Erika

9 Matus, that you were able to review all of her phone records

10:01:35 10 because the Defense had provided several months worth of her

11 phone records in discovery, correct?

12 **A.** Correct.

13 **Q.** You testified specifically about the months of

14 February, the months of February and March, right?

10:01:49 15 **A.** That's right.

16 **Q.** And basically, you were saying that it showed a

17 pattern of constant telephonic communication or a lot of

18 telephonic communication throughout those months, March and

19 February, right?

10:02:06 20 **A.** A lot of communication with whom?

21 **Q.** Between -- I'm sorry -- between Corey Stock and Erika

22 Matus, correct?

23 **A.** Yes, a lot of communication between Corey Stock and

24 Erika Matus.

10:02:15 25 **Q.** A tremendous amount of communication that showed a

1    relationship that seemed to be sort of like one of these

2    everyday relationships when you see somebody on a regular

3    basis, right?

4    **A.**    I'm sorry, seemed like what?

10:02:32  5    **Q.**    There was so much communication, it's like the persons

6    are together all the time, they're always communicating like

7    close friends do, right?

8    **A.**    They're always communicating, but I'm not sure if

9    they're always together because if they're always

10:02:43  10    communicating, probably not next to one another.

11    **Q.**    If you're together, you don't create a phone record,

12    right?

13    **A.**    Right.

14    **Q.**    If you drive a half mile from one place to another

10:02:52  15    place, and you know someone's already there, you don't have

16    to call him before you go there, right?

17    **A.**    That's fair, yeah.

18    **Q.**    You go to their house and knock on their door, right?

19    **A.**    Sure.

10:03:05  20    **Q.**    So there's not always going to be a phone record

21    that's created if someone strikes out at one place, it's not

22    always going to be a phone record created if they go

23    someplace else, right?

24    **A.**    Not necessarily.

10:03:16  25    **Q.**    Especially if they're driving by a gas station and see

Carty - Cross/Bryan

1    some guy that they know who's dealt drugs in the past

2    standing near the gas station?

3    **A.**    You're saying it's not going to be a felony record?

4    **Q.**    Like a street dealer.

10:03:28  5          Someone's driving down the street, known to be a place

6    where people deal on the street, and there's someone they

7    recognize as given them heroin in the past, you're not going

8    to create phone records between those two people?

9    **A.**    Yeah, unless they called them or texted them, there

10:03:42 10   would be no phone record.

11   **Q.**    Yeah.

12         You just pull up to them on the street and there's a

13   transaction, that's not recorded anywhere?

14   **A.**    Right.

10:03:48 15  **Q.**    Except in the minds of the people who did.

16         But what you said was -- in February and March, there

17   were 272 calls between Corey and Erika, right?

18   **A.**    Yes.

19   **Q.**    And then you said there were 770 text messages between

10:04:06 20   February and March?

21   **A.**    Yes.

22   **Q.**    Between Erika and Corey, right?

23   **A.**    Right.

24   **Q.**    Okay.

10:04:11 25         And then you gave sort of an average.  You broke it

1    down by average and said this is an average of the telephone

2    calls per day and average every text messages per day

3    between those two, correct?

4    **A.**    Correct.

10:04:24  5    **Q.**    But you know that those calls and texts weren't evenly

6    distributed through those two months, right?

7    **A.**    They were fairly, evenly distributed.

8    **Q.**    Okay.

9        Well, would you agree with me that after Jake died,

10:04:37 10   there was a huge uptick in their communication the two or

11   three days after Jake died?

12   **A.**    Actually no.  There were several days in February

13   where they had ten phone calls and 20 text messages and long

14   before Jake died?

10:04:51 15   **Q.**    Right after Corey found out Jake died, do you have

16   messages of Corey calling Erika after a significant event

17   like that?

18   **A.**    Say --

19   **Q.**    Have people dying in February, right?

10:05:04 20   **A.**    Right.

21   **Q.**    And that we're aware of, right?

22   **A.**    Yeah, that we're aware of, right.

23   **Q.**    Now, did you look at the month of January as well?

24   **A.**    I didn't look too closely at January, no.

10:05:16 25   **Q.**    Okay.

Carty - Cross/Bryan

1          Well, I'm not going to go -- you can look at January

2     later, but would you agree with me there are certain facts

3     that are known about this case now that you didn't know at

4     the time you were investigating this case, right?

10:05:35  5     **A.**      Sure.

6     **Q.**      Like you didn't know where Erika Matus lived until

7     what, a couple weeks ago?

8     **A.**      Yes.

9     **Q.**      And you didn't know she lived around the corner from

10:05:46 10     Russell Davis, right?

11     **A.**      That's right.

12     **Q.**      Okay.

13          And so when you're talking about this pattern of

14     telephone communication between them in February and

10:05:59 15     March -- strike that.

16          You know from the case and Erika's own testimony that

17     her mother passed away in December, right?

18     **A.**      I don't recall the month her mother passed away.  I'm

19     not sure what she said.  But, I think -- December sounds

10:06:11 20     right.

21     **Q.**      Okay.

22          And when she passed away, she said that her mother

23     also left her money, right?

24     **A.**      Yes, I'm aware of that.

10:06:19 25     **Q.**      And she used a chunk of that to purchase that home

1    there on West 20th Street, right?

2    **A.**    That's my understanding, yeah.

3    **Q.**    And she admitted she used a lot of it buying drugs,

4    right?

10:06:30  5    **A.**    I don't know what portion of it she used buying drugs.

6    **Q.**    But, you know when somebody dies, depending upon the

7    complexity of their stay, it may take a few weeks before

8    you're able to get the money from the estate, right?

9                    MR. CORTS:  Objection, your Honor.

10:06:46 10                    THE COURT:  Sustained.

11    **Q.**    Well, she had the money from her mother's estate by

12    February because that's when she purchased her home,

13    correct?

14                    MR. CORTS:  Objection, your Honor.

10:06:55 15                    THE COURT:  Sustained.

16    **Q.**    I'm going to show you what's been marked -- what's

17    this number, Shelly?

18            Special Agent Carty, this is -- what I'm about to show

19    you is a Defendant's Exhibit VV, which is just an extension

10:07:38 20    of the cell -- actually, just a cell tolling records of

21    Erika Matus back from February to January.  Okay?

22    **A.**    Okay.

23    **Q.**    2016, correct?

24            So you've already testified about your review of the

10:07:59 25    information in February and March, right?

Carty - Cross/Bryan

1    **A.**    That's right.

2    **Q.**    Okay.

3          In fact, you didn't give a separate breakdown for how

4    many texts were in March and how many were in February, did

10:08:18  5    you?

6    **A.**    I did not.

7    **Q.**    You just gave us a full -- a summation of all the

8    calls during that period of time?

9    **A.**    That's correct.

10:08:25  10    **Q.**    So we don't know if there were a lot more in March

11    than there were in February, other than you saying that

12    there were a lot in February as well, correct?

13    **A.**    That's correct.

14    **Q.**    Going back to the month before that, just after Erika

10:08:42  15    Matus' mother died -- the Elmo, Chris.

16          You recognize Harry or Corey Stock's telephone number

17    on Erika Matus' phone records?

18    **A.**    I do.  That's the number that's highlighted.

19    **Q.**    The number that's highlighted?

10:09:09  20          And so that's January 1st, there was a call made from

21    -- between Erika Matus and Corey Stock's phone, correct?

22    **A.**    Correct.

23    **Q.**    And when you see that minute, that can even be a call

24    that wasn't corrected, right?

10:09:23  25    **A.**    Yeah, that's possible.

Carty - Cross/Bryan

1    **Q.**    Could be just a few seconds showing the phones were

2    connected but there really probably wasn't a conversation,

3    right?

4    **A.**    That's possible, yes.

10:09:30  5    **Q.**    Okay.

6           And when you saw these call detail records, what you

7    see is -- the first thing you see is the calls and then it

8    goes back to the beginning of the month, and then you see

9    all the text messages, right, when you look at the records?

10:09:45 10    **A.**    It's in --

11    **Q.**    Sections?

12    **A.**    Yes, the cell phone call records are in one section

13    and then the text records are in another.

14    **Q.**    The call records.  And then you have a bunch of text

10:09:55 15    messages, right?

16    **A.**    Yeah, different section.

17    **Q.**    And data usage, too?

18    **A.**    Correct.

19    **Q.**    So shows all the checks to the Internet, right?

10:10:05 20    **A.**    Correct.

21    **Q.**    But, it -- or through the cell or cell company, so all

22    the data usage?

23    **A.**    I'm not sure if it's data usage or Wi-Fi usage but

24    something like that.

10:10:18 25    **Q.**    Okay.

1   But you don't have the content of those

2   communications, you just know that it's connecting to the

3   Internet, right?

4   **A.**   Correct.

10:10:23 5   **Q.**   Okay.

6   So anyway, on -- there's one call you can go through

7   and look at these records again see if we missed any but you

8   see one call on January 1st, correct?

9   **A.**   I do.

10:10:36 10   **Q.**   And I'm not -- for purposes of time, I'm going to go

11   fast.

12   So I'm thumbing through and if you could see real

13   quickly, if you see his number appearing again, catch me.

14   **A.**   Okay.

10:10:54 15   **Q.**   But I'll have my colleague help me with this so.

16   We're at January 18th already and there's still not

17   another call, right?

18   **A.**   I've not seen one yet.

19   **Q.**   Okay.  Okay.  And there's another call on January

10:11:17 20   30th, right?

21   **A.**   That's right.

22   **Q.**   So for the month of January, there were three calls

23   between Erika Matus and Corey Stock?

24   **A.**   That's what this says, yes.

10:11:30 25   **Q.**   Okay.

Carty - Cross/Bryan

1      And then going over to the text messages, I know

2   there's one in here somewhere.  Okay.  On January 20th,

3   there appears to be a text message exchange between Corey

4   Stock and Erika Matus as well, correct?

10:12:28  5   **A.**   Yes.

6   **Q.**   And then on January 31st, we have a series of text

7   messages exchanged between Erika Matus and Corey Stock,

8   correct?

9   **A.**   Correct.

10:12:56 10   **Q.**   So at least -- would you agree with me that Erika

11   Matus was communicating with far more people during at least

12   the month of January than she was with Corey Stock?

13             MR. CORTS:  Objection.  Relevance, your Honor.

14             THE COURT:  Overruled.  Based on the records,

10:13:12 15   Agent?

16             THE WITNESS:  I have to look at all those

17   other numbers.  You were flipping through those things too

18   fast, but there wasn't a whole lot of contact from Corey --

19   that's the phone bill side.  The actual call detail records

10:13:24 20   presented a little differently.  I recall more contacts in

21   January.  I looked at them briefly.

22   **Q.**   Phone calls and text messages, that's what this

23   represents, right?

24   **A.**   I think it's presented differently when you look --

10:13:36 25   that's the report.  It says C/T at the top.  When you look

1    at the report, it's AU.  I believe it presents it a little

2    differently.  It has some different records.

3    **Q.**    You would agree this isn't significant communications

4    in the month of January?

10:13:47  5    **A.**    What you just showed me highlighted there --

6                      THE COURT:  One at a time.

7                      THE WITNESS:  You just showed there, what's

8    highlighted, that communication is significant

9    communication.

10:13:59 10                      MR. BRYAN:  Okay.

11   BY MR. BRYAN:

12   **Q.**    Now, there were more significant communications in

13   February, and you testified to that too, right?

14   **A.**    Correct.

10:14:06 15   **Q.**    And I'll show you February as well to be fair.  And so

16   there's a call on February 8th from Corey Stock to her

17   phone.  All right?

18   **A.**    Right.

19   **Q.**    And then there's one on February 10th from Corey Stock

10:14:26 20   to her phone, correct?

21   **A.**    Correct.

22   **Q.**    And then there's a couple of calls on February 11th?

23   **A.**    Correct.

24   **Q.**    Okay.

10:14:36 25             And so for the first half of February, there's not a

1  lot of calls either, right?

2  **A.**   I found more calls than that when I -- I didn't do my

3  analysis off of this.  This is a different section of the

4  report.  I did the report, I think it's report AU if I'm not

10:14:52 5  mistaken.

6  **Q.**   If someone's calling somebody, it would be in their

7  tolls, right?

8  **A.**   This isn't the toll.  It's actually -- this is like

9  the phone bill.

10:14:57 10  **Q.**   Right.  It would be in their bill.  If there's a phone

11  connection made between the two phones, it would be in their

12  phone bill, right?

13  **A.**   I don't know why it's presented differently than the

14  two sections of the report.  The phone company provides a

10:15:09 15  lot of data for these lines.

16  **Q.**   The AU report, whatever?

17  **A.**   I believe it's the AU report.

18  **Q.**   That's a lot more technical information about the

19  calls in it, but it's still the same calls, right?

10:15:22 20              THE COURT:  Hold on.  Let's clarify something.

21       Agent, to your knowledge, can there be a connection

22  between two phones but the phone company does not bill for

23  that call?

24              THE WITNESS:  Yes, to my knowledge, yes.

25

BY MR. BRYAN:

**Q.**   Okay.

But, to know if there's any communication with that connection, you would have to either see the length of the call, right, which would say they're communicating?

**A.**   That would help.

**Q.**   All right.

Or the -- or if a text message exchange occurred, right?

**A.**   What's that question?

**Q.**   Well, if -- when people are texting, you can tell when they're communicating, when one sends a text and another sends a text back, right?

**A.**   Yeah, or when one --

**Q.**   Same time period?

**A.**   Right, sure.

**Q.**   Okay.

Now, going through this, I guess on the end of February 13th, there was a call to -- actually incoming call from Corey Stock.  Do you see that?

**A.**   I do.

**Q.**   You also see -- you recognize that other number, that 506 number?

**A.**   I do.

**Q.**   That's Harry Karaplis's number, correct?

1    **A.**    Correct.

2    **Q.**    And that was a call that she made to Harry Karaplis on

3    February 12th -- excuse me, February 13th, and that shows

4    the duration of four minutes.  So there was a communication

10:16:45  5    there, correct?

6    **A.**    Correct.

7    **Q.**    Okay.

8          And then February 14th, there's a couple more calls to

9    Corey Stock?

10:16:52  10    **A.**    Correct.

11    **Q.**    Okay.

12          Now we're at February 17th, again, we have three more

13    calls there, right?

14    **A.**    Right.

10:17:03  15    **Q.**    February 18th, there's two calls you see at that

16    point?

17    **A.**    Correct.

18    **Q.**    Okay.

19          Now February 20th, we're moving towards March, you see

10:17:15  20    a lot more calls being made at this point in time, correct?

21    **A.**    Correct.

22    **Q.**    But we're in February 22nd.  There's just a few calls,

23    correct?

24    **A.**    Correct.

10:17:25  25    **Q.**    February 23rd?

Carty - Cross/Bryan

1    **A.**    There are a couple missed there at the top.

2    **Q.**    Did I miss a couple?

3    **A.**    No.  The previous page you were on.

4    **Q.**    Okay.

10:17:38  5    **A.**    The other way.  I'm sorry, the other direction.

6    Actually, there's one you missed on that page, too.

7    **Q.**    Oh, yeah.  I see it.

8    **A.**    But there's one on that page.  If you flip back,

9    there's another one you missed.

10:17:53 10    **Q.**    We're in the second half of February now, right?

11    **A.**    Right.  There's one 5:35 P.M., on the 20th.

12    **Q.**    Okay.

13    **A.**    9:30 A.M. on the 20th.

14    **Q.**    Thank you.

10:18:15 15    **A.**    That's all I see on that page.

16    **Q.**    Okay.  You see any more on this page?

17    **A.**    No.

18    **Q.**    Okay.

19    **A.**    There's one at 10:39 A.M. at the top there.

10:18:27 20    **Q.**    Okay.

21    **A.**    One at 3:05 P.M. on -- upper half there.  Not sure

22    what date that is.

23    **Q.**    All right.

24         Now we're on February 24th.  Did we catch all the ones

10:18:51 25    on February 24th?

Carty - Cross/Bryan

1   **A.**   Yeah.  It's continued on the next page.

2   **Q.**   February 25th?

3   **A.**   There's two towards the bottom.

4   **Q.**   I see.

10:19:04  5          THE COURT:  You missed one in the middle.

6   **Q.**   Okay.

7          THE COURT:  Go up.

8          THE WITNESS:  5:58 P.M.

9   **Q.**   Oh, there it is.

10:19:19 10          THE COURT:  Get a refund.

11       (Laughter.)

12          THE WITNESS:  There are two at 5:11 and 5:16.

13   **Q.**   Okay.

14       Again, we're moving towards March now.  This is late

10:19:36 15   February, correct?

16   **A.**   Correct.

17   **Q.**   And then February 29th?

18   **A.**   There's one at 2:54 P.M.

19   **Q.**   February 29th.  We know there's not a February 30th

10:20:05 20   this year, right?  Okay.

21       And that's basically the calls for February.  Would

22   you agree with me that the frequencies of calls picked up in

23   the latter half of February there were in the first half of

24   February?

10:20:23 25   **A.**   I want to take a look at the first half again because

Carty - Cross/Bryan

1      we --

2      **Q.**   All right.

3            You have a rebuttal.  If you could find more, sure.

4      Please come back.

10:20:33  5            But, anyway, what we're looking at with phone records

6      is not just that a phone call was made, but we're looking at

7      patterns.  And that's what's represented by your chart,

8      Government's Exhibit 14, right?  Like when a call's being

9      made in relation to some other event, correct?

10:20:51 10      **A.**   Yeah, the chart shows patterns, yes.

11      **Q.**   It shows -- and you could -- you can see phone record

12      patterns developing even within the phone records, but they

13      could be misleading, right?  Because there could be

14      significant calling about other events, right?

10:21:07 15      **A.**   Yeah, I think that's fair.

16      **Q.**   Okay.

17            The text messages for February, I don't want to

18      belabor the point, but this is -- this would be February, I

19      guess the first text message exchange, if I didn't miss one

10:21:21 20      -- and if I did, you can point it out.  This is an Exhibit 2

21      so people can see it.

22      **A.**   That's February 11th.

23      **Q.**   Right.  February 11th.  I jumped to the -- I jumped to

24      the sticky so as not to waste too much time.

10:21:39 25      **A.**   Oh.

Carty - Cross/Bryan

1    **Q.**    But, there's a -- there's just two text exchanges

2    there, correct?

3    **A.**    Correct.

4    **Q.**    February 13th, you see more text exchanges -- oops.  I

10:21:49 5    missed one.  And February 13th, there's a lot of text

6    exchanges on that day as well?

7    **A.**    Correct.

8    **Q.**    February 15th, there appears to only be the one

9    between those time periods?

10:22:23 10    **A.**    There's one at 10:13 A.M. there on the 17th.

11    **Q.**    Okay.  The 18th.

12           Now, we're on February 19th and 20th.  Again, we're

13    later in the month of February, like the last week of

14    February where the text message is intensified, correct?

10:23:01 15    **A.**    Yeah.

16    **Q.**    Based on those days?

17    **A.**    There's one at 5:25 P.M. there, whatever date that is.

18    **Q.**    Okay.

19           Again, several more text messages on the 21st, the

10:23:29 20    22nd.  There's one the 23rd.  There's two, right?  And

21    again, the reason there may not be a lot of text exchange

22    between people, they could be together, could be in the same

23    place?  Although my kids text to each other when they're in

24    the same room, lots of people don't do that, right?

10:23:55 25    **A.**    That's probably fair, yeah.

Carty - Cross/Bryan

1    **Q.**    Okay.

2          But again, the point I'm asking you is to see, I mean

3    there's -- there's a pattern.  It's pretty sporadic in

4    January and started picking up more towards the middle of

10:24:11  5    February on, right?  And then we know that in March, they --

6    there's -- their communications are very frequent, right?

7    **A.**    Their communications in February and March are very

8    frequent.  You want to look at the full records rather than

9    the phone bill to get an appraisal of this.

10:24:32  10    **Q.**    We're trying to give you as much information as we

11   can, and that's -- but what I'm saying is that -- it speaks

12   for itself, I think Agent Carty.

13          Anyway when you go to interpret this information, the

14   critical time period in this case, would you agree with me,

10:24:58  15   would have been the evening of March 6th leading into the

16   early morning hours of March 7th, correct?

17   **A.**    Yes.

18   **Q.**    Okay.  Because that's the period of time that you --

19   the Government asserts that Harry Karaplis facilitated

10:25:20  20   getting drugs for Jacob Castro-White from Mr. Davis,

21   correct?

22   **A.**    Harry Karaplis facilitated getting drugs -- say that

23   again.

24   **Q.**    Harry Karaplis facilitated getting drugs for Jacob

10:25:36  25   Castro-White from Mr. Davis?

**A.**   That's accurate, yeah.

**Q.**   Anyway, Shelly, if you can bring up Government's
Exhibit TT, please.  Please scroll up, Shelly.

     This is that time period when they start talking about
trying to grab from Mr. Davis, correct?

**A.**   Correct.

**Q.**   Can we go to the next page, please?  You heard
testimony about this, so I won't go through every line
again, but this is a continuation of that time line,
correct?

**A.**   Correct.

**Q.**   If we could go to the next page, please.  And so
this -- you know, as we're getting into March 7th, this is a
continuation of the time line.  And everything looks like
it's being steered toward Mr. Davis' house, correct?

**A.**   Correct.

**Q.**   Okay.  And if we could go to the last page.  No, not
the last page.  The next page, please.  The next page,
please.

     Again, now we're getting -- the bottom there, where --
"I just got your sleeping text.  Laugh out loud.  He was
asleep but woke up."

     Line 242 says, "The sooner the better.  He might fall
back to sleep.  "That's Line 242.  That's 15 minutes
before -- about actually 24 minutes before the last phone

Carty - Cross/Bryan

1    call in this line.  Correct?

2    A.    24 minutes before -- say that again.  I'm sorry.

3    Q.    Yeah.  12:15 is 24 minutes before the last critical

4    telephone call in this line of communications, correct,

10:27:47  5    which happened at 12:34?

6    A.    Yeah, I believe so.  I want to scroll down to do the

7    math; 24 minutes.  All right.

8    Q.    If we could turn to the next page, please.  And then

9    Line 247, there's the 56-second call on Davis' tolls, and

10:28:12  10   the 66-second call on Karaplis's tolls.  You see that?

11   A.    57 seconds.

12   Q.    Yeah, I got it wrong.  I got it wrong.  Thank you.

13   A.    Sure.

14   Q.    Line 248, this is a call -- you've done the records,

10:28:24  15   and it says -- it says no records of the call on Davis'

16   tolls, correct?

17   A.    Correct.

18   Q.    You're the one that created this chart, right?

19   A.    That's right.

10:28:32  20   Q.    So from Mr. Karaplis' perspective, this would have

21   been a call that either he made and it got disconnected

22   right away, or that he accidentally hit the button again

23   after they hung up on the call that just happened -- that

24   just ended ten seconds before?

10:28:54  25   A.    Something like that, sure.

Carty - Cross/Bryan

1    **Q.**   You add the seconds to this time line, you see that

2    Karaplis's call with Mr. Davis prior to that ended at 3237,

3    right?

4    **A.**   I see that here on this chart, yes.

10:29:07  5    **Q.**   And 3247, there is -- it's a call, but we know it to

6    be one that never even registered in Mr. Davis' records,

7    right?

8    **A.**   Yes.

9    **Q.**   Or would have appeared?

10:29:19 10    **A.**   Something happened, right.

11    **Q.**   Or would have appeared on his phone, right?

12    **A.**   Probably -- that's probably right, yes.

13    **Q.**   Okay.

14        But, it's -- it shows up on Karaplis's phone because

10:29:28 15    it's an attempted call on his part, correct?

16    **A.**   Correct.

17    **Q.**   All right.

18        Now, turning to the next page, please.  This call

19    began at 3437, and it was also a very short duration call,

10:29:51 20    correct?

21    **A.**   It was, yes.

22    **Q.**   And it shows as being six seconds in Karaplis's phone,

23    but then it goes on to say it was 13 seconds in Davis'

24    tolls, right?

10:30:01 25    **A.**   That's right.

Carty - Cross/Bryan

1    **Q.**    Okay.

2        But we know when you add the seconds to this, that

3    Karaplis's call or Davis' call began at 3451, and Karaplis'

4    call ended at 3453.  Do you see that?

10:30:17 5    **A.**    I see that.

6    **Q.**    So there's like a two-second overlap in the phones.

7    Do you see that?

8    **A.**    I do.

9    **Q.**    And that two-second overlap, basically shows the

10:30:32 10    two-second overlap is the amount of time the phone are

11    connected, not a conversation, correct?

12    **A.**    That's probably it, yes.

13    **Q.**    Okay.

14        Very unlikely conversation could have taken place at

10:30:45 15    that time?

16    **A.**    I agree.

17    **Q.**    Okay.

18        And so showing you what's been previously marked as

19    Defendant's Exhibit F for identification purposes -- Chris,

10:31:15 20    I'm sorry.  The Elmo.

21            MS. TWINING:  I've got it.

22            MR. BRYAN:  Oh.

23    BY MR. BRYAN:

24    **Q.**    That call, that last call is represented basically

10:31:27 25    where I make the checkmark, correct?

Carty - Cross/Bryan

1    **A.**   That looks accurate, yes.

2    **Q.**   Okay.

3         And then the next communication from Mr. Davis' phone

4    to Mr. Karaplis' phone was the following morning, right?

10:31:46 5    **A.**   Well, the same morning but later that morning.

6    **Q.**   Well later that morning.  I'm sorry.  Correct?

7    **A.**   Correct.

8    **Q.**   Okay.  And that appears at this check.  All right?

9    **A.**   That's right.

10:31:55 10   **Q.**   And that check reveals -- it says 10:21, but you know

11   that actually means 11:21?

12   **A.**   That's right.

13   **Q.**   Because Sprint records, the call data is in eastern

14   time, right?

10:32:09 15   **A.**   Correct.

16   **Q.**   But the text message data is in central time?

17   **A.**   Right.

18   **Q.**   So that's really 11:21.  And it's a text, and at the

19   time when you're looking at that record, you have no idea

10:32:20 20   what that text says, right?

21   **A.**   From this record, that's correct.

22   **Q.**   Right.

23        Thankfully you did a Cellebrite on Mr. Davis' phone,

24   right?

10:32:45 25   **A.**   Right.

Carty - Cross/Bryan

1    **Q.**    You were able to get a lot of his text messages

2    because you did a Cellebrite on Mr. Davis' phones, right?

3    **A.**    That's correct.

4    **Q.**    So when you go to the content of that text message --

5    if we could bring up Defendant's Exhibit AA, Page 58.  Page

6    58, please.  Page 58.

7         You see the content of that text message right there

8    on Line 256, right?

9    **A.**    I do.

10    **Q.**    And the text message says, "Was sleep"?

11    **A.**    It does.

12    **Q.**    So put in the context of everything that early morning

13    hour, Mr. Davis was sleep, correct?

14    **A.**    Probably so.

15              MR. BRYAN:  Nothing further, your Honor.

16              THE COURT:  Okay, Mr. Bryan.  Thanks.  Mr.

17    Corts.

18              MR. CORTS:  Thank you, your Honor.

19

20

21

22

23

24

25

1     REDIRECT EXAMINATION OF CASEY CARTY

2   BY MR. CORTS:

3   **Q.**    Special Agent Carty, just a couple things to start

4   off.  I wrote it down.  Let me get to my notes.

5          And if I look at my watch now, it's 10:34.  So at

6   10:24, ten minutes ago, Mr. Bryan made the statement, "Do

7   you recall this, the critical time period in this case is

8   the evening of March 6th to the morning hours of March 7th,

9   2016?"

10          Do you recall that statement that he made?

11  **A.**    I do.

12  **Q.**    Do you agree with that statement?

13  **A.**    I do.

14  **Q.**    What relevance, in your mind or your investigation,

15  does Erika Matus' January phone records play in Mr. Bryan's

16  own statement, "the critical time period in this case is the

17  evening of March 6th, 2016, to March 7th, 2016"?

18  **A.**    None.

19  **Q.**    Are the records from Erika Matus' January phone

20  records even in that time period?

21  **A.**    They are not.

22  **Q.**    Now, one more before we start going through a couple

23  of our things.  You ever heard the term "red herring"?

24  **A.**    I have.

25  **Q.**    And you -- do you know that to be a fallacy that is an

1    irrelevant topic to divert the attention of listeners?

2    **A.**    Yeah, that's a fair definition.

3    **Q.**    All right.

4        Now we're going to talk about Erika Matus for a little

10:35:41  5    bit as we run through here, but after the Defense brought

6    forward Erika Matus' phone records and cross-examined and

7    you sat here through the entire trial, correct?

8    **A.**    I have.

9    **Q.**    Does this Erika Matus piece of this case mean anything

10:35:58 10    to you as you sit there on the stand?

11    **A.**    It does not.

12    **Q.**    And as a matter of fact, you talked with Erika Matus,

13    correct?

14    **A.**    Yes.

10:36:07 15    **Q.**    And after talking with her, does it mean anything more

16    or less to you as you sit there today?

17    **A.**    Nothing more or less really.

18    **Q.**    She came in and testified, told these people what she

19    was doing, correct?

10:36:24 20    **A.**    Correct.

21    **Q.**    Now, Special Agent Carty, do you have evidence to show

22    that multiple drug buys took place with Davis on the days

23    leading up to March 7th?

24    **A.**    I do.

10:36:41 25    **Q.**    Do you have evidence to show communications between

Carty - Redirect/Corts

1    Davis for these drug buys with either Harry Karaplis or

2    Corey Stock?

3    **A.**    Yes.

4    **Q.**    And do you have calls or texts or specifically texts

10:36:59 5    that mention the name Red during that period of time,

6    leading up to and including March 7th?

7    **A.**    Yes, I do.

8    **Q.**    And you testified yesterday that I think we added up

9    the texts, there were 150 calls or texts that surrounded

10:37:19 10    these four buys?

11    **A.**    Yes, that's correct.

12    **Q.**    Actually, five buys.

13            Now, on the flip side of that, do you have any

14    evidence to show this jury of Harry calling or texting or

10:37:38 15    contacting anyone in a similar pattern, 40 texts at a time

16    for one, ten texts at a time for another, 51 texts at a time

17    for another, and 53 texts at a time for another?

18    **A.**    No.

19    **Q.**    Do you have any evidence to show that pattern with

10:37:54 20    anyone else?

21    **A.**    No.

22    **Q.**    Do you have any evidence to show that Jacob

23    Castro-White contacted, either calling or texting in a same

24    or similar fashion with someone else?

10:38:06 25    **A.**    No.

Carty - Redirect/Corts

1    **Q.**    And after Government's Exhibit 14 -- can we have

2    Government's Exhibit 14, Page 224, please?  If you look at

3    Line 213 of that exhibit, that is a text that you looked

4    at -- and we've beat this horse to death.  We're going to

10:38:35 5    beat it one more time.

6         "Yeah, I'll just wait for the next time with Red."

7    You see that?

8    **A.**    I do.

9    **Q.**    After that particular text, I think there's a thank

10:38:44 10    you that Jacob Castro-White sent back to Corey Stock.

11         Did you see any, any other text messages or calls

12    after that other than with Harry Karaplis to set up the drug

13    buy with Red?

14    **A.**    No, I didn't.

10:39:03 15    **Q.**    Castro-White contacts no one else besides Harry, and

16    then after they make the buy, he contacts no one else in --

17    for the rest of his life, correct?

18    **A.**    That's correct.

19    **Q.**    Government's Exhibit 14, Page 28, Line 246,

10:39:42 20    Castro-White to Karaplis "I'm outside," correct?

21    **A.**    Correct.

22    **Q.**    And you heard Karaplis testify about what that meant?

23    **A.**    Yes.

24    **Q.**    Karaplis didn't have his car that night, did he?

10:39:52 25    **A.**    That's right.

Carty - Redirect/Corts

1    **Q.**    Castro-White had to pick him up?

2    **A.**    Correct.

3    **Q.**    Government's Exhibit 14, Page 29.

4          After the 12:34 call from Harry to Davis, at Line 249,

10:40:15  5    where it shows a six-second call in Karaplis records and a

6    13-second call in Davis' tolls, this occurs after that

7    previous text where Corey said -- I mean Jacob said,

8    "Outside," right?

9    **A.**    That's right.

10:40:30 10    **Q.**    So then we move on, and this 12:34 call takes place.

11    And you don't have a stop watch or anything, but just based

12    upon your experience, if I were to say, "Here," how long

13    would that take me?

14    **A.**    A fraction of a second.

10:40:49 15    **Q.**    If I were to say, "Outside," how long would that take

16    me?

17    **A.**    Similar, a fraction of a second.

18    **Q.**    So in a two-second phone call to someone who knows

19    you're on their way, who's dealt with you in the past, and

10:41:03 20    if you say, "Here," or, "Outside," that certainly can be

21    accomplished in that short period of time, correct?

22    **A.**    That's possible, and I've heard drug calls like that.

23    **Q.**    Now, did you learn of Castro-White's Facebook usage

24    through witnesses in this case through your investigation?

10:41:24 25    **A.**    I did.

Carty - Redirect/Corts

1   **Q.**   And what did you learn about that?

2   **A.**   I learned from people I would refer to as being on his

3   light side, like his mother and his girlfriend.  He didn't

4   use Facebook to communicate.  He had Facebook and he had a

10:41:37 5   Facebook page and primarily posted --

6                    MR. BRYAN:  Objection to hearsay, your Honor.

7                    THE COURT:  Well, can't offer it for the truth

8   of what he's saying, but he can certainly testify as to the

9   usage.

10:41:46 10        Go ahead, Agent.

11                   THE WITNESS:  Yes, sir.  I learned that he

12   used it for body building, and I looked on his Facebook

13   page, and there are numerous body building related pages on

14   there.

10:41:54 15        I learned of his dark side, so to speak, from his drug

16   friends.  He did not use it to communicate.  So everyone

17   agreed that he -- he's a caller and a text messenger, not a

18   Facebook Messenger.

19   **Q.**   So jumping back in time to what we just talked about,

10:42:14 20   where there's that 13-second, six-second I think you

21   referred to, could possibly be about a two-or-three-second

22   call, there are no calls or texts from Harry to Erika Matus?

23   **A.**   Correct.

24   **Q.**   At that point in time?

10:42:31 25   **A.**   That's correct.

Carty - Redirect/Corts

**Q.**    Or for that matter, really any time except for one
time back in January, I think?

**A.**    Right, there was -- there was one call or one call,
one text back in February.

10:42:40  **Q.**    Okay.

Now, let's talk about Jacob Castro-White's phone.
Again, recalling Mr. Bryan's statement that the critical
time period in this case is March 6th to March 7th, I want
to ask you, are you confident that you had every phone call

10:43:10  or a record of every phone call that was placed on Jacob
Castro-White's telephone during that critical time period
that Mr. Bryan speaks about?

**A.**    Yes.

**Q.**    And how are you confident?

10:43:22  **A.**    How am I confident?

**Q.**    Yeah, how can you make that statement?

**A.**    We have records from the phone company from Verizon
itself.

**Q.**    Okay.

10:43:29  Now, you would never be able to get the content of the
phone call; in other words, the recording of the phone call,
Person A talking to Person B, do you agree with me on that?

**A.**    That's correct, under -- yeah, we couldn't in this
case.

10:43:47  **Q.**    Okay.

1      You had a Title III or a wire tap, but you'd have to

2  get that beforehand, correct?

3  **A.**    Right, you can't retroactively recover the audio, the

4  words that were spoken.

10:43:57  5  **Q.**    All right.

6      Now, are you confident that during that critical time

7  period, that you have every text message that Jacob

8  Castro-White sent or received on that phone?

9  **A.**    Yes.

10:44:10  10  **Q.**    And tell the jury how you were confident of that.

11  **A.**    I have no reason to doubt Verizon.  They were sent a

12  preservation order promptly, and that was followed up with a

13  search warrant.  I think that's been lost here.  The

14  preservation order doesn't produce the records.  The

10:44:25  15  preservation order tells Verizon basically, "Freeze, we will

16  be following this up with a search warrant."  So then a

17  search warrant was subsequently given to Verizon, and they

18  turned over records in response to that search warrant.

19  **Q.**    Okay.

10:44:38  20      So all relevant or, for that matter, available

21  documents that would reflect times of call, and the actual

22  content of text messages, Detective Sivert had those as of

23  March 9th, two days after this death, correct?

24  **A.**    That's correct.

10:45:01  25  **Q.**    And then you had them as you were doing your analysis?

Carty - Redirect/Corts

**A.**    Right.

**Q.**    Let's talk a little bit about the phone.  You've heard testimony from the mother, from Detective Sivert, in this courtroom, and then I'm sure you've had conversations with them also prior to taking the stand, correct?

**A.**    Correct.

**Q.**    And you heard about the efforts that were made to open that phone up --

**A.**    I have, yes.

**Q.**    -- to unlock it.

And then when we discussed the -- when you testified first, we talked about the technology that was available to the FBI back in March, April, of 2016.  There was this case, San Bernardino, you recall that?

**A.**    I do.

**Q.**    Could the FBI open that phone up in March of 2016 without someone giving them a password or showing them how to unlock it?

**A.**    No, we weren't able to break into iPhone 6's at that point.

**Q.**    But again, getting back to that critical time period, you had every record that was available that was in the hands of the provider, Verizon, correct?

**A.**    Correct.

Can I clarify something?  The term "break in," that's

Carty - Redirect/Corts

1    kind of a -- perhaps I misspoke.  We get a search warrant to

2    get into an iPhone.  We don't break into an iPhone.  So we

3    were not able to get into an iPhone with a search warrant at

4    that point, iPhone 6 at that point.  Break in is sort of a

10:46:47  5    shorthand, I guess.  We weren't able to access an iPhone

6    without the user unlocking it for us, an iPhone 6 at that

7    point.  So just to be clear.

8    **Q.**    Okay.

9         Now I want to walk you through, Mr. Bryan asked you

10:46:59 10    some questions about the early parts of Detective Sivert's

11    investigation.  And you were not necessarily present or

12    involved during the first three interviews with Harry

13    Karaplis, correct?

14    **A.**    I was not present nor involved at that time.

10:47:16 15    **Q.**    For Corey Stock, you weren't present or involved,

16    correct?

17    **A.**    Correct.

18    **Q.**    With that part of the investigation?

19         But there's been some suggestion that there was this

10:47:24 20    rush to judgment and Red became a target?

21              MR. BRYAN:  Objection, your Honor.

22              THE COURT:  Sustained.

23    **Q.**    Let's walk through this.

24         On March 7th, we know that Karaplis used the name Red

10:47:41 25    during his initial interview with Detective Sivert, correct?

1    **A.**    That's correct.

2    **Q.**    Detective Sivert didn't run out and arrest Red, did

3    he?

4    **A.**    He did not.

10:47:56  5    **Q.**    In fact, there was discussion that Detective Sivert

6    initially asked the police to go grab Donny Buchs?

7    **A.**    That's correct.

8    **Q.**    Then they spoke to Harry, and then on March 9th, did

9    Patrolman Sivert receive the text messages?

10:48:23 10    **A.**    Yes, he got the text -- the content from Verizon on

11    the 9th.

12    **Q.**    And in those text messages, as we know and the jury

13    knows, there are numerous references to Red?

14    **A.**    That's correct.

10:48:35 15    **Q.**    And there's a phone number identified to Red, right?

16    **A.**    The text messages I don't believe identify a phone

17    number for Red.

18    **Q.**    Okay.

19    **A.**    The text message.

10:48:48 20    **Q.**    The text messages did not, but there is, there was

21    certainly talk of Red?

22    **A.**    Correct.

23    **Q.**    Then a period of time goes by, and on April 11th, so a

24    month or so later -- and the jury knows what took place

10:49:04 25    between that.  We don't need to go over that again, but

1    Harry came to Detective Sivert and showed him a text that he

2    had received from the Defendant, correct?

3    **A.**    That's correct.

4    **Q.**    Up to that point, Detective Sivert knew who the

10:49:25 5    Defendant was, right?

6    **A.**    I believe he had him identified at that point.

7    **Q.**    He had done some surveillance?

8    **A.**    Yes.

9    **Q.**    April 1st, there was a photo lineup that was shown and

10:49:36 10    Harry identified him?

11    **A.**    Right.

12    **Q.**    Corey Stock had talked about him?

13    **A.**    Correct.

14    **Q.**    So Detective Sivert, upon talking with Corey Stock on

10:49:46 15    or about March 22nd, didn't run out and arrest this guy?

16    **A.**    That's correct.

17    **Q.**    On April 1st, when Harry Karaplis identified him in a

18    photo lineup and told him what happened, Detective Sivert

19    didn't just run out and arrest Russell Davis, did he?

10:50:04 20    **A.**    No, he did not.

21    **Q.**    And so then on April 11th, there's a controlled call

22    that's placed, and you've had an opportunity to review that

23    call several times, correct?

24    **A.**    Correct, it was the 11th or the 12th.

10:50:25 25    **Q.**    Okay.

Carty - Redirect/Corts

1          And during that call, there's conversation between the

2   two of them, and the conversation talks about, clearly makes

3   reference that they talked before?

4   **A.**    It's clear -- yes, yes.

10:50:40  5   **Q.**    And that's consistent with what Harry told Detective

6   Sivert?

7   **A.**    Yes.

8   **Q.**    And it's clear that the conversation turns to "about

9   your boy," and that boy would be, correct?

10:50:54 10   **A.**    That's my understanding, yes.

11  **Q.**    And there's some reference in there about Corey got

12  arrested?

13  **A.**    Right.

14  **Q.**    And you heard Corey testify that he got pick up by the

10:51:02 15  police, he was let go, but he was picked up?

16  **A.**    Yes.

17  **Q.**    And than on the same day he gave a statement on March

18  22nd, correct?

19  **A.**    I believe that was the same day, yes.

10:51:11 20  **Q.**    Now we're at 22nd, where nine days, about 20 days

21  later this phone conversation was taking place between Red

22  and Harry?

23  **A.**    A little more than 20 days later.

24  **Q.**    A little more?

10:51:25 25  **A.**    Yeah.

Carty - Redirect/Corts

| | |
|---|---|
| 1 | **Q.**   And the reference on that controlled call of no |
| 2 | crooked shit? |
| 3 | **A.**   Right. |
| 4 | **Q.**   Snitching? |
| 10:51:31 5 | **A.**   Right. |
| 6 | **Q.**   And then there are references of, "I think I stopped |
| 7 | F'ing or fucking with him, I don't know, did I?  I might |
| 8 | have"? |
| 9 | **A.**   Right. |
| 10:51:42 10 | **Q.**   And that was in regards to drug trafficking, correct? |
| 11 | **A.**   Correct. |
| 12 | **Q.**   Then there are -- there was the Defendant says he came |
| 13 | to me a couple more times about Corey coming to him looking |
| 14 | for drugs? |
| 10:51:56 15 | **A.**   I recall that. |
| 16 | **Q.**   He says, "I'm hoping everything is cool," and then |
| 17 | well how did that turn out?  Did the police sweat you?  Did |
| 18 | they sweat you a lot"? |
| 19 | **A.**   Right. |
| 10:52:11 20 | **Q.**   And then he inquires, "Hey, if you hear something, let |
| 21 | me know.  You might hear something. |
| 22 | **A.**   Correct. |
| 23 | **Q.**   "And how did that turn out with your boy?  How'd that |
| 24 | turn out with your dude," that's in reference to Jacob's |
| 10:52:29 25 | death, correct? |

Carty - Redirect/Corts

1    **A.**    Yes.

2    **Q.**    So now, on or about April 11th, we -- and I should say

3    you, or at that time, Detective Sivert, had words from the

4    Defendant's own mouth, implicating him in selling drugs?

10:52:51  5    **A.**    Yes.

6    **Q.**    And as a result of that, Detective Sivert went to a

7    court, right?

8    **A.**    Right.

9    **Q.**    What did he do when he went to the court?

10:53:07 10   **A.**    He sought a search warrant for Mr. Davis' residence

11   and an arrest warrant for Mr. Davis.

12   **Q.**    Okay.

13         Did the Court send him away and say get out of here?

14   **A.**    No, it did not.

10:53:19 15   **Q.**    Signed both, correct?

16   **A.**    Correct.

17   **Q.**    And then on or about April 12th or April 13th, almost

18   a month and some days later, both of those were executed?

19   **A.**    That's correct.

10:53:35 20   **Q.**    And during the execution of the warrant, they found

21   Government's Exhibit 30?

22   **A.**    The 30 is the phone -- yeah, that's the phone.

23   **Q.**    His phone?

24         And then the other evidence that we presented here in

10:53:50 25   court?

1    **A.**    Right.

2    **Q.**    Now, there was some questions asked of you about your

3    CAST analysis.  And you are not the CAST analysis expert,

4    correct?

10:54:24 5    **A.**    Correct.

6    **Q.**    But you went to a course or two about that?

7    **A.**    Right.

8    **Q.**    And then Special Agent Jay Kunkle is the CAST analysis

9    expert in this case, right?

10:54:37 10    **A.**    That's right.

11    **Q.**    Now during this short period of time that Mr. Bryan

12    was asking you questions about the CAST analysis and put on

13    the board, Government's Exhibit 13, Page 15, and then asked

14    you questions about that, have you -- has that had any

10:55:01 15    impact or changed the status of your investigation at all?

16    **A.**    The CAST analysis?

17    **Q.**    Yeah.

18    **A.**    No, it has not.

19    **Q.**    Okay.  So in other words?

10:55:10 20    **A.**    It moved the ball along, it furthered our

21    investigation.  So it changed it in that respect.

22    **Q.**    You were asked by Mr. Bryan about Jacob's cell phone

23    and whether or not you thought you had the information and

24    if you would have had the phone.  And we agree if you would

10:55:34 25    have had the phone and were able to unlock it, there would

Carty - Redirect/Corts

1    be additional evidence, correct?

2    **A.**    There could be.

3    **Q.**    But, are you confident that you had all of the

4    relevant evidence?

10:55:46  5    **A.**    I am.

6    **Q.**    From that period of time?

7    **A.**    From that phone, yes.

8    **Q.**    Now, Special Agent, those -- the window of time from

9    the last communication by Harry and/or Corey, specifically

10:56:11 10   with Harry and Red, and we'll talk about that in a minute --

11   to the time that Jacob Castro-White was discovered, it was a

12   relatively short period of time, would you agree?

13   **A.**    The window of time -- can you say that again?

14   **Q.**    From the period of time where the last conversation

10:56:27 15   took place between Harry Karaplis and Red, the last

16   communication?

17   **A.**    Yeah.

18   **Q.**    And the time that he was found dead by his mother,

19   fairly short period of time?

10:56:37 20   **A.**    Yes.

21   **Q.**    Short window.

22          I want to ask you about Erika Matus in general.  Do

23   you consider Erika Matus a suspect today?

24   **A.**    No, I do not.

10:56:48 25   **Q.**    Did you consider her a suspect at any time that you

1    were investigating this case?

2    **A.**    No, I did not.

3    **Q.**    Can you explain to the jury why?

4    **A.**    Erika's name was mentioned in that one text from Corey

10:57:02 5    Stock to Castro-White where Corey said something to the

6    effect, "I can ask Erika if they have anything left."  The

7    text is not a particularly ringing endorsement of Erika's

8    dope.  Seemed like a half hearted offer from Corey to

9    Castro-White.  I could see if this person might have some

10:57:20 10    leftover dope.  And then Jacob almost immediately refused it

11    and said as we mentioned numerous times here, something to

12    the effect of "I'll just wait for the next time with Red."

13        So I think that was Corey's effort to sort of put off

14    Jacob Castro-White.  From what I've learned he would -- most

10:57:39 15    heroin addicts in my experience, we've heard a lot of

16    terminology here about heroin addicts, one thing they do is

17    sometimes finding where they're absolutely consumed with

18    getting drugs.  So I think Jake was sort of bugging Corey to

19    hook him up with Red, and Corey wasn't going to be able to.

10:57:58 20    So he threw this mention of Erika's name out there to get

21    Jacob off his back, and Jacob immediately dismissed it.  And

22    to me that -- that puts Erika Matus in the non suspect

23    category.

24    **Q.**    Now, after you sat through this trial and heard Erika

10:58:19 25    Matus testify, does either the Defense's presentation and

Carty - Redirect/Corts

1    accusations that it was Erika Matus who indeed supplied the

2    fatal dose --

3                    MR. BRYAN:  Objection, your Honor.

4                    THE COURT:  You have to reframe the question.

10:58:35 5  BY MR. CORTS:

6    Q.    Sure.

7          You were here when Mr. Bryan was cross-examining Harry

8    Karaplis, correct?

9    A.    I was.

10:58:39 10  Q.    And you recall him asking Harry Karaplis, "Isn't it

11   true, Mr. Karaplis, that you didn't go see Red?  You went to

12   Erika Matus' house, and you received drugs from Erika

13   Matus?"

14         You recall that question?

10:58:53 15  A.    He asked something along those lines, yes.

16   Q.    Okay.

17         Now, having sat through this trial and learned of, I

18   guess their strategy or that's at least what they asked

19   Harry Karaplis --

10:59:05 20                   MR. BRYAN:  Objection, your Honor.

21                   THE COURT:  Stop the editorializing on both

22   sides, please.

23                   MR. CORTS:  Thank you, your Honor.

24   Q.    Does that change your attitude as to whether or not

10:59:17 25  settlement is a suspect on this case -- in this case?

1   **A.**   It does not.

2   **Q.**   Based upon your 26 years of being in law enforcement?

3   **A.**   17 years.

4   **Q.**   17 years?

10:59:27 5   **A.**   Of being in law enforcement.

6   **Q.**   17.  Thank you for correcting me.  Okay.

7        Now, I don't know if you can recall this or not, but

8   I'm going to ask you a question about what records you

9   reviewed in relation to contacts with Erika Matus because it

10:59:49 10   would seem to be some difference in your opinion as to what

11   Mr. Bryan was showing you.

12        Can you talk to the jury about that a little bit,

13   please?

14   **A.**   Yes.

10:59:59 15        What was put up on the Elmo of the phone bills.  I

16   reviewed the phone records.  It's all -- the phone company

17   provides sort of a packet of information.  They provided it

18   to the defense and the defense provided it to us.

19        So I reviewed what the phone company provided.  I

11:00:14 20   reviewed the phone records.  That's what I always do.  I

21   don't review phone bills.  The phone bills in my experience

22   don't necessarily have a full picture of communications.  I

23   would rather review the phone records and I reviewed Erika's

24   phone records.  It is a distinction -- maybe it's a subtle

11:00:30 25   distinction, but I think an important one.

1          MR. CORTS:  May I approach, your Honor?

2          THE COURT:  Yes.

3     **Q.**    Handing you what's been marked for identification as

4     Government's Exhibit VV1, can you look through those.  Page

11:00:42  5     117 pages.

6     **A.**    Okay.

7     **Q.**    Are those the records that you reviewed?

8     **A.**    I did not review them in this format.  No.  This is

9     the phone bill.  This is -- this looks like what was

11:01:12  10    presented on the screen during my cross-examination.

11    **Q.**    So how is it that you were able to look at them in a

12    different format?

13    **A.**    Because the phone company provides them in a different

14    format.

11:01:21  15    **Q.**    The phone company provides a disk, correct?

16    **A.**    They -- I'm not sure how they provided it to the

17    Defense; usually via an e-mail, or maybe sometimes a disk

18    would be mailed.

19    **Q.**    All right.

11:01:34  20         What did you look at when you were looking at

21    particular items?

22    **A.**    I looked at digital records that were provided to us

23    by the Defense in a file folder labeled something to the

24    effect of Matus' Phone Records or something along those

11:01:48  25    lines.

1    **Q.**    Okay.

2                    MR. CORTS:  One moment, your Honor.

3                    THE COURT:  Go ahead.

4         (Counsel conferring.)

11:02:17  5                    MR. CORTS:  Nothing further, your Honor.

6                    THE COURT:  Counsel.

7         No, Mr. Bryan.  This way.

8         (The following proceedings were held at side bar:)

9                    THE COURT:  Okay, as usual, we're behind

11:02:27 10    schedule.  They're going to be blind.  We're going to take a

11    15-minute break, you're going to be a half hour.  That puts

12    you behind with your guy.  So we're going to steam roll

13    until tomorrow and continue testimony until tomorrow

14    morning.

11:02:40 15         No question in my mind that's what's going to happen.

16    So you'd better plan accordingly.  It's going to be probably

17    most of tomorrow morning, finish up the testimony since we

18    continuously run behind here.

19         So that's the way it's going to be.  Hopefully we can

11:02:52 20    get the case to them tomorrow afternoon, hopefully.  Right

21    now, I don't know.  Right now, I'm looking like a liar to

22    them.

23         So let's take a break.  Come back and

24    cross-examination, and that will finish the morning

11:03:05 25    probably.

1          MR. BRYAN:  What are we doing?

2          THE COURT:  WE can't start this guy, break for

3    lunch in 15 minutes.

4          MR. BRYAN:  I have some other witnesses.

11:03:14  5          THE COURT:  How many?

6          MR. BRYAN:  Two that are relatively short --

7    okay.  I have two civilian witnesses that are --

8          THE COURT:  Okay.  So let's take the -- let's

9    take a break.  Finish up on your recross and maybe squeeze

11:03:31 10   one, maybe two in before lunch.

11          MR. BRYAN:  Okay.

12          MR. CORTS:  How much you have on recross?

13          MR. BRYAN:  I don't know that it's that long,

14    but I don't want to --

11:03:39 15          THE COURT:  I know.  Please don't promise me.

16          MR. BRYAN:  -- give you false hope.

17          THE COURT:  I know.  Let's break.

18      (Proceedings resumed within the hearing of the jury:)

19          THE COURT:  Fifteen-minute break, ladies and

11:03:46 20   gentlemen.

21      (Thereupon, a recess was taken.)

22          THE COURT:  Mr. Bryan, recross?

23

24

25

Carty - Recross/Bryan

RECROSS-EXAMINATION OF CASEY CARTY

BY MR. BRYAN:

Q.   Mr. Corts asked you about Jacob's cell phone and the
fact it was locked, correct?

A.   Correct.

Q.   Okay.

     That -- the phone's returned to the mother before your
involvement in the case, correct?

A.   That's right.

Q.   So you don't know what efforts they made to try to
unlock, except for the ones they told you, correct?

A.   Correct.

Q.   The ones that they told you basically were I guess
trying -- I don't know, but the only thing I remember was
trying to take the phone to the morgue and put his
fingerprint on the phone?

A.   Yes and mom contacted Apple numerous times to see if
they would let her unlock or if they would unlock it for her
since she was the account holder.

Q.   Do you know whether or not they asked to -- did the
security questions?

A.   I don't know.

Q.   Do you know what I mean by that when I say security
questions?

A.   I think so.

Carty - Recross/Bryan

1    **Q.**    Because sometimes people forget their passwords?

2    **A.**    Sure.

3    **Q.**    So when you set your password, you set up a series of

4    security questions, right?

5    **A.**    Right.

6    **Q.**    That you should know the answer to?

7    **A.**    Right.

8    **Q.**    Sometimes your family members may know the answer to

9    those as well, right?

10   **A.**    They could.

11   **Q.**    Like what year you graduated from high school?

12   **A.**    If that was your question, yeah.

13   **Q.**    The name of your first dog or something like that?

14   **A.**    Sure.

15   **Q.**    Okay.  Do you know if they did anything like that?

16   **A.**    I'm not even sure if that was a feature on this phone.

17   I don't know.

18   **Q.**    You don't know?  Okay.

19         But the point is the phone was returned long before

20   you got involved?

21   **A.**    It was.

22   **Q.**    Okay.

23         And you lost that opportunity then to Cellebrite

24   Jake's phone, right?

25   **A.**    We would not have been able to Cellebrite his phone.

Carty - Recross/Bryan

1    We were not able to get into that type of phone at that

2    time.

3    **Q.**    Okay.

4         Well, without further effort?  Without attempting,

11:24:27  5    without further effort, it was returned; it wasn't set aside

6    for a time where maybe you may be able to get into the

7    phone, correct?

8    **A.**    Correct.

9    **Q.**    It wasn't preserved in evidence, right?

11:24:34 10    **A.**    Correct.

11    **Q.**    Like the drugs that were seized in this case were

12    preserved in evidence until we had this trial, right?

13    **A.**    Correct.

14    **Q.**    All the evidence that we see here today was preserved

11:24:46 15    in evidence until the day of this trial, correct?

16    **A.**    Correct.

17    **Q.**    And one of the most important pieces of evidence for

18    this trial would have been Jacob Castro-White's phone and it

19    was not preserved in evidence, right?

11:24:56 20    **A.**    It was not.

21    **Q.**    Now, what we do have from you is that even if we had

22    his phone, Jake's mom and his girlfriend said he wasn't much

23    of an Internet communicator, right?

24    **A.**    That's correct.

11:25:08 25    **Q.**    He was a calling and text guy, he wasn't a Facebook

1    Messaging guy, right?

2    **A.**    His mother and friends all said that, yes.

3    **Q.**    Okay.

4           But, we do know from Harry Karaplis, his own words

11:25:21  5    from the stand, that he seemed to know every app known to

6    man, right?

7    **A.**    That Harry Karaplis knew every app known to man?

8    **Q.**    That Harry Karaplis used a lot of web-based

9    applications to communicate with others, right?

11:25:36 10    **A.**    I don't know that from his testimony.  I don't recall.

11    **Q.**    You don't recall that from his testimony?

12    **A.**    No, I recall Agent Kunkle speaking about a lot of

13    apps.  He was asked a lot of questions about apps.

14    **Q.**    Harry Karaplis testified that he used web-based

11:25:47 15    applications to communicate with others?

16    **A.**    He testified -- I think he said he sent -- he used, I

17    forget which one specifically, but I think he said

18    Instagram.

19    **Q.**    He admitted to using many of them when I was

11:25:59 20    cross-examining him.  You don't remember that?

21    **A.**    I don't remember many, but I remember him talking

22    about --

23    **Q.**    That he used web-based applications to communicate

24    with others, right?

11:26:07 25    **A.**    Yes, I believe so.

1    **Q.**    And Harry Karaplis' phone wasn't seized either, right?

2    **A.**    No, it was not.

3    **Q.**    You did have Mr. Davis' phone, right?

4    **A.**    We did.

11:26:19 5    **Q.**    So almost a month and a half after this young man's

6    death, Mr. Davis' phone was available to you, right?

7    **A.**    That's correct.

8    **Q.**    He hadn't accidentally crashed his screen or crushed

9    his screen of his phone, right?

11:26:33 10    **A.**    No, he had not.

11    **Q.**    Nor did he accidentally drop his phone in the shower,

12    did he?

13    **A.**    Not that I'm aware of.

14    **Q.**    Now you also had as evidence, Mr. Corts talked to you

11:26:48 15    about this on redirect, the controlled call with Mr. Davis,

16    and it's been played a couple of times here in court.

17          When he's talking about, to Harry about Corey, there

18    seems to be a concern about Corey snitching, right?

19    **A.**    There does, yes.

11:27:03 20    **Q.**    And what seems to be the event that causes him concern

21    about him, quote, snitching is the belief that he'd somehow

22    been arrested, right?

23    **A.**    That's what it sounds like to me, yes.

24    **Q.**    So when Mr. Davis says words to the effect I don't

11:27:16 25    know if I -- I've been with him or if I -- just come out, I

1    don't know what he says, but if I sold to him, you know,

2    since he's been arrested, right?

3    **A.**     Something along those lines, yes.

4    **Q.**     What he's referencing, and you know this from your own

11:27:28  5    experience, is a concern that maybe Corey made a controlled

6    buy from Mr. Davis during half -- after the period of time

7    he was arrested, right?

8    **A.**     That could be what he's referencing, yes.

9    **Q.**     And that fear would be that you know he's cooperating

11:27:41 10   with law enforcement, trying to develop a drug case against

11   Mr. Davis, right?

12   **A.**     That would be a legitimate fear.

13   **Q.**     And that's a drug case generally, not this specific

14   case that we're here for today, the one involving the loss

11:27:56 15   of life, right?

16   **A.**     What you're saying his concern would be about a

17   general drug case?

18   **Q.**     Well, if someone makes a controlled buy from you in

19   March, late March or April, that isn't going to be able to

11:28:08 20   prove that you did something on March 7th, right?

21   **A.**     It will be related conduct, but no, not directly prove

22   what happened three weeks prior.

23   **Q.**     It would prove that you sold to them on March 25th

24   whatever, right?

11:28:24 25   **A.**     Whatever the date may be, yeah.

Carty - Recross/Bryan

1 **Q.** Those are pretty good cases, slam dunk cases, right?

2      MR. CORTS:  Objection, your Honor.

3      THE COURT:  Sustained.

4 **Q.** And then there was questioning about Mr. Davis says to

5 Harry, words to the effect about his boy, and whether the

6 police sweat him too much, right?

7 **A.** Yes, there were words to that effect.

8 **Q.** And that concern was for Harry Karaplis because Harry

9 Karaplis was with Jacob Castro-White when he died, right?

10 **A.** Yeah, that's my understanding.  He was asking Harry if

11 the police sweated him too much or much.

12 **Q.** He didn't seem to be concerned that Harry was somehow

13 cooperating against him or anything like that?

14 **A.** In that call, he did not seem to be concerned about

15 that.

16 **Q.** Okay.

17   Now, on redirect, Mr. Corts brought up this two-second

18 call, right?

19 **A.** Right.

20 **Q.** The word "call" is kind of a misleading term, is it

21 not?  Well, if we're being technical in cell phone lingo, we

22 talk about that two-second overlap, we're talking about

23 connect time, right?

24 **A.** Yeah, I think that's a fair statement.

25 **Q.** The time the phones are connected to one another,

Carty - Recross/Bryan

1    right?

2    **A.**    Yes.

3    **Q.**    Because when the sender hits send, when the dialer the

4    person calling hits send, the clock starts to run on their

11:29:50 5    account, right?

6    **A.**    Something along those lines, yes.

7    **Q.**    Okay.

8    And when the phone starts to ring on the receiver's

9    end, the clock starts to run on their side as well, correct?

11:30:03 10    **A.**    At some point along that time, yes.

11    **Q.**    Okay.

12    So the phone doesn't start -- the two-second overlap

13    takes into account some of that ring time, right?

14    **A.**    I'm not exactly sure.

11:30:17 15    **Q.**    Okay.

16    Well, you heard Agent Kunkle testify yesterday if you

17    call somebody, it'll start ringing first in your phone

18    before the receiver's phone will start ringing?

19    **A.**    Well, yeah, that happens.

11:30:31 20    **Q.**    Okay.

21    And that happens just -- we could do it in this room,

22    and my phone would -- if I -- it could start ringing a

23    couple seconds before your phone even starts to ring, right?

24    **A.**    It's probably a little faster than that, but I think

11:30:45 25    it would be safe to assume you might hear a ring if you were

1       calling me before I did.

2       **Q.**    All right.

3             You ever have the experience where someone picks up

4       the phone and you felt like it's been ringing for awhile,

11:30:59 5   and you say to them what took you so long and they say, it

6       just rang, I just -- I picked it up on the first ring?  You

7       ever had that experience?

8       **A.**    Yeah, I think I've had something like that happen

9       before.

11:31:11 10  **Q.**    And that's because the phone's ringing in your own ear

11      but not yet ringing in the ear of the receiver yet, right?

12      **A.**    Yes, perhaps.

13      **Q.**    So this two-second overlap of that 12:34 call included

14      ring time, too, correct?

11:31:28 15  **A.**    It could have.  I don't know specifically.  It could

16      have.

17                   MR. BRYAN:  Shelly, if you could bring up

18      Defendant's Exhibit AA, Page 34, please.

19      **Q.**    Special Agent Carty, you were talking about how Jake,

11:31:49 20  during this period of his life, appeared to be -- you used

21      the word "fiending," right?

22      **A.**    Yes.

23      **Q.**    That means urge to use again was so great, that he --

24      he really wanted to use, right?

11:32:01 25  **A.**    Correct.

1    **Q.**    In fact, your evidence demonstrates one of these

2    experiences literally earlier that day with Jake when there

3    was an effort again to contact Mr. Davis regarding grabbing

4    some heroin, do you recall that?

11:32:22  5    **A.**    Yeah.  You're referring to what's on the screen here?

6    **Q.**    I'm referring to what's on the screen and basically

7    that was a morning run where Corey Stock was attempting to

8    grab drugs from Mr. Davis that morning, right?

9    **A.**    Right.

11:32:33  10    **Q.**    Okay.

11         And if we could -- Line 132, Corey Stock tells Jacob

12    Castro-White -- before all of that, they're like, "You're on

13    your way," from, "You're on your way back, what's going on,"

14    he's fiending, right?

11:32:49  15    **A.**    Yeah.

16    **Q.**    And he says -- I don't need to read that again, but

17    you see what Corey says.  He says you know, "I think you

18    fell back asleep.  He picked up the phone and hung up,

19    unless he he's doing something that and couldn't talk,"

11:33:07  20    right?

21    **A.**    Right, I see that.

22    **Q.**    Okay.

23         And Jacob texted right back to Corey Stock, if we

24    could go to Page 35.  This is talking about Mr. Davis,

11:33:22  25    right?

Carty - Recross/Bryan

1    **A.**    Right.

2    **Q.**    Said, "Damn it.  Fuck him"?

3    **A.**    He did.

4              MR. BRYAN:  I have nothing further at this

11:33:28  5  time, your Honor.

6              THE COURT:  Thank you, Mr. Bryan.  All right.

7         Ladies and gentlemen, any questions of the Agent

8    before he steps down?

9         (Question 26: Would messages sent through the iPhone

11:34:22 10  messages app show up on the Verizon records if the phone was

11   connected to Wi-fi?  Assuming the receiving phone was also

12   an iPhone?)

13             THE COURT:  Counsel.

14        (The following proceedings were held at side bar:)

11:35:12 15            MR. CORTS:  No objections from us, your Honor.

16             THE COURT:  Ask it?

17             MR. BRYAN:  Yes.

18             THE COURT:  All right.  I'll ask it.

19        (Proceedings resumed within the hearing of the jury:)

11:35:23 20            THE COURT:  Agent, we have one question.

21        "Would messages sent through the iPhone messages app

22   show up on the Verizon records if the phone was connected to

23   Wi-Fi, assuming the receiving phone was also an iPhone?"

24        I'll repeat that again.

11:35:43 25       "Would messages sent through the iPhone messages app

Carty - Recross/Bryan

1    show up on the Verizon records if the phone was connected to

2    Wi-Fi, assuming the receiving phone was also an iPhone?"

3                    THE WITNESS:  I'm not sure.

4                    THE COURT:  Okay.  Fair.  Fair.  Mr. Corts,

5    anything?

6                    MR. CORTS:  Your Honor, subject to the --

7                    THE COURT:  Whoa.  Anything here?

8                    MR. CORTS:  Oh, no.  No, your Honor.

9                    THE COURT:  Okay.

10                   MR. BRYAN:  No, your Honor.

11                   THE COURT:  Mr. Bryan?

12         Agent, thanks very much.  You can step down.

13         Mr. Corts?

14                   MR. CORTS:  Yes, your Honor.  Thank you.

15         Subject to the admission of our exhibits, and any

16    rebuttal if necessary, the Government would rest its case at

17    this time.

18                   THE COURT:  All right.  Thank you.

19         May I see counsel at side bar then, please.

20         (The following proceedings were held at side bar:)

21                   THE COURT:  29?

22                   MR. BRYAN:  Your Honor, pursuant to Rule 29 of

23    the Criminal Rules of Procedure, the Defense moves for a

24    judgment of acquittal on both Count 1, and --

25                   THE COURT:  Count 1.

1      MR. BRYAN:  Right.  On Count 1 separately --

2  and jointly and separately with the sentencing

3  specification, the death specification.  It's our position

4  that even viewing the evidence in a light most favorable to

5  the Government at this juncture presents sufficient evidence

6  for a reasonable juror to find beyond a reasonable doubt

7  that Mr. Davis sold heroin to Harry Karaplis on March 7th,

8  2016; even more so, even viewing the evidence in light most

9  favorable to the Government, a reasonable juror could not

10  find beyond a reasonable doubt that the sale of heroin or

11  the consumption of heroin, either from Mr. Davis or from

12  anyone, was the result of the individual's death because of

13  the lack of evidence.

14      THE COURT:  Thank you, Mr. Bryan.  Mr. Corts.

15      MR. CORTS:  Yes, your Honor when looking at

16  the evidence in the light most favorable to the Government,

17  the Government is requesting to deny the Rule 29 motion as

18  relates to Count 1.

19      Your Honor, I think there's been ample evidence and

20  specifically, direct evidence from Harry Karaplis that, if

21  believed, clearly represents enough evidence for it to go to

22  the jury and then lots of circumstantial evidence.

23      As relates to the specification, your Honor, there's

24  been testimony from the Coroner in this particular case to

25  render a verdict that, if believed by the jury, would be

1    sufficient for them to find beyond a reasonable doubt that

2    the Defendant sold or that the drugs that the Defendant sold

3    caused the death of Jacob Castro-White.

4         And then, your Honor, there's been testimony from

5    Harry Karaplis and circumstantial evidence that the drugs on

6    top of that night stand were the drugs that were sold by

7    this Defendant to Karaplis and Castro and ingested by

8    Castro.

9              THE COURT:  Thank you.  The Court has

10   carefully considered all the evidence in this case presented

11   by the Government, and in the light most favorable to the

12   Government and drawing reasonable inferences therefrom, the

13   Court finds that the Government has provided sufficient

14   evidence on every element of Count 1 and sufficient evidence

15   on the death specification; that is, that Mr. Davis not only

16   sold the drugs but his drugs were the result of Jacob

17   Castro-White's death; therefore, the Rule 29 motion is

18   denied.

19        Okay.

20             MR. KATSAROS:  Your Honor, just for

21   clarification, I think Ed mentioned it was heroin.  Our

22   allegation is a mixture containing fentanyl.

23             THE COURT:  Correct.  Well it's -- it's a

24   reasonable mistake.  Okay.  But, yes, thank you for that

25   clarification, Mr. Katsaros.  We are dealing with fentanyl,

Carty - Recross/Bryan

1    and that is testified to by the expert witnesses.  Okay.

2         The -- we may have a rebuttal witness?

3              MR. CORTS:  We may.

4              THE COURT:  Okay.

11:40:07 5    With that, we can -- do we have time for one or two

6    lay witnesses?

7              MR. BRYAN:  We have lay witnesses ready to go,

8    your Honor.

9              THE COURT:  Okay.  Let's -- let's see how it

11:40:18 10   goes.  If we can get both on, great.  If we can get at least

11   one.

12             MR. BRYAN:  Yeah, I hope we can.  I don't know

13   what time it is.  I don't have a watch.

14             THE COURT:  It's 11:40.  Yeah, we can do it.

11:40:30 15        MR. BRYAN:  All right.

16        (Proceedings resumed within the hearing of the jury:)

17             THE COURT:  Ladies and gentlemen, the

18   Government has rested its case subject to a potential

19   rebuttal witness.  At this time, I turn to the Defense.

11:40:37 20   Mr. Bryan, what's your pleasure?

21             MR. BRYAN:  Your Honor, the Defense calls

22   Brian Stoll.

23             THE COURT:  Please be sworn.

24             DEPUTY CLERK:  Would you raise your right

11:41:44 25   hand.

Stoll - Direct/Bryan

1                           BRIAN STOLL,

2            of lawful age, a witness called by the DEFENSE,

3                   being first duly sworn, was examined

4                       and testified as follows:

11:41:54 5              DIRECT EXAMINATION OF BRIAN STOLL

6                   THE COURT:  Please have a seat.  You can pull

7        that microphone towards you, please.  Mr. Bryan.

8                   MR. BRYAN:  Thank you, your Honor.

9        BY MR. BRYAN:

11:42:04 10      Q.    Mr. Stoll, can you please state your full name and

11       spell your last name for the reporter, please?

12       A.    Brian Stoll, S-T-O-L-L.

13       Q.    Mr. Stoll, where do you live?

14             You don't have to give the address but what city do

11:42:17 15      you live in?

16       A.    Lorain.

17       Q.    Okay.  And how long have you lived there?

18       A.    My whole life.

19       Q.    Sir, how old are you?

11:42:23 20      A.    26.  Sorry.  27.

21       Q.    27 now?

22       A.    Yeah.

23       Q.    And where did you attend school?

24       A.    Amherst.

11:42:31 25      Q.    Amherst high school?

Stoll - Direct/Bryan

| | | |
|---|---|---|
| 1 | **A.** | Yes. |
| 2 | **Q.** | Okay. |
| 3 | | And which year did you graduate from there? |
| 4 | **A.** | 2010. |
| 11:42:36 5 | **Q.** | 2010?  Do you know Jacob Castro-White? |
| 6 | **A.** | I do. |
| 7 | **Q.** | Do you know Harry Karaplis? |
| 8 | **A.** | I do. |
| 9 | **Q.** | Okay. |
| 11:42:44 10 | | You know a person by the name of Corey Stock? |
| 11 | **A.** | I know of him. |
| 12 | **Q.** | You know of him but do you know him personally? |
| 13 | **A.** | No. |
| 14 | **Q.** | Okay. |
| 11:42:52 15 | | Sir, how did you know Harry Karaplis? |
| 16 | **A.** | Through Jake. |
| 17 | **Q.** | Okay.  And how long did you know Harry? |
| 18 | **A.** | Probably from 2012. |
| 19 | **Q.** | From 2012 to the present day? |
| 11:43:08 20 | **A.** | Yeah. |
| 21 | **Q.** | Okay.  And how long did you know Jake? |
| 22 | **A.** | Since 2006. |
| 23 | **Q.** | Since 2006?  You guys still in school at that time? |
| 24 | **A.** | Yes. |
| 11:43:19 25 | **Q.** | Can you explain to the jury your relationship with |

Stoll - Direct/Bryan

1    Mr. Castro-White?

2    **A.**    He's my best friend, like a brother to me.  We went

3    through high school together.  We got in body building

4    together.  I bought a house, and he was supposed to move in

11:43:39  5    with me.

6    **Q.**    Okay.

7    Mr. Stoll, where are you currently working?

8    **A.**    Yes.

9    **Q.**    Okay.  And where do you work?

11:43:50  10    **A.**    Cedar Point Police Department.

11    **Q.**    Okay.  So you're employed as a police officer now?

12    **A.**    Yes.

13    **Q.**    Okay.  You just start doing that job?

14    **A.**    I did.

11:43:57  15    **Q.**    Okay.

16    Sir, can you explain to me what kind of body building

17    that you and Jake were involved in?

18    **A.**    What do you mean by that?

19    **Q.**    Well, were you involved in competitive body building?

11:44:07  20    **A.**    Yes.

21    **Q.**    Did you go to shows and things?

22    **A.**    We did, yeah.

23    **Q.**    And you competed at shows?

24    **A.**    Yes, sir.

11:44:12  25    **Q.**    Okay.

Stoll - Direct/Bryan

1    And can you explain for the -- were you -- did you use

2    steroids?

3    **A.**   Yes, sir.

4    **Q.**   Okay.  And did Jake use steroids as well?

11:44:19 5    **A.**   Yes, sir.

6    **Q.**   Okay.

7    And were there certain things you would do around

8    competition time to make your body appear more ripped?

9    **A.**   Yes.

11:44:28 10    **Q.**   What were some of those things?

11    **A.**   Diuretics.

12    **Q.**   Okay.  And what's a diuretic?

13    **A.**   Just drains the water from your muscle cells and makes

14    you look tighter.

11:44:38 15    **Q.**   Did you ever take any medications that normally

16    wouldn't be prescribed for someone like you?

17    **A.**   What do you mean by that?

18    **Q.**   Well, you ever take any thyroid medication?

19    **A.**   I experimented once, yes.

11:44:52 20    **Q.**   Did you know of other body builders to do that?

21    **A.**   Yes.

22    **Q.**   Okay.  And it's -- just known as T3?

23    **A.**   Yes.

24    **Q.**   Okay.  And what does that do?

11:45:02 25    **A.**   Just speeds up thyroid for fat loss.

Stoll - Direct/Bryan

1    **Q.**    Increases your metabolism?

2    **A.**    Yes, sir.

3    **Q.**    You know if Jake ever did anything like that?

4    **A.**    I would assume.

11:45:12 5    **Q.**    Okay.  Did you know Jake to have suffered from asthma?

6    **A.**    Yes.

7    **Q.**    Okay.

8    **A.**    From when he was a child.

9    **Q.**    Okay.

11:45:21 10        Did you -- did you see him still suffering the effects

11    of that as an adult as well?

12    **A.**    No, sir.

13    **Q.**    Okay.

14        Now, Mr. Stoll, when -- when was the last time you saw

11:45:36 15    Jake?

16    **A.**    Probably the weekend before he passed, that Friday.

17    **Q.**    The weekend before he passed?  Okay.

18    **A.**    Yeah, we were supposed to go to the Arnold Classic.

19    **Q.**    So prior to that, what was most of the time that you

11:45:53 20    guys spent together doing?

21    **A.**    Going to the gym and eating.

22    **Q.**    Okay.

23        Were you aware that Jake had had another life outside

24    the life that he shared with you and some of your friends?

11:46:05 25    **A.**    No, sir.

Stoll - Direct/Bryan

1   **Q.**   Let me ask you this.  You were never involved in --

2   were you ever involved in using illicit drugs?

3   **A.**   No.

4   **Q.**   Okay.  Did you ever use heroin?

11:46:13 5   **A.**   No.

6   **Q.**   Did you ever use cocaine?

7   **A.**   No, sir.

8   **Q.**   Did you ever use any illegal drug, even marijuana?

9   **A.**   Marijuana, yes.

11:46:22 10   **Q.**   From time to time or --

11   **A.**   From back in high school, I was like 18.

12   **Q.**   Okay.

13        And from what you knew at that time, was Jake using

14   any of those drugs?

11:46:33 15   **A.**   I knew of marijuana and he would occasionally do coke.

16   **Q.**   Okay.  So you were aware of the coke?

17   **A.**   Yes.

18   **Q.**   Okay.

19        Did you know why he would use coke occasionally?

11:46:43 20   **A.**   Like it was supposed to suppress your appetite.  So

21   before shows, he'd get really hungry.  So that's what why he

22   mainly did it.

23   **Q.**   You weren't aware of the heroin use on his part?

24   **A.**   No, sir.

11:46:56 25   **Q.**   Now, you said you also knew Harry Karaplis, correct?

1    **A.**    Yes, sir.

2    **Q.**    And did you know him also through lifting?

3    **A.**    Yes.

4    **Q.**    Okay.

11:47:06    5        Did you also spend time with Harry and Jake together

6    to eat or anything like that?

7    **A.**    Not really, maybe once or twice.

8    **Q.**    Okay.

9        What kind of a -- what kind of time -- how frequently

11:47:19    10    do you think you like had conversations with Harry?

11    **A.**    With who?  I'm sorry.

12    **Q.**    Harry, Harry Karaplis?

13    **A.**    How many times?

14    **Q.**    Not -- you don't have to count the times, but was he

11:47:31    15    someone that you saw regularly like --

16    **A.**    Not that I seen regularly, no.

17    **Q.**    Okay.  Did Harry Karaplis ever tell you that Jake was

18    using drugs?

19    **A.**    He did.

11:47:44    20            MR. CORTS:  Objection, your Honor.  Hearsay.

21            THE COURT:  Sustained.

22            MR. BRYAN:  Okay.

23            THE COURT:  The jury will disregard the

24    answer.

11:47:51    25            MR. BRYAN:  Okay.

Stoll - Direct/Bryan

1    **Q.**   About -- did you have concern about Jake about a month

2    before his death?

3    **A.**   I noticed a little bit of like weight loss, but I

4    thought that was just from his upper respiratory infection

11:48:03 5    and asthma coming back.

6    **Q.**   Okay.  So did he have symptoms of asthma coming back

7    at that time?

8    **A.**   Yes, sir.

9    **Q.**   Okay.

11:48:09 10         Did it require him to use his treatment, his machine

11   at that time?

12   **A.**   Yes, sir, his inhaler and breathing treatments, like

13   two to three times a week.

14   **Q.**   So he was doing that about a month before he passed?

11:48:21 15   **A.**   About a month and a half, yes.

16   **Q.**   You also noticed that he seemed to be different,

17   correct?

18   **A.**   Um-hum.

19   **Q.**   Okay.

11:48:28 20         Did you say anything to Harry Karaplis about that?

21              THE COURT:  Was that a yes?

22              THE WITNESS:  Yes.

23              THE COURT:  You can't say um-hum.

24              THE WITNESS:  Yes, sir.

11:48:34 25   **Q.**   Did you say anything -- did you say anything to Harry

1    about Jake's appearance and how he didn't seem right?

2    **A.**    I didn't, no.

3    **Q.**    Okay.

4              MR. CORTS:  Sorry.  I couldn't hear that

11:48:43  5  answer.

6              THE COURT:  Keep your voice up.

7              THE WITNESS:  I didn't, no.

8    BY MR. BRYAN:

9    **Q.**    Okay.

11:48:48 10       Now, sir, at some point in time, you received a call

11   from law enforcement regarding your friend, Jake.  Do you

12   recall that?

13   **A.**    Yes, sir.

14   **Q.**    Okay.  And can you recall for the jury what that call

11:49:05 15  was about?

16   **A.**    The initial Detective just called and asked me if I

17   knew like certain phone numbers that they found and I did

18   not know any of the phone numbers.

19   **Q.**    And where were you when you were called?

11:49:16 20  **A.**    I was at training for Huntington Bank.

21   **Q.**    Okay.

22        At some point in time, did you go to Jacob

23   Castro-White's house that morning that he died?

24   **A.**    I did, I was there probably like 7:30, 8:00.

11:49:31 25  **Q.**    Okay.  When did -- when did you learn that Jake had

Stoll - Direct/Bryan

1  died?

2  **A.**  Around 7:30.

3  **Q.**  Okay.  And you went over to his house?

4  **A.**  Yes, sir.

11:49:40 5  **Q.**  And what did you do when you got to his house?

6  **A.**  I cried a lot.

7  **Q.**  Okay.  And were you interviewed by the police as well?

8  **A.**  Not really, no, sir.

9  **Q.**  Okay.

11:49:56 10          MR. BRYAN:  Shelly, can you go to Defendant's

11  Exhibit AA, Page 55, please?

12  **Q.**  I'm showing you what's been previously marked as

13  Defendant's Exhibit AA and this is Page 55 of that exhibit.

14  And there's a series of phone calls on there.

11:50:32 15      Do you recall where you were during this time period,

16  about 8:51 A.M.?

17  **A.**  I was at Jake's house.

18  **Q.**  Okay.

19      And do you recall anything going on with Jake's phone

11:50:43 20  during that period of time?

21  **A.**  His phone was continuously ringing.

22  **Q.**  Okay.

23      And did -- was the phone in law enforcement's hand?  I

24  mean were they holding on to the phone at that time?

11:50:56 25  **A.**  To be honest, I don't remember.

Stoll - Direct/Bryan

1   **Q.**    But you know that it -- it became the subject

2   matter -- did it become the subject matter of your

3   discussions?

4   **A.**    Yes, sir.

5   **Q.**    Okay.

6        And you recall anyone asking if anyone knew who this

7   person was or --

8   **A.**    Yes, sir.  They asked if I knew who Harry Karaplis

9   was.

10  **Q.**    Okay.

11       Is that how it was showing up in Jacob's phone, Harry

12  Karaplis?

13  **A.**    I think -- it was his full name, which I can't really

14  pronounce.

15  **Q.**    Okay.

16       I couldn't either, but I got good at it.  But Harry

17  Karaplis, it was showing up as Harry?

18  **A.**    Yes.

19  **Q.**    Okay.

20  **A.**    Yes, sir.

21  **Q.**    And you said -- what did you say?

22  **A.**    That's when I looked at my phone, and I realized I had

23  all the missed calls.  And I did tell them I knew Harry and

24  I handed my phone to one of the Detectives.

25  **Q.**    Okay.

Stoll - Direct/Bryan

1          Sir, do you -- looking at Defendant's Exhibit AA, Page

2     55, do you see your telephone number on that exhibit?

3     **A.**     Yes, sir.

4     **Q.**     Okay.  And which number is that?

11:52:00 5     **A.**     440-396-5526.

6     **Q.**     Okay.

7          The records reflect at 9:01.  You actually made a call

8     from your phone to Harry Karaplis.  You see that?  You see

9     that?

11:52:17 10    **A.**     Yes, sir.

11    **Q.**     Okay.

12         And then Mr. Karaplis made a phone call back -- call

13    back to your phone, correct?

14    **A.**     Yes, sir.

11:52:25 15    **Q.**     And do you see the short, relatively short duration of

16    the call?

17    **A.**     The seven seconds?

18    **Q.**     Yeah.

19    **A.**     Yes, sir.

11:52:34 20    **Q.**     Do you know if you actually spoke to Mr. Karaplis or

21    was that like a little bit of phone tag there?

22    **A.**     I can't recall that, sir.

23    **Q.**     Then the third call is from your phone to Harry

24    Karaplis.

11:52:48 25         Do you see that?

Stoll - Direct/Bryan

1    **A.**    Yes, sir.

2    **Q.**    Okay.

3          And that shows a 248 second call?  Were you talking to

4    Harry Karaplis at that time?

11:52:57 5    **A.**    The Detective was.

6    **Q.**    Okay.

7          So you handed your phone to the Detective at that

8    time?

9    **A.**    Yes, sir.

11:53:00 10   **Q.**    Okay.

11         Now -- you can take that down, Shelly.

12         You've indicated that you've -- how long have you

13   known Harry Karaplis?

14   **A.**    Since 2012, probably, around that time.

11:53:24 15   **Q.**    And you've been around him lifting and things like

16   that?

17   **A.**    Yes, sir.

18   **Q.**    Just in social settings.

19         You have a reputation -- excuse me.  You have an

11:53:34 20   opinion as to his reputation for honesty?

21                MR. CORTS:  Objection, your Honor.

22                THE COURT:  Side bar, please.

23         (The following proceedings were held at side bar:)

24                THE COURT:  Mr. Corts, go ahead.

11:53:53 25                MR. CORTS:  Your Honor, that's not the proper

1    way to ask that question even if it is relevant at this

2    point.  The Defendant, or the witnesses -- yes, so Harry

3    Karaplis character has to be placed into some type of

4    trouble or issue.  Whether or not that's occurred, the Court

11:54:15  5    can make that decision, but once that happens, then the

6    proper way to get someone's reputation is to ask if this

7    witness has been with other people in the community or

8    whatever, whether they've discussed Harry's reputation, what

9    his reputation in the community is.  The witness has to say

11:54:34  10   yes, I've been with so-and-so or we've discussed it or it

11   has to have been a type of discussion.  You can't just get

12   into this witness' perception or belief as to what they've

13   had with Harry nor can you get into specific instances of

14   conduct.

11:54:51  15       For example, two days ago, he told me that he was

16   going to the store, and I saw him at the casino.  So I would

17   object to that.

18            THE COURT:  That's true, that's true.  It's

19   got to be a community-wide thing.  You just can't get his

11:55:01  20   personal opinion as to reputation because reputation

21   involves more than one person.

22            MR. BRYAN:  The question is do you know what

23   his reputation in the community is, your Honor.

24            MR. CORTS:  Discuss that.

11:55:11  25            THE COURT:  Something along those lines.

Stoll - Direct/Bryan

1        MR. BRYAN:  We've spoken with law enforcement

2   I'm not sure what his answer is going to be now.  Before he

3   told us that the guy is a pathological liar, but I don't

4   know if he's going to be willing to say that since he's been

11:55:26  5   interviewed by PC.

6        THE COURT:  Are we going to move off the

7   reputation thing?

8        MR. BRYAN:  I think I'm going to -- I'm going

9   to rest then.  I'm going to say nothing further.

11:55:34  10        THE COURT:  Okay.

11   (Proceedings resumed within the hearing of the jury:)

12        MR. BRYAN:  I have nothing further.  Thank

13   you, Mr. Stoll.  Sorry for the loss you've had.

14        THE WITNESS:  Thank you.

11:55:50  15        THE COURT:  Thank you, Mr. Bryan.

16

17

18

19

20

21

22

23

24

25

1          CROSS-EXAMINATION OF BRIAN STOLL

2     BY MR. CORTS:

3               THE COURT:  Mr. Corts, cross, please.

4     Q.    Mr. Stoll, just a couple questions for you.  Please

5     keep your voice up.  I'm having a hard time hearing you.

6     Okay?  Would you pull the microphone to you or lean towards

7     it.

8          As I understand it, you've known Jacob Castro-White

9     for quite some time; is that correct?

10    A.    Yes, sir.

11    Q.    And you and he were fast friends, good friends?

12    A.    Yes, sir.

13    Q.    And one of the aspects of the life that you shared

14    with him was you like to work out and he likes to work out?

15    A.    Yes, sir.

16    Q.    And up until Jacob Castro-White's death, he was a

17    healthy guy, wasn't he?

18    A.    Yes, sir.

19    Q.    Strong as an ox?

20    A.    Yes, sir.

21    Q.    You worked out with him sometimes two, three times a

22    day?

23    A.    Not that many times, sir.

24    Q.    Twice a day sometimes?

25    A.    Some days, yes.

Stoll - Cross/Corts

1    **Q.**    And you knew that not only did he work out, but he

2    helped other people, he trained people?

3    **A.**    Yes, sir.

4    **Q.**    So he would sort of be working out during that period

11:56:52 5    of time?

6    **A.**    Yes, sir.

7    **Q.**    He was healthy as a bull I guess is what people say,

8    right?

9    **A.**    Yes, sir.

11:56:58 10    **Q.**    Okay.

11    And when you worked out with him, I take it from your

12    physique and his physique you guys didn't just do my work

13    out where I lift a couple weights and then go stand by the

14    water fountain, right?

11:57:13 15    **A.**    No, sir.

16    **Q.**    You hit it hard?

17    **A.**    We did.

18    **Q.**    Okay.

19    And that was continuous throughout your relationship

11:57:20 20    with him?

21    **A.**    Yes, sir.

22    **Q.**    And you knew that he used steroids?

23    **A.**    I did, sir.

24    **Q.**    And you never saw or witnessed any ill effects of

11:57:32 25    steroids with Jake, correct?

1     A.    No, sir.

2     Q.    If you did, you would have told him to stop, right?

3     A.    Yes, sir.

4     Q.    And you used steroids, too?  Do you still use

5     steroids?

6     A.    I do not, sir.

7     Q.    And you never suffered any ill effects of steroids

8     when you used them, right?

9     A.    No, sir.

10    Q.    If you did, you probably would have stopped, right?

11    A.    Correct.

12    Q.    Steroids are a little bit different than heroin; I

13    mean you're not addicted to steroids, correct?

14    A.    Correct.

15    Q.    So in your relationship with Jake, there were no

16    health problems related to steroids?

17    A.    No, sir.

18    Q.    You didn't know of any heart ailments that he had or

19    heart conditions or problems?

20    A.    No, sir.

21    Q.    Healthy kid, right?

22    A.    Yes, sir.

23    Q.    Now, when you were first testifying, Mr. Bryan asked

24    you about asthma and whether you were aware or not that he

25    had asthma.  You recall that?

964

Stoll - Cross/Corts

1    **A.**    Yes, sir.

2    **Q.**    And I wrote down that your answer was yes, he did when

3    he was a child.

4    **A.**    Um-hum.  Yes, si.

11:58:27 5    **Q.**    And then Mr. Bryan next asked you, "Did he continue to

6    suffer any ill effects of that," and your answer I believe

7    was no?

8    **A.**    Correct.

9    **Q.**    Okay.

11:58:37 10         But, later on in your testimony, you said something

11   about -- strike that.

12         So he did not continue to suffer any ill effects from

13   asthma, you never noticed him have asthmatic conditions or

14   problems when you were with him, did you?

11:58:50 15   **A.**    No, he never had to use an inhaler or breathing

16   treatments, nothing like that.

17   **Q.**    Okay.

18         So -- and the time that you spent with him, would you

19   say you spent more time with him or less time than his

11:59:04 20   mother during the last month of his life?

21   **A.**    Probably more time.

22   **Q.**    How about more time or less time than his girlfriend

23   during the last month?

24   **A.**    Probably be equal.

11:59:16 25   **Q.**    Okay.

Stoll - Redirect/Bryan

1    **A.**    I couldn't answer that one.

2    **Q.**    All right.

3          So you and Holly, that's who his girlfriend is, right?

4    If anybody knew about an asthma attack, it would be one of

11:59:25 5    you, correct?

6    **A.**    Yes, sir.

7    **Q.**    And you didn't see any and didn't see him suffer from

8    any, correct?

9    **A.**    No, sir.

11:59:43 10                MR. CORTS:  No other questions, your Honor.

11                THE COURT:  Thank you, Mr. Corts.  Mr. Bryan.

12                REDIRECT EXAMINATION OF BRIAN STOLL

13    BY MR. BRYAN:

14    **Q.**    Mr. Stoll, I want to clear up confusion about your

11:59:56 15    testimony concerning Jake's asthma.

16    **A.**    Yes, sir.

17    **Q.**    When you were -- your first answer was that you

18    remember him suffering as a child, correct?

19    **A.**    Yes, sir.

12:00:05 20    **Q.**    Okay.

21          And then when I asked you about if you noticed

22    anything about his health a month or so before his death,

23    you thought that he looked different, he was getting

24    thinner, right?

12:00:16 25    **A.**    Yes, sir.

1   **Q.**   And then you volunteered that he also was doing his

2   asthma treatments then?

3   **A.**   Yes.

4   **Q.**   Three to four times a week?

12:00:22  5   **A.**   Yes, sir.

6   **Q.**   So can we just -- can you clarify was Jake -- was he

7   being treated for his asthma a month or so before his death?

8   **A.**   The month or so before, yes, but all the time leading

9   up to that, no.

12:00:35 10   **Q.**   Right.  Okay.

11            So you noticed a decline in his health like a month

12   before his death?

13   **A.**   He was getting sick, yes.

14   **Q.**   Right.  And you said upper respiratory problems,

12:00:46 15   right?

16   **A.**   Yes.

17   **Q.**   Which included his asthma returning, right?

18   **A.**   Yes, sir.

19   **Q.**   Okay.

12:00:52 20            MR. BRYAN:  I have nothing further, Judge.

21            THE COURT:  Thank you, Mr. Bryan.  Mr. Corts

22   anything?

23

24

25

Stoll - Recross/Corts

1          RECROSS-EXAMINATION OF BRIAN STOLL

2     BY MR. CORTS:

3     **Q.**  I'm confused.  I asked you if he was healthy.  He was?

4     **A.**  He was healthy up until the month before, yes.

5     **Q.**  You noticed a little bit of change in him?

6     **A.**  A little bit, yes.

7     **Q.**  Maybe consistent with using heroin more?

8     **A.**  No.

9     **Q.**  Okay.

10    **A.**  I just thought he was getting ill.

11    **Q.**  Well, he continued to have problems, right?

12    **A.**  Yes, sir.

13    **Q.**  And you guys did heavy tough workouts, right?

14    **A.**  Yes, he would push himself.

15    **Q.**  Okay.

16         And he didn't go to a hospital or go to the doctors

17    for any kind of heart attack or anything like that?

18    **A.**  No heart attacks.

19    **Q.**  And would you be surprised if Holly said she didn't

20    notice any respiratory --

21                   MR. BRYAN:  Objection, your Honor.

22                   THE COURT:  Sustained.

23                   MR. CORTS:  Okay.

24         Nothing further.

25                   THE COURT:  Thank you, Mr. Corts.

Stoll - Recross/Corts

1           Ladies and gentlemen, any questions of Mr. Stoll?

2           Mr. Stoll, thank you.  You can step down.

3                   THE WITNESS:  Thank you, sir.

4                   THE COURT:  Mr. Bryan.

12:02:02  5                   MR. BRYAN:  Oh, I'm sorry, your Honor.  The

6       Defense would call Amanda Giovannazzo.

7           This would be our last witness before lunch, your

8       Honor.  Should be relatively short.

9                   THE COURT:  Please be sworn.

12:02:56 10                   DEPUTY CLERK:  Raise your right hand, please.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              AMANDA GIOVANNAZZO,

2         of lawful age, a witness called by the DEFENSE,

3              being first duly sworn, was examined

4                   and testified as follows:

12:03:02   5         DIRECT EXAMINATION OF AMANDA GIOVANNAZZO

6    BY MR. BRYAN:

7                   THE COURT:  Would you make sure you're close

8    to the microphone and speak clearly, please.

9                   THE WITNESS:  Okay.

12:03:18  10                   THE COURT:  And relax.

11                   THE WITNESS:  Okay.

12                   THE COURT:  You want some Kleenex?  Will you

13   be okay?

14                   THE WITNESS:  Maybe.

12:03:25  15                   THE COURT:  We'll get you some Kleenex.  Try

16   to relax.  Okay?

17         Mr. Bryan, when you're ready.

18                   MR. BRYAN:  Thank you, your Honor.

19   BY MR. BRYAN:

12:03:37  20   **Q.**   Amanda, can you state your full name and spell your

21   last name for the record please?

22   **A.**   Yeah.  Amanda Giovannazzo, G-I-O-V-A-N-N-A-Z-Z-O.

23   **Q.**   And, Amanda where do you reside?

24   **A.**   I'm sorry?

12:03:52  25   **Q.**   Where do you live?  I'm sorry.

Giovannazzo - Direct/Bryan

1    **A.**    Westlake, Ohio.

2    **Q.**    And how long have you lived in Westlake?

3    **A.**    About six months.

4    **Q.**    Okay.  Where did you grow up, Amanda?

12:04:01 5    **A.**    Elyria, Ohio.

6    **Q.**    Okay.  And where did you go to school?

7    **A.**    I went to St. Jude for elementary, Elyria Catholic for

8    high school and then I did Lorain County Community College

9    and Ashland University.

12:04:16 10    **Q.**    Okay.

11        Where were you living when you were attending those

12    schools?

13    **A.**    Elyria.

14    **Q.**    Okay.

12:04:22 15    **A.**    With my parents.

16    **Q.**    Okay.

17        And that's in Lorain County?

18    **A.**    Um-hum.

19    **Q.**    Okay.

12:04:26 20        You said that you attended Lorain County Community

21    College and Ashland University, correct?

22    **A.**    Correct.

23    **Q.**    When did you attend those facilities?

24    **A.**    Lorain County Community College, I started after high

12:04:39 25    school in 2011.

Giovannazzo - Direct/Bryan

1    **Q.**    Let me interrupt you.  So you graduated in 2011?

2    **A.**    I graduated from high school in 2011, yes.

3    **Q.**    Okay.

4    **A.**    I started LC in 2011 in August.  I did that for three

12:04:53  5    years, graduated with my associate's of arts in 2014 and

6    then immediately started Ashland University in the fall and

7    graduated in 2017 of May with my bachelor's of science.

8    **Q.**    Okay.  And what's your bachelor's of science in?

9    **A.**    Special education, K through 12.

12:05:13  10    **Q.**    Okay.

11          And so you're an educator, you're a teacher?

12    **A.**    Correct.

13    **Q.**    Okay.  Are you currently employed?

14    **A.**    Yes.

12:05:18  15    **Q.**    And how are you employed?

16    **A.**    I'm a 5-through-7 special ed teacher at Mary Rich

17    school.

18    **Q.**    Where is Mary Rich school?

19    **A.**    In Elyria.

12:05:29  20    **Q.**    Okay.

21          Amanda, do you know a person by the name of Harry

22    Karaplis?

23    **A.**    I do.

24    **Q.**    And how long have you known Harry Karaplis?

12:05:36  25    **A.**    Since the beginning of -- since January of 2013.

Giovannazzo - Direct/Bryan

1   **Q.**   Okay.  And how did you meet Harry Karaplis?

2   **A.**   We had mutual friends.

3   **Q.**   Okay.  I'll come back to him.  Did you know Jacob

4   Castro-White?

12:05:50 5   **A.**   I did.

6   **Q.**   And how did you know Jacob Castro-White?

7   **A.**   I knew who he was when we were in high school because

8   of mutual friends, but I didn't actually meet him in real

9   life until probably 2014.

12:06:04 10   **Q.**   Okay.  And how did you meet him in real life?

11   **A.**   Through Harry Karaplis.

12   **Q.**   So he was with Harry at the time?

13   **A.**   Correct.

14   **Q.**   So was he considered one of Harry's friends during

12:06:13 15   that time period?

16   **A.**   Yes.

17   **Q.**   Okay.

18        Did you -- do you know a person by the name of Corey

19   Stock?

12:06:18 20   **A.**   Yes.

21   **Q.**   How do you know Corey Stock?

22   **A.**   Through Harry Karaplis.

23   **Q.**   Okay.  And when did you first meet Corey Stock?

24   **A.**   I believe in -- some time in 2015.

12:06:27 25   **Q.**   Okay.

|  |  |  |
|--|--|--|
| 1 |  | Do you know a person by the name of Erika Matus? |
| 2 | **A.** | I do. |
| 3 | **Q.** | Okay.  And how do you know Erika Matus? |
| 4 | **A.** | I know her through Harry Karaplis and Corey Stock. |
| 5 | **Q.** | Okay. |
| 6 |  | And how long have you known her? |
| 7 | **A.** | I think I met her some time in 2016. |
| 8 | **Q.** | Okay.  And do you know Russell Davis? |
| 9 | **A.** | I do not. |
| 10 | **Q.** | Okay. |
| 11 |  | Have you -- my client who's sitting over here between |
| 12 |  | my two colleagues, have you ever met him before? |
| 13 | **A.** | No. |
| 14 | **Q.** | Okay. |
| 15 |  | Before today, is this the first time you've seen him |
| 16 |  | in person? |
| 17 | **A.** | Yes. |
| 18 | **Q.** | Okay. |
| 19 |  | Now, Amanda, you -- did you have a relationship with |
| 20 |  | Harry? |
| 21 | **A.** | Yes. |
| 22 | **Q.** | And can you describe for the jury sort of the nature |
| 23 |  | of your relationship? |
| 24 | **A.** | We started dating in October of 2013.  Up until about |
| 25 |  | March of 2017, Harry was not a good -- |

Giovannazzo - Direct/Bryan

1          MR. CORTS:  Objection.

2          THE COURT:  Yeah.  You don't have to comment

3     on Harry.

4     Q.    Okay.  You don't?

12:07:33  5          THE COURT:  Wait for the question, please.

6          THE WITNESS:  Oh.  I'm sorry.

7     BY MR. BRYAN:

8     Q.    Okay.  When you were dating Harry, where are you

9     living?

12:07:38 10   A.    I was living in Elyria with my parents.

11    Q.    Did you live with your parents through your college

12    education?

13    A.    Yes.

14    Q.    Okay.  Where was Harry living?

12:07:46 15   A.    He lived in multiple houses.  Started off in Lorain in

16    his own house, then moved to South Amherst in with a friend

17    and then back with his dad in Amherst, and then with his mom

18    in Amherst.

19    Q.    Okay.

12:08:04 20         So are you -- you're familiar with the different

21    places he was living during your time dating him?

22    A.    Yes.

23    Q.    Do you remember the mom's condo up in Green Brier I

24    believe it's called?

12:08:17 25   A.    Yes, um-hum.

Giovannazzo - Direct/Bryan

1    **Q.**    And you remember his father's home down in Amherst?

2    **A.**    Yes.

3    **Q.**    Okay.

4         When you spent time with Harry at his homes, I'm

5    talking now just -- let's just jump forward to say December

6    of 2015.

7    **A.**    Okay.

8    **Q.**    Do you recall where Harry was living during those time

9    periods?

10   **A.**    I believe with his mom.

11   **Q.**    Okay.

12        Did he also -- his father's home was also -- did he

13   also have a place at his father's house?

14   **A.**    Kind of.  His dad didn't really like him being there,

15   so if it was absolutely necessary, but not so much.

16   **Q.**    Okay.  Now, at his father's -- strike that.

17        Did there come a time that you spent time at his

18   father's house when his father was out of the country?

19   **A.**    Yes.

20   **Q.**    Okay.  Do you recall what that was like?

21   **A.**    I was only there certain days of the week.  Mostly

22   just him and I, maybe his brother.  Just we did -- we did

23   regular things that any couple would do; watch movies, hang

24   out, have dinner, things like that.

25   **Q.**    Okay.

Giovannazzo - Direct/Bryan

1          Now, did you -- were you aware of Mr. Karaplis using

2     any kind of drugs?

3     **A.**    No.

4     **Q.**    Okay.  Were there -- were there drugs that you were

12:09:34 5    aware that he used?

6     **A.**    Yes.

7               MR. CORTS:  Objection, your Honor.

8               THE COURT:  When you specify drugs -- well --

9     **Q.**    Well, what kind of drug -- I can't lead her.

12:09:44 10        What kind of drugs did you know that Mr. Karaplis

11    used?

12    **A.**    I knew of like psychedelics, and then also steroids.

13    **Q.**    Okay.

14         Were you aware during the time you were dating that he

12:09:57 15   was using heroin?

16    **A.**    I knew one single time, and that was it.

17    **Q.**    Okay.  Is that something that -- is that part of his

18    life that he shared with you?

19    **A.**    No.

12:10:07 20   **Q.**    Okay.

21         Now, did you have a circle of friends that you hung

22    out with your boyfriend with?

23    **A.**    No.

24    **Q.**    Okay.

12:10:15 25        It was just you and your boyfriend most of the time?

1    **A.**    Yeah, my friends did not allow him around.

2    **Q.**    Okay.  And when you hung out with him, did he have

3    friends with him?

4    **A.**    I only brought myself into a certain group of friends.

12:10:31    5    **Q.**    Okay.  What certain group of friends did you associate

6    with?

7    **A.**    Friends from high school, some from college, and

8    that's about it.

9    **Q.**    Okay.

12:10:39    10    Was Jake one of those friends that you would associate

11    with?

12    **A.**    Yes, but only when he had a girlfriend because we

13    would do double dates and things like that.

14    **Q.**    So you would double date like with Jake and Holly?

12:10:51    15    **A.**    Yes.

16    **Q.**    Okay.

17    What kind of things did you guys do as a friend?

18    **A.**    We would go to dinner.  We would go to arcades.

19                    MR. CORTS:  Objection.

12:11:01    20                    THE COURT:  Okay.  Let's have a quick side

21    bar.

22    (The following proceedings were held at side bar:)

23                    THE COURT:  Ed, get to relevance.

24                    MR. BRYAN:  Just establishing the nature of

12:11:18    25    the relationship, how it was.  I'm going to ask her were you

Giovannazzo - Direct/Bryan

1    aware Harry had another group of friends that you didn't

2    associate with, and she's going to say yeah, that's Corey

3    Stock, the group of friends.

4                    THE COURT:  Okay.  And that's it then?

12:11:35  5          MR. BRYAN:  Then we'll get into more case

6    specific stuff, yes.

7                    THE COURT:  Okay.  Yeah.

8                    MR. BRYAN:  But it's -- oh, well.

9         (Proceedings resumed within the hearing of the jury:)

12:11:47  10   BY MR. BRYAN:

11   Q.   Now, while you were dating Mr. Karaplis, did he also

12   have a circle of friends that you didn't spend time with?

13   A.   Yes.

14   Q.   Okay.  And who was in that circle of friends?

12:12:03  15   A.   Mostly just Corey and Erika, Corey Stock and Erika

16   Matus.

17   Q.   Okay.

18        So while you were dating him, did you know him to have

19   at least a friendship with Erika Matus?

12:12:15  20   A.   Yes.

21   Q.   Okay.

22        Did there ever come a time that you had concerns it

23   was something more than that?

24   A.   Yes.

12:12:20  25   Q.   And did you confront Harry about that?

Giovannazzo - Direct/Bryan

1    **A.**    Yes.

2    **Q.**    And what happened?

3                    MR. CORTS:  Objection, your Honor.

4                    THE COURT:  Sustained.  Relevance.

12:12:28 5    BY MR. BRYAN:

6    **Q.**    Okay.

7                    THE WITNESS:  Does that mean I answer?

8                    THE COURT:  No.

9                    THE WITNESS:  Okay.  All right.

12:12:38 10                   MR. BRYAN:  One second, your Honor.  I'm

11   sorry.

12   **Q.**    Ms. Giovannazzo, did I do it right?

13   **A.**    Um-um, Giovannazzo.

14   **Q.**    Giovannazzo.  Amanda.

12:13:03 15   **A.**    Yes.

16   **Q.**    Where were you employed during the period of March of

17   2016?

18   **A.**    I was employed at KinderCare in North Ridgeville.

19   **Q.**    So you were working as a daycare worker at that time?

12:13:17 20   **A.**    Yes, um-hum.

21                   THE COURT:  Is that a yes.

22                   THE WITNESS:  Yes.

23   **Q.**    You have to say yes or no because the Court Reporter

24   can't see head nods.

12:13:27 25   **A.**    Sorry.

980

Giovannazzo - Direct/Bryan

1   **Q.**   And did there come a time when you received a

2   telephone call from your boyfriend, Harry Karaplis?

3   **A.**   Yes.

4              THE COURT:  When, Mr. Bryan.

12:13:37 5              MR. BRYAN:  I'm sorry.

6        Oh, I'm sorry.  I thought -- I thought you asked me to

7   wait.

8              THE COURT:  You said phone call.  I said when.

9              MR. BRYAN:  I thought you said, "Wait up, Mr.

12:13:57 10  Bryan."  Ears are going, too, Judge.

11  BY MR. BRYAN:

12  **Q.**   If we could turn to Defendant's Exhibit AA, Page 56.

13       Amanda, I'm showing you what's been previously marked

14  as Defendant's Exhibit AA for identification, and Page 56 of

12:14:24 15  that chart, of that exhibit.

16       Have you seen this chart before?

17  **A.**   Yes.

18  **Q.**   Okay.  When did you see this chart before?

19  **A.**   Yesterday with you.

12:14:34 20  **Q.**   Okay.  And so I showed you this chart?

21  **A.**   Yes.

22  **Q.**   And when you looked at this chart, what did this chart

23  do for you?

24  **A.**   Gave me a little bit of clarification that I was not

12:14:47 25  the only person that was getting a phone call that day.

Giovannazzo - Direct/Bryan

1    **Q.**    Okay.

2           Well, as it related to you, did it -- did it spur any

3    memories of getting a phone call from Harry that morning?

4    **A.**    Yes.

12:14:58 5    **Q.**    Okay.

6           And directing your attention to about 9:10 of that

7    morning, do you see a call that was made to you?

8    **A.**    Yes.

9    **Q.**    Okay.  And is that your number, 440-542-2707?

12:15:14 10   **A.**    Yes.

11   **Q.**    Okay.

12          And it's a relatively short call.  Can you explain

13   what you were doing at the time that you first got that

14   call?

12:15:21 15   **A.**    I was working.  So I did not answer my phone right

16   away.

17   **Q.**    Okay.  And do you recall exactly what you were doing

18   at work?

19   **A.**    I was changing a baby's diaper.

12:15:31 20   **Q.**    Okay.

21          And then there are other calls.  Then it appears that

22   you attempted to call Harry back at 9:12.  Do you see that?

23   **A.**    Yes.

24   **Q.**    And then he attempts to call you back.  You see that?

12:15:44 25   **A.**    Yes.

Giovannazzo - Direct/Bryan

1    **Q.**    Okay.

2          And do you recall there being a period of time where

3    there was a little bit of phone tag going on?

4    **A.**    Yes.

12:15:50  5    **Q.**    Okay.

6          If we can go to Page 57, please.  At 9:13 it appeared

7    that you called Mr. Karaplis, and there's a connection time

8    of about six minutes.  Do you see that?

9    **A.**    Yes.

12:16:09  10    **Q.**    And do you recall what that call was about?

11    **A.**    Yes.

12    **Q.**    What was that call about?

13              MR. CORTS:  Objection, your Honor.

14    **Q.**    Well, I'll back up.

12:16:21  15              THE COURT:  Yeah, rephrase, please.

16    **Q.**    How was -- what was Harry's demeanor at the time over

17    the phone?

18    **A.**    He was in hysterics, crying.  I could not really

19    understand him.

12:16:35  20    **Q.**    So he was crying a lot?

21    **A.**    Yes.

22    **Q.**    Sort of hysterical?

23    **A.**    Yes.

24    **Q.**    Did he seem extremely, like excited, not in a good way

12:16:45  25    but agitated?

Giovannazzo - Direct/Bryan

1   **A.**   Yeah, like it was kind of a shock.

2   **Q.**   Okay.  What was that conversation about?

3   **A.**   Just --

4           MR. CORTS:  Objection, your Honor.

12:16:52 5       THE COURT:  Depends what he's using it for.

6   It can't be used for the truth of what happened.  Mr. Bryan,

7   what do you want to use it for?

8           MR. BRYAN:  Okay.

9   **Q.**   Did you learn something from that conversation?

12:17:05 10  **A.**   Just that Jake had passed.

11  **Q.**   Okay.

12          And then there was -- then another -- then you moved

13  on from that, right?

14  **A.**   Um-hum.

12:17:16 15  **Q.**   Okay.

16  **A.**   Yes.

17          THE COURT:  Is that a yes?

18          THE WITNESS:  Yes.

19  **Q.**   Were you able to see Harry then later that day?

12:17:21 20  **A.**   Yes.

21  **Q.**   When did you get off work that day?

22  **A.**   I think I left work around noon.

23  **Q.**   Okay.

24          And did you continue to date Harry during this period

12:17:32 25  of time?

Giovannazzo - Direct/Bryan

1    **A.**    Yes.

2    **Q.**    Okay.

3           So how long after this did you date Harry?

4    **A.**    About a year.

12:17:41 5    **Q.**    About a year?

6    **A.**    Um-hum, yes.

7    **Q.**    In that month following Jake's death, did you see

8    Corey Stock at all?

9    **A.**    Not -- maybe once, but I didn't associate myself with

12:17:53 10   him.

11   **Q.**    Okay.

12          Do you know if Harry spent any time with Corey Stock?

13   **A.**    Yes.

14   **Q.**    And how do you know he spent time with Corey Stock?

12:18:00 15   **A.**    Harry would tell me.

16   **Q.**    Okay.

17          And how frequently was he spending time with Corey

18   Stock after he died?

19   **A.**    If he was not with me then it was everyday.

12:18:08 20   **Q.**    Okay.

21          Did you have a concern about how much time he was

22   spending with Corey Stock at that time?

23   **A.**    Yes.

24   **Q.**    And what did you say?

12:18:16 25   **A.**    I just asked why he was spending so much time with

Giovannazzo - Direct/Bryan

1    him.  I got the answer he was a comfort --

2              MR. CORTS:  Objection.

3              THE COURT:  Sustained.  You can't say what he

4    said.

12:18:30  5    BY MR. BRYAN:

6    Q.   But from March 7th, to April, were you -- how

7    frequently was Harry and Corey together?

8    A.   Extremely frequent.

9              MR. CORTS:  Objection, your Honor.  What she

12:18:48 10   knows.

11             THE COURT:  Sustained, unless you personally

12   see them together.

13   Q.   Well, how did you know that?

14   A.   Through text messages, phone calls.  We updated each

12:18:58 15  other on what we were doing very often.  Almost everything

16   we did, we told each other.

17   Q.   And he was with him all the time?

18   A.   Yes.

19   Q.   Okay.

12:19:08 20       Now, you met -- you brought up text messages and phone

21   calls and stuff.  How did you communicate with Harry?

22   A.   Mostly text.

23   Q.   Okay.

24        Did you know of him to communicate using web-based

12:19:24 25  applications?

Giovannazzo - Direct/Bryan

1   **A.**   Yes.

2   **Q.**   And what was your -- what's your personal knowledge of

3   that?

4   **A.**   I just knew what he had on his phone and what he was

12:19:33 5   using.  There was like four different things.

6   **Q.**   Okay.  And what were they, if you recall?

7   **A.**   I remember Messenger on Facebook, Snap Chat, Kick, and

8   What's App.

9   **Q.**   What's App?

12:19:46 10   **A.**   What's App.

11   **Q.**   Okay.  And what's that like?

12   **A.**   I've never used it.  I just know that it's a messaging

13   thing.

14   **Q.**   Okay.  And those are all web-based applications?

12:19:58 15   **A.**   Yes.

16   **Q.**   Okay.

17        Now, since you dated Harry for a number of years, did

18   you have an opportunity to be with Harry with others?

19   **A.**   Like friends?

12:20:11 20   **Q.**   Well, you were familiar with your circle of friends?

21   **A.**   Most of the time, it was just him and I.

22   **Q.**   Okay.

23        Did you -- and there were times you were with Jake and

24   Holly, right?

12:20:27 25   **A.**   Yes.

Giovannazzo - Direct/Bryan

1   Q.    Okay.  And you also knew him to have lifted weights

2   with Jake and Holly?

3   A.    Yes.

4   Q.    And do you know his reputation for honesty in the

12:20:38   5   community?

6   A.    Yes.

7   Q.    Okay.

8              MR. CORTS:  I'm going to object, your Honor.

9              THE COURT:  Mr. Bryan, have to have a little

12:20:45  10   more foundation for that.  Define community.

11   BY MR. BRYAN:

12   Q.    Amongst your friends and peers?

13   A.    He was not honest.

14   Q.    Okay.

12:20:57  15        So what was Harry Karaplis' reputation for honesty

16   amongst your peer group?

17   A.    He just -- he was a liar usually.

18              MR. BRYAN:  I have nothing further, your

19   Honor.

12:21:11  20              THE COURT:  Thank you, Mr. Bryan.  Mr. Corts.

21

22

23

24

25

1           CROSS-EXAMINATION OF AMANDA GIOVANNAZZO

2   BY MR. CORTS:

3   **Q.**   Ms. Giovannazzo?

4   **A.**   Yes.

12:21:23 5   **Q.**   You grew up in Elyria?

6   **A.**   Yes.

7   **Q.**   What are your parents' names?

8   **A.**   Shawna and David.

9   **Q.**   Okay.

12:21:30 10        And then you went to Elyria Catholic.  And since then,

11   you've gone on to schooling and also work; is that correct?

12   **A.**   Correct.

13   **Q.**   And you knew Jacob Castro-White?

14   **A.**   Yes.

12:21:43 15   **Q.**   And you and Harry, as a couple, would go out and date

16   along with Jacob Castro-White and Holly?

17   **A.**   Yes.

18   **Q.**   And then Jacob and other girls; is that correct?

19   **A.**   Maybe like one or two, yes.

12:22:01 20   **Q.**   Okay.  And I think you testified that after you

21   learned of Jake's death, you stayed with Harry for another

22   year?

23   **A.**   Correct.

24   **Q.**   Now, as you sit there today, Ms. Giovannazzo, did you

12:22:19 25   know that Harry Karaplis had a daily heroin habit?

1    **A.**    I did not.

2    **Q.**    Okay.

3          So there were huge portions of his life that you knew

4    absolutely nothing about; is that correct?

12:22:34  5    **A.**    Correct.

6    **Q.**    But, yet, even after the death of Jacob Castro-White,

7    and you learned early after that that it was in relation to

8    drugs, it was a drug overdose, correct?

9    **A.**    Yes.

12:22:46 10    **Q.**    You continued to date Harry for a year after that?

11    **A.**    Yes.

12    **Q.**    So as you sit there today, it's fair to say you're not

13    with him anymore?

14    **A.**    Correct.

12:23:03 15    **Q.**    And do you continue to talk with Harry?

16    **A.**    Once a month, to pay a bill on a credit card.

17    **Q.**    Okay.

18          And that's the extent of your contact with him, right?

19    **A.**    Yes.

12:23:18 20    **Q.**    You don't like him?

21    **A.**    No.

22    **Q.**    Okay.

23          And part of that has to do with his keeping this

24    secret life from you?

12:23:28 25    **A.**    Yes, amongst other things.

1     **Q.**    Okay.

2           And the information that you had about Harry spending

3     time with Corey, that comes directly from Harry, correct?

4     **A.**    Yes.

12:23:45 5     **Q.**    So you can -- you can tell the jury after Jake died,

6     fix that time, you never saw -- you continued to spend time

7     with Harry, right?

8     **A.**    Yes.

9     **Q.**    Dated him for a year, spent time with him everyday?

12:24:04 10    **A.**    Almost.

11    **Q.**    Okay.

12          You never were in the company of Harry and Corey

13    during that period of time, correct?

14    **A.**    If I was, it was for a very short period of time.  It

12:24:15 15    was not to spend large amounts of time together.

16    **Q.**    But after a week and a half, you never even saw Corey

17    with Harry.  You'd agree with me on that?

18    **A.**    I was in Florida.  So through the funeral and

19    everything.

12:24:29 20    **Q.**    Okay.  But, I mean from that point on until the end of

21    time, you never personally saw Jake -- sorry, you never

22    personally saw Corey and Harry together; is that correct.

23    **A.**    I have, yes, but I never spent time with them.

24    **Q.**    Okay.  When did you get back from Florida?

12:24:48 25    **A.**    A few days after the funeral.

Giovannazzo - Cross/Corts

**Q.**    Okay.

Now, you don't like Corey either, do you?

**A.**    No.

**Q.**    And as it relates to this circle of friends that you had, it appears that you -- you had a circle of friends that would sort of intersect slightly with Harry's intersection of friends, correct?

**A.**    Yes.

**Q.**    And that was Jacob and/or Jacob's girlfriends at the time?

**A.**    Yes.

**Q.**    Holly, and then maybe another couple of girls that he might have been spending some time with?

**A.**    Yes.

**Q.**    So Harry, when he was not in that group, you don't know what Harry was doing, correct?

**A.**    Correct.

MR. CORTS:  Just a moment, your Honor.

THE COURT:  Sure.

(Counsel conferring.)

MR. CORTS:  No further questions.  Thank you.

THE COURT:  Thank you, Mr. Corts.  Mr. Bryan, anything?

MR. BRYAN:  No redirect, your Honor.  Thank you.

Giovannazzo - Cross/Corts

1          THE COURT:  Ladies and gentlemen, any

2     questions before she steps down?

3          (Question 27:  Harry?  Did Jacob smoke Newports?)

4          THE COURT:  Counsel.

12:26:46  5     (The following proceedings were held at side bar:)

6          THE COURT:  I like the question.  What kind?

7     Let's just see what she says.  Okay.

8          (Proceedings resumed within the hearing of the jury:)

9          THE COURT:  Ma'am, we have one question for

12:27:07  10     you.  Did Harry smoke Newports?

11          THE WITNESS:  Yes.

12          THE COURT:  Yes?

13          THE WITNESS:  Yes.

14          THE COURT:  You know if Jacob smoked Newports?

12:27:21  15          THE WITNESS:  I have no idea.

16          THE COURT:  Okay.  Well, Mr. Bryan, any follow

17     up?

18          MR. BRYAN:  Nothing, your Honor.  Thank you.

19          THE COURT:  Mr. Corts?

12:27:28  20          MR. CORTS:  No, your Honor.

21          THE COURT:  Thank you.  You can step down.

22          Time for lunch, ladies and gentlemen.  1:30.

23     Downstairs.  We'll call you and resume the testimony.

24          (Thereupon, a luncheon recess was had.)

13:25:53  25          TUESDAY SESSION, MAY 1, 2018, AT 1:25 P.M.

Young - Direct/Thompson

1    THE COURT:  Mr. Thompson.

2    MR. THOMPSON:  Your Honor, the Defense calls

3  Dr. Thomas Young.

4    THE COURT:  Please be sworn.

13:42:08  5    DEPUTY CLERK:  Would you raise your right

6  hand, please.

7    THOMAS YOUNG,

8    of lawful age, a witness called by the DEFENSE,

9    being first duly sworn, was examined

13:42:17 10    and testified as follows:

11    DIRECT EXAMINATION OF THOMAS YOUNG

12  BY MR. THOMPSON:

13    THE COURT:  When you're ready, Mr. Thompson.

14  **Q.**    Good afternoon, your Honor.  Good afternoon, Doctor.

13:42:31 15    Could you introduce yourself to the jury and spell

16  your last name for the record?

17  **A.**    My name is Thomas William Young, Y-O-U-N-G.

18  **Q.**    And you are a forensic pathologist?

19  **A.**    I'm a forensic pathologist.

13:42:47 20  **Q.**    Okay.

21    And you've been retained by the Defense to offer

22  expert opinions regarding the death of Jacob Castro-White

23  and the investigation thereof?

24  **A.**    Yes, sir.

13:43:00 25  **Q.**    All right.  Before we get into that, let's talk about

1      who you are.

2          Let's go through your credentials starting with

3      medical school if you would.

4      A.    I'm a medical doctor.  I graduated from medical school

13:43:15  5    at Loma University School of Medicine in southern California

6      back in 1980.

7          I did a residency in anatomic and clinical pathology

8      at the Loma University Medical Center for four years.  And

9      then following active duty service in the United States Air

13:43:39 10   Force for three and a half years, I traveled to Atlanta and

11     did a one-year fellowship in forensics pathology at the

12     Office of the Fulton County Medical Examiner in Atlanta,

13     Georgia.

14     Q.    Are you board certified?

13:43:53 15   A.    I am certified by the American Board of Pathology in

16     anatomic clinical and forensic pathology.

17     Q.    Thank you.  When did you get those certifications?

18     A.    I did the combined anatomic and clinical pathology

19     certification in 1985 and the forensic pathology sub

13:44:13 20   specialty certification in 1989.

21     Q.    Did you work for the -- let's talk about where you've

22     been employed as a pathologist.  Starting with Atlanta, sir.

23     A.    Following my fellowship, I remained in Atlanta for

24     seven years as an associate medical examiner for Fulton

13:44:37 25   County, which is mostly Atlanta, Georgia.  And I also served

1    as a medical examiner for the Division of Forensic Sciences

2    Bureau of Investigation.

3    **Q.**    Did you subsequently work anywhere else?

4    **A.**    In 1995, I accepted the position of Jackson County

13:44:56 5    Medical Examiner, which was essentially the Chief Medical

6    Examiner position in Kansas City, Missouri.  And I also

7    served as the Medical Examiner for several counties in the

8    metropolitan Kansas city area on the Missouri side of the

9    state line.

13:45:16 10   **Q.**    And how long were you there?

11   **A.**    I served in that position for 11 and a half years from

12   1995 to 2006.

13   **Q.**    Subsequent to that, tell the jury what you've been

14   doing.

13:45:31 15   **A.**    At the beginning of 2007, I am a forensic pathology

16   consultant.  I started a business called Heartland Forensic

17   Pathology, LLC.  And I've been doing that since 2007.

18   **Q.**    Have you performed autopsies?

19   **A.**    I have.

13:45:51 20   **Q.**    Can you estimate how many?

21   **A.**    About 5400.

22   **Q.**    And did those include cause of death determinations?

23   **A.**    Yes, sir.

24   **Q.**    And some -- roughly how many of those included a cause

13:46:07 25   of death determination?

Young - Direct/Thompson

1    **A.**    Usually medical examiner autopsies, which are the

2    great majority of the autopsies I've done, they basically

3    involved determinations for cause and manner of death.

4    **Q.**    Okay.

5          How many times -- have you testified as an expert

6    before?

7    **A.**    I have.

8    **Q.**    And as an expert in forensic pathology?

9    **A.**    Yes, sir.

10   **Q.**    How many times?

11   **A.**    About 460 times.

12   **Q.**    Okay.

13   **A.**    In court.

14   **Q.**    Has that been in state court, federal court or both?

15   **A.**    Both.

16   **Q.**    So our office hired you to consult and assist in this

17   case.  Let's start with -- what is a forensic pathologist?

18   **A.**    A forensic pathologist is a practice of forensic

19   pathology.  Pathology is the study of disease.  Forensic

20   pathology is the application of that study of disease to the

21   courtroom setting.

22          Forensic basically means debate.  And so forensic

23   pathologists, rather than practicing in a hospital patient

24   care setting, practice in a situation in which there's a

25   matter of law that's involved, such as this venue here.

1    **Q.** And our office, as I indicated, hired you. We've

2    heard testimony regarding the Government's experts and how

3    and manner in which they were paid for their work.

4         Can you indicate how much have you charged us and how

13:47:51 5    do you charge us?

6    **A.** I bill for my time at a rate of $300 per hour. In

7    this case, so far I've put in a little more than 70 hours.

8    **Q.** Okay.

9    **A.** So with $300 per hour, that's already $21,000.

13:48:08 10   **Q.** Now, in preparation for giving the opinions that

11   you've -- have you produced reports in this case?

12   **A.** I did.

13   **Q.** Okay.

14        And in preparing those reports and preparing to

13:48:23 15   testify, you reviewed some materials in connection with this

16   case?

17   **A.** Yes, sir.

18   **Q.** Can you let the jury know what you've reviewed?

19   **A.** I read documents from the Lorain police department,

13:48:36 20   the toxicology report from AIT Laboratories, the death

21   certificate of Jacob Tyler Castro-White, completed by

22   Coroner Stephen B. Evans, the Coroner's Report, the

23   laboratory report for -- from the Lorain County Crime Drug

24   Lab, and I also had an opportunity to look at multiple

13:49:01 25   photographs of the scene of death with the body present.

Young - Direct/Thompson

1  **Q.**   I want to just identify a couple of exhibits for the

2  record.  Exhibit SS-1 -- I'm sorry.  SS.  And then it's Page

3  1 through completion of the document.

4       Do you recognize this as a copy of your curriculum --

5  I never know how to pronounce that -- vitae, maybe?

6  **A.**   Yes, sir.

7  **Q.**   Exhibit -- Defendant's Exhibit WW, and again the 17

8  just indicates the Page Number, do you recognize that as the

9  first report you produced in connection with your work in

10 this case?

11 **A.**   Yes, sir.

12 **Q.**   And Exhibit II, you recognize that as the second

13 report you produced in connection with this case?

14 **A.**   Yes, sir.

15 **Q.**   Can you indicate whether you agree with Dr. Evans'

16 conclusion as to cause and manner of death in this case?

17 **A.**   There's a problem.  In order to be able to do an

18 investigation of the death of a suspected drug intoxication,

19 you need to do an autopsy.  Dr. Evans did not have an

20 autopsy performed.  He rendered an opinion for manner and

21 cause of death, but in my opinion, that determination did

22 not have sufficient data to be able to make that kind of

23 call.

24 **Q.**   Can you explain -- we've been using the term

25 "autopsy."  Could you explain to the jury what -- what is an

1    autopsy?  What does it entail?

2    **A.**    An autopsy is a systematic examination of a dead

3    person in order to see what evidence of disease and injury

4    there is on the outside and inside of the body and also as

13:51:07  5    an important part of doing a death investigation of which

6    cause and manner of death are determined.

7    **Q.**    Are autopsies necessary in cases of suspected drug

8    overdose?

9    **A.**    They are.

13:51:23  10   **Q.**    Can you explain to the jury why?

11   **A.**    One of the problems here has to do with drug levels,

12   doing toxicology.  In other words, taking a sample of blood

13   and measuring an amount.  It might be simple to say hm, this

14   is a high amount of drug, maybe you can look at a particular

13:51:50  15   chart or table and say that that's an amount that would lead

16   to death.  But, the problem is that doing toxicology,

17   measuring drug levels in dead bodies is problematic because

18   there are a lot of situations in which what you're seeing in

19   that dead body as far as a drug level does not reflect what

13:52:13  20   was in the body at the time of death.

21        As such, you can't just rely on a level of drug.  In a

22   drug intoxication death, you have to find out as much

23   information as you can.  And then having found all that

24   information, infer to what you consider the most plausible

13:52:37  25   explanation for the death.  Just simply looking at a level

1      of drug in the blood -- for instance, there are too many

2      problems with that.  And it's not reliable.  So this is what

3      you have to do.

4      **Q.**     Now, are you familiar with the National Association of

13:52:54 5   Medical Examiners?

6      **A.**     Yes, sir.

7      **Q.**     Can you explain to the jury what that association is

8      and what they do?

9      **A.**     The National Association of Medical Examiners is an

13:53:07 10  organization of forensic pathologies.  I'm a member and even

11     a fellow of the Fellow Association of Medical Examiners.

12     They've been in existence since 1966.  One of the major

13     functions of this organization is to provide guidance and

14     support for coroners, pathologists, and medical examiners

13:53:33 15  throughout the United States.

16     **Q.**     Okay.

17            Have they issued standards indicating their position

18     on when autopsies are really -- really must be performed by

19     investigating Coroners or investigating medical examiners?

13:53:53 20  **A.**     Okay.

21            First of all, a standard is basically what they would

22     recommend as the minimum that needs to be done in a case.

23     Any time any organization gets together and puts out

24     standards, they're not telling you that this is the most to

13:54:08 25  be done.  They're telling you that this is the least that

Young - Direct/Thompson

1    they -- that should be done.

2          Forensic autopsy standards, which are basically

3    promulgated by the National Association of Medical

4    Examiners, Standard B3.7 says in any kind of death from a

13:54:27  5    suspected drug intoxication, an autopsy should be performed.

6    **Q.**    Sir, let me just show you what's been previously

7    marked as Defendant's Exhibit PP.  Do you recognize that as

8    the forensic autopsy performance standards put out by the

9    National Association of Medical Examiners to which you were

13:54:45 10    just referring?

11    **A.**    Yes, that's the cover page of it.

12    **Q.**    Okay.

13          And then I'm going to turn now to Page 9 of the

14    exhibit, and this is Standard B3, and it's titled Selected

13:55:03 15    Death -- Selecting Deaths Requiring Forensic Autopsies; is

16    that correct?

17    **A.**    Yes, sir.

18    **Q.**    Is this the section to which you were referring?

19    **A.**    Yes, sir.

13:55:11 20    **Q.**    And does it indicate that for the categories listed,

21    B3.1 through 3.13, that the public interest is so compelling

22    that, quote, "One must always assume that the question --

23    that questions will arise that require information

24    obtainable only by forensic autopsy"?

13:55:37 25    **A.**    Okay.  I'm not -- I'm not clear on what you're asking.

Young - Direct/Thompson

**Q.**    I apologize.  Could you explain which section again
you were referring to when you testified a moment ago about
how this standard applies to forensic autopsies in cases of
suspected drug overdose?

**A.**    Okay.

The page which the ladies and gentlemen of the jury
are looking at pertains to forensic autopsies.  Standard B3
is titled Selecting Deaths Requiring Forensic Autopsies.
And then it says further down, it says, "The forensic
pathologist shall perform forensic autopsy when," and then
look down to B3.7 where it states, "The death is by apparent
intoxication by alcohol, drugs, or poison, unless a
significant interval has passed and the medical findings in
absence of trauma are well-documented."

**Q.**    And so these standards would suggest what or would
require what with regard to the investigation into the cause
of death for Jacob Castro-White?

**A.**    Jacob Castro-White, the situation in which he's found,
it clearly is suspicious for a drug death.  And as such, it
would require a forensic autopsy.

**Q.**    Now, has the National Association of Medical Examiners
put out a position paper regarding investigation of deaths
related to opioids specifically?

**A.**    Yes, sir.

**Q.**    Okay.

Young - Direct/Thompson

1    Showing you what's been marked as Defendant's Exhibit

2    QQ, are these xeroxed pages from that position paper?

3    **A.**    They are.

4    **Q.**    Okay.

13:57:30  5    Can you indicate to the jury what this position paper

6    indicates with regard to investigation of a death like Jacob

7    Castro-White?

8    **A.**    Well, in this position paper, in which there's one

9    author who is Dr. Gregory Davis, but then members of the

13:57:53 10    National Association of Medical Examiners and the American

11    College of Medical Toxicology brought together experts to

12    review this paper, and these are what would be called

13    evidence-based recommendations, having to do with

14    investigation of opioid-related deaths.  There are several

13:58:16 15    items there that are listed in the abstract, but the very

16    first one states, "A complete autopsy is necessary for

17    optimal indication of toxicology results, which must also be

18    considered in the context of the circumstances surrounding

19    death, medical history, and seen findings."

13:58:38 20    **Q.**    Okay.

21    So if I understood that correctly, what this panel of

22    experts from both toxicologists and -- or toxicology and

23    pathology, the first among their findings is that a complete

24    autopsy is necessary?

13:59:01 25    **A.**    Yes.

Young - Direct/Thompson

1    **Q.**    Is that right?

2    **A.**    That is correct.

3    **Q.**    All right.

4         And that's for cases like this, lake the situation

13:59:07  5    that we are presented with?

6    **A.**    Yes, sir.

7    **Q.**    Okay.

8         I want to discuss some of the -- some of the evidence

9    that you reviewed, some of the different things related to

13:59:35  10   Mr. Castro-White as he was found.  Okay?

11   **A.**    Yes, sir.

12   **Q.**    First, there's been testimony about rigor mortis.

13   Could you just explain briefly what rigor mortis is?

14   **A.**    When a person dies, over the passage of time, there

13:59:53  15   are several kinds of changes that occur in the body that are

16   typical for dead people.  One of those changes is a

17   stiffening of the muscles, which basically gradually appears

18   over a period of time.  And then as further time passes and

19   decomposition of the body sets in, it will disappear.

14:00:14  20        Rigor mortis is the term, it's a Latin term that has

21   to do with the stiffening of the muscle of the dead body

22   after death.

23   **Q.**    Is it possible to determine how long it took rigor

24   mortis to set in, in this or any case?

14:00:33  25   **A.**    It is problematic.  And the reason why is just like

1    you may have learned in high school chemistry, temperature

2    is an important variable for how rapidly a chemical reaction

3    can take place.  And what happens in rigor mortis is

4    essentially chemical reactions.  So if the environment is

14:00:55 5    hot, the stiffening comes and goes rapidly, relatively

6    rapidly.  If the temperature is cold, the onset of the

7    stiffening may not even occur.  And so there are -- there

8    are several issues that are involved in how rapidly the

9    stiffening comes and goes.  Temperature is one of them.

14:01:21 10   Ambient air current is another one.  How muscular and how

11   built the body is is another factor that may have an impact.

12        The presence of certain kinds of drugs may have an

13   impact.  How active the person was prior to death may have

14   an impact as well.

14:01:36 15   Q.    You recall from the photos you looked at, that there

16   was a condition called livor mortis?

17   A.    Yes, sir.

18   Q.    Was that present in this case?

19   A.    It was.

14:01:50 20   Q.    Can you explain to the jury what that term means?

21   A.    Our blood is contained -- contains red cells, which

22   give the blood a red color.  And what happens here, if

23   the -- if the heart is no longer beating, such as what

24   occurs in death, then those red blood cells will basically

14:02:15 25   settle with gravity, just like if you were to have a glass

Young - Direct/Thompson

1　　of grape juice sitting on your counter and let it sit there.

2　　Over time, the grape fibers will settle and it will be dark

3　　around the bottom, and it will be clear on the top.

4　　　　Well, the same happens in a dead person.  The red

14:02:35 5　　cells, over time, will settle with gravity so that the

6　　lowest portions of the body will get a deep red color, and

7　　the upper portions of the body will have an a pale color.

8　　That deep red color is called lividity or livor mortis.

9　　**Q.**　　Doctor, is it possible to tell exactly how long that

14:02:59 10　　process took in a particular case?

11　　**A.**　　That's also problematic, too, because there are many

12　　variables that will depend on how quickly the livor mortis

13　　will take place.  One of them is what his hemoglobin is.  Is

14　　he anemic?  If the person is anemic, you may not see the

14:03:20 15　　livor mortis that soon.

16　　　　Temperature is also another factor that will cause it

17　　to speed up and slow down.  And also whether the lividity

18　　becomes fixed in a position, which means that if you were to

19　　push your thumb against the skin, rather than blanching

14:03:38 20　　pale, but it actually doesn't change color, that also is

21　　affected by the passage of time as well.

22　　**Q.**　　Okay.

23　　　　I want to direct your attention to the evidence and

24　　the testimony regarding a foam cone in this case.  Could you

14:03:56 25　　explain to the jury what a foam cone is?

Young - Direct/Thompson

1    **A.**    A foam cone is basically when you see in a dead body

2    that there is a white -- a whitish or reddish whitish foam

3    that comes out of the nose and mouth, it basically means

4    there is pulmonary edema.  Pulmonary means lung.  Edema

5    means water.  Fluid-filled, water-filled lungs basically are

6    pulmonary edema.

7         Now, the lungs have air tubes go into them.  But, they

8    have basically finely divided air sacs, little tiny air

9    sacs.  They're called alveoli.  And in the alveoli is where

10    the passage of oxygen and carbon dioxide take place between

11    the blood stream and the air in the lungs.

12         Because these tiny sacks are so tiny, if there is

13    excess fluid that gets into those tiny air sacs over time,

14    those tiny air sacs are reflected in the very, very fine

15    foam that basically over time will bubble up into the

16    airwaves, will go out of the bronchi and trachea and out of

17    the mouth and out of the nose passages, and will show up as

18    a foam.

19    **Q.**    Have you seen a foam cone in any of your 5,000

20    autopsies you've performed?

21    **A.**    Many times, yes.

22    **Q.**    Okay.  Is it specific to cases of drug overdose?

23    **A.**    It is not.

24    **Q.**    Can you tell the jury what other causes of death,

25    problems at the time of death can lead to pulmonary edema

Young - Direct/Thompson

1    and production of a foam cone?

2    **A.**    A wide variety of deaths that cause pulmonary edema,

3    there are many kinds of deaths that will cause pulmonary

4    edema.  If a person basically dies as a result of a fire,

5    one of the things you may see is a foam cone.  If a person

6    drowns, you may see a foam cone.

7        If a person has a head injury or he has a stroke or

8    some kind of -- something going on inside the head, that's

9    devastating, you can see a foam cone.  If the heart fails,

10   the pumping of the heart is too weak, then you can get

11   pulmonary edema and you can get a foam cone.

12   **Q.**    Okay.  So any of those different things could also

13   cause a foam cone?

14   **A.**    Yes, sir.

15   **Q.**    Is it possible to look at a foam cone and say well

16   that's definitely a foam cone that was produced by a drug

17   overdose but not a stroke or not a heart problem?

18   **A.**    No, sir.  It all looks the same.

19   **Q.**    Okay.  I want to talk about the toxicology results.

20   Just briefly.

21       You reviewed the toxicology results as well as the

22   other documents?

23   **A.**    Yes, sir.

24   **Q.**    And in addition to the problems in identifying the

25   fentanyl level at the time of death that we previously

Young - Direct/Thompson

1    discussed and you referenced a moment ago, I'm going to ask

2    you whether it's possible that other opiates were present at

3    the time of death but did not show up in the toxicology

4    results?

14:07:41  5    **A.**    That could happen in this death.

6    **Q.**    Explain to the jury how.

7    **A.**    The presence of a foam cone in a narcotic or an opioid

8    death indicates that the death did not occur all at once but

9    took place over minutes to hours.  When a person basically

14:08:08 10    has a narcotic and it impairs the person's ability to

11    breathe and they start breathing slower and more and more

12    shallow, the lung -- the heart continues to pump the blood

13    through the lungs, but because there's less air and less air

14    movement in the lungs, then you start getting the pulmonary

14:08:30 15    edema, and it can start to develop over time and start to

16    percolate up the air waves and out the nose and the mouth.

17    That takes time.

18        In an opioid death, what can happen is a person may

19    not die right away but they may go into a coma, where they

14:08:47 20    basically become less and less responsive.  The heart rate

21    with very, very little oxygen, starts to get slower and

22    slower and slower and eventually stops.  But that may take

23    awhile.

24        So what can happen is that during this long while,

14:09:07 25    even though somebody may have drugs in the system,

1    sufficient to cause that kind of problem, by the time the

2    death occurs, the drug level has already been metabolized

3    down and eliminated through the urine.  So one of the

4    surprising things to see in a case like this is basically

14:09:27 5    where you have somebody that has always findings that

6    indicate a drug overdose.  But, then you find levels of the

7    drug that are very low, and even potentially may not even be

8    there, depending on how long it takes the body to eliminate

9    the drug.

14:09:42 10   Q.    I'd like to talk just very briefly about anabolic

11   steroids, specifically.  Some of the health problems that

12   could be caused by anabolic steroids, heart related,

13   neurological, or brain-related problems, could you explain

14   those to the jury?

14:10:07 15   A.    Somebody who uses anabolic steroids, maybe a body

16   builder, frequently body builders or other athletes can have

17   numerous side effects, and these have been well documented

18   and well explained.

19        In this particular case, of course, with the foam cone

14:10:27 20   and the situation in which he's found, you have to wonder

21   what kind of impact could it have had on his brain or his

22   heart because those would be two organs that I've mentioned

23   here that might involve the formation of a foam cone.

24        One of the complications of steroid use, anabolic

14:10:47 25   steroid use is having a stroke or a hemorrhage in the head.

1    This kind of thing can set up a situation where a person

2    breathes shallow or doesn't breathe very much and go into a

3    coma, like a narcotic would be causing a coma.  Same thing

4    can happen after a stroke and it may lead to a foam cone.

14:11:09 5    There are also certain conditions that might have

6    gotten -- become worse as a result of anabolic steroid use.

7    One particular article that I looked at talked about the

8    inherited condition called Arrhythmogenic Right Ventricular

9    Cardiomyopathy.  Fancy name, but it's basically an inherited

14:11:33 10    heart problem.

11    Well, apparently, for some reason, people who use

12    anabolic steroids, it really has a major impact on heart

13    function, not only causing it to perhaps have an abnormal

14    rhythm but even for the heart muscle to pump slower and

14:11:50 15    weaker, which could also lead to a pulmonary edema and could

16    lead to a foam cone.

17    **Q.**    Now before any of these problems became acute, the

18    problems you just referenced, would the person otherwise

19    appear to be healthy as an ox or strong as a bull?

14:12:05 20    **A.**    Well, sure.  People who are using anabolic steroids

21    are usually trying to become bulky and build up, maybe even

22    get in a body building contest.  And so appearance is very,

23    very important, you know, how bulky they look, how muscular

24    they look.  But just because somebody looks bulky muscular

14:12:29 25    doesn't mean they're in good health, and certainly having

Young - Direct/Thompson

1    anabolic steroids, which are basically outlawed in a lot of

2    these body building contests, is to prevent people from

3    harming their health during the contest.

4    Q.   And to tie this together and wrap it up, are those

5    kinds of hidden problems exactly why autopsies are required

6    in cases like this?

7    A.   There are several reasons why autopsies are required

8    and some of them, we haven't even touched on.

9         One of them is that -- there may be other conditions

10   that could lead to the findings you might see at the scene.

11   Another thing is just the unreliability of any particular

12   drug level that you might draw.  I happen to be sitting in

13   the courtroom when there was testimony about a phenomenon

14   called post-mortem redistribution; particularly of fentanyl.

15   And the ladies and gentlemen of the jury might recall that

16   discussion.

17        What can happen -- well, let me state that if a person

18   is living, the body regulates things in a very, very close

19   and precise way.  It's got a very, very organized

20   functioning.  You know, the drug is absorbed and then the

21   drug is eliminated, and it happens in a fairly systematic

22   way.  But, what can happen after death is chaos.  Basically,

23   you don't have that fine tuning of drug levels anymore.

24   Instead, you've got membrane breakdown and you've got

25   changes in the acid level of the blood and the tissues, and

1    drugs that may have been deposited into other tissues and

2    cells may start to leak.

3        And so you may, over time, in a dead person, may start

4    to get an increase in a drug level.  That's called

5    post-mortem redistribution.  And according to some of the

6    literature that was demonstrated to the ladies and gentlemen

7    of the jury, fentanyl is a particular problem with

8    post-mortem redistribution; particularly, femoral blood

9    levels.

10       Now frequently, you hope to avoid it because you're

11   trying to get away from blood that's near the heart or the

12   lungs or the stomach or the liver, thinking that you don't

13   want the drug to leak in from these other areas.  And you'd

14   think the femoral blood would be far enough away there

15   wouldn't be problems, but some of the research has

16   demonstrated that with femoral levels on fentanyl, that

17   isn't the problem.  Apparently these things are deposited in

18   muscle and fat tissue.  And these drug levels are just

19   starting to up and up and up.  It's because of these sorts

20   of things that you have to get as much information as

21   possible before you can even interpret a fentanyl level

22   drawn from the femoral artery.

23   Q.   And getting that kind of additional information

24   includes getting an autopsy, performing an autopsy?

25   A.   Includes getting an autopsy.  And one more thing about

1    the autopsy.  At the time of autopsy, you can also sample

2    from the brain and from the liver, and if you have a

3    particular level that looks high, you can say well let's

4    double check this.

14:15:50  5         With a liver level or with a brain level, which may

6    not be as susceptible to post-mortem redistribution, which

7    in the literature has mostly to do with blood.  So you can

8    use these other sorts of things to double check it.  But in

9    order to be able to get brain and to get liver, you've got

14:16:08 10    to have an autopsy.

11   **Q.**    Without an autopsy in this case, can a cause of death

12   be determined?

13   **A.**    In my opinion, no.

14   **Q.**    Okay.

14:16:24 15   **A.**    This is the reason why it's a standard.  All right?

16         A lot of times, professional organizations will put

17   out standards because people who are doing the job might

18   think well, this is self-evident, you know.  You've got

19   somebody who looks like he's a drug death, and you do a drug

14:16:42 20   level, and he's got a high level of fentanyl and, therefore,

21   this is obviously a fentanyl overdose.  You don't need an

22   autopsy.

23         It's for these kinds of reasons that organizations,

24   like the National Association of Medical Examiners or the

14:16:55 25   Society of Clinical Toxicologists, say no, hold your horses,

1    slow down here.  Lots of problems you may not have thought

2    about.  It may not even have entered your mind what's going

3    on in this case.  And you need to do a thorough examination.

4    You need to do an autopsy.

5        And that's why standards like this exist.  They're to

6    educate.

7                  MR. THOMPSON:  One moment, sir.

8            (Counsel conferring.)

9                  MR. THOMPSON:  Thank you.  Nothing further.

10                 THE COURT:  Thank you, Mr. Thompson.

11   Mr. Katsaros.

12                 MR. KATSAROS:  Thank you, your Honor.

13                 CROSS-EXAMINATION OF THOMAS YOUNG

14   BY MR. KATSAROS:

15   **Q.**   Good afternoon, Dr. Young.

16   **A.**   Good afternoon.

17   **Q.**   Is it fair to say that your practice at Heartland

18   Forensics is mainly focused on testifying as an expert for

19   the Defense over the last ten years?

20   **A.**   In cases that are criminal cases, yes, that would be

21   accurate.

22   **Q.**   Okay.

23   **A.**   In other kinds of cases, no.

24   **Q.**   In criminal cases over the last ten years, have you

25   always testified for the Defense in these cases?

Young - Cross/Katsaros

| | | |
|---|---|---|
| 1 | **A.** | Yes. |
| 2 | **Q.** | Okay. |
| 3 | | And you're well paid to do that, correct? |
| 4 | **A.** | Yes. |

14:19:26  5  **Q.**   Now you said obviously you're a medical examiner in

6  Missouri for approximately ten years, correct?

7  **A.**   Eleven and a half years.

8  **Q.**   Did you do scene investigations when you were a

9  medical examiner in Missouri at that time?

14:19:44 10  **A.**   In some situations, I did, but in those situations, I

11  had under my employ a medical examiner investigator that

12  would go to the scenes, document what they saw, and even

13  photograph them.

14  **Q.**   Well, how many scenes have you been to?

14:19:59 15  **A.**   Several hundred.

16  **Q.**   And scenes relevant to drug overdose deaths?

17  **A.**   Yes, sir.

18  **Q.**   How many?

19  **A.**   I don't know.

14:20:08 20  **Q.**   How many scenes have you been to relative to a drug

21  overdose death?

22  **A.**   Probably in the -- maybe around 50.

23  **Q.**   So -- and what did you do when you went to those

24  scenes?

14:20:22 25  **A.**   Usually what I do is I'm accompanied by a medical

Young - Cross/Katsaros

1    examiner investigator, and my job is just to keep my mouth

2    shut and my hands in my pockets, just watch what -- what's

3    going.

4    **Q.**    So do you take photographs?

14:20:38  5    **A.**    I don't, the investigator does.

6    **Q.**    Do you talk to the police Detectives at the scene to

7    see what they located or any drugs?

8    **A.**    I don't talk to anybody.  I keep my mouth shut and my

9    hands in my pockets.

14:20:49 10    **Q.**    Would you agree with me that scene investigations are

11    integrally important in these overdose situations?

12    **A.**    Sure.

13    **Q.**    Okay.

14        You sort of gave the impression to the jury, and I

14:21:01 15    don't know if you did, that basically, Dr. Evans looked at

16    this blood level that he saw in the fentanyl and said oh, we

17    got an overdose death.  Is that what you're saying to this

18    jury?

19    **A.**    No, Dr. Evans didn't just look at the drug level.  He

14:21:14 20    looked at several things.

21    **Q.**    So there are several factors, would you not agree with

22    me, that go into a determination as to cause of death, it's

23    not just based upon blood level, right?

24    **A.**    I think that's fair, yes.

14:21:25 25    **Q.**    Not just based upon the scene, right?

1  **A.**   Correct.

2  **Q.**   It's not just simply based on the medical history of

3  the victim, right?

4  **A.**   That's fair.

14:21:33 5  **Q.**   You have to look at everything, a multitude of

6  factors?

7  **A.**   That's fair.

8  **Q.**   Okay.

9      When was the last time you were at an overdose scene?

14:21:42 10  How long ago was that?

11  **A.**   It's probably been maybe about 15 years.

12  **Q.**   Okay.  When was the last time you did an autopsy?

13  **A.**   2011.

14  **Q.**   And that was in relation to what?  Were you working

14:21:58 15  for a medical examiner or what was that for?

16  **A.**   Well, under my self-employment at Heartland Forensic

17  Pathology, LLC, I would be on occasion asked to do an

18  autopsy, either a second autopsy or a first autopsy, and I

19  would do that on occasion.

14:22:19 20  **Q.**   You heard Dr. Evans testify, correct?

21  **A.**   I did.

22  **Q.**   You've heard of his -- I guess I would characterize it

23  as practical experience dealing with overdose scenes,

24  overdosed patients; you heard that testimony, right?

14:22:34 25  **A.**   I did hear that testimony.

Young - Cross/Katsaros

**Q.**    You think that's an important factor in a medical

professional determination cause of death; namely, as it

relates to drug overdoses?

**A.**    In a situation where you're doing something, and

14:22:51  you're drawing a conclusion without doing a thorough

examination, experience can be misleading because it could

basically be making the same mistake over and over again.

**Q.**    Yeah, but he talked about the thousands of patients,

right, that he had treated in the ER through overdoses,

14:23:09  right?  He talked about the hundreds of scenes that he had

been to relevant to drug overdoses.  You heard that

testimony, right?

**A.**    Yes, sir.

**Q.**    Have you ever treated a live patient before?

14:23:20  **A.**    Yes.

**Q.**    When?

**A.**    Back in the 1980s in the Air Force.

**Q.**    So the last time you've ever seen a live patient was

in 1980, correct?

14:23:29  **A.**    It's not last time I've ever seen a live patient.

I've seen live patients many times, but as far as doing

medical treatment and care, it would be back in the 1980s in

the Air Force when I was doing hospital pathology.

**Q.**    Have you ever treated an overdose victim?

14:23:46  **A.**    No, sir.

Young - Cross/Katsaros

**Q.**    Okay.

So you have no practical experience dealing with an overdose victim coming into the hospital, correct?

**A.**    That would be fair, yes.

14:23:58    **Q.**    You're aware he also has on his staff Dr. Miller, who's been a clinical pathologist for 30 some odd years, correct?

**A.**    Yes.

**Q.**    And when you looked at these cases when you were the medical examiner, you discussed them with other individuals in your office, don't you?

**A.**    Yes.

**Q.**    To make determinations in terms of whether you're going to do certain things or not do certain things, correct?

**A.**    Correct.

**Q.**    Is it your testimony that the only way to determine cause of death in any case is through an autopsy?

**A.**    That's not my testimony.

14:24:28    **Q.**    Okay.

So there are circumstances, would you agree, that we don't need to do an autopsy?

**A.**    That's fair, yes.

**Q.**    If I'm standing in the street and I've got an ax, there's a witness I clocked somebody over the head and the

Young - Cross/Katsaros

1    ax is sticking in his head, you don't need an autopsy for

2    that, do we?

3    **A.**    Actually you would need an autopsy in that case.

4    **Q.**    We would?

14:24:46  5    **A.**    Yes.

6    **Q.**    Okay.

7    **A.**    Because it's a case where it's alleged homicide and

8    it's going to court.  Because of the type of testimony that

9    you would have, that -- that would be the sort of case that

14:24:58 10  an autopsy would be needed.

11   **Q.**    So what are you saying; any time there's a criminal, I

12   guess potential for criminal, that an autopsy is required?

13   **A.**    That would be fair, yes.  In a drug situation here, if

14   the person has been in the hospital for a long time, you

14:25:15 15  might not learn that much from an autopsy.  But, even so,

16   even in a case like that, if it's going to court, it's going

17   to be tried in court, we would automatically autopsy that.

18   **Q.**    Is it fair to say that the way forensic pathologists

19   look at cases and the way doctors look at patients is

14:25:38 20  different?

21               THE COURT:  They're both -- they're both

22   doctors.

23   **Q.**    I'm sorry.  Well, treating medical physicians and

24   clinical pathologists, you look at cases different, correct?

14:25:51 25  **A.**    Well, the two situations are not alike.  One is

1    medical care in which you're trying to decide how you're

2    going to treat somebody's illness to make them better.  In

3    the forensic situation, you're trying to determine what

4    happened and who is responsible for what happened.  These

14:26:08  5    are two different issues, two different situations.  So one

6    doesn't really have that much to do with the other, except

7    for the fact that you're using the same kind of medical

8    education to do both jobs.

9    **Q.**    You're a forensic pathologist, doing autopsy is what

14:26:26 10    you do, right?  That's your job description, right?

11    **A.**    It's not the entire thing of what I do.  Determining

12    cause and manner of death, we're investigating a death is

13    essentially what I do.  But, whether or not an autopsy would

14    be needed or useful is going to depend on the circumstances.

14:26:47 15    **Q.**    So is it your testimony that in death circumstances

16    only a forensic pathologist can make cause determinations as

17    to death?

18    **A.**    I didn't say that.

19    **Q.**    Let me ask you this.  What is the most likely cause of

14:27:06 20    death in this case?

21    **A.**    Well I'm supposed to answer questions to a reasonable

22    degree of certainty, but if I were to basically tell you

23    what my hunch is, my hunch is that it would probably be a

24    drug overdose death involving multiple drugs.

14:27:27 25    **Q.**    Well, why do you say multiple drugs?

Young - Cross/Katsaros

**A.**    Because he's got a foam cone, which basically means that he's -- the passage of time has occurred.  Fentanyl levels, usually fentanyl sticks around in the blood longer than the other drugs that were present, such as heroin or Buprenorphine.  It has a longer half life.  So it's entirely possible that you could still have fentanyl in the system and the other drugs have passed away or passed out of the system into the urine by the time he dies.

**Q.**    What's the -- I mean we all know what fentanyl is, right; 40, anywhere from 100 times stronger than heroin, isn't it?

**A.**    Yes.

**Q.**    Okay.

Has caused hundreds and hundreds of deaths across the country, right?

**A.**    Sure.

**Q.**    When it's used in the lab, how do they handle fentanyl in the lab setting?

**A.**    Well, usually working in a lab setting, because you don't always know what you're doing, you have to use protective personal protective gear.  Okay.

It's -- fentanyl is not the kind of thing that is necessarily as bad as some of the other kinds of opioid drugs that have started to come out now.  But, in any kind of a situation where you're in a laboratory, you've got to

Young - Cross/Katsaros

1    wear personal protective equipment.  Usually gloves, mask,

2    gown.

3    **Q.**    This is different -- I'm talking about illicit

4    fentanyl.  I'm not talking about pharmaceutical fentanyl

14:28:56  5    patches; illicit fentanyl, where usually -- you've done, I

6    take it, research on fentanyl.  Where is this illicit

7    fentanyl being made, if you know?

8    **A.**    Okay.

9          My understanding here about illicit fentanyl is a lot

14:29:09 10    of it's coming from China and making its way into the United

11    States in that fashion.

12    **Q.**    You've heard of people actually OD'ing on airborne

13    fentanyl, haven't you?

14    **A.**    On what?

14:29:21 15    **Q.**    Fentanyl in the air?

16    **A.**    No, I haven't heard that.

17    **Q.**    Okay.

18          You've never heard police officers have become

19    incapacitated or overdosed when executing search warrants

14:29:31 20    from fentanyl?

21    **A.**    Okay.  I haven't heard that, no.

22    **Q.**    Okay.

23          So you say in this particular case, an autopsy is

24    needed, correct?

14:29:43 25    **A.**    Yes.

Young - Cross/Katsaros

1    **Q.**    And that if we had an autopsy, then we would know

2    the -- he would be able, Dr. Evans, to make a determination

3    as to cause of death, correct?

4    **A.**    Okay.

14:29:56  5         One -- it's hard to say what we would know because an

6    autopsy wasn't performed.  So we don't know what it would

7    have uncovered.  But, suffice to say in a situation here in

8    which a case is going to court, for instance, any time that

9    situation occurred, when I was a medical examiner, we

14:30:18  10   autopsied all those cases because there would be the kind of

11   scrutiny, the kind of time that would take place in the

12   analysis of this kind of a case, and so doing an autopsy is

13   important.

14   **Q.**    Are you trying to make a legal and medical opinion in

14:30:34  15  that testimony?

16   **A.**    What I'm talking about --

17   **Q.**    You're not a lawyer, are you?

18   **A.**    No, sir.

19   **Q.**    Okay.

14:30:39  20        Are you trying to say then that in certain cases, that

21   namely in criminal cases, that you have to have an autopsy?

22   **A.**    What I'm trying to say is that as a medical examiner

23   and a forensic pathologist, you have to anticipate how the

24   information that you're going to uncover is going to be

14:30:58  25  used; and certainly if it's a situation that might go to

Young - Cross/Katsaros

1     court, such as the ax scenario that you mentioned right

2     there, that's clearly a case that would enter the legal

3     system.  And so it would behoove the pathologist there to do

4     an autopsy in those kinds of cases.

14:31:17  5     **Q.**     But you don't have to do an autopsy, do you?

6     **A.**     Well, I suppose you could say you don't have to do

7     anything.

8     **Q.**     Well --

9     **A.**     But in a situation where you're trying to provide the

14:31:26  10     best kind of information, especially for an inquiry such as

11     this, an autopsy is fundamental and it's important.

12     **Q.**     Well, autopsies aren't infallible are they?  They're

13     not infallible, right?

14     **A.**     Well, nothing human is infallible.

14:31:43  15     **Q.**     Well you've basically made a career, have you not, in

16     the last ten years, about questioning what other medical

17     examiners have done in their autopsies, haven't you?

18     **A.**     Not entirely true.

19     **Q.**     So you haven't testified in other criminal cases and

14:32:00  20     found, and had differing opinions from other medical

21     examiners relevant to what they found in an autopsy?

22     **A.**     What I've usually found, and this is in most cases if

23     not -- but not all, is that the autopsy has been adequate.

24     The problem is drawing the conclusions from the autopsy

14:32:20  25     findings.  But, at least in many of those cases, an autopsy

Young - Cross/Katsaros

1    was done.  In this case, we don't really know what we've

2    got.  And so this case is a little different.

3    Q.    Yeah, but -- I guess the point I'm trying to make is

4    you go into court all the time and question what the results

14:32:37 5    of an autopsy are, don't you?

6    A.    Okay.  I tried to answer that, but I don't think you

7    understood what I said.

8    Q.    I understood what you said.  I'm --

9    A.    Much of what I find in with regard to the autopsy is

14:32:50 10   good.  They're good autopsies.  The problem, however, is

11   drawing appropriate conclusions from the autopsy findings,

12   which is usually the problem, but in this case, this case is

13   a little different because an autopsy was not even

14   performed.

14:33:04 15   Q.    Let's talk about this particular case then.  Okay?

16   A.    Yes, sir.

17   Q.    You're aware of the age of Jacob Castro-White, the

18   victim in this case, right, according to the --

19   A.    According to the death certificate, he was 23 years of

14:33:20 20   age.

21   Q.    Okay.

22         You're aware, are you not, from the testimony, too,

23   that he was physically active in terms of lifting weights,

24   et cetera?

14:33:38 25   A.    That's my understanding, yes.

Young - Cross/Katsaros

**Q.**    You're also aware, are you not, in terms of medical history, there's no medical history to include any issues regarding cardiomyopathy, any type of epileptic seizures, any type of strokes he's had over the course of his 23 years on this earth, right?

**A.**    Right.

**Q.**    Okay.

So for all intents and purposes, he's a healthy young man, right?

**A.**    Okay.

What you said before is accurate.  No information, no history.  But, in terms of his overall health, we don't know that.  All right?  It's not uncommon at an all to disclose something that didn't come out in prior history.

**Q.**    Well, you're aware -- I mean the Coroner talked to the mom, right?

**A.**    Yes, sir.

**Q.**    Okay.

To get a medical background in terms of the kid was seeing a physician, a treating physician, anything I guess significant in his past medical history, and there wasn't anything.  You're aware of that, right?

**A.**    Yes, sir.

**Q.**    Okay.

Has never had situations where he's had maybe we'll

Young - Cross/Katsaros

1    say fainting spells or fatigue or anything like that?

2    **A.**    Okay.  I don't know about the fainting spells or

3    fatigue.

4    **Q.**    Okay.  Let's talk about your reports.  You did two

14:35:06 5    reports in this case, right?

6    **A.**    Yes, sir.

7    **Q.**    Now, why two reports?

8    **A.**    I did the first report back in April of 2017.  After I

9    looked at the first items that were sent to me, just a

14:35:26 10   little bit after being contacted by Mr. Bryan in February of

11   2017.  The second report I did this last Saturday evening at

12   the request of Mr. Thompson.  He wanted another report.

13   **Q.**    Well, the first report you had everything, right?  You

14   had the AIT Lab toxicology report, the death certificate,

14:35:46 15   the Coroner's report, the laboratory report, the laboratory

16   report from the drug lab in terms of what were found in

17   Mr. Castro-White's room, and you also stated you viewed

18   multiple photographs of his body, right?

19   **A.**    Yes, sir.

14:36:02 20   **Q.**    So you had everything in front of you, and you

21   prepared a report relevant to that, did you not?

22   **A.**    Sure.

23   **Q.**    And in that -- looks -- let's talk about that report.

24         In that report, you say basically, blankly without an

14:36:17 25   autopsy, Dr. Evans would not be able to make an accurate

Young - Cross/Katsaros

1 determination of the cause or manner of death because an

2 autopsy wasn't done, correct?

3 **A.** Right.

4 **Q.** Then you go on to talk about the level of fentanyl in

14:36:28 5 the blood at 9.6 is not that high?

6 **A.** Right.

7 **Q.** And you heard Dr. Evans testify, right?

8 **A.** I did.

9 **Q.** He's reviewed -- he's had hundreds and hundreds of

14:36:42 10 overdose deaths in Lorain County?

11 **A.** Sure.

12 **Q.** And in his opinion, that was extremely high for what

13 he's seen?

14 **A.** I don't agree with him.  It isn't that high.

14:36:53 15 **Q.** Well, how many -- how many toxicology reports have you

16 reviewed over the last 15, 20 years?

17 **A.** I couldn't tell you.

18 **Q.** Well, you're not a medical examiner, correct?  I mean

19 in terms of a practicing medical examiner, right?

14:37:09 20 **A.** Not currently, no.

21 **Q.** Okay.

22 So he has -- does he not have practical knowledge in

23 reference to what he's seen from his County in terms of that

24 level?  You would agree with me about that, wouldn't you?

14:37:23 25 **A.** Well, the problem here is that one can conclude

Young - Cross/Katsaros

1  anything they want to conclude, all right, and if basically

2  one makes up their mind that this is a drug overdose, then

3  they might see something as a 9.6 as being really high, I

4  suppose.  The only problem here is that in living patients,

14:37:42  5  many of them have levels like 9.6, and they're not even

6  unconscious.

7  **Q.**     Aren't most of the cases you're talking about cases

8  dealing with non- illicit fentanyl, the utilization of

9  transdermal patches on patients that are monitored in a

14:37:57  10  hospital setting, aren't most of those studies based upon

11  that?

12  **A.**     I think that that's fair, sure.

13  **Q.**     Okay.

14          So how can you sit here and compare those findings

14:38:08  15  compared to illicit fentanyl taken intravenously?

16  **A.**     Okay.

17          Perhaps the easy way to say this is that fentanyl is

18  fentanyl, regardless of how it entered the body, regardless

19  of whether it was an illicit circumstance or in-patient care

14:38:25  20  circumstances, you have basically a level of fentanyl.  And

21  it's at 9.6 nanograms per milliliter.  Regardless of all the

22  other stuff, if you're simply looking at that level, and the

23  person's basically sitting there and they're talking and

24  they're breathing, and they're awake and alert and have a

14:38:48  25  level of 9.6, then that -- you really can't take a look at

Young - Cross/Katsaros

1     the Number 9.6 say that that is a horribly high level.

2     **Q.**    Well, so you're telling me that the fentanyl that's

3     made in China that comes over here, the illicit fentanyl is

4     the same as the fentanyl that we're giving the patients in

14:39:07 5     the ER, it's the same thing?

6     **A.**    It's the same drug.  Fentanyl is fentanyl.

7     **Q.**    So there's no difference between those two substances?

8     **A.**    It's the same chemistry, same drug.  Maybe it's under

9     different circumstances, maybe they're different roots of

14:39:24 10    administration, but it's still fentanyl.

11     **Q.**    Isn't the route of administration of the drug

12    important, too?

13     **A.**    Well, I'm sure there are all kinds of things that are

14    important but if you're looking at a drug level in trying to

14:39:38 15    take that drug level and declare that that would have had to

16    have been the cause of death, that's problematic.  Fentanyl

17    at 9.6 nanograms per milliliter is really not all that high.

18     **Q.**    Doctor, I'm not saying that that -- we all know that's

19    not the only thing that Dr. Evans looked at.  Can you agree

14:39:56 20    with me on that?

21     **A.**    Well, sure.

22     **Q.**    That's not the determining factor based on his

23    opinion.  Can you agree with me on that?

24     **A.**    I think that's fair, sure.

14:40:06 25    **Q.**    Okay.

1        So he takes the 9.6 and looks at everything else,

2  correct?

3  **A.**    He tries to look at everything else except an autopsy.

4  **Q.**    Well, is it fair to say anything over 3 nanograms per

14:40:24 5  milliliter is considered a legal dose of fentanyl?

6  **A.**    No, that's not fair to say.

7  **Q.**    Okay.

8        So you disagree with what Mr. Shanks said relevant to

9  that?

14:40:33 10  **A.**    Well, what the literature says on that is that they've

11  had certain kinds of cases at 3 nanograms per milliliter

12  that have been fatal.  But, just like I've just mentioned

13  earlier, if a person has basically taken minutes to hours to

14  die, those drug levels can go down to a level like 3, and

14:40:54 15  the person may be dead from that.  Okay.

16        This is the tricky thing about opiate and opioids.

17  Okay.  They may have a really low level and still be the

18  cause of death, depending on the circumstances.  So having a

19  3 nanograms per milliliter level, which is not that high,

14:41:14 20  may still reflect the drug that did cause the coma and the

21  eventual death.

22  **Q.**    So it's fair to say that in each individual person, it

23  really depends upon the person in terms of how much fentanyl

24  can potentially kill them, correct?

14:41:33 25  **A.**    Well, I'm sure there are a lot of variables.

Young - Cross/Katsaros

1  **Q.**    Well, I think the literature talks about 2 nanograms

2  can kill somebody, based upon, I guess, their physical

3  characteristics or their tolerance.  There's no hard and

4  fast rule, correct?

14:41:49  5  **A.**    Well, yeah.  Just as I mentioned here before, they may

6  have had a higher level at an earlier time, but by the time

7  they die, it may have gone down to 2 nanograms per

8  milliliter.

9  **Q.**    Let's talk about post-mortem redistribution.  We've

14:42:04 10  had a lot of talk about that, right?

11  **A.**    Yes, sir.

12  **Q.**    In terms of the way the Coroner handled the blood

13  draw, they took it from the correct site, correct; they took

14  it from the femoral vein?

14:42:13 15  **A.**    Well, usually you don't know if it's the artery or the

16  vein.  That's basically a stick in the groin.  Okay.  And if

17  you get blood, then you call it a femoral stick.  So you

18  don't know if it's the artery or the vein.

19  **Q.**    Well they took -- Dr. Evans testified that they took

14:42:29 20  it from a femoral site, correct?

21  **A.**    Yeah, that's fair.

22  **Q.**    Okay.  And is that the best place to take a sample for

23  purposes of limiting post-mortem redistribution?

24  **A.**    Not in the case of fentanyl.  One of the amazing

14:42:42 25  things here is with fentanyl, the post-mortem redistribution

Young - Cross/Katsaros

1    happens to be worse with the femoral stick than even with

2    heart blood.

3    Q.    And where have you read that?

4    A.    That was presented earlier in earlier testimony here,

14:43:02 5    Mr. Thompson saying that.

6    Q.    So you're saying --

7    A.    Excuse me, sir.  Let me finish.

8              THE COURT:  Let him finish.

9              THE WITNESS:  Mr. Thompson presented several

14:43:10 10    exhibits here, which were shown to the toxicologist.  I

11    happen to be here when he was testifying.  And if you look

12    at the data and you look at the charts in those cases, the

13    femoral blood had worse post-mortem redistribution problems

14    than the heart blood in these cases.

14:43:24 15    Q.    But those cases dealt with pharmaceutical fentanyl,

16    didn't they?  They dealt with fentanyl patches; they didn't

17    deal with illicit fentanyl, did they?

18    A.    Well, I don't know.  Okay.  They were dealing with

19    drug deaths from fentanyl?  I imagine they could have been

14:43:39 20    several different things.  Much of -- much of the problems

21    we've had here with illicit fentanyl have been basically

22    from about 2010, 2011, and the articles have basically come

23    out around that time, some of those articles, and even after

24    that.  So many of those cases may have been from illicit

14:43:58 25    fentanyl.

Young - Cross/Katsaros

**Q.**    I read the articles.  Did you read the articles?

**A.**    Yes, sir.

**Q.**    Okay.

And the majority of all those studies dealt with prescribed fentanyl, right?

**A.**    That's not my understanding.

**Q.**    Thermal patches on a limited amount of fentanyl patients, right?

**A.**    Not on all of them, no.

**Q.**    Well, we can't go out and really conduct testing, can we, utilizing illicit fentanyl on people?  Can we do that?  That's never done, right?

**A.**    Okay, but that's not what we're talking about here.  This isn't a case in which -- there are cases that are investigated in which there was fentanyl, fentanyl detected.  Okay.  And post-mortem redistribution means that the person died.  All right?

So this is not a situation where you're giving living people illicit fentanyl.  That's not what these studies were about at all.

**Q.**    Is it fair to say, Doctor, that the fentanyl is a significant factor in Jacob Castro-White's death?

**A.**    I don't know.

**Q.**    Well, would fentanyl use impact basically anything?  In other words, let's just assume for argument purposes that

Young - Cross/Katsaros

1  he had a seizure.  Would the use of fentanyl have an impact

2  on him having a seizure?

3  **A.**    Well, he was taking other drugs, too.  He was --

4  **Q.**    That's not my question.

14:45:25 5  **A.**    You're talking about this case, are you not, sir.

6  **Q.**    Assume for my question that he's taken fentanyl.  What

7  effect would that have if he did have a seizure?

8  **A.**    What effect on what?

9  **Q.**    How would it affect -- would the fentanyl help him

14:45:40 10  with the seizure or hurt him with the seizure?

11  **A.**    I don't know.

12  **Q.**    How about if he was having a heart attack; would the

13  use of fentanyl help him or hurt him?

14  **A.**    I don't know.

14:45:52 15  **Q.**    So you don't believe that the use of fentanyl would

16  make any condition he had significantly worse?

17  **A.**    I don't know.

18  **Q.**    You talked about fentanyl is fentanyl.  Are hospitals

19  giving people the fentanyl that is coming from China?

14:46:16 20  **A.**    I would hope not.

21  **Q.**    Why not?

22  **A.**    Because that's -- that's part of the drug trade.

23  That's street drug.  Fentanyl or any kind of medication used

24  in a hospital setting has to be cleared by the Food and Drug

14:46:30 25  Administration, and it has to be appropriate for patient

1    care.

2    **Q.**    So would it be fair to say then fentanyl isn't

3    fentanyl in all cases?

4    **A.**    When it comes to a level or a measurement of a

14:46:46 5    molecule in the blood, then fentanyl is fentanyl.  It's the

6    same molecule.

7    **Q.**    So let's go to your second report, Doctor.

8          And I guess my question relevant to your second report

9    is would you agree with me that relevant to this death

14:47:05 10    scene, that the foam cone on Jacob Castro-White is a

11    significant piece of the puzzle?

12    **A.**    Sure.

13    **Q.**    Okay.

14          So you had all the photographs, you had everything

14:47:18 15    before; yet, there was no mention in your original report

16    about the foam cone.  Agree with me?

17    **A.**    Correct.

18    **Q.**    Okay.

19          Why isn't it in there on the first report, if it's

14:47:29 20    such a significant part of the analysis in this case?

21    **A.**    The photographs basically show him on the ground and

22    there's one photograph in which there's no foam cone.  Then

23    there are later photographs in which a foam cone is

24    developing, and then there's a picture of him on a morgue

14:47:50 25    gurney, in which there's a foam cone.  It looks like from

Young - Cross/Katsaros

| | |
|---|---|
| 1 | the photographs, a lot of the foam cone basically came up at |
| 2 | a later time, which would not be surprising because if |
| 3 | you're moving the body, and you've got the stuff percolating |
| 4 | up, then it could start to come out even at a later time. |
| 14:48:06 5 | **Q.**   Okay. |
| 6 | So it's important, right, the foam cone is important, |
| 7 | right? |
| 8 | **A.**   I didn't say it wasn't.  I said. |
| 9 | **Q.**   Why isn't it in your first report? |
| 14:48:15 10 | **A.**   I didn't see it on the photographs there of the -- |
| 11 | there's one photograph where he's down on the ground on his |
| 12 | back.  And his arms are up like that.  Okay.  I didn't see a |
| 13 | foam cone coming out of his nose and mouth in that |
| 14 | photograph.  I didn't see any foam on the covers of the |
| 14:48:31 15 | pillow and the sheet and that sort of thing.  That's just |
| 16 | basically blood stained fluid. |
| 17 | **Q.**   So you're telling me that the Defense never gave you a |
| 18 | photo of the foam cone? |
| 19 | MR. THOMPSON:  Objection, your Honor. |
| 14:48:43 20 | MR. CORTS:  In your original analysis -- |
| 21 | THE COURT:  Hold on.  Side bar. |
| 22 | (Proceedings at side bar:) |
| 23 | MR. THOMPSON:  I don't want to be a witness |
| 24 | but -- |
| 14:48:54 25 | THE COURT:  Hold on. |

1    MR. THOMPSON:  Your Honor, I'd like Mr. Bryan

2    to spread on the record when he provided Dr. Young a copy of

3    the photo that has the foam cone.

4    THE COURT:  Could you indicate, please?

14:49:07  5    MR. BRYAN:  Basically what happened is I had

6    some photographs, I didn't have all the photographs when I

7    initially retained Dr. Young.  The photographs that I had

8    didn't have a picture of a foam cone.  I don't know if

9    Vasile remembers this, but you and I -- when I first

14:49:24 10    retained him, I sent him everything I had, but I didn't have

11    a picture of the foam cone.  Apparently the investigators

12    took different pictures than the Coroner did and I didn't

13    have the Coroner's pictures.  So after I got the Coroner's

14    pictures, actually Vasile is the one fighting about how he

14:49:40 15    died because he didn't do an autopsy.  Vasile says what

16    about the foam cone, and I said I didn't believe it was a

17    foam cone, and he says there's a picture of the foam cone.

18    I don't know if you remember this, but --

19    MR. KATSAROS:  I gave him -- I --

14:49:53 20    MR. BRYAN:  I texted you a picture of the foam

21    cone.

22    MR. KATSAROS:  I understand that, and I'm sure

23    it's in the text messages, all those photos.

24    MR. BRYAN:  But I didn't provide them to him.

14:50:02 25    I didn't see them at that time.  And so I later sent him the

Young - Cross/Katsaros

```
         1    pictures of the foam cone, and you said yeah, it's a foam
         2    cone.  But when he wrote that report, he didn't have a foam
         3    cone in front of -- he didn't have a picture of the foam
         4    cone.  So that's --
14:50:16 5            THE COURT:  All right.  Something that they
         6    didn't provide.
         7            MR. BRYAN:  He says he didn't have the picture
         8    on direct, now they're setting up pictures.  The original
         9    report, he didn't see it.
14:50:30 10           THE COURT:  All right.  Fine.
        11    BY MR. KATSAROS:
        12    Q.   So in this report, Doctor, you discuss that foam cones
        13    are marked lung edema.  You talked to the jury about what it
        14    is, correct?
14:50:55 15   A.   Correct.
        16    Q.   In your experience, isn't it indicative of an opioid
        17    overdose?
        18    A.   No.
        19    Q.   So it's not indicative of an opioid overdose?
14:51:06 20   A.   No, sir.
        21    Q.   So you're telling me that in most -- well, strike
        22    that.  I'm going to read for you a -- I guess it's the
        23    abstract of an article that you provided from David Dolinak.
        24    And agree or disagree with this and then I'm going to ask
14:51:39 25   the question.
```

Young - Cross/Katsaros

1      It says autopsy.  This is at autopsy, the most

2   significant internal finding that is reflective of opioid

3   toxicity is pulmonary edema and congestion, and frothy water

4   fluid is often present in the airways.  Okay?

14:51:57  5      He says the most significant finding.  So I guess my

6   question is we have a foam cone, don't we?

7   **A.**   Yes.

8   **Q.**   We have a lung edema, don't we, based upon that foam

9   cone?

14:52:09 10  **A.**   Yes, sir.

11  **Q.**   Okay.

12      So you're telling me is he wrong in saying that it is

13  one of the most significant findings in an opioid toxicity

14  case?

14:52:20 15  **A.**   Okay.

16      It is a significant finding, but if there are other

17  things that can cause a foam cone, then you can't say that a

18  foam cone indicates a drug overdose.  Okay?  If there are

19  other kinds of things that can cause foam cones, you can't

14:52:37 20  say that.  That's why I asked.

21  **Q.**   All I asked you was is it significant if you see a

22  foam cone?

23  **A.**   No, I remember what you asked me.  And that was not

24  what you asked.  You said does it indicate a drug overdose.

14:52:49 25  And I said no.

Young - Cross/Katsaros

1    **Q.**    So -- maybe we're just splitting terms here, but it

2    says the most significant internal finding that is reflected

3    of opioid toxicity is pulmonary edema and congestion, and

4    frothy water fluid is often present in the airways?

14:53:11 5    **A.**    Well, sure that's significant, but many things can

6    cause pulmonary edema.

7    **Q.**    Okay.

8        Let's talk about that.  You referenced some articles

9    in here regarding other things that can be seen and could

14:53:25 10    cause a pulmonary edema.  Okay?  You say a head trauma.  Is

11    there any evidence of any head trauma in this case?

12    **A.**    No, sir.

13    **Q.**    Okay.

14        You say intracranial hemorrhage.  Is there any

14:53:41 15    evidence of an intracranial hemorrhage in this case?

16    **A.**    I don't know.  No autopsy was performed.

17    **Q.**    Well, somebody saw Jacob Castro-White alive, right,

18    around 12 --

19    **A.**    Sure.

14:53:56 20    **Q.**    There's no significant markings on his face, no

21    injuries, no outside injuries, correct?

22    **A.**    Correct.

23    **Q.**    Are you trying to say that he could have had some huge

24    hemorrhage in his brain?

14:54:10 25    **A.**    Yes.

Young - Cross/Katsaros

1  **Q.**  Moving on.  Drowning?

2  **A.**  There's no evidence of drowning in this case.

3  **Q.**  No fire death, correct?

4  **A.**  Correct.

14:54:22 5  **Q.**  No heart failure?

6  **A.**  Don't know.

7  **Q.**  Well, he hasn't had any issues or been to a doctor

8  relevant to his heart, has he?

9  **A.**  That's my understanding.

14:54:33 10  **Q.**  He's 23 years old, right?

11  **A.**  Yes.

12  **Q.**  Do most 23 year olds die from heart failure?

13  **A.**  No, sir.

14  **Q.**  Okay.

14:54:43 15  What are the odds that -- what are the odds that Jacob

16  Castro-White was suffering from heart failure?

17  **A.**  I don't think it's likely.  But the problem here is

18  that there may be rare things that could cause somebody's

19  death, but you would never know unless you did an autopsy.

14:55:04 20  **Q.**  Seizures.  He has no history of seizures, does he?

21  **A.**  It's my understanding.

22  **Q.**  So -- and then finally, deaths from inhalants.

23  There's no evidence that he died from an inhalant, right?

24  **A.**  Not that I'm aware of, no.

14:55:24 25  **Q.**  Okay.

Young - Cross/Katsaros

1    And you list those as other conditions that can lead

2   to foam cones?

3   **A.**    Yes, I did.

4   **Q.**    Now, Dolinak also talked about that and he only listed

14:55:36 5   four.  He listed drowning as a possible way to get a foam

6   cone.  He listed congestive heart failure.  What is

7   congestive heart failure?

8   **A.**    That's a situation where the heart is pumping weakly,

9   and in that kind of situation, the fluid can back up into

14:55:56 10   the lungs and also the kidneys can retain more fluid and

11   that can lead to marked pulmonary edema.

12   **Q.**    And there are symptoms for that, aren't there?

13   **A.**    Sure.

14   **Q.**    A multitude of symptoms, such as being lethargic,

14:56:13 15   nausea, a whole list of symptoms, correct?

16   **A.**    Well, yeah.  However, being lethargic and nausea would

17   be what you would consider symptoms and signs of congestive

18   heart failure, but that's okay.

19   **Q.**    I'll list them for you because I know I wrote them

14:56:31 20   down.  I'll get back to that.  Epileptic seizure.  Any

21   chance he died from an epileptic seizure?

22   **A.**    It's possible.

23   **Q.**    So he went undiagnosed with epilepsy for the last 23

24   years and suddenly died of an epileptic seizure after he had

14:57:00 25   intravenously used drugs?

Young - Cross/Katsaros

1    **A.**    It can happen.

2    **Q.**    It can happen.  Okay.

3          Traumatic head injury.  Any evidence of a traumatic

4    head injury?

14:57:10 5    **A.**    No, sir.

6    **Q.**    Okay.

7          You cite Dolinak in reference to this specific, these

8    other potential ways to form a foam cone, do you not?

9    **A.**    Yes.

14:57:24 10    **Q.**    And I'm going to read you something from Dolinak

11    contained within that article where he says, "One must

12    remember that in many fentanyl drug related cases, a very

13    high or outright toxic level of the drug need not be

14    present.  Sometimes the mere presence of a drug in the right

14:57:42 15    circumstances can be responsible for an individual's death."

16          Would you agree with that?

17    **A.**    Sure.

18    **Q.**    Okay.

19          Let's talk about your report this -- the use of

14:57:55 20    anabolic steroids.  Were you aware when you wrote your

21    original report that there were steroids found at Jacob

22    Castro-White's house?

23    **A.**    Okay.  I don't recall what I was aware of back in 2017

24    in that regard.

14:58:09 25    **Q.**    So is it fair to say that after you sat in on

1    testimony, that Mr. Thompson asked you to write another

2    report relevant to these issues that had come up on Dr.

3    Evans' direct?  Is that fair to say?

4    **A.**    Sure.

14:58:22 5    **Q.**    So he said, "Doc, can you write me something relevant

6    to foam cones and relevant to anabolic steroids," right?

7    **A.**    Correct.

8    **Q.**    And you opine in here that the use of anabolic

9    steroids can result in situations that could lead to foam

14:58:38 10    cones, right?

11    **A.**    Correct.

12    **Q.**    And you cite a British heart foundation article,

13    right?

14    **A.**    Yes, sir.

14:58:44 15    **Q.**    And in that article -- first of all, that was the

16    study of individuals who have cardiomyopathy, correct?

17    **A.**    It has to do with anabolic steroids.

18    **Q.**    Well, it specifically dealt with dihydrotesterone, did

19    it not?

14:59:03 20    **A.**    An anabolic steroid.

21    **Q.**    You know Jacob Castro-White was taking that?

22    **A.**    The only thing that I've heard he was taking were

23    anabolic steroids.

24    **Q.**    Okay.  That study was done on mice, wasn't it?

14:59:16 25    **A.**    Okay.  I don't recall.

1    **Q.**    It says a team of researchers from the University of

2    Birmingham found evidence to suggest when taken by people

3    with the inherited heart condition, arrhythmogenic right

4    ventricular cardiomyopathy, steroids to lead into problems

14:59:51 5    with the heart's electrical signals.  The changes would then

6    increase the likelihood that people taking steroids would

7    suffer from atrial fibrillation and abnormal heart disorder,

8    which is itself a cause of -- a major cause of stroke.  AVRC

9    is caused by mutation in one or more genes responsible for

15:00:13 10    producing the proteins that hold the heart muscle together.

11    The researchers gave dihydrotesterone an anabolic

12    steroid commonly used in athletic performance to mice with a

13    deficiency in one of these same proteins.  So you're relying

14    on a study that dealt with mice to opine to this jury that

15:00:36 15    Jacob Castro-White could have had cardiomyopathy, which then

16    led to a neurogenic pulmonary edema, which then led to a

17    foam cone.  Is that what you're telling us?

18    **A.**    No.

19    **Q.**    Well, why do you cite to such an article?  Tell me the

15:00:55 20    relevance of that article to human beings.

21    **A.**    It points out the fact that people who use anabolic

22    steroids can have problems with the heart or with the brain

23    in the form of a stroke.  That's all it's doing.  The thing

24    there is that unless an autopsy is performed, we can only

15:01:13 25    speculate here.  But, in the situation where an autopsy

Young - Cross/Katsaros

1    isn't performed, then even rare causes of death, such as an

2    arrhythmic right ventricular cardiomyopathy could have been

3    present, but we would never know because an autopsy wasn't

4    performed.

5    **Q.**    But how can you compare a study of mice to potentially

6    being a cause of death for a 23-year-old healthy white male?

7    **A.**    The scientific term is induction by analogy.  All

8    right.  They do a lot of experiments and tests on animals

9    because they see that there are commonalities between humans

10   and mice in some regards, and that's why they do these kinds

11   of tests.  It's not like testing directly a human because

12   that would be unethical.  But, still there -- the scientific

13   literature is replete with those kinds of studies with the

14   idea of an analogy, you know.  You're comparing one thing to

15   another thing and saying that this could be a problem.

16   **Q.**    You also cite another report in here where there was

17   one case report of anabolic steroid use and systemic stroke.

18   The victim was only 25.

19        Now so I can clarify this question, that study was of

20   one person, correct?  And he had a stroke but he didn't die.

21   And you're utilizing that also to talk about steroids as a

22   possible stroke creator for Jacob Castro-White, are you not?

23   **A.**    Well, sure.

24   **Q.**    Okay.

25   **A.**    The reason why I mention the 25 here is that Dr.

Young - Cross/Katsaros

1    Evans, from this witness stand, said that these kinds of

2    problems only affect somebody who's had long-term anabolic

3    steroid use.  And this is a situation, whereas a young man,

4    who's only two years older than Jacob here, all right, who's

15:03:14  5    having a problem with a stroke.  He -- he led people to

6    believe that strokes only occur with older people.  All

7    right?

8    **Q.**    Don't they?

9    **A.**    In a situation here with anabolic steroid abuse, here

15:03:25 10    you have a case report where something has occurred to a

11    25-year-old.

12    **Q.**    Well, first of all, you don't know how long Jacob

13    Castro-White was taking anabolic steroids, right?

14    **A.**    No, sir.

15:03:35 15    **Q.**    And there's no evidence in this case that shows he had

16    any pre-existing medical conditions, correct?

17    **A.**    Correct.

18    **Q.**    He wasn't suffering or there was no evidence that he

19    had a bad heart, there was no evidence that he had suffered

15:03:50 20    a stroke previously, there had been no evidence that he had

21    suffered a seizure, correct?

22    **A.**    Well, when you don't do an autopsy, you have no

23    evidence.

24    **Q.**    That's not my question.  Is that correct?

15:04:00 25    **A.**    Well, sure.

Young - Cross/Katsaros

**Q.**    Okay.

**A.**    If you don't do an autopsy, you don't have evidence.

**Q.**    Well, let's talk about the evidence then.  Okay?
Let's talk about that.  Let's talk about the things that we
know relevant to this case.

Would you agree with me, Doctor, that there are a
number of factors, and we have talked about this before,
that go into determining manner and cause of death, correct?

**A.**    Sure.

**Q.**    Okay.  Let's talk about in this case, I'm going to
list these out.  I think I listed them out as 11 different
things.  We have Jacob Castro-White as the subject of this,
correct?

**A.**    Okay.  Repeat your question, please.

**Q.**    I said Jacob Castro-White, would you agree with me
that he's 23 years old?

**A.**    That's what's on the death certificate, yes.

**Q.**    He's an active male?

**A.**    I don't know how active he is.  I would assume so,
considering he's a body builder.

**Q.**    He has no medical history of heart issues, seizures,
or strokes?

**A.**    Fair.

**Q.**    And he exercises regularly but uses steroids?

**A.**    I would assume so, as a body builder.

Young - Cross/Katsaros

**Q.** Would you agree with me, though, that based upon the nature of how much he -- he exercises, would you agree with me that body builders push themselves to extremes?

**A.** Wow, that's kind of an interesting question.

**Q.** In order to get to where they are, they work out hours and hours a day, is that fair?

**A.** I would say that it takes a lot of hard work to be a body builder, sure.

**Q.** Okay.

Would you expect that pushing your body to those limits, that an indicator such as a seizure, fainting, any of these indicative things of a heart disease, et cetera, would arise when you push your body that hard?

**A.** Maybe, maybe not.  Don't know.

**Q.** Well, don't most of these things pop up in many circumstances when people are exercising vigorously, really pushing themselves?

**A.** Well, sure.  I mean you can have a -- for instance, there have been cases of professional basketball players who was in the peak of health and dribbling along, and then they suddenly die, and everybody's in shock because this occurred right there in the stadium.  And then they do an autopsy and they discover something that they didn't even know he had.

**Q.** But they don't have a syringe and fentanyl and a spoon laying right next to them, do they?

Young - Cross/Katsaros

**A.**    Okay.  We're not -- I'm using this as a way of

comparing what can happen if somebody who's at the peak of

health.

**Q.**    Can we compare apples to apples, please?

**A.**    Well, I'm trying to -- I'm trying to be responsive to

what you're doing here.  Okay.

You can have somebody who doesn't have a medical

history, he's at the peak of health.  He's even a

professional basketball player and he's running up and down

the court and then boom, he suddenly dies.  And then he has

a coronary artery that comes off the pulmonary artery

instead of the aorta.  Nobody thought he had that but there

he is.

**Q.**    Let's go on.

Number 2, the scene in this case shows intravenous

drug use of opioids.  Would you agree with me?

**A.**    Okay.  Say that again.

**Q.**    I said the scene in this case shows intravenous drug

use of opioids.

**A.**    Well, there are the works that are present there, and

there's a spoon, a heating element.  Those kinds of things

are typically seen in -- and used by people who do abuse

drugs intravenously.

**Q.**    Okay.

The manner in which it's used, what's more dangerous

Young - Cross/Katsaros

1   intravenously, snorting?  What's the most dangerous when

2   you're using illicit drugs?

3   **A.**      Well, I imagine if you were to kind of look at the

4   time in a common sense way, you might think well,

15:07:52 5   intravenous might be more dangerous.  But the problem here

6   is that you can have a sudden unexpected death or a problem

7   with all varieties and manners of how you take the drugs.

8   So if you're dying from it, then who's to say what's more

9   dangerous in that kind of a way of looking at it.

15:08:14 10   **Q.**      You're aware, are you not, that the urine screen at

11   the time of his death showed positive for opioids?  You know

12   that, right?

13   **A.**      Yes, sir.

14   **Q.**      Okay.

15:08:24 15          And you're also aware that the drugs at the scene were

16   tested and tested positive for opioids?

17   **A.**      They did some field testing, yes.

18   **Q.**      And those drugs were pretty much open and honest,

19   right?  They were just laying on top of the dresser?

15:08:41 20   **A.**      That's my understanding.

21   **Q.**      Okay.

22          You're aware, are you not, Factor 3, that the drugs,

23   the substance that came back from the scene came back as

24   fentanyl and heroin on that night stand?  You're aware of

15:08:55 25   that, right?

1    **A.**    Yes, sir.

2    **Q.**    You're aware both spoons came back positive for

3    fentanyl, are you not?

4    **A.**    Sure.

15:08:59 5    **Q.**    What's the difference in strength between fentanyl and

6    heroin?

7    **A.**    Fentanyl is more potent than heroin.

8    **Q.**    How much more potent?

9    **A.**    There are different numbers that are involved.

15:09:13 10    Some -- some people say 100 to 200 times more potent.  I'm

11    not sure how they determine that necessarily, but that's

12    what's -- that's what has been written.

13    **Q.**    Would it be fair to say the fentanyl utilized by

14    Mr. Castro-White was illicit fentanyl?

15:09:36 15    **A.**    Yeah, he's using it illegally.  So that would be

16    illicit fentanyl.

17    **Q.**    Okay.  So that's Factor 3.  Let's go to Factor 4.

18          You're aware that at this scene that the door was

19    closed, right, when the investigators -- where the -- or

15:09:52 20    Mrs. Castro-White testified that Jacob Castro-White's door

21    was closed, correct?

22    **A.**    Okay.  I don't know about that.

23    **Q.**    Okay.  You're aware he lives with his mother, right?

24    **A.**    That's what I've heard.

15:10:03 25    **Q.**    You're aware she was unaware of his drug abuse,

Young - Cross/Katsaros

1   correct?

2   **A.**    I don't know.

3   **Q.**    Okay.

4         Is it fair to assume or is it fair to look at that

15:10:18  5   scene and determine that Mr. Castro-White shut the door and

6   decided to intravenously use heroin based upon what you've

7   seen in those photos, or excuse me, an intravenous use of

8   the drugs on that counter?

9   **A.**    Okay.  Those are assumptions.  Those are speculations.

15:10:36  10  Nobody saw that.  But, that's okay.  I mean there really

11  isn't anything about this -- the circumstances in the

12  situation.  Looks like a drug death.  That's what it looks

13  like.  I'd agree.  Okay.  But, in terms of what you're

14  asking here, that's -- that's a speculation.

15:10:53  15  **Q.**    Well let's talk about something else.  When the mom --

16  when Mrs. Castro-White finds her son, right -- and I don't

17  think you were in here for the testimony.  She said that it

18  looked like he was sleeping, like he normally sleeps.  He

19  was -- his chest was down, his head was maybe tilted to the

15:11:10  20  side, and he had his arm over himself.  Are you aware of

21  that?

22  **A.**    Yes.

23  **Q.**    Okay.  Is it fair to say that most opioid deaths occur

24  while people are sleeping?

15:11:22  25  **A.**    Well, yeah.  If they go into a coma, that's kind of

1    like a sleep.  Okay.  I've -- I've seen some of these

2    deaths, however, where they are -- they assume positions

3    that are very unlike a sleeping position.  Really quite

4    startling what kind of positions some of these people end up

15:11:38  5    in.  In the way -- when you have a drug here and it affects

6    the person's ability to be alert and they slip into a coma,

7    that can kind of like be compared to a sleep.

8    Q.    I mean -- I took that from Dolinak.  It stated most

9    opioid deaths occur during sleep.  And why is that?  Why do

15:11:59 10    most opioid deaths occur during sleep?

11    A.    Okay.

12          I would respectfully challenge Dr. Dolinak on that.

13    On a lot of these cases, you don't really know what the

14    circumstances were prior to that.  That seems to be a little

15:12:15 15    speculative on his part.

16    Q.    He states opioid deaths generally occur during sleep,

17    a time when an individual no longer has conscious awareness

18    and is dependent upon autonomic mechanisms to maintain

19    proper respiratory effort.

15:12:37 20          Now this isn't my article.  This is the article you

21    cited in your -- in your report that you provided to

22    Mr. Thompson.  So you're telling me you disagree with what

23    he's saying here?

24    A.    I said I would respectfully challenge what he said

15:12:50 25    there.  I'm assuming by what you mean asleep is something

Young - Cross/Katsaros

1    that we all do at night when we go to bed and close our eyes

2    and we sleep.  But, a lot of times, people who are taking

3    drugs like this, that affect their ability to remain alert

4    and awake and can also impair the respiration, they slip

15:13:09  5    into a coma under circumstances that are not necessarily

6    under those sleep kind of conditions that I just mentioned

7    here.  Something that we all do everyday.

8    **Q.**    Well, isn't what happens, they pass out, they fall

9    asleep, their breathing becomes shallower and shallower, the

15:13:29 10    lungs fill with fluid, and then they basically asphyxiate,

11    die because they're not breathing anymore?  Isn't that what

12    happens in an opioid death?

13    **A.**    Okay.  The asphyxia thing, I'm not sure about that.

14    But, what you've generally described is kind of typical of

15:13:48 15    an opioid death, sure.

16    **Q.**    Okay.

17    **A.**    From what we understand.

18    **Q.**    And in some respects, would you agree it's sort of

19    a -- I don't want to -- sort of a peaceful death in terms of

15:14:00 20    you just fall asleep and you don't get back up?

21    **A.**    Oh, boy.  I don't really know.

22    **Q.**    Okay.

23    **A.**    You know it's kind of hard to put the term "peaceful"

24    here.

15:14:12 25    **Q.**    I was searching for another word, but -- what about

1     somebody suffering from a stroke, seizure, heart attack,

2     what usually happens in those circumstances?

3     **A.**     All kinds of things happen with strokes, seizures and

4     have whatever -- whatever you want.  There are many

15:14:35  5     different types of variances of seizures here.  All kinds of

6     things that can happen.  Not a one answer fits all sort of

7     response that I did --

8     **Q.**     Could they call out, somebody call out for help?

9     **A.**     When somebody is having a seizure, they typically are

15:14:50  10     not awake and alert regardless of the kind of manifestation

11     of the seizure.

12     **Q.**     They're not shaking, they're not convulsing, doing any

13     of that?

14     **A.**     They could.

15:15:04  15     **Q.**     Well, there's -- the sixth factor, there's no history,

16     is there, Doctor, that Jacob Castro-White ever suffered from

17     a seizure, a stroke, or any heart ailments?

18     **A.**     There's no history of that, no.

19     **Q.**     Okay.

15:15:15  20     **A.**     Just like there isn't a history of the basketball

21     player, who was at the peak of health and suddenly drops

22     dead on the court.

23     **Q.**     We talked about lethal levels vary per the individual,

24     correct?

15:15:29  25     **A.**     Okay.  Repeat your question, please.

Young - Cross/Katsaros

**Q.**     The amount of fentanyl necessary to cause somebody to overdose varies from individual to individual?

**A.**     It could.

**Q.**     Okay.

So let's talk about this case.  My Factor 7 here.  Are you aware, Doctor, that the testimony has been that there was another individual that used the same drugs as Mr. Castro-White?  Are you aware of that?

**A.**     I heard something about that, sure.

**Q.**     Okay.

And that individual, based upon the testimony that we've heard of, heard, has a higher tolerance than Mr. Castro-White?

**A.**     We don't know that.  There are many different things that could be going on.  We don't know that.

**Q.**     Well, what are -- does weight factor into tolerance levels?

**A.**     Pardon me?

**Q.**     Your weight, how big you are?

**A.**     I don't think it's that simple, no.  And usually, tolerance has to do with the condition of somebody's nervous system and their ability to metabolize a particular drug.

**Q.**     Well, this individual was approximately 50 pounds heavier than Mr. Castro-White.  He was approximately 6'4".  I think he said around 240, 250.  And I think

Young - Cross/Katsaros

1   Mr. Castro-White was about 5'8", and the weight, it escapes

2   me.

3        But, in your analysis, the fact that somebody else

4   used the same drugs as Mr. White and told people that he had

15:16:58  5   fallen out, passed out or overdosed, would that factor into

6   your analysis of whether the drugs found at Jacob

7   Castro-White's house caused him to overdose and die?

8   **A.**   If anything, it kind of weakens the whole situation.

9   If he's using basically the same fentanyl and he's living

15:17:24 10   after it, doesn't that seem to weaken it.

11   **Q.**   He overdosed, said he overdosed?

12   **A.**   Yeah.  And he survived.

13   **Q.**   Everybody's different, right?

14   **A.**   Okay.  But if you're talking about using something as

15:17:37 15   evidence that Jacob had an overdose from fentanyl, that's --

16   that makes your argument weaker.

17   **Q.**   How does it make it weaker?  You want to characterize

18   -- hold on.

19        MR. THOMPSON:  Your Honor.

15:17:52 20   **Q.**   You want to characterize and utilize studies for mice,

21   okay, to make a determination as to how steroids affect

22   people.  I'm utilizing an example using two individuals who

23   take the same drug, one is a lot larger and based on the

24   testimony, says his tolerance was higher.  These two used

15:18:14 25   together, they know each other, they see how much each of

1    them does.  This guy has an overdose.  This guy dies.  Does

2    that factor into how you determine whether the drugs found

3    in Jacob Castro-White's room killed him?

4    **A.**    Okay.

5         If they're using -- and this is why I said it kind of

6    weakens your argument if they're using the same drugs, same

7    batch, doing it the same way and one person basically

8    survives it and the other person doesn't.  Then it makes it

9    a lot less "Wow, he's using fentanyl.  It's so potent, it

10   would just kill anybody."  All right.

11        Well that wasn't the case here.  It weakens your

12   argument.

13   **Q.**    Well this individual has been a user for two years and

14   this was only the second time that he had ever overdosed,

15   and his testimony was that it was the strongest batch of

16   drugs he had ever done.  Does that -- does that -- so you're

17   telling --

18   **A.**    That's fine, but he survived it.

19   **Q.**    What about the fact that there was testimony in this

20   case that Jacob Castro-White, when he was buying drugs from

21   a seller, that those drugs were being diluted during the

22   course of his purchasing?

23   **A.**    Okay.  What -- what is the question?

24   **Q.**    The question is if his drugs were being diluted during

25   the course of him purchasing from a certain seller, and on

Young - Cross/Katsaros

1    this night, those drugs weren't diluted, what potential

2    effect could that have?

3              MR. THOMPSON:  Your Honor, objection.

4              THE COURT:  Overruled.  I'll see counsel.

15:20:01  5        (The following proceedings were held at side bar:)

6              THE COURT:  Okay.

7         So we're going to be done with him because the jury

8    needs a break; 15 minutes.

9              MR. KATSAROS:  Ten minutes.

15:20:22 10            MR. THOMPSON:  15 minutes, Judge.

11             THE COURT:  Okay.  We'll get through today.

12             MR. THOMPSON:  I hope so.  We need a -- I

13   don't have an expert tomorrow.  I can't cross him tomorrow

14   without the pathologist with me.  I'm going to put him on

15:20:38 15   this afternoon, go out of order.

16             MR. KATSAROS:  Is Aguero available tomorrow?

17             MR. THOMPSON:  I can ask.  He has a trial

18   starting in D.C. tomorrow.  I don't know what time.

19             MR. BRYAN:  The trial starts or that's when

15:20:51 20   they need him?

21             MR. THOMPSON:  My understanding is the trial

22   starts tomorrow, and he's heading out there.  I don't know

23   exactly the details.  I'll have to find them out I suppose.

24             THE COURT:  All right.

15:21:16 25            MR. KATSAROS:  Who's leaving?

Young - Cross/Katsaros

1      MR. THOMPSON:  Both were leaving.  He has a

2   trial in Kansas City tomorrow; he being Dr. Young.  Aguero

3   got a trial in Washington, D.C. starting tomorrow, and I

4   scheduled this -- it was anticipated to end next week.

15:21:28   5   You've -- I'm sorry we ran into this problem, but this is

6   where we're at.

7      MR. BRYAN:  You want to put Miller on?

8      MR. KATSAROS:  We can take him out of order.

9   I mean I -- I'm still debating whether I was going to put

15:21:42   10   him on but I can -- you're saying if I'm going to put him

11   on, you want to put Young back on?

12      MR. THOMPSON:  No, I just need -- I need

13   Miller to testify because otherwise, I can't potentially

14   cross-examine an expert pathologist without a pathologist

15:21:57   15   next to me.

16      MR. KATSAROS:  Are you serious?

17      MR. THOMPSON:  Yeah, I'm completely serious.

18   He gets up and starts saying there's some study or my

19   studies aren't valid or something, I am not an expert and

15:22:08   20   cannot evaluate whether or not that testimony is accurate.

21   I can't do it.

22      MR. CORTS:  You can get a transcript of that

23   and give it to whomever, and if you feel like you need --

24      MR. THOMPSON:  Fax it to him overnight and --

15:22:21   25      MR. BRYAN:  That won't work.

Young - Cross/Katsaros

1           MR. CORTS:  All right.

2           THE COURT:  It won't work.  You said 10 or 15

3   more minutes?

4           MR. KATSAROS:  Fifteen, your Honor.

15:22:28  5           THE COURT:  Let's take a break.  I mean we've

6   been going for -- what time did we start?

7           DEPUTY CLERK:  1:40.

8           THE COURT:  1:40?  Yeah, let's take a break.

9   Take 15 minutes, come back.

15:22:42 10       (Proceedings resumed within the hearing of the jury:)

11           THE COURT:  Fifteen minutes, ladies and

12   gentlemen.

13       (Thereupon, a recess was taken.)

14       (The following proceedings were held at side bar:)

15:39:04 15           MR. THOMPSON:  I have Mr. Aguero in the

16   courtroom right now, the witness, in case your Honor wants

17   to inquire directly.  His understanding is he's expected to

18   testify first thing in the morning tomorrow, D.C. court.

19   He's planning on being prepared by the attorney tonight at

15:39:17 20   10:00 when he got in.

21       I asked Dr. Young, and he indicated that he's expected

22   there first thing tomorrow, does not know anything more than

23   that in terms of when they're putting him on the stand or

24   anything else, you know.  Okay.

15:39:30 25           THE COURT:  How long do we expect Aguero to

Young - Cross/Katsaros

1   be?

2                   MR. THOMPSON:  30 to 45 minutes on our side,

3   your Honor.

4                   THE COURT:  Okay.  Well, if we finish with

15:39:41 5   him --

6                   MR. CORTS:  Five to ten minutes on.

7                   THE COURT:  Okay.  All right.

8        Let's get them both in tonight.  I'll tell the jury

9   that we'll probably go later tonight.

15:39:58 10                   MR. THOMPSON:  And then we put Miller on

11   tonight as well then?

12                   MR. KATSAROS:  I haven't decided if I'm going

13   to.

14        I said we haven't made the determination if we're

15:40:15 15   putting him on.  And I at least have to sit down and talk to

16   him relative to what Dr. Young said to determine --

17                   THE COURT:  That's a problem then.  That's the

18   problem, the main problem.  Anything else we can take care

19   of, we can go over later tonight on that, but if you need

15:40:32 20   more time, I can't keep people here forever.

21                   MR. KATSAROS:  I can talk to him after and,

22   you know, I can -- I can call him after Aguero's done.  I

23   can call him after Aguero's done and have that conversation

24   with him and then get back to you tonight.

15:40:52 25                   MR. THOMPSON:  Are you handling him also?  Can

1  you talk to him during Aguero's testimony?

2            MR. KATSAROS:  I want to talk -- I mean I make

3  the decisions, too, so but I'll let you know tonight.

4            THE COURT:  You're not going to have him

5  tomorrow?

6            MR. KATSAROS:  I'll let you know by 6:00.

7  Okay, 6:00 P.M. that should give you enough time to let him

8  know, right?

9            MR. CORTS:  He said he could check with his

10  guy.

11            THE COURT:  Yeah, I mean after he gets off the

12  stand, he can call the lawyer and see what -- you know, if

13  he can get in later in the morning or something, you know.

14  We'll find that out as well.

15            MR. KATSAROS:  Okay.

16            THE COURT:  Okay.  I'm going to ask the jury

17  if they mind staying until 5:30, quarter to 6:00, something

18  like that in case we run that late.  Depending on what you

19  do with Miller, you could be done by 5:30 today.

20            MR. KATSAROS:  With Aguero, I think we'll be

21  done with Aguero.  The only question is Miller.

22            MR. CORTS:  Miller is not going to disagree

23  with us.

24            THE COURT:  I think that's fair.

25            MR. CORTS:  I think we can get Aguero done.

Young - Cross/Katsaros

1     THE COURT:  Okay.  Let me ask the jury about

2  any problems staying later.  So maybe I'll send them back to

3  make phone calls to clear it ahead of time.  Okay?  Let's

4  bring them in and I'll talk to them.

15:42:15  5     (Proceedings resumed within the hearing of the jury:)

6     THE COURT:  Ladies and gentlemen, we're trying

7  to get the testimony in tonight.  If we stay later, say

8  5:30, quarter to 6:00, is that a major problem for anyone?

9  Does anyone need to make phone calls to accommodate that?

15:43:03 10  Okay.

11     A JUROR:  I can send a quick text.

12     THE COURT:  Same thing?

13     A JUROR:  Yes.

14     THE COURT:  Would you please do that now.

15:43:15 15     A JUROR:  My phone is in there.

16     THE COURT:  Go ahead.  Get whatever you need.

17  Let's make arrangements now.  Thank you.

18     (Thereupon, a recess was taken.)

19     THE COURT:  Mr. Katsaros, when you're ready.

15:47:01 20     MR. KATSAROS:  A couple more questions, your

21  Honor.

22  BY MR. KATSAROS:

23  Q.    I think I'm on Factor 8, Doctor, sort of a

24  hypothetical question.

15:47:09 25     If an opioid user utilizes and is used to a certain

Young - Cross/Katsaros

1    dosage or certain amount of opioids, and he builds up a

2    tolerance we'll say to that opioid, are you with me?

3    **A.**    Sure.

4    **Q.**    If he then utilizes or ingests an opioid that is much

15:47:31 5    stronger or hasn't been diluted, what potentially could

6    happen in that scenario?

7    **A.**    He could live or he could die.

8    **Q.**    Okay.  So it's potential in that circumstance, is it

9    not, for somebody to overdose, based upon the strength of

15:47:50 10    that later dosage?

11    **A.**    Sure.

12    **Q.**    Is that fair?

13    **A.**    Sure.

14    **Q.**    Okay.

15:47:55 15    Factor 9 I want to talk about is this 9.6 nanograms

16    per milliliter of fentanyl in the blood.  You heard Dr.

17    Evans testify, did you not?

18    **A.**    I did.

19    **Q.**    Okay.

15:48:10 20    Regarding he -- in his opinion, based upon his review

21    of toxicology reports, he felt it was one of the higher

22    levels he's seen as the Coroner out in Lorain County.  You

23    heard that testimony, right?

24    **A.**    Yes, sir.

15:48:27 25    **Q.**    You also heard the testimony from Kevin Shanks, did

Young - Cross/Katsaros

1     you not?

2     **A.**    Yes, sir.

3     **Q.**    He also talked about that level, and I think he

4     characterized it as elevated level, correct?

15:48:37 5     **A.**    Sure.

6     **Q.**    Elevated level of fentanyl.  Okay.

7          Factor 10.  I guess I have to ask this again.

8          Is there any difference between illicit street

9     fentanyl and medical fentanyl that we use in a hospital

15:48:57 10    setting?

11    **A.**    One is illicit and illegal and one is legal and

12    regulated.

13    **Q.**    So you're telling me there's no difference in terms of

14    prescribing it or administering fentanyl in a hospital

15:49:16 15    setting or taking a syringe and taking it intravenously?

16    **A.**    One is regulated and one is not.  I imagine the one

17    that's not regulated is more dangerous.

18    **Q.**    You'd agree with me it's more dangerous, right?

19    **A.**    Sure.

15:49:36 20    **Q.**    Okay.

21         Factor 11.  Talk again just briefly about the foam

22    cone.  You heard Dr. Evans testify that in all his years of

23    working these cases, his 25, 30 years of experience, that

24    this was a classic case of an opioid death, and one of the

15:49:54 25    factors was that foam cone.  That foam cone is indicative of

Young - Cross/Katsaros

1    a pulmonary edema, is it not?

2    **A.**    Yes.

3    **Q.**    Okay.

4         And would you agree with me, I'm going to say it

15:50:09 5    again, an autopsy, the most significant finding that is

6    reflective of opioid toxicity is pulmonary edema and

7    congestion, and frothy watery fluid is often present in the

8    airways.  Would you agree with that statement?

9    **A.**    I have no problem with that statement.

15:50:27 10    **Q.**    Okay.

11         And that's from the case -- that's from Dolinak that

12    you actually cited to in your report?

13    **A.**    Sure.

14    **Q.**    So I guess finally, based upon the medical history,

15:50:40 15    the victim, his age, the drugs found at the scene, the

16    position of the body, the toxicology reports, the witness

17    testimony in this case and the foam cone, did the use of

18    fentanyl caused Jacob Castro-White to die?

19    **A.**    I don't know.

15:50:56 20    **Q.**    Okay.

21         Well, let me ask it a different way.  Is fentanyl the

22    likely cause of Jacob Castro-White's death, based upon all

23    those factors that I just outlined?

24                   MR. THOMPSON:  Objection.

15:51:16 25                   THE COURT:  Doctor, are you prepared to answer

Young - Redirect/Thompson

1        that?

2                          THE WITNESS:  Yes.

3                          THE COURT:  Go ahead.

4                          THE WITNESS:  I told you what I had a hunch

15:51:21 5     about in this case.  Okay.  That haunch is what I would

6        consider to be the most likely situation.

7                          MR. KATSAROS:  Nothing further, your Honor.

8                          THE COURT:  Thank you, Mr. Katsaros.

9        Mr. Thompson.

15:51:39 10              REDIRECT EXAMINATION OF THOMAS YOUNG

11       BY MR. THOMPSON:

12       Q.    Doctor, can you say to a degree of medical certainty

13       what the cause of death was?

14       A.    No.

15:51:40 15    Q.    Could Dr. Evans make that conclusion?

16       A.    No.

17       Q.    To touch briefly on the issue of illicit versus

18       pharmaceutical fentanyl, I just want to make sure because I

19       think everyone may be talking past each other.  A fentanyl

15:52:01 20    molecule is always the same as another fentanyl molecule; is

21       that right?

22       A.    Yes.

23       Q.    So to say fentanyl is fentanyl is a fair statement,

24       right?

15:52:10 25    A.    Yes, I'm saying that a fentanyl molecule is a fentanyl

Young - Redirect/Thompson

1    molecule.

2    **Q.**    Okay.  All right.

3         I just want to make sure everyone's on the same page

4    about that.  Thank you.

5         Now you were asked whether you have practical

6    experience in treating patients.  Is it a fair statement

7    that you have practical experience in determining the causes

8    of death?

9    **A.**    Yes.

10   **Q.**    Okay.  And that includes performing hundreds of

11   autopsies?

12   **A.**    5400.

13   **Q.**    Okay.

14        I'm going to ask you just to, so I understand as well,

15   you were asked about the post-mortem redistribution

16   literature.  I believe Mr. Katsaros asked whether the

17   majority of it involved transdermal patches.  Again,

18   fentanyl is fentanyl once it hits the blood, is that a fair

19   statement?

20   **A.**    When you're talking about measuring levels of

21   fentanyl, you're measuring the amount of the fentanyl

22   molecule essentially.  So, yeah, fentanyl is fentanyl.

23   **Q.**    Would it be the same as alcohol from a distillery

24   versus alcohol from, sort of a backwoods kind of gin mill or

25   something?

Young - Redirect/Thompson

1　　**A.**　　Well, unless you're getting antifreeze mixed in, then

2　　we're talking about another problem.

3　　**Q.**　　Sure.

4　　**A.**　　Okay?

15:53:50　5　　　　But, you know, whether you're talking about a whiskey

6　　bottle or a beer can.

7　　**Q.**　　Um-hum.

8　　**A.**　　What you're essentially measuring in a person who

9　　drinks either one is ethyl alcohol.  You're measuring the

15:54:05　10　　molecule.

11　　**Q.**　　Okay.

12　　　　Now the post-mortem redistribution literature did

13　　include examples of intravenous use, if you know?

14　　**A.**　　Okay.

15:54:17　15　　　　My recollection of the literature that I looked at is

16　　they summarized a great deal, and they didn't have a lot of

17　　that kind of detail in it that I can recall.

18　　**Q.**　　Fair enough.

19　　　　Is it fair to say that the literature showed in

15:54:33　20　　surveying all the different examples, drastic changes in

21　　levels post-mortem redistribution?

22　　**A.**　　That would be a fair statement.

23　　**Q.**　　And the conclusion of all of them was, therefore, you

24　　can't try to work backwards as to what the level was at the

15:54:48　25　　time of death?

Young - Redirect/Thompson

1          MR. KATSAROS:  Objection, your Honor, as to

2     leading.

3          THE WITNESS:  Okay.  I think working

4     backwards --

15:54:55  5          THE COURT:  Hold on, Doctor.

6          THE WITNESS:  I'm sorry.

7          THE COURT:  State your question one more time,

8     Mr. Thompson, in reference to the literature again.

9          MR. THOMPSON:  Sure.

15:55:04 10   Q.   Can you summarize the findings of the literature

11    regarding whether or not it is possible to work backwards

12    from post-mortem redistribution levels to level of fentanyl

13    at the time of death?

14    A.   Okay.  I think the working backward is your term.

15:55:24 15   Q.   Yes, it is.

16    A.   Okay.

17         My understanding of what I read there is that fentanyl

18    levels for determining cause of death are not reliable

19    because they go up after death.  And as such, you can't look

15:55:39 20   at a level and say wow, this is enough to have caused his

21    death or this is not enough to have caused his death because

22    they're not reliable.

23    Q.   Fair enough.  Thank you.

24         You were asked about the photos that involved foam

15:55:57 25   cone.  Do you recall whether you received the photos and the

Young - Redirect/Thompson

1       evidence in this case in multiple batches or waves, at that

2       point from Mr. Bryan?

3   **A.**     Okay.

4           I have to say that I don't really recall that kind of

15:56:14  5   detail.  This was back from -- before April of 2017.  And so

6       I can't tell you with reasonable certainty.

7   **Q.**     You were asked whether or not a hemorrhage in the

8       brain was possible.  Do you recall that -- those questions?

9   **A.**     Yes.

15:56:32 10  **Q.**     You indicated -- did you indicate that you felt it was

11      possible?

12  **A.**     It's possible.

13  **Q.**     Could you expand on that, please?  Why do you feel

14      that would be possible.  Mr. Katsaros asked if there were

15:56:47 15  some other symptoms that would obviously have been present.

16  **A.**     Okay.

17          I'm not really sure what you're asking.

18  **Q.**     Okay.

19  **A.**     You're asking me why is it possible?

15:57:00 20  **Q.**     Yes, I guess so.  What -- my recollection was that the

21      Prosecutor asked you well, wouldn't there have been some

22      other symptoms that would have been seen earlier in the

23      night?

24  **A.**     The answer to that is it could come on suddenly and

15:57:15 25  unexpectedly.  One of the causes of a sudden and unexpected

Young - Redirect/Thompson

1    death where you're not expecting it or you're not

2    anticipating it could be an intracranial hemorrhage and

3    there are a wide variety of ways to get intracranial

4    hemorrhages.

15:57:30    5    **Q.**    Could you give examples of those, please?

6    **A.**    One of them is what's called a berry aneurysm, which

7    means one of the arteries, there's this kind of weakening of

8    the vessel wall.  Now, in some people, they may leak a

9    little bit and have severe headaches, but not infrequently,

15:57:52   10    somebody will be in their usual state of health and then

11    boom, they die.

12    **Q.**    Um-hum.

13          You were also asked about whether there would have

14    been warnings with the various heart problems that could

15:58:14   15    have -- could have occurred in this case.  Would -- are

16    there always warnings of impending heart problems?

17    **A.**    Well, there are situations, and I gave plenty of

18    examples here of the professional basketball player.  There

19    was no warning of that at all.  It was just basically a

15:58:32   20    shock, completely unanticipated.

21    **Q.**    And did I recall correctly, did you testify that

22    autopsies can reveal health problems that no one knew about?

23    **A.**    Oh, yeah, not infrequently.

24    **Q.**    How would that be applicable to whether or not -- what

15:58:56   25    an autopsy could have shown us in this case?

Young - Redirect/Thompson

1       **A.**    Okay.

2              We don't know what an autopsy could have shown us in

3       this case.  But the very fact that it can reveal something

4       that nobody anticipated, the fact that it does that points

15:59:11 5     to the importance of doing an autopsy in these kinds of

6       cases.

7       **Q.**    If I could refer briefly to the David Dolinak article,

8       an article that appears in the academic forensic pathology

9       journal, which is the official publication of the National

15:59:34 10    Association of Medical Examiners, that organization we

11      talked about before.  Do you know whether David Dolinak is

12      at the Cuyahoga County Medical Examiner's Office?

13      **A.**    At the time of that article, he was.  I don't know

14      where he is currently.

15:59:48 15    **Q.**    If I could show you the highlighted portion on Page 8

16      of Defendant's Exhibit NN, do you recall this portion of the

17      article?

18      **A.**    Yes.

19      **Q.**    Okay.

16:00:05 20            And at this portion here, in this portion, Dr.

21      Dolinak is talking about the foam cone and when it is

22      present and when it is not present?

23      **A.**    Yes.

24      **Q.**    All right.

16:00:24 25            And he indicates that -- he indicates what with regard

1   to whether or not a foam cone is specific to overdose?

2   **A.**   Okay.  Specific means that it only occurs in overdose

3   cases.  And what he's saying is it doesn't only occur in

4   overdose cases; it can occur in a variety of cases.

16:00:51  5   Congestive heart failure, epileptic seizure and traumatic

6   head injury are some of the cases he mentions in there.  If

7   you look at other articles they mention other things, but if

8   it can be associated with more than one thing like that,

9   then it's not specific for an overdose.

16:01:11  10   **Q.**   With regard to anabolic steroids, is it a

11   controversial statement anabolic steroids are bad for you?

12   **A.**   Well, I don't consider it controversial.

13   **Q.**   In the research that I did, what are some of the side

14   effects of anabolic steroids that can have an impact on what

16:01:35  15   happens in this case?

16   **A.**   Okay.

17       What I did, there are a wide variety of problems one

18   can get with anabolic steroid use.  Okay.

19       What I focused on would be the kinds of issues that

16:01:46  20   might be present in this specific case; particularly one in

21   which there was a foam cone.

22       And I basically focused on the second report on issues

23   having to do with the brain and the heart.  Okay.  But,

24   anabolic steroids cause a wide variety of problems.

16:02:03  25   **Q.**   Okay.

Young - Redirect/Thompson

1        And again, does any of the questions or the additional

2   information that Mr. Katsaros hypothesized to you when you

3   later found that there were the foam cone photos, any of

4   this information change your opinion in this case?

16:02:25  5   **A.**    No.

6   **Q.**    Okay.  And what is your opinion in this case?

7   **A.**    That we can speculate all day long about what might

8   have happened or what might not have happened.  But, without

9   an autopsy, this is a major important procedure that's

16:02:42 10   needed in order to be able to come up with what would be the

11   only plausible explanation for the death.  Without an

12   autopsy we are left in the dark.

13            MR. THOMPSON:  Thank you.  Nothing further.

14            THE COURT:  Thank you, Mr. Thompson.

16:02:56 15        Mr. Katsaros, anything?

16            MR. KATSAROS:  No, your Honor.

17            THE COURT:  Okay.

18        Ladies and gentlemen, any questions of Dr. Young?

19        (Question 28: Due to post-mortem redistribution, can

16:03:47 20   fentanyl levels decrease from time of death to when femoral

21   blood is drawn?

22        How many foam cones have you seen in nonopioid deaths

23   involving individuals 20 to 30 years old?

24        Are there any external signs of an intracranial

16:04:24 25   hemorrhage that could be seen post-mortem?

Young - Redirect/Thompson

1    Question 30:  What is stated on Jacob's death

2    certificate as primary cause of death?

3    Did Jacob's death certificate show a secondary or

4    contributing cause of death?  If so, what is it?

16:05:01  5    Question 31:  How long would it take to have AFIB or

6    CHF to create a foam cone the size of Jacob Castro-White?

7    Could laying on one's side drain pulmonary edema?  And

8    laying on back would look like?  Explain.")

9    THE COURT:  Counsel.

16:05:50  10    (The following proceedings were held at side bar:)

11    THE COURT:  Any objection to that one?

12    MR. CORTS:  No.

13    MR. BRYAN:  No.

14    THE COURT:  Okay.

16:06:21  15    Pretty good questions.  Look at this one?

16    MR. BRYAN:  Show what?

17    MR. KATSAROS:  Contributing.

18    THE COURT:  Okay.  I don't know if he asked

19    Jacob he might not but if he remembers.

16:06:52  20    MR. CORTS:  Fentanyl and marijuana.

21    THE COURT:  If he can answer those.  Yeah.

22    Okay.  Pretty good questions.

23    (Proceedings resumed within the hearing of the jury:)

24    THE COURT:  Okay.  We have multiple questions,

16:07:17  25    ladies and gentlemen.  Looks like we can ask all of them.

Young - Redirect/Thompson

1    So let's start with this one.

2         Doctor, due to post-mortem redistribution, can

3    fentanyl levels decrease from time of death to when femoral

4    blood is drawn?

16:07:33  5         THE WITNESS:  The studies that I reviewed show

6    them all going up.  I don't recall a single case where they

7    actually went down.

8         THE COURT:  Okay.

9         How many foam cones have you seen in nonopioid deaths

16:07:48 10   involving individuals 20 to 30 years old?  If at all?

11        THE WITNESS:  Foam cones are common findings

12   I've seen in fire deaths and drownings, see them a lot.

13        These are kinds of things, having a foam cone here

14   does look suspicious for a drug OD, and I can't recall a

16:08:10 15   case, other than fire deaths and drownings, in which I saw a

16   foam cone.

17        THE COURT:  Okay.

18        Are there any external signs of an intracranial

19   hemorrhage that can be seen post-mortem?

16:08:30 20        THE WITNESS:  No.

21        THE COURT:  If you recall what's stated on

22   Jacob's death certificate as the primary cause of death?

23        THE WITNESS:  I think they listed it as mixed

24   drug toxicity, including fentanyl and marijuana.

16:08:44 25        THE COURT:  Did the death certificate show a

Young - Redirect/Thompson

1    secondary or contributing cause of death?

2              THE WITNESS:  Not that I can recall.

3              THE COURT:  If you know, how long would it

4    take to have an AFIB or CHF to create a foam cone the size

16:09:05 5    of Jacob Castro-White's?  I suppose congestive heart failure

6    for AFIB.  How long would it take to have AFIB or congestive

7    heart failure to create a foam cone the size of Jacob

8    Castro-White's?

9              THE WITNESS:  Okay.  What's described in the

16:09:22 10   literature is that it takes minutes to hours to make a foam

11   cone.

12        Atrial fibrillation causing blood clots in the atrium

13   end up flying into the brain and causing a stroke that can

14   be pretty immediate.  Heart failure would suggest it would

16:09:46 15   be a slower process potentially.

16             THE COURT:  Okay.  Could laying on one's side

17   drain pulmonary edema?

18             THE WITNESS:  I don't think it really has to

19   do with what side you're laying on.  If there's pulmonary

16:10:04 20   edema, that's marked like this, it's just going to bubble

21   up.

22        However, if you're moving the body, it can -- it can

23   appear later on where it didn't appear before.

24             THE COURT:  And if you're laying -- one is

16:10:20 25   laying on his or her back, would it look any different?

Young - Redirect/Thompson

1   What would that look like?

2            THE WITNESS:  If they're on the back, then the

3   foam cone is going to look like a foam cone.  If somebody is

4   on their stomach where there's potentially a sheet or

16:10:37  5   something leaking, then you might not necessarily see it

6   like a foam cone.  But, I'm not really sure.  You know, I

7   don't make those comparisons.

8            THE COURT:  Okay.  Fair enough.  Thank you.

9   Mr. Thompson, any follow-up?

16:11:06  10       (Counsel conferring.)

11            MR. THOMPSON:  Nothing on that, your Honor.

12            THE COURT:  Thank you, Mr. Thompson.

13   Mr. Katsaros.

14            MR. KATSAROS:  Just a couple quick questions.

16:11:30  15            THE COURT:  Go ahead.

16

17

18

19

20

21

22

23

24

25

Young - Recross/Corts

RECROSS-EXAMINATION OF THOMAS YOUNG

BY MR. CORTS:

**Q.**    The Coroner's verdict listed mixed drug overdose, including fentanyl and marijuana.  You're aware of that as you testify --

**A.**    I think that's what I said, is it not?

**Q.**    Yes.

        You've heard Dr. Evans' testimony that he believes the use of fentanyl was the "but for" cause of Jacob Castro-White's death.  You're aware of that, right?

**A.**    Yes, sir.

**Q.**    Does the marijuana implicate anything relative to this death?

**A.**    No.

**Q.**    No?

        And Dr. Evans testified that the only reason he listed is for reporting procedures with the state, correct?

**A.**    Sure.

**Q.**    So the marijuana has no role, no effect relative to the cause of death in this circumstance?

**A.**    I agree.

                MR. KATSAROS:  Nothing further.

                THE COURT:  Thank you, Mr. Katsaros.  Doctor, thanks very much.  You can step down.

                THE WITNESS:  Thank you.  Mr. Thompson.

Young - Recross/Corts

1    MR. THOMPSON:  Your Honor, may I have a

2  moment?

3    THE COURT:  Sure.

4    MR. THOMPSON:  Your Honor the Defense calls

16:13:45  5  Robert Aguero.

6    THE COURT:  Please be sworn.

7    DEPUTY CLERK:  Would you raise your right

8  hand, please.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Aguero - Direct/Thompson

1    ROBERT AGUERO,

2    of lawful age, a witness called by the DEFENSE,

3    being first duly sworn, was examined

4    and testified as follows:

16:13:59 5    DIRECT EXAMINATION OF ROBERT AGUERO

6    BY MR. THOMPSON:

7    THE COURT:  When you're ready, Mr. Thompson.

8    **Q.**    Good afternoon, sir, could you introduce yourself to

9    the jury and spell your last name for the record?

16:14:15 10    **A.**    My name is Robert Aguero, A-G-U-E-R-O.

11    **Q.**    Okay.

12    And what do you do for a living, sir?

13    **A.**    I own my own business.  Conducting cell phone

14    forensics and cell tower data analysis.  I've been doing

16:14:30 15    that for the last nine years exclusively.

16    **Q.**    Okay.

17    And our office hired you to help with the cell tower

18    forensics and the cell phone forensics in this case?

19    **A.**    Yes, sir.

16:14:43 20    **Q.**    Okay.

21    Before we get into that, I'd like to just go through

22    and introduce you a little bit to the jury.  Okay?  What did

23    you do before cell phone forensics?

24    **A.**    My career started in law enforcement back in 1979

16:15:00 25    quite awhile ago; spent 15 years in law enforcement, worked

1088

Aguero - Direct/Thompson

1    patrol all the way to Detective.  After I left law

2    enforcement, I became a private investigator; did that for

3    several years.  And then about nine years ago, I

4    transitioned into the cell phone forensics and cell tower

16:15:18 5    data analysis.

6    **Q.**    Thank you.

7         What kind of education and certification have you

8    obtained to assist you in performing these investigations?

9    **A.**    With regards to the cell phone forensics part, I

16:15:35 10   received training and certification from Cellebrite.  That's

11   a forensics software for extracting data from cell phones.

12   I've received; training in certification from Secure View.

13   Again, that's another forensics software for extracting data

14   from phones.  I've received training and certification from

16:15:52 15   Katana, K-A-T-A-N-A, Lantern.  And again, that's another

16   forensics software for extracting data from cell phones.

17        With regards to the cell tower, I've received training

18   from Secure Cube on the BTS tracker.  That's a device, a

19   hardware device, for doing cell site surveys and determining

16:16:18 20   the coverage area for specific towers and sectors.

21        I've received training from Axis Data on the call

22   detail record analysis, as well as GPS data analysis.  I've

23   received training from Paraben, that's P-A-R-A-B-E-N, on the

24   call detail record analysis and GPS data analysis.  I've

16:16:42 25   received training from uncharted, that's the software I use

Aguero - Direct/Thompson

1    for mapping and they provided training on how to properly

2    import and read the data from the call detail records and

3    the phone company records, in order to map them out.

4         I also received training from the Public Agency

16:16:59 5    Training Council on the call detail record analysis and the

6    GPS data analysis.

7    **Q.**    Thank you.

8         Have you ever provided expert testimony regarding cell

9    tower or cell phone forensics in court before?

16:17:14 10    **A.**    Yes, I have.

11    **Q.**    How many times?

12    **A.**    I've testified in both cell phone and cell tower

13    analysis more than 70 times now.

14    **Q.**    Okay.

16:17:24 15         Has that been in state courts, federal courts or both?

16    **A.**    In both.  Primarily state courts but some federal

17    cases also.

18    **Q.**    Have you ever lectured or spoke on cell tower and cell

19    phone forensics?

16:17:38 20    **A.**    Yes.

21    **Q.**    On how many different occasions have you, if you know?

22    **A.**    Been more than a dozen, 12 to 15 times.  I've spoken

23    to several national associations of attorneys, several

24    Public Defender's Offices, for some private investigations

16:17:58 25    on the topic of cell phone forensics and cell phone data

Aguero - Direct/Thompson

1   analysis.

2              MR. THOMPSON:  Can I just have one moment,

3   your Honor?

4              THE COURT:  Go ahead.

16:18:04 5   **Q.**   All right.  Let's -- again, I'm talking about this

6   case.  First, before we get into what we do have, let's talk

7   briefly about what we don't have.

8       Are you familiar through your training and experience

9   with how to access an iPhone?

16:18:31 10   **A.**   Yes, I am.

11   **Q.**   Could you explain how the password protection works

12   and what you can get with or without a postscript word?

13   **A.**   With regards to iPhones or just phones in general?

14   **Q.**   I-Phones specifically.

16:18:48 15   **A.**   Okay.

16       With iPhones, if you have a password set up on it, and

17   the model of your iPhone is iPhone 4S or later, all the way

18   through the modern ones, then you would require the password

19   in order to gain access to the phone.  Without the password,

16:19:04 20   it's merely impossible to gain access to the phone.  To my

21   knowledge, none of the forensics software will actually

22   bypass the password on a 4S or later.  If you have an older

23   iPhone 4 or later, then the Cellebrite forensics software

24   will be able to bypass that password.  But the 4S, most

16:19:24 25   phones nowadays and later, you cannot.

Aguero - Direct/Thompson

1    **Q.**    Do you know whether iPhones have a feature where if

2    you forget your password, you can answer security questions?

3    **A.**    Yes.

4    **Q.**    And explain that to the jury, please.

16:19:38  5    **A.**    With most modern iPhones when you set them up,

6    especially with the iCloud, you are asked security questions

7    in the event you forget your password, you're able to go

8    through the security prompts to recover your password.

9            Otherwise, if you forget your password, then all of

16:19:55 10    your data is pretty much lost.  So you do need to either

11    have the password or if you forget it, be able to have the

12    security questions in order to recover the password.

13    **Q.**    Can a consumer gain access to photos or contacts from

14    an iPhone without either password or answering security

16:20:16 15    questions to bypass that?

16    **A.**    If it's an iPhone 4S or later and the password is not

17    known, or the security question, the answers are not known,

18    then it would be impossible for anyone to gain access to

19    that phone and to obtain any data, including contacts and

16:20:33 20    photographs.

21    **Q.**    Okay.

22            Let's talk about what they call the cloud.  I guess

23    it's an iCloud in this case.  Can you explain what is meant

24    by that?  I think people tend to toss that term around.

16:20:45 25    Let's make sure we know what that means.

Aguero - Direct/Thompson

1     **A.**     It's basically just a database that Apple keeps on a

2     computer off your premises at their location.  Your phone

3     will back up data to the iCloud unless you specifically tell

4     it not to back it up, but the backup -- data from the phone

16:21:05  5     all gets backed up to the other iCloud, and that's password

6     protected.  So you would need the password to access the

7     iCloud, or if you forget the password, be able to answer

8     security questions to recover the password.

9     **Q.**     Do you know about law enforcement's capability to

16:21:21  10    access things stored in the cloud?

11    **A.**     Yes.  With law enforcement, they have the ability to

12    get a search warrant and go to Apple and get copies of the

13    iCloud data sent to them.

14    **Q.**     And when cell phone forensics is performed using

16:21:43  15    Cellebrite, for example, I'd like to talk about some of the

16    different things that can be obtained.  Okay?  And what

17    those things may be useful.  First of all, it may contain a

18    record of the Wi-Fi connections the phone has made?

19    **A.**     Yes, most phones will maintain connections to Wi-Fi.

16:22:03  20    And they'll give you a date and time when it's connected to

21    the Wi-Fi.  So yes, it does maintain that.

22    **Q.**     And what could that help us determine in that

23    particular case?

24    **A.**     Well, the Wi-Fi could be a definitive way of telling

16:22:18  25    whether someone is at one location or not at that location,

Aguero - Direct/Thompson

1    where they've moved from one place to another.  For example,

2    if you have a Wi-Fi at home, which most people do, your

3    phone will automatically connect to that Wi-Fi.  And when

4    you leave for work, if you have a Wi-Fi at work, your phone

5    will connect to that Wi-Fi if you set it up for that.  And

6    by looking at the dates and times that Wi-Fi's are

7    connected, not only through the phone but actually through

8    the actual physical router at the premise, you can make a

9    determination if the phone has been at one location or not.

10   **Q.**    Will the phone contain call logs also?

11   **A.**    Yes, the cell phone will maintain call logs.  Call

12   logs that are made through the network.  You notice that

13   when you dial a number and hit send and you connect to the

14   network, and it also has call logs from various apps that

15   can be used to make phone calls.

16   **Q.**    What are some of the apps that can be used to make

17   phone calls?

18   **A.**    Some of the more popular ones, things like Skype, Face

19   Time, and there's a whole variety of apps, Facebook

20   Messenger do video face timing or videoconferencing, and if

21   you go on the Apple store, there's literally hundreds and

22   hundreds of various apps where you can make either voice

23   calls or video messaging with another person.

24   **Q.**    And those calls that aren't through the network,

25   meaning the cell tower network, would they appear on call

1    detail records from your cell phone company?

2    **A.**    If the voice call goes through the cell tower network,

3    then yes, because you're making a connection to the network

4    as being routed through their system, so the call detailed

16:23:59 5    records will have a reference to that call, going through

6    their network.

7    **Q.**    What about ones that don't go through that network,

8    ones that use one of these apps?

9    **A.**    If you use an app to make a call or a video chat with

16:24:13 10   someone, that utilizes data transmissions.  So that would

11   not show up on the call detailed records as a voice call.

12   That would only show up on the phone company records as data

13   transmissions that's going through their network.

14   **Q.**    Okay.

16:24:28 15        Will it show up at all if you were connected to Wi-Fi

16   at that point?

17   **A.**    No, if you're connected to Wi-Fi at home or at work or

18   Starbucks or anywhere they have a Wi-Fi, then the Wi-Fi

19   connection would be used for your data transmissions and

16:24:42 20   that would not be using the phone company's network.

21   **Q.**    Okay.

22        Would the cell phone also contain app and Internet

23   usage information that could be obtained from the -- by

24   using the Cellebrite technology?

16:25:00 25   **A.**    Yes, the -- you do Cellebrite extraction, it extracts

Aguero - Direct/Thompson

1    pretty much most of the popular apps automatically, and you

2    will be able to get times that app was used.  If for some

3    reason someone has an off-the-wall app that's not supported,

4    Cellebrite allows you to manually go into the app and search

16:25:19  5    the data yourself manually and be able to pull up whatever

6    is on that app.

7    **Q.**    Okay.

8         What kind of information -- what could you use that

9    kind of information for?

16:25:30 10    **A.**    The information from the apps?

11    **Q.**    Yes.

12    **A.**    Well, the information from the apps, if you're making

13    a voice call or a video chat with someone, you would have a

14    record of date and time and who was involved in that chat or

16:25:43 15    that voice call.  If you're sending a message, such as a

16    Face Time -- excuse me, iMessage on an iPhone or one of

17    the -- yeah, Facebook Messenger or one of the hundreds of

18    messaging apps, there would be a record of date and time of

19    those transactions, and then again, the parties involved in

16:26:03 20    the transaction.

21    **Q.**    Could that include -- the information associated with

22    those apps include information data?

23    **A.**    Yes, the phone -- again, the depending on the app,

24    many apps search for your location, and they store some of

16:26:20 25    that data on their apps and the phone also has location

Aguero - Direct/Thompson

1    information stored in itself aside from the apps.

2    **Q.**    What about messaging apps like Instagram, Kick, What's

3    App, Facebook Messenger, is that information stored in your

4    cell phone on a cell phone?

5    **A.**    Yes, it can be.  Depending on how long it's been

6    there, whether it's been deleted from the server.  Once

7    deleted from the server, it comes from the phone, but as

8    long as it's not deleted from the server, there's a good

9    likelihood you can recover some of that data that will show

10   again date, time, consent of messages between people they're

11   communicating.

12   **Q.**    And that could show -- you could obtain that kind of

13   information using the Cellebrite technology as well?

14   **A.**    I'm sorry?  I didn't hear.

15   **Q.**    You could obtain that information using the Cellebrite

16   technology as well?

17   **A.**    Yes, with Cellebrite, you would be able to recover all

18   of that information.

19   **Q.**    Showing you what's marked for identification as

20   Defendant's Exhibit TT-6, Page 6 of that, sir, do you

21   recognize this chart, and specifically, this page of this

22   chart?

23   **A.**    Yes, I recognize the phone numbers.  I'm not super

24   familiar with the names associated with the phone numbers.

25   I dealt primarily with the phone numbers.

Aguero - Direct/Thompson

1  **Q.**    Okay.  And you see that it -- it indicates a

2  two-second overlap in the call times?  You see that, sir?

3  **A.**    I'm sorry.  This chart that's on my screen is a

4  contact chart.

16:28:32  5  **Q.**    Here, sir.  Can you see this part?

6  **A.**    Oh, sorry.  I was missing that.

7  **Q.**    Yeah.  So this on the left here, it indicates a start

8  and a finish time from the caller and then a start and

9  finish time on this -- on the receiver phone?

16:28:49 10  **A.**    Correct, yes.

11  **Q.**    Can you explain to the jury the -- why those times

12  would be different?

13  **A.**    Well, the person making the call, their clock would

14  start running the minute they hit send on the phone.  So

16:29:03 15  starting on the receiver.  And then it will take a few

16  seconds to get processed through the network.  Once the

17  receiver phone begins, it rings.  Then it begins to calendar

18  on their end and begins to construct the time on their end.

19  **Q.**    Okay.

16:29:18 20     Does this indicate that the caller hung up two seconds

21  after it began to ring on the receiver's phone?

22  **A.**    Yes, it does.

23  **Q.**    Okay.

24     From that, can you draw any conclusions as to whether

16:29:31 25  or not there was an actual conversation between these two

Aguero - Direct/Thompson

1    people?

2    **A.**    With a two-second duration of the connection between

3    both phones, it would be very unlikely that any kind of

4    talking took place.  That's very quick.  And the phone has

16:29:48 5    to at least ring one time, which it would take a couple

6    seconds.  So very unlikely that a conversation took place in

7    a two-second time frame.

8    **Q.**    Sir, did you also do cell tower analysis in this case?

9    **A.**    Yes, I did.

16:30:31 10    **Q.**    Would you explain to the jury just very briefly kind

11    of what cell tower analysis is and what it shows?

12    **A.**    For cell tower analysis, you take the call detail

13    records from the phone company, each carries a little bit

14    differently, some carriers provide all the data needed on

16:30:49 15    one spreadsheet.  Others will only provide the cell tower

16    and sector on the spreadsheet.  Then you have to look at a

17    cell tower list on a second spreadsheet and combine them

18    together.

19    Once you have all the data for the specific voice

16:31:04 20    transaction or text message, whatever you're looking at, and

21    you have the cell tower location, the sector, the

22    orientation for the sector and the GPS coordinates for the

23    tower, then you can take that and put it into a map to show

24    the cell tower location.

16:31:19 25    And then in the case of my maps, I created a pie wedge

1   that goes out it from the tower, indicating the orientation

2   of the sector that's being utilized.  Keeping in mind that

3   the pie shapes you see are only visual aids to help you see

4   the direction that it's facing.  Those are not meant to be

16:31:40  5   an actual propagation map or actual exact coverage of the

6   sector.  It's only a visual aid so you can see the direction

7   it's facing.

8   **Q.**   I'd like to show you what's been marked as Exhibit FF.

9   Can you explain what this is, please?

16:31:56 10   **A.**   This is the cover page for the set of maps that I

11   created for the phon number 440-670-3173 for the time frame

12   of March 7, 2016, about between 12:31 and 1:40 A.M.

13   **Q.**   You know whether this is the phone of -- you

14   understand this to be the phone of Erika Matus?

16:32:19 15   **A.**   I'm not really 100 percent familiar with the names.  I

16   have dealt mostly with the phone numbers so I -- I'm not

17   sure of the names associated with the numbers.

18   **Q.**   Fair enough.

19       Is it fair to say that this report only has one slide,

16:32:34 20   one page?

21   **A.**   Yes.  This report, during that specific time frame

22   utilized one tower and one sector.  And on the map here, to

23   the left side of the map, you'll see a little cell tower

24   icon that represents the location of the cell tower, and

16:32:49 25   then the shaded area is the orientation or the way that the

Aguero - Direct/Thompson

1   sector's facing, keeping in mind that that's only a visual

2   aid for you to see the direction that it goes.

3   **Q.**   Okay.  So this is the tower here, sir?

4   **A.**   Yes, it is.

16:33:04 5   **Q.**   Okay.

6        And this pie wedge you indicated is not -- that's not

7   100 percent precise.  That's a rough estimation of the

8   direction of coverage for this sector of the tower?

9   **A.**   The pie wedge is just a generic 120-degree wide pie

16:33:22 10   shape.  In my case, they go out a mile.  Again, it's meant

11   to be a visual aid so that you can see the direction that it

12   faces.  The actual propagation would be quite different than

13   what you see here on screen.

14   **Q.**   Thank you.

16:33:48 15        Showing you what's been marked as Exhibit GG, can you

16   explain what's contained in this report?

17   **A.**   This is the set of maps that I created for the phone

18   number of 440-506-7353 for the time frame of 3-6-2016,

19   between 9:348 P.M. and 3-7-16 at 9:0009 A.M.

16:34:11 20   **Q.**   Each page will have either a different specific time

21   or time frame, time span that shows on the map, is that a

22   fair statement?

23   **A.**   That is correct, yes.

24   **Q.**   For example, on Page 2 of this, there's one time

16:34:26 25   listed, 11:34 P.M.?

Aguero - Direct/Thompson

1       **A.**     That is correct.

2       **Q.**     Okay.  And what does this map then show?

3       **A.**     This map shows again the cell tower being used is

4       towards the top middle of the map.  And then the brown

16:34:39  5   shaded area is the orientation of the sector that's being

6       used by that call at that particular moment.

7       **Q.**     And you know whether this house icon, this house icon

8       and this house icon, where did they come from?

9       **A.**     Those three icons I took the addresses from the map

16:34:58 10   the prosecution provided through the Defense and I obtained

11      a copy of, and they have three addresses.  And I placed

12      those three icons at the same location as the addresses that

13      they had shown on their maps.

14      **Q.**     So there was -- those are the same three houses or the

16:35:13 15   same three addresses as in the --

16      **A.**     That is correct, yes.

17      **Q.**     Thank you.

18              Page 2, this shows a time period between 11:42 P.M.

19      and 12:0009 A.M. on the next day?

16:35:25 20   **A.**     Correct, yes.

21      **Q.**     Where are the contacts with the cell tower in this

22      time period?

23      **A.**     The cell tower, as you can see, is kind of the lower

24      middle to the left of the map.  And in the site that's being

16:35:38 25   used, it is aimed in a northbound direction from the tower.

Aguero - Direct/Thompson

**Q.**    Okay.

And so again, this indicates that the cell phone being used is likely somewhere in this general area; is that a fair statement?

**A.**    Yeah, the general area you can go beyond the shaded area, but somewhere in that area to the north of the tower.

**Q.**    Could it extend not as far as the shaded area also?

**A.**    Yes.  It could be less.  Until you do a national drive test or go out and actually measure the -- that cell tower and sector, you don't know the exact range of that sector. But it can be much less, it could be more, either way.

**Q.**    Oh, I apologize.  And I don't think we discussed this. I'm going to show you the coverage page again.  This is the 440-506-7353?

**A.**    Correct.

**Q.**    And you understand this is the phone associated with Harry Karaplis?

**A.**    Again, I'm not sure of the names.  I believe that was a T-Mobile phone.

**Q.**    Fair enough.  This is the T-Mobile phone.  All right.

So where does this Page 4 show the T-Mobile phone at 12:11 A.M.?

**A.**    At 12:11, it' utilizing the tower at the bottom of the map.  And again, the sector being used is aimed in a north direction from the tower.

Aguero - Direct/Thompson

1    **Q.**    Given the fact that there's another tower right here,

2    what can that -- what can you deduce from that regarding

3    where this phone would be inside this general pie-shaped

4    area?

16:37:09  5    **A.**    Well, when you have other towers nearby, they're going

6    to create overlapping coverage.  So the phone is somewhere

7    in that general area.  I wouldn't say, for example, that

8    it's all the way up by the lake area since you have other

9    towers covering that area.  But it would be in that general

16:37:27  10    area that's highlighted and beyond that possibly, too.

11    **Q.**    Okay.

12        And from 12:15 to 12:18 A.M., it returns -- the cell

13    phone of Harry Karaplis returns to that northern sector of

14    this tower directly below the blue and the green houses?

16:37:49  15    **A.**    Yes, it does.

16    **Q.**    Okay.

17        12:31 to 12:34 A.M., the phone is hitting off of

18    towers where, sir?

19    **A.**    The two towers that are being utilized are the upper

16:38:06  20    right portion of the map, and the two sectors are facing

21    each other.  So the phone is somewhere within the

22    overlapping coverage of those two sectors during that time

23    frame.

24    **Q.**    Okay.

16:38:16  25        And there's one house that's actually shown on this

Aguero - Direct/Thompson

1    map; is that right?

2    **A.**    Yes, sir.

3    **Q.**    Okay.

4         But, it could easily have been at a house, say here,

16:38:25  5    and it would still be hitting those same towers?

6    **A.**    That is correct, yes.

7    **Q.**    In fact, it could start out close to one house and

8    then end up going to a second house, as long as it stays in

9    those sectors, it's still going to be hitting the same

16:38:38  10   towers?

11   **A.**    Yes, sir.

12   **Q.**    And that's something, one of the limitations on using

13   cell tower data to show where a phone is; is that a fair

14   statement?

16:38:48  15   **A.**    Yes, you can only get general areas.  There's no way

16   of getting a specific location where the phone is.

17   **Q.**    Okay.

18        Page 7, where is the phone hitting during this time

19   period?

16:39:06  20   **A.**    During this time period, the tower at the bottom of

21   the map is being utilized.  Here, I showed a northbound

22   sector, but that's not accurate.  It should be a full

23   circle.  So somewhere within that tower, we don't know the

24   specific orientation for that sector.

16:39:21  25   **Q.**    Okay.

Aguero - Direct/Thompson

1    So this -- this tower, T-Mobile records don't show

2    which sector was being used?

3    **A.**    No, for this record, the T-Mobile records had a lot of

4    missing information.  And I used, in part, maps that were

16:39:41 5    provided from the police department who had access to cell

6    tower lists to fill in some of the blanks.  So to my

7    knowledge, we haven't been able to get an actual sector

8    orientation to show where the sector is facing.

9    **Q.**    If the phone during this time period was at this blue

16:39:59 10    house, would you expect it to be hitting this tower as

11    opposed to one of the closest towers, like this one or this

12    one?

13    **A.**    In my opinion, if the phone was at the -- the blue

14    house, one of the other two towers would be utilized, and we

16:40:18 15    saw that earlier when the top -- the tower to the top had a

16    sector facing southwest direction that was being utilized,

17    and other parts where the tower at the bottom hit the

18    northbound sector being utilized.  So during this time

19    frame, again, if the phone's at the house location or in

16:40:36 20    that general area, I would expect one of the other two

21    towers that would be the ones being used.

22        MR. THOMPSON:  I'm sorry, Chris.  Could we get

23    the --

24        DEPUTY CLERK:  Got it.

16:41:04 25        MR. THOMPSON:  You already did it?  Thank you.

Aguero - Direct/Thompson

1    **Q.**    Mr. Aguero, Exhibit DD, which is what we're about to

2    show the jury, is the Verizon phone, this one here.  Could

3    you explain to the jury what's contained in this report?

4    **A.**    In this report is the report or the map's done for the

16:41:31  5    440-989-7397 for the period of 3-6-2016 at 9:34 P.M. going

6    on through the next morning at 3-7 at 9:09 A.M.

7    **Q.**    Okay.

8        You see the next slide?  You understand this to be the

9    phone associated with Jacob Castro-White?

16:41:51  10    **A.**    Yes.

11    **Q.**    What does this -- the first Page 2, 3, and 4 of this

12    report show?  What is shown in these tables?

13    **A.**    The first page, as you have seen, each of these maps

14    are the actual data from either the 3G, 4G or the voice

16:42:11  15    calls that utilize the cell tower.  So they're placed --

16    combined -- they're provided a separate spreadsheet for this

17    map.  I combine them altogether.  So you can see the

18    sequential order of all the data; again, from the 3G, 4G,

19    data transmissions as well as the voice calls that were

16:42:32  20    utilized.

21    **Q.**    Okay.

22        And then that's the data underlying the map on Page 5;

23    is that right?

24    **A.**    Yes.

16:42:39  25    **Q.**    Okay.

1107

Aguero - Direct/Thompson

1    Explain what's shown on this map, please?

2    **A.**    This map we see the tower kind of in the middle of the

3    map.

4          And there are two different sectors that are being

16:42:53 5    utilized.  And, again, they're color coded.  So as you go

6    through the list, the list that highlights green color would

7    be hitting the green sector on the list.  If you see a blue

8    color that's utilizing the blue sector, I think that makes

9    it a little bit easier rather than trying to figure out

16:43:10 10   degrees of orientation.

11   **Q.**    So during this time period, the Jacob Castro-White

12   Verizon phone hit both the north sector and the eastern

13   sector?

14   **A.**    That is correct, yes.

16:43:20 15   **Q.**    Okay.

16          Next slide, please.  Okay.  And this is the data for

17   Page 7?

18   **A.**    Yes, it is.

19   **Q.**    Okay.

16:43:33 20          And so during this time period, does this show the

21   cell phone hitting two different towers?

22   **A.**    Yes, it does.

23          Again, the primary tower, the one in the middle, the

24   green one, and the other one on the lower left is also

16:43:49 25   utilized by the phone at some points.

Aguero - Direct/Thompson

1      **Q.**    Okay.

2      **A.**    Again, color code as you go through the list, you can

3      see at which point it's hitting which tower.

4      **Q.**    Okay.

16:43:59  5          And then these next two pages of data are the support

6      for this map on Page 10, correct?

7      **A.**    That is correct, yes.

8      **Q.**    So during this time period, the phone, the Verizon

9      phone, only hits on one tower, one sector, right?

16:44:16  10    **A.**    Yes, during this time, it's utilizing the tower in the

11     middle with the sector that faces northbound.

12     **Q.**    Okay.  Go ahead.

13          And this next time period, it -- that same phone is

14     hitting off of this tower to the north -- to the northeast

16:44:39  15    of these maps, is that fair?

16     **A.**    That is correct, yes.

17     **Q.**    Okay.

18          And, again, this is a coverage area that includes this

19     house here, this reddish house; is that right?

16:44:48  20    **A.**    That is correct, yes.

21     **Q.**    But it would also include a house -- well, any other

22     houses that were stopped at in that same area in that same

23     time period, right?

24     **A.**    That is correct.  Any house in that general area would

16:45:01  25    be serviced by that sector on the tower.

Aguero - Direct/Thompson

1    **Q.**    And without specific location, data like you can get

2    off of a cell phone using a Cellebrite analysis, you can't

3    locate the phone anymore, specifically --

4    **A.**    Without additional location information, the best you

16:45:15   5    can get is the tower and sector, and just the phone is in

6    that general area.  There's no way of pinpointing to any

7    specific location.

8    **Q.**    Okay.  Go ahead.  Okay.

9         And then between those times were -- okay.  Again, so

16:45:40  10    that's 12:52 and 2:20 A.M., the phone is connected to only

11    one sector of one tower again?

12    **A.**    That is correct.  And the sector is located in the

13    middle of the map.  And again, that's the north-facing

14    sector during this time frame.

16:45:55  15    **Q.**    Okay.  And then let's see the next map, please, and

16    the supporting data.  Go ahead.  What is shown in -- what

17    happened during this time period and what is shown in this

18    map?

19    **A.**    During this time period, 2:51 through 3:05 --

16:46:16  20    **Q.**    -- what page -- what, Shell?  16?  The map is on Page

21    16?  Oh, I apologize.  It's at the top of the screen.

22         Page 16, and then the data is on 14 and 15, I believe.

23    **A.**    Yes.

24         In this map, the data that was shown on the previous

16:46:30  25    pages shows that the cell phone was utilizing that tower in

1  the middle of the map.  And again, there are two sectors

2  being utilized.  And again, they're color coded.  So as you

3  go through the data, you can see the ones from the -- on the

4  spreadsheet are shown on the screen, hit the green sector

16:46:49  5  the blue hitting the blue sector.  They will overlap.  So

6  some overlapping coverage between them.

7  **Q.**    Some of this data from -- some of these cell phone,

8  cell tower contacts are from incoming cell phone calls?

9  **A.**    Yes, they were.

16:47:07 10  **Q.**    Okay.

11  What's the value of tower contacts from incoming cell

12  phone or from cell phone calls generally versus other kind

13  of tower contacts?

14  **A.**    Well, with the cell phone connections, we know that

16:47:19 15  user is using the phone to either send or receive a phone

16  call.

17  So the phone has to be within reach of whatever

18  sector's being used during this time frame for the voice

19  calls -- the voice calls, just sector is highlighted in blue

16:47:34 20  was the one utilizing as the beginning and as well as the

21  ending sector for every single one of those calls.

22  **Q.**    Okay.

23  Are voice call contacts, more or less, are the same

24  reliability for sector information as data contacts?

16:47:50 25  **A.**    In my opinion, yeah.  The voice contacts are a little

Aguero - Direct/Thompson

1    more reliable than just data transmissions.  Voice

2    connection, like I said, you have to physically be making a

3    call to or receiving a call, and we know the phone has to be

4    connected to a tower, and a sector with data transmissions,

5    they can be a little less reliable at times.  So the sector

6    that's being utilized, which is data transmission, may or

7    may not be 100 percent accurate.

8    Q.   Okay.  Go ahead.

9              THE COURT:  Mr. Thompson?

10             MR. THOMPSON:  Yes?

11             THE COURT:  I think Dr. Young wants to see you

12   briefly.  Run out there, talk to him, and come back in.

13             MR. THOMPSON:  Thank you, your Honor.

14             THE COURT:  Okay.

15             MR. THOMPSON:  Thank your Honor.  Sorry,

16   ladies and gentlemen.

17   BY MR. THOMPSON:

18   Q.   Could we go through the next data on the next map,

19   then?

20        From 3:05 to 6:40 A.M., again the phone hits just that

21   northern sector?

22   A.   That is correct, yes.

23   Q.   Okay.  And the next, please.  Okay.

24        Now what is shown during this time period with regard

25   to cell tower contacts?

1112

Aguero - Direct/Thompson

**A.**    Well, during this time period, again, there are two

sectors being utilized by the phone, both the green one and

the blue one.  And during this time frame, you see the voice

calls utilized both sectors.  So the calls are switching

16:49:41  between sectors at times.  At times, it's starting in the

north sector.  At times, it will start and end on the east,

the blue sector, and times begins with one and ends with the

other.

**Q.**    Okay.  Can you go back another, please?

16:50:03        For example, is this an example of what you were

talking about, where this entry here on Page 21, where it's

a voice call, and it starts in one sector and ends in

another sector?

**A.**    That is correct, yes.

16:50:18  **Q.**    And again here, this is what you're referring to when

you say the cell phone is using both the north sector and

the eastern sector?

**A.**    That is correct, yes.

**Q.**    Okay.  Go ahead, Shelly.  Go back up.  What does that

16:50:34  suggest again about where the phone is located?

**A.**    Well, when the phone is bouncing back and forth

between two different sectors, it means the phone has been

in overlap area, and the overlap area is fairly large in

this area.  So it could be anywhere that they overlap.

16:50:53        I believe the FBI did a drive test, which shows going

Aguero - Direct/Thompson

1    north, excuse me, going north, it extends quite a bit.

2    There was no drive test done for the sector.  So we don't

3    know the overlap for that sector, but I'm assuming it'll be

4    quite a bit of overlap on both.

16:51:10 5    **Q.**    Can we go back to the mole for a second?  Showing you

6    what's been marked as Exhibit UU, do you recognize these

7    records, sir?

8    **A.**    Yes, they're the AT&T records for the number of --

9    **Q.**    I'm going to zoom in because no one could possibly

16:51:48 10    read that.

11    **A.**    440-670-3173.

12    **Q.**    Okay.

13        I'm going to -- can I even zoom more than that?  Yeah,

14    okay.  So I'd like to just ask you what do these two entries

16:52:07 15    show right here, sir?

16    **A.**    Well, those two entries are for two voice calls that

17    are coming in.  And on the far right, just off the screen,

18    you see the code of VM, which means the call was forwarded

19    to voice mail.

16:52:24 20    **Q.**    Okay.

21        Now can you tell us what the incoming and out -- which

22    two phone numbers are involved here?  You need me to zoom

23    out?

24    **A.**    Yes.  One second, please.  Can I see the top of the

16:52:48 25    page?  Okay.  The 3173.  And you can go back to those two

Aguero - Direct/Thompson

1    calls.

2    **Q.**    Okay.

3    **A.**    They're incoming calls to the 3173, the target number

4    here, and there are calls coming in from the --

16:53:10  5    **Q.**    397.

6    **A.**    Yes, the 7397 number that's shown on the original,

7    originating phone number.

8    **Q.**    Is that -- do you recall whether or not that's the

9    Verizon phone?

16:53:20  10   **A.**    As I recall, I believe it is, yes.

11   **Q.**    And you recall whether or not this 3173 AT&T phone,

12   that's the Erika Matus' phone?

13   **A.**    It's the AT&T, I believe, that is Erika's phone.

14   **Q.**    Okay.

16:53:33  15        And does this -- these entries here is the same thing;

16   is that right?

17   **A.**    Correct, yes.

18   **Q.**    Okay.

19             MR. CORTS:  Is that 228?

16:53:44  20            MR. THOMPSON:  Hm?

21             MR. CORTS:  228?

22             MR. THOMPSON:  I believe that's the date.

23   This date is 2-28.

24             THE WITNESS:  Correct, yes.

16:53:50  25            MR. CORTS:  What exhibit was that?

Aguero - Direct/Thompson

1          MR. THOMPSON:  Defendant's U.

2          MR. CORTS:  Page or --

3          MR. THOMPSON:  Page 1.

4    **Q.**   And this is Page 2, sir?

16:54:14   5    **A.**   Yes.

6    **Q.**   Are you able to tell me this is more voice phones?

7    **A.**   Voice call, yes.

8    **Q.**   Okay.

9    **A.**   And this shows an outgoing call from 3173, last four

16:54:28  10   digits calling the 7353 number, and to the left of that, we

11   see that the call lasted -- the connection lasted three

12   minutes and 50 seconds.

13   **Q.**   Okay.

14          So this is a call from this 3173 to Erika Matus number

16:54:43  15   the 7353 number, the Harry Karaplis or Harry Karaplis'

16   T-Mobile?

17          THE COURT:  Date, Mr. Aguero?  Date on that,

18   please?

19          THE WITNESS:  The date on here is 2-14 at 2:52

16:54:58  20   A.M. but this is in UTC time.  So it would be actually the

21   13th, five hours back from that 2:00.  These are in UTC

22   time, not local time.

23          MR. THOMPSON:  Is that clear, your Honor?

24          THE COURT:  Yes.

16:55:10  25          MR. THOMPSON:  Okay.

Aguero - Direct/Thompson

BY MR. THOMPSON:

**Q.** Then the last calls I want to ask you about are these -- I apologize. Can you identify whether this is voice calls or something else?

**A.** This is the text message section of the AT&T records for the 3173 number.

**Q.** And does this show text messages between what numbers?

**A.** It shows text message between the 7353 and the 3173. Again, we have multiple lines that are all part of one actual text message, not multiple text messages.

**Q.** Again, that's the Harry Karaplis T-Mobile and the AT&T Erika Matus lines communicating?

**A.** Yes.

**Q.** And cell phone records like this necessarily can only show network contacts; is that right?

**A.** That is correct, yes.

**Q.** It can't show contacts through messenger apps, for example?

**A.** No, anything involving an app, whether Messenger app or an I-Message or anything of that nature would go through data transmissions, and those would not show up under the voice or the text message section.

**Q.** Okay.

And the only way to get information about what was communicated in --

Aguero - Cross/Corts

1    **A.**    Sorry.  I couldn't hear you.

2    **Q.**    The only way to get information was communicated in

3    Messenger app was to review the phone itself?

4    **A.**    Yes, as far as the communication from the app, you

16:56:49  5    need to do an extraction of the phone and be able to see

6    what apps were on the phone and what communication took

7    place.

8                    MR. THOMPSON:  Okay.  One moment.

9              (Counsel conferring.)

16:57:27  10                    MR. THOMPSON:  Thank you.  Nothing further.

11                    THE COURT:  Thank you, Mr. Thompson.  Mr.

12    Corts, cross.

13                    CROSS-EXAMINATION OF ROBERT AGUERO

14    BY MR. CORTS:

16:57:36  15    **Q.**    Sir, prior to today, you had an opportunity to review

16    the PowerPoint presentation, which is Government's Exhibit

17    13 in this case, is that correct, provided by Special Agent

18    Jacob Kunkle?

19    **A.**    Yes, I did.

16:57:51  20    **Q.**    And if I understand your testimony here today, I don't

21    think you disagree with his PowerPoint at all, do you?

22    **A.**    No, the PowerPoints are both fairly similar.  I really

23    didn't see a whole lot of differences between them.

24    **Q.**    Okay.

16:58:04  25              So essentially, both PowerPoints show that those

Aguero - Cross/Corts

1    phones, the phone associated with Harry Karaplis, the

2    number, 440-506-7353 because you did it by numbers, and

3    989-7397 essentially start out down in the same sector that

4    both of their houses are located, correct?

16:58:34  5    **A.**    Correct, yes, sir.

6    **Q.**    And then between 12:00 and 1:00 A.M., those two

7    phones -- and if we could pull up Government's Exhibit 13,

8    Page 15.  Those two phones move up to the area around this

9    red house, correct?

16:58:55  10    **A.**    To that general area, yeah.  I can't say it was the

11    red house but that general area.

12    **Q.**    To the general area that's marked on the map?

13    **A.**    That is correct.  Yes, sir.

14    **Q.**    There was a house marked on a map on your map, too,

16:59:06  15    correct?

16    **A.**    That is correct, yes.

17    **Q.**    So they both move up there between 12:00 A.M. and 1:00

18    A.M., the Verizon phone, 989-7397, and the T-Mobile phone,

19    440-506-7353 use various cell sites in Northeast Ohio and

16:59:25  20    during this time, the Sprint phone used one cell site.  So

21    we can draw a conclusion from that that those phones moved

22    with whoever was in possession of them up towards that red

23    house or the red figure on the map, correct?

24    **A.**    Towards that general area, yes, sir.

16:59:42  25    **Q.**    And the person who had the red phone, which is denoted

1    here, there was some phone activity there.  According to

2    that phone activity, it remained in that general area?

3    **A.**    That is correct, yes, sir.

4    **Q.**    It didn't go down here, it didn't go over here, it

17:00:01 5    remained hitting there, correct?

6    **A.**    Yes, sir.

7    **Q.**    And you were in here when Special Agent Kunkle

8    testified, correct?

9    **A.**    Yes, sir.

17:00:11 10    **Q.**    And so you agree with his conclusions that that

11    occurred, correct?

12    **A.**    That the phones moved to that direction?

13    **Q.**    Yeah.

14    **A.**    Yes, sir.

17:00:20 15    **Q.**    And the next slide is -- or the next move was at some

16    point in time, the green phone, or 440-989-7397 moved back

17    down towards the direction of this arrow, correct?

18    **A.**    Yes, it moved back to that general area somewhere to

19    the north of the tower.

17:00:42 20    **Q.**    Okay.

21    And the blue phone at that point in time didn't have

22    any phone activity.  So no one can essentially tell where it

23    was?  In other word, there's no arrow with it coming back at

24    that time, do you agree with me?

17:00:58 25    **A.**    At that time, that's correct.  Yes, sir.

Aguero - Cross/Corts

1    **Q.**    Now, if you could move to Government's Exhibit -- or

2    Page 16.  And let's move to Page 17.

3         This particular tower down here, do you recall what

4    network that is related to?

5    **A.**    I'm sorry.  Which tower are you speaking of?

6    **Q.**    I'm sorry.

7    **A.**    That's a T-Mobile tower.

8    **Q.**    Okay.

9         And I don't want to go through the process of going to

10   your exhibits, but I recall you saying specifically when

11   that exhibit was up, you had that wrong, you had that tower

12   wrong in some respects, didn't you?

13   **A.**    Yeah.  I had the northbound-facing sector.  And again,

14   that was missing data.  When I was putting it in, I put the

15   wrong sector information.

16   **Q.**    And you told the jury that?

17   **A.**    Yes, sir.

18   **Q.**    Right.

19        But, the bottom line is that -- I don't want to use

20   the wrong terminology -- a multi-directional tower or the

21   data doesn't say which side or sector it comes in on; is

22   that correct?

23   **A.**    To be clear, I never had a T-Mobile cell tower and

24   requested it.  So I can't tell you what the T-Mobile tower

25   says because I never saw it.  That call detail records

Aguero - Cross/Corts

1    didn't have any information regarding it.  So I don't know

2    what the T-Mobile tower lists said with regards to that

3    tower.

4    **Q.**    But you have worked with members of the CAST unit with

17:02:29  5    the FBI before, correct?

6    **A.**    Well, I haven't worked with them.  We've had cases

7    where we've been on the opposite side.

8    **Q.**    That what I mean.

9    **A.**    Yes, sir.

17:02:36  10   **Q.**    But you don't dispute what Special Agent Kunkle says

11   about that tower having no -- you don't dispute, that do

12   you?

13   **A.**    I don't have any way of disputing it.  I'm not

14   disputing since I never saw the cell tower list.  I can take

17:02:51  15   his word, but again, I have no way of saying yeah, he's

16   right or he's wrong without looking at a cell tower list.

17   **Q.**    Thank you, sir.

18          Let's move to 18.  Let's go to 19, please.  19.  You

19   know what this represents?

17:03:19  20   **A.**    Yes, sir.

21   **Q.**    And what does it represent in your mind?

22   **A.**    Radio frequency propagation showing the coverage for

23   that Sector 1, the 3G network off Sector 1 for that tower.

24   **Q.**    Okay.

17:03:33  25          And you understand that Special Agent Kunkle did

1       what's known as a drive test to come up with this map,

2       correct?

3       **A.**     Yes, sir.

4       **Q.**     And again, you don't dispute these findings or opinion

17:03:46 5      by Special Agent Kunkle, correct?

6       **A.**     No, I have no reason to dispute it, no.

7       **Q.**     Okay.

8              And if we could go to the next, this shows a close up

9       of it; is that correct?

17:04:01 10     **A.**     Yes, sir.

11      **Q.**     And let's note that this is the Castro-White

12      residence, correct?

13      **A.**     Correct, sir.

14      **Q.**     And what Special Agent Kunkle was essentially doing,

17:04:14 15     he was sort of taking a look at this easterly-facing side of

16      that cell tower, correct?

17      **A.**     Correct.

18      **Q.**     And he was trying to determine if you were, for

19      example, right here, if the phone -- and I -- you weren't

17:04:35 20     here earlier when I was doing this looping thing, but if the

21      phone would connect to the easterly side of the tower, you

22      recall that, correct?

23      **A.**     Yes, sir.

24      **Q.**     And his test shows it would; is that correct?

17:04:46 25     **A.**     That's correct.

Aguero - Cross/Corts

1  **Q.**    And his test shows even if the phone were in Jacob

2  Castro-White's house, it could and would connect to the

3  easterly face of that tower, correct?

4  **A.**    It definitely could.  Yes, sir.

17:05:01  5  **Q.**    Okay.

6          So drawing in these pie shapes, as you said, they're

7  not -- they're just kind of meant to show a general

8  direction, correct?

9  **A.**    Yeah, visual aids so that someone looking at them can

17:05:20 10  tell the general direction.

11  **Q.**    So it really doesn't matter if you're on this side or

12  this side; that's just a general guide that you've given,

13  correct?

14  **A.**    Yeah, that pie is a visual aid.  You can be on either

17:05:34 15  side of the line.  It can be smaller.  That's what's known

16  shown.  It could be bigger than what's shown, depending on

17  the size and factors.

18  **Q.**    You know based upon the facts in this case this phone

19  remained stationary at this house from about 7:00 until

17:05:50 20  about 9:00 or 8:50 in the morning, correct?

21  **A.**    That's what I was -- that's what I was told about the

22  phone, yeah.

23  **Q.**    And during that period of time, that phone stayed

24  within Jacob Castro-White's residence?

17:06:04 25  **A.**    Yes, sir.

Aguero - Cross/Corts

1  **Q.**    There were times when that phone registered or hit off

2  the east side of the tower, correct?

3  **A.**    Yes, sir.

4  **Q.**    So even though it's up here to the northerly

17:06:19  5  direction, it's coming off and being detected off the

6  eastern side of the tower?

7  **A.**    Yes.

8  **Q.**    We know that, correct?

9  **A.**    Yes.

17:06:26 10  **Q.**    So earlier in the evening, if there is some phone

11  activity that appears from the map to have occurred here,

12  here, here, here, this could have occurred here, right?

13  **A.**    It could have occurred there, yes, sir.

14  **Q.**    And it could have occurred here?

17:06:45 15  **A.**    Well, that's where I disagree with you.  The voice

16  calls are in the evening or the morning; again, the

17  beginning and the ending tower and sector were both on the

18  east-facing sector.  And again, with -- in my opinion when

19  you're looking at call detail records, you need to analyze

17:07:03 20  patterns over a period of time.  You really can't analyze a

21  single call and make a great determination from a single

22  call.  You have to look at patterns.  If this phone is

23  utilizing one sector from the beginning and ending, if a

24  phone is bouncing back and forth between two sectors, two

17:07:20 25  towers, you need to look at patterns over a period of time

1    to make any determination.

2    **Q.**    But looking at -- could we have the Elmo for a second,

3    please?  Looking at your Exhibit DD -- oh, I'm sorry, Z-8.

4    And excuse my writing at the top, but this is your exhibit,

17:07:43  5    correct?  You prepared this?

6    **A.**    Yes, sir.

7    **Q.**    And this denotes the location of the tower sector that

8    that phone that we're talking about hit off of starting at

9    6:41 in the morning on 3-7 all the way through 9:09 in the

17:08:02  10    morning, correct?

11    **A.**    Yes, sir.

12    **Q.**    And you're using first serving cell, first serving

13    cell face, first serving cell site, last serving cell, and

14    last serving cell, correct?

17:08:14  15    **A.**    That is correct, yes.

16    **Q.**    And that develops a pattern, does it not?

17    **A.**    Yes, sir.

18    **Q.**    And there are -- I mean you would expect that if that

19    phone was moving, and that's -- and we know it wasn't moving

17:08:28  20    during that time period, correct?

21    **A.**    Correct.

22    **Q.**    You would expect each of these maybe to be a different

23    color, right?

24    **A.**    Not necessarily each one.  You're saying moving.  It

17:08:39  25    really depends on where the phone is moving.  So if it's

Aguero - Cross/Corts

1   moving within the overlapping section, you would see this

2   pattern.  If it's stationary within the overlapping section,

3   you would see this pattern.

4   **Q.**   The pattern?

17:08:49 5   **A.**   Yes.

6   **Q.**   We know the phone -- again, we know where the phone

7   was during those early morning hours, correct?

8   **A.**   Correct, yes.

9   **Q.**   And this is the pattern that you would expect to see?

17:08:58 10   **A.**   That is correct.

11   **Q.**   Okay.

12        So you can't say that during that period of time, that

13   phone was not in that location?  In fact, you won't because

14   we know where it was, right?

17:09:11 15   **A.**   Right.  The pattern is consistent with being there,

16   yes.

17   **Q.**   And you explained that you looked at the call records

18   early in the evening, and you saw different starting points

19   and different ending points, correct?

17:09:22 20   **A.**   Yes, sir.

21   **Q.**   And so you're drawing a conclusion from that that --

22   well, because it had different starting and different

23   endings, it must have been moving?  That's where you

24   disagree with Special Agent Kunkle, correct?

17:09:33 25   **A.**   I'm sorry.  I'm not sure I understand your question.

1    **Q.**    Okay.  Let me ask you this.

2        If Special Agent Kunkle says that at the time period

3    of those earlier calls from 2:51 and on, that the phone

4    could have been -- and I'll get you back to Government's

17:09:56 5    Exhibit -- if we could have the Elmo back.

6               DEPUTY CLERK:  The Elmo?

7               MR. CORTS:  I'm sorry.  Not the Elmo, our

8    program.  Sorry.  13-19.

9    **Q.**    Again, Special Agent Kunkle testified that it's

17:10:20 10    consistent with being in that residence between 2:00 A.M.

11    and those calls that were taking place.  You wouldn't

12    disagree with him based upon that?

13    **A.**    Between what time frame again?  I missed the time

14    frame.

17:10:33 15    **Q.**    2:00 A.M. to 7:00 A.M.

16    **A.**    Well, if you take the full-time 2:00 to 7:00, then

17    yeah, it's possible to be there.

18    **Q.**    Okay.

19        And I want to direct your attention now to

17:10:46 20    Government's Exhibit 20.  I'm sorry, Page 20.  And that's

21    just sort of a blow up of what we just talked about.  And

22    let's go to 21.  And this is even a closer look at that

23    purple shaded area, correct?

24    **A.**    Yes, sir.

17:11:19 25    **Q.**    And that Special Agent Kunkle came up with from the

Aguero - Cross/Corts

1      drive test?

2      **A.**   Yes, sir.

3      **Q.**   Okay.  Take that down.

4           Back in 2016, March, law enforcement could not get

17:11:49  5   into an iPhone 5 or 6 without someone giving them a

6      password; is that correct?  You agree with that, don't you?

7      **A.**   Yes, sir, I do.

8      **Q.**   And the San Bernardino case didn't occur until after

9      that, correct?  You're familiar with San Bernardino?

17:12:09 10  **A.**   Yes, I am.  I'm trying to remember the date.  It was

11      after or before that.  I don't recall the date.

12      **Q.**   And being in this field, you know a little bit about

13      the San Bernardino case, correct?

14      **A.**   Yes, sir.

17:12:19 15  **Q.**   And that essentially was that the phone

16      manufacturer -- you recall who it was in that case?

17      **A.**   Apple.

18      **Q.**   Didn't want to give law enforcement access to private

19      citizens' phones?

17:12:41 20  **A.**   Again, my understanding of that phone is what I read

21      in the paper.  I didn't have any inside information, and I

22      believe that their claim being made in the paper that I read

23      was they were not able to get into the phone.

24      **Q.**   They weren't able, they were claiming, and they didn't

17:12:54 25  want to, correct?

Aguero - Cross/Corts

1    **A.**    Again, sir, it's been awhile since I read the article.

2    Bottom line, they wanted to get into the phone, whatever the

3    reason.

4    **Q.**    Bottom line is without a password, you couldn't get

17:13:06 5    into an iPhone 5 or 6 at that time?

6    **A.**    Correct, sir.

7    **Q.**    And you would expect that if the owner of the phone

8    might have been in Jacob Castro-White's mom's name -- but I

9    think the testimony is it was Jake's phone, given to him as

17:13:27 10    a present.  The person who actually possessed the phone is

11    most likely the person to enter the pass code and the

12    password protection screens, right?

13    **A.**    Well, the person that's the user of the phone is the

14    one that's the most likely to put the password in.

17:13:43 15    **Q.**    And the -- what do you call them, the security

16    questions?

17    **A.**    Yes, sir.

18    **Q.**    Because if I'm two states away, and I need to use my

19    phone, and I need to get into it, I can't necessarily call

17:13:59 20    my mom because my phone's dead, right?

21    **A.**    Correct.

22    **Q.**    So I'm the one who has to put the password in?

23    **A.**    Yes, sir.

24    **Q.**    Okay.

17:14:06 25        And you would expect that if the owner of the phone

Aguero - Redirect/Thompson

1    after Jacob's death went to Apple, and said, "Hey, help us

2    out," or went to cell phone service provider, they would

3    have discussed that and tried that, right?

4    **A.**    They would not open the phone for them, no.

17:14:27  5    **Q.**    Right.

6        But, if there was a way to get in with a security

7    question, they would have at least talked about that.

8    Wouldn't you agree with me on that?

9    **A.**    Again, you're saying they.  I'm not sure who you're

17:14:40 10    referring to exactly.

11                 MR. CORTS:  One moment.  No further questions.

12                 THE COURT:  Thank you, Mr. Corts.

13    Mr. Thompson.

14                 MR. THOMPSON:  Very briefly your Honor.

17:14:51 15              REDIRECT EXAMINATION OF ROBERT AGUERO

16    BY MR. THOMPSON:

17    **Q.**    I want to ask about --

18                 THE COURT:  You have to get to a microphone,

19    please.

17:14:59 20                 MR. THOMPSON:  Sorry.

21    **Q.**    The Prosecutor asked you questions about accessing the

22    phone with a password and so forth.  If you factory reset

23    the phone, what does it mean to factory reset an iPhone?

24    **A.**    Factory reset is when you basically reset it to wipe

17:15:17 25    the phone out and set it up as a brand new phone so it can

Aguero - Redirect/Thompson

1    be used as a brand new phone.

2    **Q.**    Okay.

3         In order to start it up after a factory reset, do you

4    need to know the password?

17:15:31  5    **A.**    Yes.  When you do a password protected, if you do a

6    factory reset on it, when it starts back up again, one of

7    the first questions that it will ask you is what the

8    password was for when this phone was and it'll give you the

9    phone number.

17:15:46  10        And if you don't know the password, you won't be able

11   to reset it, you basically have a brick that's useless.

12   **Q.**    Is that to prevent people from stealing phones and

13   factory resetting them and using them?

14   **A.**    Yes.

17:15:58  15   **Q.**    Okay.  I want to talk to you about whether or not the

16   phone location was consistent with that map, showing the

17   purple area and the green house.  Okay.  I want to show you

18   things -- just what sector you think that -- in your

19   opinion, based on your training and experience, what sector

17:16:16  20   was that phone in between 2:51 and 3:10 A.M.?

21   **A.**    During that time frame, again, based on the fact that

22   all of the voice calls which we know a user has to be making

23   a call or receiving a call, all begin and ended on the

24   east-facing sector.  The phone was somewhere in the

17:16:36  25   east-facing sector because you have a pattern of various

Aguero - Recross/Corts

1    calls being made during that time frame, and they all begin

2    and end on the same sector.  If you are somewhere in the

3    overlapping or somewhere to the north, then you will expect

4    to see a pattern like we saw later in the day, where the

17:16:53 5    phone will go back and forth between the two sectors.

6                    MR. THOMPSON:  Thank you.

7                    THE COURT:  Thank you, Mr. Thompson.  Mr.

8    Corts.

9                RECROSS-EXAMINATION OF ROBERT AGUERO

17:17:00 10   BY MR. CORTS:

11   **Q.**    Those calls were unanswered.  You were talking about,

12   those calls from 2:40 on; those were unanswered calls,

13   correct?

14   **A.**    Yes, sir.

17:17:11 15   **Q.**    Okay.

16         And you don't disagree with Special Agent Kunkle's

17   testimony that Jacob Castro-White's phone could be used, and

18   in this case, it was -- he wasn't using it, but someone was

19   trying to ring into it, correct?

17:17:35 20   **A.**    Correct.

21   **Q.**    And you don't disagree that he did a drive test,

22   Special Agent Kunkle did a drive test, and he outlined those

23   two purple areas, right?

24   **A.**    Correct, yes.

17:17:46 25   **Q.**    And Jacob Castro-White's home was in one of those

Aguero - Recross/Corts

1    shaded purple areas, correct?

2    **A.**    At the very edge, and what he calls the lighter purple

3    one, yes.

4    **Q.**    Yes.

5    And you previously agreed that if it's in that home,

6    that means it's in -- within the area that was provided by

7    the drive test, correct?

8    **A.**    Yes, sir.

9    **Q.**    Which can connect up to that eastern face, correct?

10   **A.**    Yes, sir.

11   **Q.**    Correct?

12   So you don't disagree with Special Agent Kunkle when

13   he says that phone could have been at Harry's house, which

14   is just two minutes away from Jake's house, you don't

15   disagree with that, right?  It could have been there?

16   **A.**    It could have been anywhere, yes, sir, in the coverage

17   area.

18   **Q.**    And we know that in the morning on all those calls

19   made or contacts made, we know it was in the house, correct?

20   **A.**    Correct, sir.

21          MR. CORTS:  Nothing further.  Thank you, your

22   Honor.

23          THE COURT:  Thank you, Mr. Corts.  Ladies and

24   gentlemen, any questions?

25          (Question 32: Do you know the difference in iCloud

Aguero - Recross/Corts

1      account and password and the phone password?

2            Do you know if the iCloud backup is also password

3      protected?  If so, can this be broken into?

4            What would cause the call to 216-526-8810 to end later

17:21:35  5    if the cell was only two seconds?  The call showed 11

6      seconds longer than 440-506-7353.

7            Do you know if the technology was the same for the

8      closer towers versus the tower further away, LTE, 3G, 4G?

9            Do you know what a DFU mode restore is?  And if so, do

17:22:24  10   you need a password after?

11           Question 33: With regard to Harry Karaplis' T-Mobile

12     phone, would a 4G, LTE phone preferentially connect to a 4G

13     tower, even if it was further away than a 3G tower?")

14                  THE COURT:  Counsel.

17:23:12  15    (The following proceedings were held at side bar:)

16                  THE COURT:  See if you can decipher this.

17                  MR. CORTS:  Do you know the difference in

18     iCloud account and password --

19                  THE COURT:  Password.

17:23:32  20                  MR. BRYAN:  Different password for iCloud.

21                  MR. CORTS:  Do you know if the iCloud backup

22     is also password protected?  If so, can this be broken into?

23     What would cause the cell to 216 to end later if the call

24     was only two seconds?  The call showed 11 seconds longer

17:23:50  25    than 440-506-7353.

Aguero - Recross/Corts

1    Do you know if the technology was the same for the

2  closer towers versus the towers further away?

3    Do you know what a DFU mode restore is?  And if so, do

4  you need a password?

17:24:08 5       MR. THOMPSON:  I think those all sound okay.

6       THE COURT:  Do you know the difference in

7  iCloud account and password?

8       MR. CORTS:  I think we're probably going too

9  far afield there.

17:24:23 10       MR. BRYAN:  I don't think so.

11       MR. THOMPSON:  I guess I'm not -- I think the

12  iCloud password.

13       MR. KATSAROS:  Does the password --

14       MR. THOMPSON:  That's how I understood it.

17:24:36 15       MR. CORTS:  From the --

16       MR. BRYAN:  ICloud.  There's been testimony

17  that you can -- Agent Kunkle testified that he could get the

18  pictures from the cloud, and he said that wasn't password

19  protected, so.

17:24:49 20       MR. THOMPSON:  He could say that.

21       MR. KATSAROS:  I don't recall.

22       MR. BRYAN:  Yes, he did.

23       MR. THOMPSON:  Do you know the difference in

24  iCloud account and password and the phone password?

17:24:59 25       MR. BRYAN:  You asked Kunkle if he got the

1    contacts and the pictures.  He said he could get it from the

2    cloud, from the cloud.

3              MR. CORTS:  Yeah I think he did say that.

4              MR. BRYAN:  You can't access the cloud unless

5    you know the password.

6              THE COURT:  Maybe I'll rephrase it that way.

7    Okay.  Good question.

8              MR. CORTS:  Regarding the phone, would the 4G

9    LTE preferentially connect to an HG tower?  I was just

10   reading that last one.

11             THE COURT:  All right.  Let's ask it.

12        (Proceedings resumed within the hearing of the jury:)

13             THE COURT:  Mr. Aguero, you know if there's a

14   difference in an iPhone account versus a phone password?

15             THE WITNESS:  Yeah, they can be different

16   passwords, depending on how you set it up.  So you can set

17   up your iCloud with one password and then your phone with a

18   different password.

19             THE COURT:  Is it easier to get into the

20   iCloud?

21             THE WITNESS:  Again, if it's password

22   protected, you wouldn't.  You would need to have the

23   password or the security questions to be able to get into

24   it.  So they both require the same knowledge, either the

25   password or the answer for the security questions.

Aguero - Recross/Corts

1  THE COURT:  Okay.  Just follow-up to that, do

2  you know if the iCloud backup is also password protected?

3  THE WITNESS:  The iCloud itself has a password

4  protection.  Now, there can also be an encryption on the

5  phone that's separate from password protection.  But, yes,

6  the password iCloud is password protected.

7  THE COURT:  And if so, can this be broken

8  into?

9  THE WITNESS:  Again, the only way I know to

10  get into it would be if you have the password or if you have

11  the answers for the security questions to reset your

12  password.

13  THE COURT:  What would cause the call to

14  216-526-8810 to end later if the call was only two seconds?

15  The call showed 11 seconds longer than 440-506-7353.

16  THE WITNESS:  If I understand, we're talking

17  about the Sprint and the Verizon where the Sprint had a

18  total of six seconds, Verizon had a total of, I believe, 138

19  seconds.

20  MR. THOMPSON:  That's not right.

21  MR. BRYAN:  T-Mobile.

22  THE WITNESS:  T-Mobile.  My apologies.

23  T-Mobile initiated the call.  So the time went on his

24  phone first.  According to the other records, the call --

25  the timer began taking place, and the phones were only

1    connected for a total of two seconds that overlap the

2    T-Mobile person or someone -- the T-Mobile disconnect the

3    phone, the phone to that -- the other phone, there's a

4    number that indicates it was being routed.  So when you have

17:28:10 5    a routing occurring, it can take a delay.  For example, the

6    T-Mobile is calling, they hang up, and the call's being

7    routed, it would take a few extra seconds for it to

8    disconnect and that could account for the extra time on that

9    phone since it wasn't answered.

17:28:35 10                THE COURT:  Mr. Aguero, you know if the

11    technology was the same for the closer towers versus the

12    tower further away; LTE, 3G, 4G?

13                THE WITNESS:  Is that the entire question?

14                THE COURT:  That's what I have.

17:28:53 15        Do you know if the technology was the same for the

16    closer towers versus the tower further away LTE, 3G, 4G?

17                THE WITNESS:  I'm a little bit confused about

18    the question.  I'm not sure the closer and the further away.

19    The 3G, 4G, LTE, they are different technologies.  The

17:29:15 20    4G/LTE towers are primarily data transmission towers, and

21    you can't have voice over IP.  Those towers -- the 3G

22    primary connections for voice calls and also some data

23    transfer also.

24        As far as the closer for the tower, I'm not sure

17:29:34 25    exactly what they're referencing.

Aguero - Recross/Corts

1           THE COURT:  Okay.

2        I can't make this out.  Somebody help me here.

3           DEPUTY CLERK:  You were good at reading.

4           THE COURT:  I have my experts help me out.

17:30:16  5       Mr. Aguero, do you know what a DFU mode restore is?

6  And if so, do you need a password after it?

7           THE WITNESS:  Any type of restore, whether

8  it's DFU or straight restore, will wipe the phone out.  The

9  phone will then be restarted again.  And when it restarts,

17:30:36 10  if it was password protected before, regardless of the

11  method used, it will ask for a password before it will

12  restore the phone.

13           THE COURT:  Okay.

14        With regard to Harry Karaplis's T-Mobile phone, would

17:30:50 15  a 4G, LTE phone preferentially connect to a 4G tower even if

16  it was further away than a 3G tower?

17           THE WITNESS:  Well, the type of phone

18  really -- if it's a 4G phone, that's not the determining

19  factor.  If it connected to a 4G or LTE tower, it would be a

17:31:13 20  voice over LTE transmissions.  And in this case, I didn't

21  see any type of records indicating voice over LTE.  So all

22  the voice calls were made on the standard 3G network.

23           THE COURT:  Okay.  Mr. Thompson any follow-up?

24

25

1        <u>REDIRECT EXAMINATION OF ROBERT AGUERO</u>

2             MR. THOMPSON:  Very briefly, your Honor.  Can

3  I have the Elmo, please?

4  **Q.**   Page 2 of Defendant's Exhibit TT, you see on Line 231,

17:31:52 5  there are two separate calls referenced from Karaplis to

6  Davis?  These calls have different times between the

7  Karaplis' records and the Davis' records.  Do you see that,

8  sir?

9  **A.**   Yes, sir.

17:32:04 10  **Q.**   Okay.

11       And what could be an explanation?  Is the explanation

12  for this the same as the explanation you referred to before?

13  **A.**   Not necessarily.  Without looking at the actual call

14  detail records, that 25-second -- again, looking at the

17:32:23 15  entire record may indicate a phone being forwarded to voice

16  mail, but without looking at the record, it's hard to make a

17  definitive statement based on just this page.

18             MR. THOMPSON:  Okay.

19      (Counsel conferring.)

17:32:53 20  **Q.**   Showing you Exhibit F-1, I believe the calls we're

21  looking for are 59, and 59 are two calls.  That would be

22  these entries right here?

23  **A.**   Yes.  Those calls do go to voice mail.  As you see on

24  the next line item below, you have the Code 6245000 and then

17:33:22 25  some other numbers.  That indicates the call's being

Aguero - Recross/Corts

1       forwarded to voice mail.

2   **Q.**     So it's that routing process that causes the call to

3       linger and keep going, even though the person, who is the

4       caller, so to speak, has hung up; is that right?

17:33:40 5  **A.**     Yes.

6   **Q.**     And broken the connection?

7   **A.**     Correct.

8   **Q.**     Okay.

9           So your conclusion remains that two-second connection,

17:33:47 10     that includes that connect time starts when the receiver's

11      phone started ringing?

12  **A.**     Correct.

13                  MR. THOMPSON:  Nothing further.  Thank you.

14                  THE COURT:  Thank you, Mr. Thompson.

17:33:59 15                 MR. CORTS:  Quick follow-up.

16              RECROSS-EXAMINATION OF ROBERT AGUERO

17  BY MR. CORTS:

18  **Q.**     When you were being questioned by Mr. Thompson a

19      couple rounds ago, he asked you about that.  And you said

17:34:07 20     it's unlikely there was a conversation during that period of

21      time.  I think that's what you said, correct?

22  **A.**     Correct.

23  **Q.**     Now, do you mean conversation to be two people

24      engaging in, you know, a running diatribe?  That's what you

17:34:20 25     mean by a conversation?

1    **A.**    Not necessarily.  Where there's actually any -- any

2    exchange of words between a two-second connection time,

3    again, you've got to allow for at least one ring to take

4    place for the phone to be answered.  So it would be very

5    unlikely.

6    **Q.**    And it's one cell phone provider calling another cell

7    phone provider, correct?

8    **A.**    Correct, sir.

9    **Q.**    So their clock could be -- and you've seen it where

10   they're a little bit off, a little bit different, right?

11   **A.**    I haven't seen a case where I've been able to

12   determine they are, in fact, off.  They each claim they have

13   accurate times on their records.

14   **Q.**    Okay.

15        And just time me for a second.  "Here."  That takes me

16   less than two seconds to say?

17   **A.**    Yes.

18   **Q.**    "Outside."  Did that take me less than two seconds to

19   say?

20   **A.**    Yes, sir.

21   **Q.**    "Ready."  Did that take me less than two seconds to

22   say?

23   **A.**    Yes.

24            MR. CORTS:  Nothing further.

25            THE COURT:  Thank you, Mr. Corts.

1    Mr. Aguero, thank you very much.  You can step down.

2              THE WITNESS:  Thank you.

3    Counsel, please.

4    (The following proceedings were held at side bar:)

17:35:30  5              THE COURT:  What are we doing?

6              MR. BRYAN:  I want to go talk to Miller and

7    then five minutes, Judge.  If we could have five minutes, I

8    think we will likely -- about five or ten minutes at the

9    most.

17:35:43 10              MR. CORTS:  I think we're likely not going to

11   call him, but we just need like a minute or two to talk to

12   him.

13              THE COURT:  Okay.  All right.

14   I'll tell them to take a short break.  Assuming that

17:35:57 15   you don't call him, okay, then tomorrow morning, because I

16   want to give you guys some time to get your thoughts and

17   exhibits together, we can do the exhibits first thing

18   tomorrow morning.  You can do your Rule 29 if you want.  Do

19   the exhibits, get that out of the way, and then go back in

17:36:15 20   my chambers, go over the instructions.  I'm not going to

21   have them show up early.  I'm going to have them show up

22   whatever time you think you guys --

23              MR. CORTS:  11:00.

24              THE COURT:  Yeah.  I mean you want to do plan

17:36:29 25   on arguing about noon or so?

1144

| | |
|---|---|
| 1 | MR. KATSAROS:  That would be great. |
| 2 | THE COURT:  Okay.  How much time you think for |
| 3 | closing arguments on each side? |
| 4 | MR. BRYAN:  An hour. |
| 17:36:42 5 | THE COURT:  Fair. |
| 6 | MR. CORTS:  The same, an hour.  Because we |
| 7 | have the burden, 15 minutes extra or something? |
| 8 | MR. BRYAN:  Not extra.  You can split your |
| 9 | time.  I mean -- |
| 17:36:56 10 | MR. CORTS:  An hour's fine. |
| 11 | MR. BRYAN:  Go an hour 15 on that. |
| 12 | MR. CORTS:  An hour's fine. |
| 13 | MR. BRYAN:  But, I mean we need breathing |
| 14 | room. |
| 17:37:05 15 | THE COURT:  Instructions aren't bad.  We have |
| 16 | one count in this case.  It shouldn't be too bad, but we'll |
| 17 | go over that.  Plug in what you can for tomorrow. |
| 18 | MR. KATSAROS:  And the stipulations. |
| 19 | THE COURT:  Get the stipulations, and we'll |
| 17:37:16 20 | insert those. |
| 21 | MR. KATSAROS:  What time you want us here |
| 22 | tomorrow? |
| 23 | THE COURT:  Let's start around 9:00, and we'll |
| 24 | get that stuff ready. |
| 17:37:22 25 | MR. KATSAROS:  Okay. |

1    THE COURT:  Maybe a little after, depending

2 on --

3    MR. CORTS:  I'll have an answer for you in

4 five minutes.

17:37:30 5    THE COURT:  Okay.

6    Just want to know if they should leave -- yeah, we'll

7 give them a short break and have them come back, and I'll

8 tell them that.  I'll tell them what we're going to do.  All

9 right?  Okay.

17:37:50 10    You're going to rest.  Why don't you rest right now.

11    MR. BRYAN:  Okay.

12    (Proceedings resumed within the hearing of the jury:)

13    THE COURT:  Mr. Bryan?

14    MR. BRYAN:  Your Honor, at this time, the

17:37:59 15 Defense rests.

16    THE COURT:  Okay.

17    Ladies and gentlemen, we're at the point where the

18 Government has rested its case-in-chief, and the Defense has

19 rested.  The Government wants five or ten minutes to speak

17:38:09 20 with a potential rebuttal witness.  So we're just going to

21 excuse you for five or ten minutes, bring you right back in

22 and let you know what's going on.  Okay?

23    Take a quick break.

24    (Thereupon, a recess was taken.)

17:47:47 25    THE COURT:  Mr. Corts, on behalf of the

1    Government.

2              MR. CORTS:  Your Honor, the Government is not

3    going to call any rebuttal witnesses, and we're prepared for

4    the next stage of the trial.

17:47:56  5              THE COURT:  Okay.  Thank you.

6         All right, ladies and gentlemen.  We're done with all

7    the testimony and evidence in this case.

8         Tomorrow morning I will be spending time with the

9    attorneys going through all the exhibits, preparing all the

17:48:08 10   instructions, getting everything ready.  So I don't want you

11   showing up here until 11:30.  Okay?  11:30.

12        We plan on starting no later than 12:00.  Instructions

13   of law, closing arguments, it'll take us a good part of the

14   afternoon to get through all of that based upon how much we

17:48:26 15   have to go over.

16        So put some food in your stomachs before you come

17   here.  We're not going to have your traditional noon or

18   12:30 lunch.  So load up.  And we'll take it from there.

19        So that's the plan.  Again, 11:30 downstairs and we'll

17:48:42 20   call you when we're ready and get going with the final phase

21   of the trial.  Have a good evening.

22             (Proceedings in the absence of the jury:)

23             THE COURT:  Before we officially adjourn,

24   renew?

17:49:16 25             MR. BRYAN:  Thank you, your Honor.  At this

1    time, the Defense renews its motion for judgment of

2    acquittal, pursuant to Criminal Rule 29; the count and to

3    the specification.

4                    THE COURT:  Okay.  Mr. Corts?

17:49:28   5                MR. CORTS:  Your Honor, we would incorporate

6    by reference our earlier arguments and ask you to allow this

7    case to proceed to the jury.

8                    THE COURT:  Okay.

9        Nothing I've heard since has changed the Court's mind.

17:49:37  10    So the motion is denied.  Same reasoning.

11                    MR. CORTS:  Thank you, Judge.

12                    THE COURT:  Thank you.  All right.  Rob,

13    you'll -- Shirle, we're off the record.

14        (Discussion held off the record.)

17:51:41  15        (Proceedings adjourned at 5:51 p.m.)

16    CROSS-EXAMINATION OF CASEY CARTY                    842

17    REDIRECT EXAMINATION OF CASEY CARTY                 908

18    RECROSS-EXAMINATION OF CASEY CARTY                  931

19    DIRECT EXAMINATION OF BRIAN STOLL                   946

20    CROSS-EXAMINATION OF BRIAN STOLL                    960

21    REDIRECT EXAMINATION OF BRIAN STOLL                 965

22    RECROSS-EXAMINATION OF BRIAN STOLL                  967

23    DIRECT EXAMINATION OF AMANDA GIOVANNAZZO            969

24    CROSS-EXAMINATION OF AMANDA GIOVANNAZZO             988

25    DIRECT EXAMINATION OF THOMAS YOUNG                  993

1    CROSS-EXAMINATION OF THOMAS YOUNG                1015

2    REDIRECT EXAMINATION OF THOMAS YOUNG             1072

3    RECROSS-EXAMINATION OF THOMAS YOUNG              1085

4    DIRECT EXAMINATION OF ROBERT AGUERO              1087

5    CROSS-EXAMINATION OF ROBERT AGUERO              1117

6    REDIRECT EXAMINATION OF ROBERT AGUERO           1130

7    RECROSS-EXAMINATION OF ROBERT AGUERO            1132

8    REDIRECT EXAMINATION OF ROBERT AGUERO           1140

9    RECROSS-EXAMINATION OF ROBERT AGUERO            1141

10

11                   C E R T I F I C A T E

12            I certify that the foregoing is a correct

13   transcript from the record of proceedings in the

14   above-entitled matter.

15

16

17

18   s/Shirle Perkins_____
     Shirle M. Perkins, RDR, CRR
19   U.S. District Court - Room 7-189
     801 West Superior Avenue
20   Cleveland, Ohio 44113
     (216) 357-7106
21

22

23

24

25