IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


UNITED STATES OF AMERICA,       )
                                )
              Plaintiff,         )    Judge Boyko
                                )    Cleveland, Ohio
        vs.                      )
                                )    Number 1:16CR260
RUSSELL DAVIS,                   )
                                )
              Defendant.         )
                        - - - - -

TRANSCRIPT OF PROCEEDINGS HAD BEFORE

THE HONORABLE CHRISTOPHER A. BOYKO

JUDGE OF SAID COURT,

ON WEDNESDAY, MAY 2, 2018

**Volume 7**
                        - - - - -

APPEARANCES:
For the Government:          ROBERT E. CORTS,
                            VASILE KATSAROS,
                            Assistant U.S. Attorneys
                            801 West Superior Avenue
                            Cleveland, OH 44113
                            (216) 622-3600

For the Defendant:          EDWARD G. BRYAN, ESQ.,
                            DARIN THOMPSON,
                            Federal Public Defender's
                            Office - Cleveland
                            750 Skylight Office Tower
                            1660 West Second Street
                            Cleveland, OH 44113
                            (216) 522-4856

Official Court Reporter:    Shirle M. Perkins, RDR, CRR
                            U.S. District Court
                            801 West Superior, #7-189
                            Cleveland, OH 44113-1829
                            (216) 357-7106

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

|       |                                                              |
|-------|--------------------------------------------------------------|
| 1     | <u>WEDNESDAY SESSION, MAY 2, 2018, AT 8:54 A.M.</u>          |
| 2     | (Proceedings in the absence of the jury:)                    |
| 3     | THE COURT:  Good morning.                                    |
| 4     | COUNSEL:  Good morning, your Honor.                          |
| 09:25:59 5 | THE COURT:  Okay.                                       |

           6      My understanding is that we'll deal with one objection
           7   by the Government, but before we deal with that, let's go
           8   through the Government's exhibit list to list exhibits that
           9   are moved into evidence.  Mr. Corts.
09:26:26  10                   MR. CORTS:  Yes, your Honor.  The Government
          11   would move into evidence Government's Exhibit 1-A, B and D,
          12   your Honor.
          13                   THE COURT:  Go ahead right down the list.
          14                   MR. CORTS:  Government's Exhibit 4-A through
09:26:39  15   L, Government's Exhibit 5-A, 5-B and 5-D.  Government's
          16   Exhibit 6, 7, 8, 9, 10, 11, 12, 13, 13-A, 14, 15, 16, 18,
          17   19, 20-A through G, 21, 23 and 23-A.  24, 25, 26, 27, 28,
          18   29, 30, 31, 32, 33, 34-A, B, C and E, 35-A, 35-B, 35-C.
          19                   THE COURT:  Okay.
09:27:30  20      Mr. Bryan, any objection?
          21                   MR. BRYAN:  No objection, your Honor.
          22                   THE COURT:  Admitted.  Let's go to the
          23   Defendant's exhibits.  Mr. Thompson.
          24                   MR. THOMPSON:  Good morning, your Honor.
09:27:42  25      The Defense moves Exhibits A, B, C, D, E, F, O, P, Q,

1  R, S, T, U, V, W, X, AA, BB, DD, EE, FF, GG, HH, II, SS, TT,

2  UU, and VV.

3      THE COURT:  All right.  Thank you.

4    Mr. Corts, I understand there's one objection.

09:28:23  5      MR. KATSAROS:  Yeah, your Honor.  We would

6  object to the --

7      THE COURT:  Mr. Katsaros.

8      MR. KATSAROS:  We would object to the addendum

9  report of Mr. Young going back to the jury.  It's basically

09:28:32 10  his opinion.  We believe the jurors should rely on his

11  testimony in terms of making that determination.  We don't

12  feel like that report should go back to the jury.

13      THE COURT:  Are there any other reports going

14  back?  Any other reports that have been moved into evidence

09:28:45 15  other than that one?

16      MR. KATSAROS:  Well, we did --

17      THE COURT:  I'm talking about expert report.

18      MR. THOMPSON:  Your Honor, there are a lot of

19  other expert reports that are going back.  The PowerPoint by

09:28:59 20  Special Agent Kunkle is his -- that's what we were given as

21  his report.

22    The reports by Aguero, the PowerPoint presentation,

23  although it was PDF slides.  Those maps, those are reports

24  in essence.  So I think the answer to your question is yes.

09:29:19 25  In terms of textual reports or reports in this format, like

1        a written report, I don't know that there are.

2                    MR. KATSAROS:  I think the -- your Honor, the

3        difference in this one, he's providing an opinion in that

4        report.

09:29:31 5        We've -- the Aguero report, the Kunkle report relative

6        to their CAST analysis, that's just the analysis that is

7        going back.  This actually goes to an opinion, and I think

8        the jury knows what his opinion is.  He said it on the

9        stand, and he shouldn't have this report back there.

09:29:47 10                    THE COURT:  I agree.  I never let an expert

11        opinion go back when there's expert testimony in that

12        regard.  So that will not go back.  Okay.

13        Anything else before all of us go back to my chambers

14        to start discussing the instructions?  Anything else?

09:30:01 15                    MR. KATSAROS:  We have a stipulation, your

16        Honor.

17                    THE COURT:  Okay.  Okay.

18        I have the stipulations of the parties.  I'll read it

19        into the record.  It is hereby stipulated and agreed by and

09:30:38 20        between the United States of America and the Defendant,

21        Russell Davis, AKA Red, that all of the records obtained

22        from the Lorain County Medical Examiner's Office are

23        self-authenticating public documents, admissible over

24        objections as to authenticity, best evidence, or chain of

09:30:54 25        custody.

1       It is hereby stipulated and agreed by and between the

2   United States of America and Defendant, Russell Davis, AKA

3   Red, that all of the records obtained from Axis Forensic

4   Laboratory are self-authenticating public documents and

5   admissible over objections as to authenticity, best

6   evidence, or chain of custody.

7       It is hereby stipulated and agreed by and between the

8   United States of America and Defendant, Russell Davis, AKA

9   Red, that all the records obtained from the City of Lorain

10  and LEADS are self-authenticating public documents and

11  admissible over objections as to authenticity, best

12  evidence, or chain of custody.

13      It is hereby stipulated and agreed by and between the

14  United States of America and Defendant, Russell Davis, AKA

15  Red, that all of the phone records, reports, and subscriber

16  information relating to Defendant, Jacob Castro-White, Harry

17  Karaplis, and Corey Stock, and the phones at issue in this

18  case, are self-authenticating business records and

19  admissible over objections as to authenticity, best

20  evidence, or chain of custody.

21      It is hereby stipulated and agreed by and between the

22  United States of America and the Defendant, Russell Davis,

23  AKA Red, that all of the records obtained from the Emergency

24  Medical Service, Lorain, are self-authenticating business

25  records and admissible over objections as to authenticity,

1      best evidence, or chain of custody.

2          It is hereby stipulated and agreed by and between the

3      United States of America and Defendant, Russell Davis, AKA

4      Red, that all of the records relating to the Cellebrite

5      phone dump of the Defendant's phone are admissible over

6      objections as to authenticity, best evidence, or chain of

7      custody.

8          It is hereby stipulated and agreed by and between the

9      of America and Defendant, Russell Davis, AKA Red, that the

10     Government's and Defense's summary charts, pursuant to

11     evidence Rule 1006, are admissible as primary evidence,

12     summaries, and are evidence to be considered by the jury.

13         And I have signatures by Mr. Katsaros and Mr. Bryan on

14     behalf of both the Government and the Defendant.

15         Appear to be okay, Mr. Bryan?

16              MR. BRYAN:  Yes, your Honor.

17              THE COURT:  Okay.  Mr. Katsaros?

18              MR. KATSAROS:  Yes, your Honor.

19              THE COURT:  Very well.  I will accept these

20     stipulations.  These will be attached to the back of the

21     proposed jury instructions, and when we get to the point

22     where I talk about stipulations, I'll reference this to the

23     jury, and they'll have these with them.  Okay.

24         With that in mind, let's adjourn to my chambers and

25     we'll discuss the instructions of law.
                  (Thereupon, a recess was taken.)

<u>WEDNESDAY SESSION, MAY 2, 2018, AT 11:56 A.M.</u>

          THE COURT:  Good afternoon, everyone.

          THE JURY:  Good afternoon.

          THE COURT:  Ladies and gentlemen looks like we're ready for the final phase of this trial.  Our order of business will be as follows:

     I will read you the instructions of law.  You will read along with me.  After that, we will take a short break because then when we come back in for closing arguments we'll be here for about two and a half hours.  Okay?  So that's the order of business.  Instructions of law, take a break, use the restroom, whatever you have to do.  Then we'll come back in for closing arguments.

<u>CHARGE OF THE COURT</u>

THE COURT:  Please read along with me.

Members of the Jury, now it is time for me to instruct you about the law that you must follow in deciding this case.  I will start by explaining your duties and the general rules that apply in every criminal case.

Then I will explain the elements or parts of the crime that the Defendant is accused of committing.  Then I will explain the Defendant's position.  Then I will explain some rules that you must use in evaluating particular testimony and evidence.  And last, I will explain the rules that you must follow during your deliberations in the jury room and the possible verdicts that you may return.

Please listen very carefully to everything I say.

You have two main duties as jurors.  The first one is to decide what the facts are from the evidence that you saw and heard here in court.  Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide if the Government has proved the Defendant guilty beyond a reasonable doubt.  It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to

1   follow the instructions that I give you, even if you

2   personally disagree with them.  This includes the

3   instructions that I gave you before and during the trial and

4   these instructions.  All the instructions are important and

5   you should consider them together as a whole.

6        The lawyers will talk about the law during their

7   arguments.  But, if what they say is different from what I

8   say, you must follow what I say.  What I say about the law

9   controls.

10        Perform these duties fairly.  Do not let any bias,

11   sympathy, or prejudice that you may feel toward one side or

12   the other influence your decision in any way.

13        As you know, the Defendant has pleaded not guilty to

14   the crime charged in the indictment.  The indictment is not

15   any evidence at all of guilt.  It is just the formal way

16   that the Government tells the Defendant what crime he is

17   accused of committing.  It does not even raise any suspicion

18   of guilt.  Instead, the Defendant starts the trial with a

19   clean slate, with no evidence at all against him, and the

20   law presumes that he is innocent.

21        This presumption of innocence stays with him unless

22   the Government presents evidence here in court that

23   overcomes the presumption and convinces you beyond a

24   reasonable doubt that he is guilty.

25        This means that the Defendant has no obligation to

1   present any evidence at all or to prove to you in any way

2   that he is innocent.  It is up to the Government to prove

3   that he is guilty, and this burden stays on the Government

4   from start to finish.  You must find the Defendant not

12:08:11  5   guilty unless the Government convinces you beyond a

6   reasonable doubt that he is guilty.  The Government must

7   prove every element of the crime charged beyond a reasonable

8   doubt.  Proof beyond a reasonable doubt does not mean proof

9   beyond all possible doubt.  Possible doubts or doubts based

12:08:28 10   purely on speculation are not reasonable doubts.

11       A reasonable doubt is a doubt based on reason and

12   common sense.  It may arise from the evidence, the lack of

13   evidence, or the nature of the evidence.  Proof beyond a

14   reasonable doubt means proof which is so convincing, that

12:08:43 15   you would not hesitate to rely and act on it in making the

16   most important decisions in your own lives.

17       If you are convinced that the Government has proved

18   the Defendant guilty beyond a reasonable doubt, say so by

19   returning a guilty verdict.  If you are not convinced, say

12:08:58 20   so by returning a not guilty verdict.

21       You must make your decision based only on the evidence

22   that you saw and heard here in court.  Do not let rumors,

23   suspicions, or anything else that you may have seen or heard

24   outside of the court influence your decision in any way.

12:09:16 25   The evidence in this case includes only what the witnesses

1    said while they were testifying under oath, the exhibits

2    that I allowed into evidence, and the stipulations that the

3    lawyers agree to.

4        Nothing else is evidence.  The lawyers' statements and

12:09:30   5    arguments are not evidence.  Their questions and objections

6    are not evidence.  My legal rulings are not evidence.  And

7    my comments and questions are not evidence.

8        During the trial, I did not let you hear the answers

9    to some of the questions that the lawyers asked.  I also

12:09:45  10   ruled that you could not see some of the exhibits that the

11   lawyers wanted you to see.  And sometimes I may have ordered

12   you to disregard things that you saw or heard or I struck

13   things from the record.  You must completely ignore all of

14   these things.  Do not even think about them.  Do not

12:10:01  15   speculate about what a witness might have said or what an

16   exhibit might have shown.  These things are not evidence and

17   you are bound by your oath not to let them influence your

18   decision in any way.

19       Make your decision based only on the evidence as I

12:10:15  20   have defined it here and nothing else.

21       You should use your common sense in weighing the

22   evidence.  Consider it in light of your everyday experience

23   with people and events.  And give it whatever weight you

24   believe it deserves.  If your experience tells you that

12:10:31  25   certain evidence reasonably leads to a conclusion, you are

1    free to reach that conclusion.

2        Now some of you may have heard the terms direct

3    evidence and circumstantial evidence.  Direct evidence is

4    simply evidence, like the testimony of an eyewitness, which,

12:10:47 5    if you believe it, directly proves a fact.

6        If a witness testified that he saw it raining outside,

7    and you believed him, that would be direct evidence that it

8    was raining.  Circumstantial evidence is simply a chain of

9    circumstances that indirectly proves a fact.  If someone

12:11:03 10   walked into the courtroom wearing a raincoat covered with

11   drops of water, and carrying a wet umbrella, that would be

12   circumstantial evidence from which you could conclude that

13   it was raining.

14       It is your job to decide how much weight to give the

12:11:17 15   direct and circumstantial evidence.  The law makes no

16   distinction between the weight that you should give to

17   either one or say that one is any better evidence than the

18   other.  You should consider all the evidence, both direct

19   and circumstantial, and give it whatever weight you believe

12:11:34 20   it deserves.

21       Another part of your job as jurors is to decide how

22   credible or believable each witness was.  This is your job,

23   not mine.  It is up to you to decide if a witness' testimony

24   was believable, and how much weight you think it deserves.

12:11:50 25   You are free to believe everything that a witness said or

1    only part of it or none of it at all.  But, you should act

2    reasonably and carefully in making these decisions.

3         Let me suggest some things for you to consider in

4    evaluating each witness' testimony.  Ask yourself if the

5    witness was able to clearly see or hear the events.

6    Sometimes even an honest witness may not have been able to

7    see or hear what was happening and may make a mistake.  Ask

8    yourself how good the witness' memory seemed to be.  Did the

9    witness seem able to accurately remember what happened?  Ask

10   yourself if there was anything else that may have interfered

11   with the witness' ability to perceive or remember the

12   events.  Ask yourself how the witness acted while

13   testifying.  Did the witness appear honest or did the

14   witness appear to be lying?  Ask yourself if the witness had

15   any relationship to the Government or the Defendant or

16   anything to gain or lose from the case that might influence

17   the witness' testimony.

18        Ask yourself if the witness had any bias or prejudice

19   or reason for testifying that might cause the witness to lie

20   or slant the testimony in favor of one side or the other.

21        Ask yourself if the witness testified inconsistently

22   while on the witness stand or if the witness said or did

23   something or failed to say or do something at any other time

24   that is inconsistent with what the witness said while

25   testifying.

1    If you believe the witness was inconsistent, ask

2    yourself if this makes any witness -- makes the witness'

3    testimony less believable.  Sometimes it may, other times,

4    it may not.

12:13:24  5    Consider whether the inconsistency was about something

6    important or about some unimportant detail.  Ask yourself if

7    it seemed like an innocent mistake or if it seemed

8    deliberate.  And ask yourself how believable the witness'

9    testimony was in light of all the other evidence.  Was the

12:13:42 10   witness' testimony supported or contradicted by other

11   evidence that you found believable.  If you believe that a

12   witness' testimony was contradicted by other evidence,

13   remember that people sometimes forget things and that even

14   two honest people who witness the same event may not

12:13:59 15   describe it exactly the same way.

16   These are only some of the things you may consider in

17   deciding how believable each witness was.  You may also

18   consider other things that you think shed some light on the

19   witness' believability.  Use your common sense in your

12:14:14 20   everyday experience in dealing with other people.  Then

21   decide what testimony you believe and how much weight you

22   think it deserves.

23   One more point about the witnesses.  Sometimes jurors

24   wonder if the number of witnesses who testified makes any

12:14:29 25   difference.  Do not make any decision based only on the

1      number of witnesses who testified.  What is more important

2      is how believable the witnesses were and how much weight you

3      think their testimony deserves.  Concentrate on that, not

4      the numbers.

12:14:44   5      There's one more general subject that I want to talk

6      to you about before I begin explaining the elements of the

7      crime charged.  The lawyers for both sides objected to some

8      of the things that were said or done during the trial.  Do

9      not hold that against either side.  The lawyers have a duty

12:15:00  10     to object whenever they think that something is not

11     permitted by the Rules of Evidence.  Those rules are

12     designed to make sure that both sides receive a fair trial.

13     And do not interpret my rulings on their objections as any

14     indication of how I think the case should be decided.  My

12:15:17  15     rulings were based on the Rules of Evidence, not on how I

16     feel about the case.  Remember that your decision must be

17     based only on the evidence that you saw and heard here in

18     court.

19     That concludes the part of my instructions explaining

12:15:32  20     your duties and the general rules that apply in every

21     criminal case.  In a moment, I will explain the elements of

22     the crime that the Defendant is accused of committing.  But,

23     before I do that, I want to emphasize that the Defendant is

24     only on trial for the particular crime charged in the

12:15:48  25     indictment.  Your job is limited to deciding whether the

1    Government has proved the crime charged.

2        Also keep in mind that whether anyone else should be

3    prosecuted and convicted for this crime is not a proper

4    matter for you to consider.  The possible guilt of others is

12:16:02 5    no defense to a criminal charge.  Your job is to decide if

6    the Government has proved this Defendant guilty.  Do not let

7    the possible guilt of others influence your decision in any

8    way.

9        Count 1 of the indictment charges the Defendant with

12:16:18 10   distribution of fentanyl, a Schedule II controlled

11   substance, in violation of Title 21, United States Code,

12   sections 841(a)(1), and (b)(1)(C).  Count 1 of the

13   indictment charges on or about March 7, 2016 in the Northern

14   District of Ohio, Eastern Division, Russell Davis, AKA Red,

12:16:39 15   the Defendant herein, did unlawfully, knowingly and

16   intentionally distribute a quantity of a mixture and

17   substance containing a detectable amount of fentanyl a,

18   Schedule II controlled substance.

19       For you to find the Defendant guilty of Count 1, you

12:16:55 20   must find the Government has proved each and every one of

21   the following elements beyond a reasonable doubt:

22       A.  The Defendant knowingly and intentionally

23   distributed fentanyl.

24       And B.  The Defendant knew at the time of distribution

12:17:07 25   that the substance was a controlled substance.

1    Now, I will give you more detailed instructions on
2    some of these terms.
3        A.  To prove the Defendant knowingly distributed the
4    fentanyl, the Defendant did not have to know the substance
5    was fentanyl.  It is enough that the Defendant knew that it
6    was some kind of controlled substance.
7        Further, the Defendant did not have to know how much
8    fentanyl he distributed.  It is enough that the Defendant
9    knew that he distributed some quantity of fentanyl.
10   The term "distribute" means the Defendant delivered or
11   transferred a controlled substance.  If you are convinced
12   that the Government has proved all of these elements, say so
13   by returning a guilty verdict on this charge.  If you have a
14   reasonable doubt about any one of these elements, then you
15   must find the Defendant not guilty of this charge.
16       Count 1 of the indictment further alleges that death
17   resulted from Defendant's distribution of fentanyl.  The
18   allegations of Count 1 are hereby realleged and incorporated
19   by reference herein.
20       It is further alleged that on or about March 7, 2016,
21   in Lorain, Ohio, Jacob Castro-White did fatally ingest and
22   overdose on a controlled substance; namely, fentanyl, which
23   had been distributed by Russell Davis.
24       For this enhanced penalty to apply, the Government
25   must prove the additional element that the Defendant's

1     conduct caused the death.  In order to establish that the

2     drugs distributed by the Defendant resulted in the death of

3     JCW, the Government must prove that JCW died as a

4     consequence of his use of the drugs, that the Defendant

12:18:46  5   distributed on or about the date alleged in the indictment.

6         This means that the Government must prove beyond a

7     reasonable doubt that but for the use of the drugs that the

8     Defendant provided, JCW would not have died.

9         "But for" causation exists where death would not have

12:19:04 10   occurred had the controlled substance distributed by the

11    Defendant not been ingested by JCW.

12        In other words, there is "but for" causation where the

13    use or use of the controlled substance combines with other

14    factors to produce death and death would not have occurred

12:19:21 15   without the incremental effect of the controlled substance.

16        The Government is not required to prove that the

17    Defendant intended to cause the death of JCW or that his

18    death was foreseeable by the Defendant or others.

19        Next I want to explain something about proving a

12:19:40 20   Defendant's state of mind.  Ordinarily, there is no way that

21    a Defendant's state of mind can be proved directly because

22    no one can read another person's mind and tell what that

23    person is thinking.  But, a Defendant's state of mind can be

24    proved indirectly from the surrounding circumstances.  This

12:19:57 25   includes things like what the Defendant said, what the

1    Defendant did, how the Defendant acted, and any other facts

2    or circumstances in evidence that show what was in the

3    Defendant's mind.

4        You may also consider the natural and probable results

12:20:13 5    of any acts that the Defendant knowingly did or did not do

6    and whether it is reasonable to conclude that the Defendant

7    intended those results.  This, of course, is all for you to

8    decide.

9        Next, I want to explain something about possession.

12:20:29 10   The Government does not necessarily have to prove that the

11   Defendant physically possessed the controlled substance for

12   you to find him guilty of this crime.  The law recognizes

13   two kinds of possession.  Actual possession, and

14   constructive possession, and either one of these, if proved

12:20:45 15   by the Government, is enough to convict.

16       To establish actual possession, the Government must

17   prove at that time Defendant had direct, physical control

18   over the fentanyl and knew that he had control of it.  To

19   establish constructive possession, the Government must prove

12:21:00 20   that the Defendant had the right to exercise physical

21   control over the fentanyl and knew that he had this right,

22   that he intended to exercise physical control over a

23   fentanyl at some time, either directly or through another

24   person.

12:21:16 25       For example, if you left something with a friend

1       intending to come back later and pick it up or intending to

2       send someone else to pick it up for you, you would have

3       constructive possession of it while it was in the actual

4       possession of your friend.

5               But understand that just being present where something

6       is located does not equal possession.  The Government must

7       prove that the Defendant had actual or constructive

8       possession of the controlled substance and knew that he did

9       for you to find him guilty of this crime.  This, of course,

10      is all for you to decide.

11              That concludes the part of my instructions explaining

12      the elements of the crime.  Next, I will explain some rules

13      that you must use in considering some of the testimony and

14      evidence.

15              The Defendant has an absolute right not to testify.

16      The fact that he did not testify cannot be considered by you

17      in any way.  Do not even discuss it in your deliberations.

18      Remember, that it is up to the Government to prove the

19      Defendant guilty beyond a reasonable doubt.  It is not up to

20      the Defendant to prove that he is innocent.

21              You have heard the testimony of Dr. Stephen B. Evans,

22      Kevin Shanks, Thomas William Young, and Robert Aguero, who

23      testified as opinion witnesses.  You do not have to accept

24      their opinions.  In deciding how much weight to give it, you

25      should consider the witnesses' qualifications and how they

1   reached their conclusions.  Also consider the other factors

2   discussed in these instructions for weighing the credibility

3   of the witnesses.  Remember you alone decide how much of a

4   witness' testimony to believe and how much weight it

12:22:56  5   deserves.

6       You have heard the testimony of Jacob Kunkle and Casey

7   Carty, who testified to both facts and opinions.  Each of

8   these types of testimony should be given the proper weight.

9   As to the testimony on facts, consider the factors discussed

12:23:14  10   earlier in these instructions for weighing the credibility

11   of witnesses.  As to the testimony on opinions, you do not

12   have to accept their opinions.  In deciding how much weight

13   to give it, you should consider the witness' qualifications

14   and how they reached their conclusions, along with the other

12:23:29  15   factors discussed in these instructions for weighing the

16   credibility of witnesses.  Remember that you alone decide

17   how much of a witness' testimony to believe and how much

18   weight it deserves.

19       You have heard the testimony of Corey Stock.  You have

12:23:45  20   also heard that before this trial, he was convicted of a

21   crime.  This earlier conviction was brought to your

22   attention as one way to help you decide how believable his

23   testimony was.  Do not use it for any other purpose.  It is

24   not evidence of anything else.

12:24:06  25       You have heard the testimony of a number of witnesses.

1    You have also heard that before this trial, they made a
2    statement that may be different from their testimony here in
3    court.  This earlier statement was brought to your attention
4    only to help you decide how believable their testimony was.
5    You cannot use it as proof of anything else.  You can use
6    it, only use it as one way of evaluating their testimony
7    here in court.

8        You have heard testimony that the Defendant committed
9    crimes other than the ones charged in the indictment.  If
10   you find the Defendant did commit -- did those crimes, you
11   can consider the evidence only as it relates to rebut the
12   Defendant's claim to law enforcement that he is not a drug
13   dealer.  You must not consider it for any other purpose.

14       Remember that the Defendant is on trial here only for
15   Count 1, and the enhancement for death resulting not for
16   other acts.  Do not return a guilty verdict unless the
17   Government proves the crime charged in the indictment beyond
18   a reasonable doubt.

19       You have heard and seen some recordings that were
20   received in evidence, and you were able to see the
21   recordings with written transcripts.  Keep in mind that the
22   transcripts are not evidence.  They were given to you only
23   as a guide to help you follow what was being said.  The
24   tapes themselves are the evidence.  If you notice any
25   differences between what you heard on the tapes and what you

1    read in the transcripts, you must rely on what you heard,

2    not what you read.  And if you could not hear or understand

3    certain parts of the tapes, you must ignore the transcripts

4    as far as those parts are concerned.

5        You have heard evidence that the Defendant, Russell

6    Davis, made a statement.  It is for you to decide whether

7    the Defendant made that statement, and if so, how much

8    weight it deserves.  In making these decisions, you can

9    consider all of the evidence about the statement, including

10   the circumstances under which the Defendant allegedly made

11   it.  You may not convict the Defendant solely upon his

12   uncorroborated statement or admission.

13       Now the Government and Defendant have agreed or

14   stipulated to certain facts.  Therefore, we must accept the

15   following stipulated facts as proved.  Look at the last two

16   pages of the instructions, ladies and gentlemen, and you'll

17   see stipulations of the parties.

18       Please read along with me.

19       Now come the parties and agree to the following

20   stipulations or agreements:  It is hereby stipulated and

21   agreed by and between the United States of America and

22   Defendant, Russell Davis, AKA Red, that all of the records

23   obtained from the Lorain County Medical Examiner's Office

24   are self-authenticating public documents, and admissible

25   over objections as to authenticity, best evidence, or chain

1   of custody.

2        It is hereby stipulated and agreed by and between the

3   United States of America and Defendant, Russell Davis, AKA

4   Red, that all the records obtained from Axis Forensics

5   Laboratory are self-authenticating public documents and

6   admissible over objections as to authenticity, best

7   evidence, or chain of custody.

8        It is hereby stipulated and agreed by and between the

9   United States of America and Defendant Russell Davis, AKA

10  Red, that all the documents obtained from the City of Lorain

11  and LEADS are self-authenticating public documents and

12  admissible over objections as to authenticity, best

13  evidence, or chain of custody.

14       It is hereby stipulated and agreed by and between the

15  United States of America and Defendant, Russell Davis, AKA

16  Red, that all the phone records, reports, and subscriber

17  information relating to the Defendant, Jacob Castro-White,

18  Harry Karaplis, Erika Matus, and Corey Stock, and the phones

19  at issue in this case are self-authenticating business

20  records and admissible over objections as to authenticity,

21  best evidence, or chain of custody.

22       It is hereby stipulated and agreed by and between

23  United States of America and Defendant, Russell Davis, AKA

24  Red, all the records relating to the Cellebrite phone dump

25  of the Defendant's phone are admissible over objections as

1      to authenticity best evidence, or chain of custody.

2          And it is hereby stipulated and agreed by and between

3      the United States of America, and Defendant, Russell Davis,

4      AKA Red, that the Government's and Defense's summary charts,

5      pursuant to Evidence Rule 1006, are admissible as primary

6      evidence, summaries, and are evidence to be considered by

7      the jury.  Okay.

8          Ladies and gentlemen, we're going to stop right at

9      that point.  And I will see counsel at side bar, please.

10          (The following proceedings were held at side bar:)

11              THE COURT:  Okay.  The Court has read the

12      instructions of law in this case.  On behalf of the

13      Government, Mr. Katsaros, Mr. Corts, any objections,

14      comments, or additions?

15              MR. KATSAROS:  No objection.

16              THE COURT:  Mr. Bryan, on behalf of the

17      Defense?

18              MR. BRYAN:  No objection, your Honor.

19              THE COURT:  Okay.  All right, guys.  We'll

20      take a short break for the jury.  Come back and go straight

21      through.  You're reserving -- you're opening?

22              MR. CORTS:  I'm doing the initial, and I'm

23      going to try to finish by 55 minutes which will leave him

24      about 20 minutes.

25              THE COURT:  Fair enough.

1174

1    MR. KATSAROS:  You'll let me know or should I

2  keep track of how much time I have?

3    THE COURT:  I'll probably send a note to Chris

4  if -- I'll urge you to try to keep track but -- I'll do the

12:29:40  5  same on my end.  Same thing for you, Ed.

6    MR. BRYAN:  Yes, Judge.

7    THE COURT:  Okay.  Anything else, guys, at

8  this point?

9    MR. CORTS:  No.

12:29:48 10    THE COURT:  Okay.  Let's try and keep the

11  closing arguments clean so we're not littering with

12  objections and rulings on closing arguments.  Okay?

13    MR. CORTS:  Okay.

14    THE COURT:  All right?  Thank you.

12:29:57 15    (Proceedings resumed within the hearing of the jury:)

16    THE COURT:  Ladies and gentlemen, at this

17  point, let's take a short break.  We'll come back and start

18  with the closing arguments.

19    What we'll do is have the closing arguments.  Then

12:30:09 20  we'll pick up where we left off with the introduction, which

21  will give you the procedures to follow in the jury room.

22    So the flow is the instructions of law, closing

23  arguments, then procedures in the jury room.  So let's take

24  a short break.

12:30:20 25    (Thereupon, a recess was taken.)

1          THE COURT:  Ladies and gentlemen, time for

2     closing arguments.  Mr. Corts, on behalf of the Government.

3          CLOSING ARGUMENTS ON BEHALF OF THE GOVERNMENT

4          MR. CORTS:  Thank you, your Honor.  May it

12:44:47  5     please the Court.  Defense counsel.

6          Ladies and gentlemen, on March 7, 2016, after 12:34

7     A.M., in the morning, and after Jacob Castro-White and Harry

8     Karaplis used a mixture of heroin and fentanyl, they

9     received from the Defendant, Russell Davis, Red, Jacob

12:45:19 10   Castro-White, an otherwise healthy 23-year-old in shape,

11    strong individual, who was also addicted to heroin, became

12    one of too many statistics of individuals in our communities

13    who suffer and die as a result of people like the Defendant,

14    a self-admitted drug dealer, peddling poison in our

12:45:50 15   community.

16         The Government, ladies and gentlemen, has offered you

17    a clear and compelling and common sense approach, a strong

18    and a direct case against that individual, which I'm going

19    to refer to most of this argument as Red, because that's

12:46:09 20   what everybody has known him as, and that's what the records

21    indicate.

22         But, ladies and gentlemen, I'm sure that Mr. Bryan is

23    going to do what he is supposed to do.  He's going to get up

24    here and he is going to attack the Government's case.  And

12:46:25 25   I'm sure he's going to spend a significant amount of time

1    attacking Harry Karaplis and his testimony.

2         So I want to start somewhere else.  I'll get to that.

3    But, I want to start right there with Mr. Davis himself.  I

4    want to tell you to take his word for it because, ladies and

12:46:44 5    gentlemen, on April 13, 2016, you recall Russell Davis met

6    with Detective Buddy Sivert.  And Russell Davis, in one

7    sentence, ladies and gentlemen, in one sentence,

8    crystallized this entire case and told you about this entire

9    case what the Government's been trying to endeavor to prove

12:47:10 10    to you for a week.

11         Russell Davis told Buddy Sivert -- and we're going to

12    turn to Government's Exhibit 32 and play this portion for

13    you.  You'll have the entire document and the entire

14    interview if you want to hear it.  But, can you play that,

12:47:26 15    please?

16         (Government's Exhibit 32 played before the jury.)

17              MR. CORTS:  There it is, ladies and gentlemen.

18    Russell Davis on April 13th in front of Detective Buddy

19    Sivert, and Buddy Sivert tells him what was going on, that

12:48:15 20    there was a young person who had died, and he said,

21    "Somebody said I sold them drugs and died?"  Detective

22    Sivert responds:  "Well he definitely died."

23         Here it is.  Russell Davis says, "I didn't sell him

24    nothing.  Now, did somebody give it to him?  Maybe."

12:48:33 25         Now, ladies and gentlemen, I submit to you that that

1       is tantamount to an admission in this case because Red knows

2       the case.  That's the case, ladies and gentlemen.  The case

3       is that on those early morning hours, Harry Karaplis and

4       Jacob Castro-White went over to Red's house to get drugs.

12:48:53  5   The phone records back that up.  The text messages back that

6       up.  Common sense phone records, common sense phone records.

7             They go over there.  Harry Karaplis gets the drugs

8       from Red.  Red doesn't give them directly to Jacob

9       Castro-White.  He gives them to Harry Karaplis.  Harry

12:49:14 10   Karaplis then takes them and gives them and shares them with

11      Jacob Castro-White.  That is the case.  Red didn't give them

12      directly to Harry Karaplis.  He gave them to somebody else.

13      Now did somebody else give them?  I guess so.

14            Now, ladies and gentlemen, that is one sentence from

12:49:31 15   the Defendant, straight from his mouth.  We're going to talk

16      about many other quotes from him, but that's the case in a

17      nutshell.  But Red didn't understand or appreciate the role.

18            Now you just heard the Judge instruct you, and I'm

19      going to go through a couple of the things that are

12:49:50 20   important that the Government doesn't have to prove, ladies

21      and gentlemen.

22            The Government doesn't have to prove, and you heard

23      the Judge's instructions, that Jacob' death was purposeful.

24      In other words, we're not even saying that Red purposefully

12:50:03 25   caused the death of Jacob Castro-White, that Jacob's death

1    was foreseeable to Red.  The Judge instructed you that.

2        So we're not even saying that, you know, we have to

3    prove that he was either reckless in that regard or knew.

4    The Judge will instruct you on that.  Now clearly, ladies

12:50:23  5    and gentlemen, drug dealers know that the product and poison

6    that they're selling are capable of any time of causing

7    death or causing significant harm.

8        And, ladies and gentlemen, by their own strategy in

9    this case, we're going to talk about that, they told you

12:50:42 10    several times and asked the witnesses questions, he was a

11    drug dealer, he was a drug dealer on this day but he sold

12    heroin, he sold heroin on the 5th, on the 6th, but not on

13    the 7th.  But, drug dealers know or certainly are reckless

14    in that regard, that people who use their product could

12:51:01 15    suffer substantial harm.  And that's no secret.  Especially,

16    ladies and gentlemen, when you look at that April 13th

17    interview, as it goes on, he talks about it.  He knows that

18    people are dying left and right on the streets of Lorain.

19    He says that, ladies and gentlemen.  So we don't have to

12:51:19 20    prove that the death was foreseeable to Red.  We don't have

21    to prove that Red sold directly to Harry.  That's where Red

22    is wrong.

23        If you remember, he told Corey that, too.  Corey

24    stopped, remember, in a conversation that Red had with Corey

12:51:36 25    Stock, as this case moved along after Jacob died, he told

1   Corey Stock, "I don't have anything to worry about.  I

2   didn't sell directly to that kid.  I sold to Harry."

3       Now, that's not what the law is, but maybe that's what

4   Russell Davis believed when he was telling all these people

12:51:53  5   when he was making these admissions.

6       We don't have to prove that Red even knew what he was

7   selling was powerful and potent fentanyl that everyone knows

8   about, that is at least 400 or 40 to 100 times stronger than

9   heroin.  Those are the things that the Government doesn't

12:52:11  10   have to prove in this case.  Nor does the Government have

11   to, as I told you in voir dire, have any burden in this

12   case.

13       The burden of proof in this case is proof beyond a

14   reasonable doubt.  The Judge just instructed you on what

12:52:26  15   that means.  It's not proof beyond all mere doubt.  It's not

16   proof beyond all doubt because everything open to human and

17   moral affairs has some doubt.  So your job and duty, ladies

18   and gentlemen, when you go back to the jury room, and the

19   Judge will explain this to you, is not to say I think the

12:52:42  20   Government proved its case.  But, boy, I wish we had this or

21   I wish we had this or I wish we had this or they had that.

22   Ladies and gentlemen, these cases develop as they are, and

23   the Government presents to you evidence.  And what you need

24   to do is take a look at what the evidence is presented and

12:52:59  25   then ask yourself to go through the analysis that the Judge

1    will instruct you, has the Government proven its case.

2         Ladies and gentlemen, this last week, you have sort of

3    gotten a look into an ugly and dark world where there really

4    are no winners.  There are none.  Young kids, high school

12:53:25  5    kids, getting addicted to drugs, starting with pills and

6    then that not being strong enough, and then going to illicit

7    drugs, ruining their lives, being addicted, living a

8    dysfunctional life.  The casualty in this case was Jacob

9    Castro-White.  He was the casualty.

12:53:45 10         I guess there's some bright spots here that Corey

11   Stock and that Harry Karaplis and that Erika Matus appear,

12   at least it appears, that they're clean and sober and

13   proceeding towards living a productive life.  I don't know

14   if they're going to make that path.  They have demons.

12:54:05 15   These addicts have demons.  There's a demon over there,

16   ladies and gentlemen.  He's a demon who preyed upon these

17   people.

18         All you need to know is that after he learned of Jacob

19   Castro's death, what was he doing?  He continued, continued

12:54:22 20   to sell dope in our community.  He continued to sell dope to

21   addicts; Corey Stock.  He continued to sell dope to addicts,

22   Harry Karaplis.

23         And as I said, maybe there's a bright spot.  Maybe

24   some of these young people can turn their lives around, but

12:54:40 25   ladies and gentlemen, they've got demons.  And there's a

1       demon sitting in this courtroom, and I ask you to look at

2       the evidence and make him answer for what he's done in this

3       case.

4               Ladies and gentlemen, strong compelling case.  Follow

5       the phones.  As my colleague said initially, follow the

6       phones.  Use your common sense.

7               Let's talk about reasonable doubt and talk about

8       things that there are no doubts about.  There is no doubt,

9       ladies and gentlemen, none, reasonable or otherwise, that

10      Russell Davis, Red, is a drug dealer.  There's no doubt,

11      reasonable or otherwise, that he's a drug dealer that sells

12      heroin.

13              Ladies and gentlemen, there's no doubt in this case,

14      reasonable or otherwise, that on the days leading up to

15      March 7, 2016, that drug dealer sold heroin, opiate, drugs,

16      there's no doubt, to Corey, to Harry, to Jacob.  There's no

17      doubt.

18              In fact, how do we know that?  First of all, they

19      almost conceded that.  They're not challenging that.  That's

20      a strategic choice they made in the Defense to come in and

21      say yeah, he's a drug dealer, but you know on this one

22      occasion, he was asleep.  So they went to Erika Matus'

23      house.  We'll talk about Erika Matus, but that's essentially

24      their defense, ladies and gentlemen.  But, there's no doubt,

25      none, reasonable or otherwise, he's a drug dealer.  He's a

1    heroin dealer.  He sold drugs to Harry, to Jacob, to Corey.

2        What other evidence do we have is this the phone

3    records.  The phone records are replete with instances where

4    there's contact between those individuals and Red and

5    discussion from Red, discussing amounts, discussing

6    locations, are in the street, yeah, discussing times.

7        Also you heard Special Agent Casey Carty talk about

8    the Cellebrite he did on the Defendant's phone, and he

9    talked about other instances about drug talk, about heroin,

10   about white stuff, about cocaine, about marijuana.

11       What else do we know?  We know that Harry and Corey

12   have provided direct testimony, direct testimony that comes

13   from the witness stand where they come in here and have to

14   face cross-examination, and they have the guts to tell you

15   yeah, I'm a heroin addict, and yeah, I bought off of Red.

16   And the Defense goes on and continues to ask him, well, you

17   know, Red only service you, you, and you.  Red dealt with

18   you on this day.  You met Red here.  That's not the

19   Government -- that's the Defendant's only case.  Unrefuted,

20   unrebutted, no doubt about it.  He's a drug dealer.  He

21   sells heroin, and he met with these guys.  How else do we

22   know that?

23       The covert call.  You'll have an opportunity to listen

24   to that covert call between Mr. Davis and Harry Karaplis.

25   During that call, there are important things to think about.

1    First of all, he says hey, "I haven't heard from your boy in

2    a long time.  What's going on?"  Because he did hear Corey

3    was arrested.  So now he's worried, what's next.

4        "I think he's not doubling back on me or double

5    crossing me or snitching.  I think I stopped fucking with

6    him before that, selling drugs."

7        That's evidence, ladies and gentlemen, that is strong

8    and compelling about Mr. Davis selling drugs to these

9    individuals and specifically selling drugs on March 7th, as

10   the phone records indicate and the witnesses testified

11   about.

12       Ladies and gentlemen, what else do we know that proves

13   without a doubt that he is a drug dealer?  The drugs that

14   were taken from his house that were packaged for sell and

15   distribution amounts.  What else, ladies and gentlemen?

16   Again, his own words.  And you have two instances where

17   you're going to hear his own words that show you that.

18   That's Exhibit 31 and Exhibit 32; the covert call, and the

19   statements he made at the police station.

20       What else, ladies and gentlemen?  Government's Exhibit

21   13, Page 15 and on.  You recall this.  These are the cell

22   foreign records, and I stopped at Government's Exhibit 15

23   because everyone in this case agrees that the green phone

24   and the blue phone, Corey's phone and Harry's phone, went up

25   at the appropriate times between 12:00 and 1:00 A.M.  You'll

1    have this exhibit, up towards Red's house.  Consistent with

2    the chatter, the text, the phone calls between Harry and Red

3    about setting this drug deal up.

4         What do we know next?  Red's phone stayed up there in

5    his sector by his house.  And we know that Jacob's phone

6    came back, and we know that Harry's phone didn't come back

7    immediately because it came back, but there was no phone

8    records.  There was no phone activity.  So it doesn't

9    register.

10        So those are the things that we know, ladies and

11   gentlemen, for sure.

12        Now what else do we know?  And I ask you again.

13   Follow the phones.  Use your common sense as the jury

14   instructions say throughout.  Don't leave your common sense

15   at that door.

16        Again, Government's Exhibit 32, where he crystallized

17   and pointed out the entire facts of this case in one

18   sentence when he said, "I didn't sell him nothing.  Now, did

19   someone give it to him?  Maybe."  And he said the same thing

20   to Corey Stock.  And you'll recall Corey Stock.

21        Now, let's take a look, and I ask you to take a look

22   at Government's Exhibit 31 and 32 and compare them to each

23   other.  During the controlled call, which is Government's

24   Exhibit 31, Harry and Davis, and it's obvious that Davis had

25   been talking to Harry after Jake's death.  We know this to

1    be true for a number of reasons:

2         1.  The phone records indicate that.  They don't

3    dispute that.

4         2.  Harry says he's still buying off of him.

13:01:04  5    Remember the night of the wake on March 9th, this

6    demon is still out there selling dope to people after he

7    learned that Jacob Castro-White died.

8         And furthermore, on April 11th, the day of the call,

9    you'll hear conversation between Harry making evidence that

13:01:23 10    they clearly had been talking to each other.  Harry says it.

11    "Red, like I told you last time, dude," which of course

12    connotes they've been talking, "I heard he got arrested and

13    I haven't talked to him since.  That's Corey.

14         Then Davis says, "Oh, I thought I would make -- I just

13:01:38 15    wanted to make sure he ain't did no crooked shit.  Feel me?"

16    Wants to make sure he's not being snitched on.

17         "Oh, that's why I thought I would just make sure he

18    ain't doing no crooked shit.  Yeah, because I was thinking

19    I'm trying to think if I stopped fucking with him before he

13:01:53 20    went or after he got busted.  Then he came to me a couple

21    more times.  A couple of jewels and there."

22         Stopped fucking with him.  That means selling dope.

23    And he says, "He came to me a couple more times."  Now you

24    heard Corey Stock testify that the only relationship they

13:02:10 25    had was a drug relationship, a heroin relationship.

1    Harry says, "Yeah, well, after, you know, all that

2    shit happened with my dude, he just ran," interrupts him.

3    So there's no dispute about this, ladies and gentlemen.  He

4    knows exactly what he's talking about.  He says, "Oh, yeah.

13:02:28  5    How that turn out?  Did they sweat you a lot?"

6    He goes on, just to make sure that we all know what it

7    is.  He says, "I mean well, I mean the police.  Did they

8    sweat you a lot?"  He knows exactly what's going on.  He

9    knows about Jake.  He heard about Jake.  Corey Stock talked

13:02:48 10    to him.  Remember, Corey Stock talked to him and said, "Hey,

11    did you hear about what happened with Jake?"  And remember

12    the testimony from Corey Stock was he said he's got nothing

13    to worry about; he didn't sell it to that kid.

14    Now, when you juxtapose that, that statement heard on

13:03:06 15    April 11th, that covert call, when you juxtapose that with

16    his statement to the police on April 13th, you compare it,

17    what happens?  First, he comes in and denies that he's even

18    a drug dealer.

19    Now, we know that's a lie.  We know that's a lie for

13:03:20 20    so many reasons.  I'm not even going to spend time on that,

21    ladies and gentlemen.

22    He gives multiple phone numbers and lies about the

23    whereabouts of the phones.  Remember?  Detective Sivert was

24    asking him about the phone, and he gives a fake number.

13:03:33 25    Then he gives another fake number.  Then he gives another

1  fake number and Sivert says to him, "Hey I'm trying to get

2  some trust in you."  Then he gives another one, and then he

3  lies about the location of the phones.  Says it's over his

4  girlfriend's.  If you listen to that testimony again, later

13:03:49  5  on, Detective Sivert says, "Hey, we're going to tear that

6  house apart, and I kind of want to avoid that.  Can you tell

7  me where the phone is?"  He finally admits the phone is in

8  the house and tells him where.  And that's significant

9  because Government's Exhibit 30 is a treasure trove of

13:04:02  10  information as it relates to the Defendant in this

11  significant time period.  You recall that?  The significant

12  time period.  That's what Mr. Bryan says, and I agree, too.

13  From the 5th through the 7th, that's a significant time

14  period.  We've got Jacob Castro-White's records.  We've got

13:04:20  15  his records now.

16      So what do you see?  At that particular time, the

17  patrol -- Detective Sivert asked him, "You know about Jake?"

18  And he denies it.  He says he doesn't know anything about

19  it.

13:04:34  20      So juxtapose those two statements and also remember

21  what he says because it's the key to the case along with the

22  phones.  Common sense.  And, of course, Red's own

23  statements.  I didn't sell him nothing.  Now, did somebody

24  give it to him?  Maybe.

13:04:52  25      So let's look next, ladies and gentlemen, at the five

1    drug stings that took place between the Defendant, Red, and

2    these three individuals, Jacob, Harry, or Corey, leading up

3    to this time period.

4        On March 5th, '16, 11:00, Corey and Jake buy from Red.

5    You'll have those phone records.  Those are on Pages 3

6    through 9 of Government's Exhibit 14.  And you'll have an

7    opportunity, of course, to use those and go through those.

8        But, next, on that same day, March 5, 2016, at

9    approximately 4:00, Corey, Jake, and Harry grab from Red

10   again.

11       The next day, March 6th at 1:10, Jake and Corey buy

12   from Red.  The next buy is -- that's at 1:10.  The next buy

13   is 9:51 to 10:00 P.M.  Corey buys off of Red and, of course,

14   on 3-7-16 at 12:34 A.M., Harry and Jake buy from Red on that

15   last occasion.

16       So what we had presented to you were call patterns.

17   If you'll recall, Special Agent Carty testified that on that

18   March 5th buy from 9:40 to 11:09, about less than 90 minutes

19   of time, there were about 40 text messages between

20   Castro-White and Stock, and he surrounded that morning buy

21   from Red.  And there are discussions of Red and meetings

22   with Red, and you'll see that.

23       So that's about 40 texts.  On March 5th, '16 from 3:52

24   to 4:17, about 25 minutes, there were ten texts.  This is

25   Government's Exhibit 14 Page 10.  You'll have this.  There

1      were ten texts surrounding that meeting.

2            Government's Exhibit 14, Pages 12 through 20, this is

3      the third buy.  On March 6, 2016 from 4:29 to 4:56, less

4      than 30 minutes where ten texts between Castro-White and

13:07:03  5      Corey regarding buying from Red.  And then they picked up

6      again, ladies and gentlemen, about 8:18 A.M. to 1:10 for a

7      period of about four hours.  And during those times, there

8      were 41 other texts that were exchanged about grabbing from

9      Red and talking about Red.  You'll see them.  These texts

13:07:22  10     pertain to the 3-6 morning buy from red.  And then they pick

11     up again later.

12            Ladies and gentlemen, on March 6, 2016, from about

13     9:51 to 10:46, less than an hour period, there were 22 texts

14     exchanged.  The series ended with -- I want to show you

13:07:44  15     this.  This is Page 24, Line 213 of Government's Exhibit.

16     You look at 213, remember this, one.  This is the one right

17     before the Defense pointed out, and it's in the Government's

18     chart too, that, "Hey, I can grab from Erika.  It wasn't as

19     good."

13:08:04  20            What does Jacob Castro-White say?  "Yeah, I'll just

21     wait for next time with Red."  That's important, ladies and

22     gentlemen.

23            Then we see, of course, the 11:34 buy on March 7th.

24     And if we could start on that particular Line 220, and just

13:08:26  25     walk through that fairly quickly.

1    So if you start with Line 220, ladies and gentlemen,

2    you see text messages going back and forth but on 2:20,

3    "Where are you trying to throw down at all?" Later on,

4    there's a call from Stock, Karaplis to Stock, then Karaplis,

13:08:47 5    "Hey, man. I -- can I get for -- hey man, can I get for me,

6    dude?" Let's go to the next page, please.

7    Karaplis calls. No answer. I called. He didn't pick

8    up. So either I'll let you know if he answers.

9    Next --- you can follow along with me, ladies and

13:09:06 10    gentlemen. "Okay. Cool. Thank you."

11    Karaplis: "Yeah, no problem. I'll call him again in

12    like 20. He might be with -- he might be with a hooker if

13    he's not sleeping.

14    Ha-ha. That's hilarious. They're all gross around

13:09:20 15    here.

16    Yeah. He loves that shit. I know it's sick.

17    Go to the next page please. Now we're turning to the

18    morning hours of 3-7.

19    Corey or Castro-White says to Karaplis, "I never seen

13:09:32 20    him. Ha-ha." That's because he hasn't. These other guys

21    have been hooking him up through Red. Karaplis says, "If he

22    answers you will because you'll have to take me there." You

23    recall at this time Corey had Harry's -- had Harry's car.

24    Then there's a call on Line 234. It shows a

13:09:50 25    two-second call between Karaplis and Davis. Karaplis then

1    says I called three more times, no answer.

2         Then there's Davis to Karaplis call.  So that's

3    originating from Davis, the Defendant in this case, to

4    Karaplis.  So he's calling him back.  Then there's a call

13:10:08  5    from Karaplis to Davis.  This is eight minutes.  The call

6    shows a 46-second call in Karaplis' tolls and a 62-second

7    call in Davis' tolls.  And a conversation take place.

8         Can we go to the next slide, please?

9         Then Karaplis calls Castro-White.  Castro-White texts

13:10:28 10    Karaplis, "He's probably asleep."  Karaplis texts, "I just

11    got your sleeping text.  LOL.  He was asleep, but he woke

12    up."  And the calls that precede that show that he woke up

13    because they had conversations.

14         Karaplis says, "The sooner the better because he might

13:10:46 15    fall back asleep."

16         Castro-White says, "On way."  And at 16 minutes after

17    about to be there, KK.  Karaplis says outside.  Go to the

18    next, please.

19         Then there's calls between Karaplis -- if we can go

13:11:04 20    back one page for a second.  At the bottom, there's a Davis

21    call to Karaplis.  If can you go to the next page.  And that

22    call shows a 50-second call and a 66-second call in tolls,

23    from Davis' tolls.  Another conversation, ladies and

24    gentlemen between Davis and Karaplis, initiated that time by

13:11:20 25    Davis.  Then there are more calls.  Line 248 a call from

1    Karaplis to Davis.

2        Line 249 a call from Karaplis to Davis.

3        Line 250, I'm -- 249 is the last call, ladies and

4    gentlemen, Karaplis to Davis.  That's the one that there's

13:11:39  5    this debate about six seconds.  I asked the phone expert the

6    timing of how long does it take, outside, how long does it

7    take to say here.  You heard that testimony.

8        So the phones.  Common sense, and Red's own words.

9    That's the theme of the Government's closing here.

13:12:04 10        Now, the cell tower records.  I'm not going to go

11    through those again, but you know what they are.  The phones

12    go up, phones come down.

13        So ladies and gentlemen, that is essentially sort of

14    the first part of the case.  Did Red sell to these

13:12:20 15    individuals?  I submit to you that the evidence is

16    compelling.  The next part of the case that we turn to is

17    did the drugs that were used by Jacob Castro-White that he

18    received from the Defendant cause the death.  Were they the

19    "but for" cause of Jacob Castro-White's death?

13:12:38 20        Now let's look at the testimony that was presented.

21    Dr. Evans, Lorain County Coroner, He's been an emergency

22    room physician since 1985.  He was a Deputy Coroner since

23    1993, and he became a Coroner in 2001.

24        He told you of his practical, everyday, on the street

13:12:58 25    experience with drug users, with addicts, with these type of

1  activities that are occurring at a wild pace in all of our

2  communities, but especially Lorain County.  He told you that

3  he talks with addicts.  He told you that he goes to the

4  scene.  He told you that when he was a treating physician,

13:13:17  5  he treated these people, and he deals with this stuff on a

6  daily basis.

7  He told you of the hundreds of times of scenes of

8  these overdoses that he's been to, especially and

9  importantly in the last six years.  If you recall Dr.

13:13:32  10  Young's testimony, the Defense expert, he said that this

11  heroin/opioid epidemic and fentanyl really just started to

12  heat up since 2010, 2011.  Well, I submit to you, Dr. Young

13  hasn't been out in the field.  He's been in his ivory tower.

14  We're going to talk about Dr. Young and why there's

13:13:52  15  approximately 21,000 reasons why he would agree with Dr.

16  Evans.  He would go almost as far as Dr. Evans went, but

17  then he would walk back.

18  Now, so you have Dr. Evans, and he opines through his

19  Coroner Verdict there was a mixture of overdose, including

13:14:17  20  fentanyl and marijuana.  Even Dr. Young agrees the marijuana

21  doesn't have anything to do with this.  The fentanyl is the

22  big ticket.  Dr. Evans says it was the fentanyl that was the

23  main cause of the death; the "but for" cause.  The marijuana

24  was just a statistics that he had.

13:14:36  25  Of course, he conferred with his Deputy Coroner, Dr.

1    Miller, pathologist; same qualifications, same title as Dr.

2    Young on all the cases and whether to perform an autopsy or

3    not.

4         Now, Dr. Young seemed to say -- seems a bad word -- he

13:14:58  5    did say it looked like an overdose.  It seemed like an

6    overdose.  He had a haunch it was a overdose but, ladies and

7    gentlemen, remember on cross-examination, it came out that

8    he was hired by the Defense and paid a pretty penny to come

9    in here and give his testimony.

13:15:15 10         As he does, the evidence shows, in all cases, in all

11    cases that he has appeared since he became a consultant, he

12    testifies only for the Defense.  He sets his own rate.  In

13    other words, he gets paid.  He makes the money.  And he

14    doesn't survive if he writes a report that's not beneficial

13:15:36 15    to the defense.  He doesn't get hired.

16         He sits in his ivory tower where it's easy to do that.

17    And I'm not saying he's coming in here and lied.  What I'm

18    saying is he doesn't have the real time experience with

19    these drug overdose people.  He doesn't have the knowledge.

13:15:54 20    Remember this, I'm still stung by it, when he was asked

21    about tolerance.  We as lay people all know that users

22    develop a tolerance for drugs.  We see it in everyday media.

23    We talk about it.  Erika Matus told you she started off with

24    pills.  They weren't good enough for her.  She had to go to

13:16:13 25    the next thing.  She had to go to the illicit street drugs

1    to get a higher punch to get what she needed.  He wouldn't

2    even acknowledge any of that.  He says that that was a

3    fallacy or a fake.  But, he's essentially a consultant that

4    answers to no one.  His data is not peer reviewed.  His

13:16:33  5    reports are not peer reviewed.  He's a one-man shot.

6        But, ladies and gentlemen, be that as it may, he said

7    it seemed like an overdose, looked like an overdose, sort of

8    the old "walks like a duck, talks like a duck, it is a

9    duck."

13:16:50  10       Well, let's talk more about anyway -- in fact, one

11   other thing that Mr. Katsaros brought out on him, and then I

12   want to talk about one question that an injury asked.  And

13   that is Mr. Katsaros said, "Hey, Doc.  You've looked at the

14   cases that you testified on, and it seems that if there is

13:17:10  15   an autopsy, then your next attack or approach is you

16   criticize the findings in the autopsy or you criticize the

17   way the autopsy was done.

18       Ladies and gentlemen, he testifies only for the

19   Defense.  He doesn't have the real time, real word

13:17:27  20   experience.  I mean I think the last time he said he

21   actually treated a patient was back when he was in the Air

22   Force some years ago.

23       Autopsy, no autopsy.  That's where Dr. Young took

24   issue.  And again, ladies and gentlemen, proof beyond a

13:17:46  25   reasonable doubt does not mean proof beyond all doubt, and

1    I'm not apologizing, I'm not here trying to say take it easy

2    on the Government.  We proved to you this case with common

3    sense with the phone records, and the medical records of the

4    Defendant's own words.

5         Let's look at the factors that Dr. Evans considered

6    and Dr. Young talked about as to why no autopsy in this

7    case.  Dr. Young agreed with some of them, disputed some of

8    them, and we'll talk about that.  But, even a doctor -- but

9    Evans was a doctor who I said had the real experience in

10   this particular case.

11        As I said, Young hasn't treated a patient since he was

12   in the Air Force some time ago.  He hasn't dealt with

13   fentanyl as much as Dr. Evans.  He's been to very few scenes

14   in the recent years when this fentanyl opioid crisis was

15   going forward, and he admitted fentanyl is a newer

16   phenomenon, and he's a pathologist.  But let's look at the

17   facts.

18        First fact, Government's Exhibit 1-A.  Jacob

19   Castro-White himself, by all accounts, was a healthy

20   24-year-old body builder.  Government's Exhibit 1-B.  He was

21   in great shape.  All the witnesses testified to that.  He

22   had no pre-existing medical condition.  He worked out hard

23   everyday and Brian Stoll worked out hard with him.  They did

24   not just goof around.  He worked hard.  He exerted himself.

25   Healthy and happy.  Government's Exhibit 1-D, that's one of

1    the factors.

2         Now, Dr. Evans testified that you have a 23-year-old

3    healthy kid.  Remember what he said.  Sometimes he would go

4    out to the scene and he would have people that still had the

5    needle in their arms, and he determined that in those

6    particular situations, based upon a number of other factors,

7    he wouldn't do it all times.  He also testified, though, if

8    there was a reason to do an autopsy, in a drug overdose

9    case, he would do it.  He wasn't precluding doing it.  He

10   looks at them on a case-by-case basis.  He counsels with his

11   pathologist on staff and other people, and in this case

12   determined that one of the factors for not doing that was

13   the health and the condition of Jacob Castro-White.

14        The next thing he talked about was the scene evidence.

15   Let's talk about Government's Exhibit 4-G.  He comes into

16   the room, this picture is very revealing.  There's a drug

17   kit there.  There's remnants of drug usage.  And, Jacob

18   Castro-White, as I'm going to talk about in a minute, is

19   less than two feet away from that.  The significance of the

20   light being on.  You recall that.  But, this spoon and

21   syringes -- go to Government's Exhibit 4-J, please -- along

22   with the water and the lighter kit, the lighter that's the

23   kit that he talked about, out in the open, not hidden.

24   Remember he's trying to keep his drug usage from his mother.

25   The fact that it's out in the open tells us a couple of

1    things.  It tells us that whatever hit him, hit him fast.

2    He couldn't get up and put it away, to keep it away from his

3    mom.  He's had this heroin addiction for some time.  Mom

4    didn't know anything about it because Jacob didn't leave

13:21:00  5    stuff like that out on his dresser.  But, that tells us

6    about the condition.

7         And, of course, the history, knowing that the method

8    of injection was to immediately introduce by a syringe this

9    potent poison into the blood stream where he immediately

13:21:18 10    reacts, not like snorting, not like wearing the patches that

11    Dr. Young testified about.

12         Let's go on to the next factor; the position of the

13    body.  4-B, Government's Exhibit 4-B.  Mom said looked like

14    he had fallen asleep.  Dr. Evans testified that this is

13:21:36 15    usually the way the overdosers go.  They lay down, they get

16    sleepy, they struggle with breathing.  The position of his

17    arms.  Let's go with Government's Exhibit -- you see the

18    position of his arms.  And at that time, the rigor had set

19    in.

13:21:48 20         Government's Exhibit 4-J.  He was not more than one

21    foot or two-foot away from where he ultimately expired and

22    that was on the bed.  And you remember Dr. Evans' testimony

23    about that.  Kind of lay down as he did, and the mom

24    testified that he had his hands in a position that she

13:22:07 25    normally sees him sleeping and his head was tilted to the

1    side.

2         This, ladies and gentlemen, is another piece of

3    evidence that shows what Jacob Castro suffered from.

4    Healthy 23-year-old.  The Coroner walks in the room, the

13:22:22  5    police walk into the room, and there's a drug kit and open

6    drugs right there.  He was initially on the bed where his

7    mom had to pull him off, and he has rigor that's set in, and

8    he was in a sleeping position.

9         4-E, please.  Those images of course are etched on the

13:22:45  10   mother's mind forever, but Dr. Young ultimately agreed that

11   it was a factor that the body was right next to the dresser

12   with the kid and the drugs and that's -- he's saying sure

13   does look like a drug overdose, very suspicious.  If I had

14   to guess, if I had a haunch, it would be a drug overdose.

13:23:03  15        The door was shut.  He used drugs in secret from mom.

16   Drugs out in the open.  Couldn't put it away in time.

17   Basically used and fell out.  And the light on from the

18   night before gives the doctor some indication of when Jacob

19   suffered this -- this malady.

13:23:23  20        Five, the lab work, Government's Exhibit 7.  The

21   spoons tested positive for fentanyl.  The drugs tested

22   positive for heroin and fentanyl mix.  And then we'll talk

23   about the toxicology results, Government's Exhibit 18, in a

24   minute.  But these are the factors that Dr. Evans is looking

13:23:40  25   at in determining whether or not this next step of an

1    autopsy is important.

2         Number 6, this is that tolerance issue.  Another

3    individual with a greater tolerance by all accounts from

4    everyone else who testified.  Overdose, fell out, nodded

13:24:00  5    off, however you want to quantify it, from these drugs.  And

6    this is where Dr. Young took issue with any aspect of this

7    tolerance level.

8         The way the drugs were ingested immediately into the

9    system, the works, that Jacob made it to the bed, that's

13:24:17 10    about as far as he made it, and remember, this is 40 to 100

11    times stronger than heroin; 40 to 100 times stronger.  And

12    he intervenously put it into his body.

13         Let's look at Government's Exhibit 18.  This is the

14    toxicology report.  9.6, ladies and gentlemen, the

13:24:41 15    therapeutic level of fentanyl, and we're not talking about

16    patches and we're talking about illicit fentanyl in this

17    case.  Don't get confused by this molecule discussion about

18    fentanyl is fentanyl because if fentanyl was fentanyl, why

19    wouldn't doctors be subscribing or prescribing illicit drugs

13:25:00 20    from the hospital?  We all know that's ridiculous that

21    fentanyl is fentanyl.  Why wouldn't doctors say go out --

22    instead of buying from me, just go down the street corner

23    and buy fentanyl from Joe Drug Dealer or from people like

24    Red, Russell Davis?  It's ridiculous.

13:25:18 25         Dr. Young had to had to concede no, hospitals wouldn't

1    use illicit fentanyl, even though fentanyl was fentanyl.  He

2    had to concede that hospitals couldn't use illicit drugs.

3    It wouldn't be proper.  It wouldn't be safe.

4         But, look at Government's Exhibit 18.  The therapeutic

5    level is 1 to 3.  This was 9.6.  Dr. Evans, who sees this

6    stuff, these type of reports weekly, monthly, says that is a

7    textbook case.  It's three times and more.  The level, it's

8    the highest one he's ever seen.

9         Kevin Shanks.  You heard about the numbers that they

10   do.  Incredible numbers.  Basically, I think he goes through

11   literally thousands of these a year.  He says that was an

12   elevated level.  Three times the amount.  You can put that

13   back up, please.  Three times the amount of the therapeutic

14   level.

15        So this post-mortem redistribution issue.  I think Dr.

16   Evans and Mr. Shanks both testified that the window was the

17   gold standard.  It was a very small window and the place

18   they took it from was the femoral artery.  Then, ladies and

19   gentlemen, let's get sort of to the coup de grâce of this,

20   and that is the foam cone.

21        Now again, Dr. Evans is out on the street.  He's doing

22   these.  He's going to scenes and says that the foam cone is

23   indicative of an opiate/heroin overdose.  He says that.

24   Detective Sivert, the street Detective who has to respond to

25   these things, he told you about his responses.  He tells you

1      that that's evident and apparent and a sign of a heroin or

2      opiate overdose.

3          And then, Dr. Young, who, again, ladies and gentlemen,

4      I submit to you, he's been out of it for awhile.  He's been

13:27:35  5      in his ivory tower, going around the country for the

6      Defense, hired exclusively by defendants to criticize the

7      work of the Government, he says or starts out to say or

8      skirt the issue that a foam cone is not indicative of an

9      opiate overdose.  But remember Mr. Katsaros took one his the

13:27:57 10      own pieces of literature that he attached to his report, and

11      that's Dr. Dolnik, and Mr. Katsaros confronted him with it,

12      and the literature said the most -- the most significant

13      indicator in an autopsy of an opiate overdose was the lung

14      or pulmonary edema resulting in frothy white substance

13:28:24 15      resulting in essentially a foam cone.

16          In other words, if you do an autopsy and you find this

17      edema, it is the most -- it is the most significant

18      indicator of an opiate overdose.  Dr. Evans said that was a

19      textbook.

13:28:44 20          Let's look at 4-D.  That was a textbook foam cone.  If

21      he was teaching a class, he would use that.  That's what he

22      would put in his textbook.  Eventually, Dr. Young had to

23      agree.  He had to agree with his own study, and the autopsy

24      would show that.  It's the most significant indicator.  We

13:29:13 25      had the autopsy.  So, ladies and gentlemen, let's walk

1    through this.

2         You had a foam cone.  You had drugs on the table with

3    the needles and the kit within two feet of the body.  Thank

4    you.

5         You had Jacob on the bed in rigor, pulled off the bed

6    in rigor, light on, which says had some significance as to

7    when this occurred.

8         You have the drugs, not secretive as he always did,

9    which means an immediate episode.  The phone conversation

10   between Harry and Red throughout the night that we've spoken

11   about.  Conversations with Corey later where Red admits that

12   he sold drugs to Harry but doesn't have anything to worry

13   about because he didn't sell them to Jake.

14        Red's statement on April 13th that we've talked about

15   where he says yeah, maybe someone gave it to him because he

16   knew he didn't give it directly to Jacob.

17        The covert call.  Red's statements to the police.

18   Common sense, common sense, follow the phones.

19        Now, let's just look for a second at Dr. Young's

20   testimony.  Again, all the factors that we just discussed,

21   you'll recall, he agreed with some of them, he skirted some

22   of them, some he disagreed with.  The one he disagreed with

23   was the tolerance level.

24        He had a haunch it was an overdose.  He thought it was

25   suspicious.  He suspected, he just didn't opine as Dr. Evans

1       did that it was, and I submit to you he remembers who's

2       paying his bill.  And it's a significant bill, $21,000.

3             Ladies and gentlemen, I don't say that without some

4       belief, based upon his cross-examination -- the only, he

13:31:17  5       only testifies for defense people.  He has no peer review in

6       what he does, as others do.  The Government's experts, Kevin

7       Shanks made a salary ry.  He comes here and testifies.  He

8       walks off.  He says it like it is and he doesn't have to

9       worry about getting paid because his company's going to pay

13:31:39 10       him.

11             Jay Kunkle comes in.  He's a Government employee with

12       training, outstanding training.  He tells it like it is.  In

13       fact, their expert agreed with him.

14             But, those type of things represent buys.  And the

13:31:56 15       Court instructed you, you can look at buys.  Common sense.

16       This young healthy person, with no pre-existing physical or

17       medical conditions died of a heroin overdose,

18       fentanyl/opiate overdose that's sitting just feet -- just a

19       foot or two away from him.

13:32:24 20             Now, remember I said something about a question one of

21       the jurors asked, and you've been very attentive, and I

22       thank you all for that, but here is one of those a-ha

23       moments.  One of the jurors, I believe, asked a question of

24       Dr. Young.  It was a really good question.  If there was an

13:32:43 25       episode of inner cranial hemorrhage -- I think that was the

1    question.  Fill in the blank, whatever it was, because it

2    was something that he said that you should do the autopsy

3    for because those are the things you're going to find in the

4    autopsy, and those are the things that could cause a regular

5    healthy kid to just expire immediately.

6         So the question was asked would you be able to find

7    post-mortem, and that means after an autopsy, would you be

8    able to find -- fill in the blank.  I think it was

9    intracranial hemorrhage.  Would you be able to find that

10   with an autopsy.  Anybody recall what his answer was?  His

11   answer was no.

12        So post-mortem, you recall if that's accurate or not.

13   That's the way I recall it.  So he's saying that hey, this

14   autopsy should be done because we need to look for this and

15   this and this, and then when asked the direct question, he

16   says no.  Use your own recollection.  I hear the Defense

17   back there shuffling saying that's not what was said.  If

18   it's not, I'm not trying to mislead you.  I'm not trying to

19   fool you.  We're putting this case on as it came to us,

20   works and all, ladies and gentlemen.  But, that's what I

21   believe the testimony to have been.  And if I'm wrong, I'm

22   wrong.  Don't hold that against my client, the United States

23   of America.  I'm not trying to mislead you.  That's the way

24   I recall the testimony to have been.

25        Ladies and gentlemen, let's talk about the Defense

1    alternatives.  And let's put up Government's Exhibit 15

2    before we go on to that.  And that is Dr. Evans' Coroner's

3    Verdict where he found that this was a fentanyl overdose,

4    that was the "but for" cause.  But, let's talk about

13:34:42  5    defense -- talk about a possible frame job by Erika Matus,

6    Harry Karaplis, and Corey Stock.

7        Ladies and gentlemen, if you believe that the three of

8    those people got together and concocted this story, give it

9    the weight you feel is appropriate.  The Government submits

13:34:56  10   that that's the reason we went through the call logs and the

11   patterns.  There are no patterns like there were on those

12   five drug buys that we talked about, with Jacob or Harry in

13   relation to Erika Matus.  They're just not there.  You saw

14   how frantic and the pace these people had to go through.

13:35:16  15   All these texts and phone calls had to go buy from Red.

16   That's the way things work in the Drug World.

17        First of all, you just don't sell to someone you don't

18   know.  Red was worried about Corey snitching on him.

19        Let's talk about a rush to judgment.  Now, let's just

13:35:35  20   run through that real quick.  Harry I.D.'s Red by name at

21   the first interview, still I.D.'d him at the second

22   interview, and Corey told you that he I.D.'d him and

23   afterwards gave the Detective some information about where

24   he lived and what car he drove and things like that.  But,

13:35:52  25   ladies and gentlemen, it wasn't until Detective Sivert heard

1       Red's own words on April 11th during that covert call he,

2       where he -- where he denied -- or where he more or less

3       admitted that he knew of the Jake situation, even though he

4       denied it on April 13th, but that's when things started to

13:36:15  5   roll.  And at that time, they had phone records, they had

6       witness statements, they had other evidence.  They have the

7       toxicology reports back.  Erika Matus was called by the

8       Government.  We didn't talk to her until late in this

9       because it was one of those outs that the Defense was going

13:36:34 10   to give you.

11          It was Erika Matus'.  Erika Matus sold the drug.  It

12      was Erika Matus.  And there's phone records between Corey

13      Stock and Erika Matus.  Again, you assign what weight or

14      credibility you think to Corey Stock and Erika Matus.  But,

13:36:52 15   I tell you, the phone records back up what their testimony

16      is and the phone records in this case.  And we implore you,

17      as Mr. Katsaros told you at the beginning of this case, use

18      the phone records.  But, Erika Matus came in here, told you

19      about her heroin addiction, and it's horrible.  It's

13:37:12 20   horrible for Corey.  It's horrible for Harry.  It's horrible

21      for Erika.  It's horrible for all the people that that demon

22      and the demons that they have are preyed upon.  He sold two

23      days later, the day of the wake, he sold to Corey for some

24      time.  Heck, he sold so much when he is talking to the

13:37:41 25   police, he can't even say -- "I think I stopped fucking with

1    him selling dope.  I think I stopped fucking with Corey a

2    week or so ago.  I can't remember."

3        Ladies and gentlemen, he's a drug dealer beyond all

4    doubt.  He, the evidence will show, supplied drugs of heroin

13:38:03  5    and fentanyl mix to Harry and Corey on that night.

6        Now, ladies and gentlemen, I'm about to sit down.

7    But, I'm going to tell you something.  I believe that either

8    the evidence has shown a compelling, striking, clear cut,

9    common sense case that the Defendant is guilty, or he is the

13:38:28 10    unluckiest guy in the world because he's been beset or

11    befallen by a number of unlucky coincidences.

12        You can go back in there and talk about this, fill the

13    blanks in, but he's either guilty or the unluckiest guy in

14    the world because he just happened to do these things, at

13:38:57 15    the same period of time, other things happened.  For

16    example, he just happens to go in and admit to the Detective

17    on April 13th that about a month and a week after he sold to

18    Harry, who gave it to Jacob, that yeah, you know, maybe

19    somebody gave it him.

13:39:13 20        Now, that's just unlucky.  Out of the blue, if he's

21    not guilty, how would he have that information?  He's just

22    unlucky he said something like that.

23        He tells Corey he has nothing to worry about because

24    he sold to Harry and not to the kid.  Wow, another unlucky

13:39:32 25    coincidence Corey Stock came in and testified to that.  Wow.

1    These unlucky coincidences are piling up.  He tells the

2    police he's not a drug dealer when all the evidence shows

3    that he clearly is.

4        He has a gold Buick parked by his residence.  Another

13:39:50  5    unlucky coincidence.  He has packaging -- that means I'm

6    almost done.  He has packaging for marijuana, cocaine, and

7    almost admit or concedes that he sells heroin.  The phone

8    records, it's just an unlucky coincidence that on the day

9    that he's trying to say he didn't sell this dope, that the

13:40:11 10    green phone and the blue phone went up around the residence

11    and came back.  And then one of the biggest ones, ladies and

12    gentlemen, when he talks to Detective Sivert, out of the

13    blue, he recites almost verbatim in that one short sentence

14    the narrative of this case.  Another unlucky coincidence.

13:40:37 15        And then the biggest unlucky coincidence of them all,

16    he happened to have all of these things that I just talked

17    about, phone records, people coming to his house, people

18    leaving, on the same day or almost the same time that they

19    would have you believe that Jacob Castro-White, a healthy

13:41:01 20    23-year-old male, who lifts weights, who works out, kind of

21    like the NBA basketball player, but on the same day, the

22    same time he sold dope, or sure does look like it, Jacob

23    Castro-White suffered a stroke, a heart attack, an embolism,

24    steroid-induced coma, heart attack with a foam cone, on the

13:41:26 25    same day, had those -- the drug kit, and the drug

1210

1   paraphernalia out, from the person who there's no denying

2   sold him drugs.  On the 5th, on the 6th, and ladies and

3   gentlemen, on the 7th.

4        Who will stand up for Jacob Castro-White and others?

13:41:51  5   The United States will, and we ask you to join us, and we

6   ask you to find this Defendant guilty of all the charges in

7   this case.

8        Thank you, ladies and gentlemen.

9             THE COURT:  Thank you, Mr.  Courts.  Mr.

13:42:04  10   Bryan.

11             MR. BRYAN:  If I may just have a moment, your

12   Honor.

13             THE COURT:  Sure.

14             MR. BRYAN:  To get set up.

13:42:09  15

16

17

18

19

20

21

22

23

24

25

<u>CLOSING ARGUMENTS ON BEHALF OF THE DEFENSE</u>

MR. BRYAN:  Ready, your Honor.

THE COURT:  Go ahead, Mr. Bryan.

MR. BRYAN:  Ladies and gentlemen of the jury, I first want to acknowledge the life of Jacob Castro-White. His loss was a true tragedy, an anomaly from some of the statements, for all the people that loved him so much.

You saw his mother testify.  You saw his girlfriend testify.  We actually called his best friend to the stand to testify.  And all of them delivered emotional testimony in this case.  All of them choked back tears.  All of them, you can sense and determine how devastating this was for them.

And it was devastating for us as well to observe all that and to see the pictures of Jacob as he lie dead in his room and see all of the horrific surroundings that made up his exit from this world.

And we talked about this some in voir dire as well, and the reason we talked about this is because I had a concern, and that concern is a legitimate concern in cases like these, when the Prosecutor refers to your client as a demon, there's a concern that bias and sympathy and prejudice can come into play.  The Judge began this case by saying that jury service was one of the highest callings in our democracy.  Only behind active military service is jury service.  The most important thing we can do in our

1    democracy.  And just like active military service where our

2    liberty is literally defended by people who have put

3    themselves in harm's way, you, as jurors, when you

4    objectively evaluate the evidence, not motivated by any

5    bias, sympathy or prejudice, just look at the evidence and

6    arrive at a conclusion that is based upon the evidence, you

7    help provide protection for liberty as well.  In essence,

8    ladies and gentlemen you're liberty's gatekeeper.

9         This case is difficult, but when you go to the

10   evidence in this case, as much as my client could be the

11   devil himself, and you actually look at the evidence and not

12   just look at it quantitatively, but qualitatively and look

13   at where it leads and look at things in their proper context

14   and not just well, she and him talked a lot in February,

15   they talked a lot in March.  Well, of course, they talked a

16   lot in March because that's when Jacob passed away.

17        But, they can go back and say how much did they talk

18   in January.  And you look at that and you see a pattern

19   developing.  And you look at different times and places and

20   things like that, you can -- you can start to look at the

21   evidence and determine whether or not the story told by

22   their witnesses is supported by the evidence.

23        Plus they're going to say don't believe without

24   evidence.  Don't trust humanity without collateral support.

25   And what he meant by that wasn't that everybody lies.  A lot

1    of people do -- a lot of people lie to protect themselves.

2    They lie to protect others.  They lie to -- because they're

3    afraid -- but because human beings are fallible, our

4    perceptions are flawed.  We have biases.  Law enforcement

13:47:07 5    officers have bias when they're investigating a case.  They

6    can become married to their opinions as well and may not

7    look at the evidence in a way that they should or may just

8    ignore exculpatory evidence as it arises.

9        We're not here to suggest that -- and it isn't

13:47:24 10    strategy.  It isn't strategy that, quote, we're conceding

11    that Mr. Davis was a drug dealer.  We're accepting that

12    that's the evidence in this case, ladies and gentlemen.

13    That is the evidence in this case.  But, just as much as

14    there's evidence that our client, during this period of

13:47:40 15    time, is dealing with drugs, there's incredible evidence --

16    in fact, I consider my client the luckiest man alive --

17    there's incredible evidence that exonerates him in this

18    case.  And that incredible evidence comes in two words:

19    "Was sleep," was sleep.  And we'll talk a lot more about

13:48:00 20    that.

21        I'm sure in rebuttal they'll try to get up and say

22    well he was referring to something else or whatever, but go

23    through those details very closely, and you'll determine

24    that it's not that simple that he was just referring to

13:48:14 25    something else.  In fact, through the testimony of Harry

1  Karaplis, they tried to sort of lead him in that direction

2  about a call that was made just before the 12:34 call.  But

3  when you look at the records, it's a call that doesn't even

4  appear in Mr. Davis' records because it was such a short

13:48:29  5  call on Mr. Karaplis' phone.

6      And these phone records are important.  And I'm not

7  surprised that they didn't show you the -- their own

8  Cellebrite evidence in this case because it's exonerating.

9  It's evidence that shows that things didn't happen the way

13:48:45  10  the witnesses claim they happened.

11      So what is the evidence in this case?  Being honest

12  with the evidence, and that's what I think we all should do,

13  and when you objectively evaluate this evidence, honesty

14  suggests that yeah, Mr. Russell Davis was one of the persons

13:49:03  15  that these young people were grabbing from during this time

16  period.  How long were they grabbing from him?  How long had

17  they actually been getting heroin from him as compared to

18  other drugs?  Pretty clear, based upon the search of Russell

19  Davis's house, that he to sell a lot of marijuana.  It's

13:49:20  20  also clear that he likes to smoke a lot of marijuana, too.

21  There was some cocaine at his house as well, and there was

22  also the scale, the scale that the Government's witness

23  testified had marijuana residue on it, but it didn't even

24  have cocaine residue on it and didn't have fentanyl or

13:49:38  25  heroin or anything like that on it.

1        So what type of dealer was Russell Davis to these

2   people leading up to this?  I'm not going to suggest oh, he

3   was just supplying weed, cocaine, things like that, although

4   that could be an argument that could be made.  We're going

13:49:53  5   to acknowledge that there's -- there's compelling evidence

6   that he went beyond that and that he became a source of

7   supply for dope, for heroin.  But, how did he become a

8   source of supply for that?

9        We heard from the witness himself, Corey Stock, and

13:50:08 10   I'll consider him one of the most credible witnesses that

11   testified in this case, except for when it comes to Erika

12   Matus and his desire obviously to protect his dear friend.

13   But, when we hear from Corey Stock, what we hear is he knew

14   Mr. Davis, he knew that he went to him after receiving a

13:50:29 15   batch of heroin that was really strong.  Tried to explain to

16   him you need to learn how to cut this.  And even though

17   it -- it wasn't very business wise for Mr. Davis, he said,

18   "I'll just give it to you and Harry anyway.  You take care

19   of it.  You can cut it or whatever."

13:50:47 20        That's Corey's testimony.  There's evidence to support

21   that, you know, in the records.  There's that first text

22   message in January of 2016, talking about, "I'll come over

23   and show you how to do it."  The drug abuser is going to

24   show the drug dealer how to cut his heroin basically.  So

13:51:03 25   this isn't something that I would suggest Mr. Davis was

1    doing a lot, but this is evidence and acknowledged

2    admittedly so in this case that he was dealing heroin.  But

3    just as much as that evidence exists in this case, the

4    evidence is equally strong that he didn't deal heroin when

13:51:22  5    it actually matters in this case, in this homicide case, on

6    March 7th at 11:34 A.M. in the morning.

7         And we talked about that also in voir dire.  If my

8    client, if you think he's a drug dealer, are you going to be

9    able to weigh and consider all the evidence as it relates to

13:51:39 10   this specific charge?  Will you hold it against him, presume

11   him any less innocent just because he -- he's kind of

12   leading a sordid life-style?  And you all acknowledged upon

13   taking the oath you would do that, you're going to

14   objectively evaluate the evidence in this case.

13:51:56 15        Anyway, Mr. Davis and the evidence is equally clear.

16   Mr. Davis wasn't the only source of supply for these

17   individuals.

18        The sources of supply were Corey Stock testified that

19   he had at least ten different sources of supply.  That other

13:52:16 20   users had other sources of supply as well.  Those sources of

21   supplies were supplied by a person by the name of Borrey, a

22   guy by the name of A, someone else who had shit that was

23   better than most.

24        And this is all from just that tiny period of time,

13:52:33 25   this tiny window we have from the Government's case, that

1    March 4th, 5th, 6th and 7th, based upon the phone draft, or

2    excuse me.  Not the phone draft, but the text draft sent out

3    by Detective Sivert, but we also know these people from

4    their own words were using drugs on a regular basis around

5    the clock.  So they had sources of supply.

6        And one of the multiple sources of supply was Erika

7    Matus.  And we -- we're not throwing her in there as a red

8    herring.  We're throwing her in there because the evidence,

9    ladies and gentlemen, when you step back and you look at the

10   case, and you look at the evidence, it's obvious that she's

11   someone who needs to be considered, and we'll get into more

12   detail in a minute about that.

13       But as it relates to how this case began, the case

14   actually began about Jacob's death, March 7, 2016.  At that

15   time, we've heard the evidence what happened.  Detective

16   Sivert came in and became involved.  The Coroner came

17   around, got involved.  He conducted a minimal investigation.

18   Mr. Sivert started conducting his investigation.  And he

19   started working backwards from there.

20       You know, who was last with this young man.  He finds

21   out Harry Karaplis is one of the persons that was last with

22   him.  And eventually, he starts talking to Harry Karaplis.

23   Harry Karaplis comes in and lies.  He sees the text

24   messages.  He confronts him later on.  Harry Karaplis comes

25   in and lies again, gets a lawyer.  He sees the text

1    messages.  Comes in again with a lawyer and he's going to

2    tell all the truth now.

3         And so the focus is, always the focus is because Harry

4    Karaplis in the beginning said it was Jake's -- Jake's

5    supplier is someone named Red, who he doesn't know.  And I

6    will submit to you that throwing out a name like that

7    doesn't mean they actually bought from Red that night but

8    it's a young man trying to extricate himself from a

9    situation.

10        So he does so by lying about everything that happened

11   the night before, and to the point where he is maligning his

12   dead friend by saying, "I didn't use with him.  I was trying

13   to talk him out of using."  And yet, he stole money from him

14   and he went and got drugs from someone.  We know it was

15   someone named Red.  We know where Red is now.

16        So yeah, but he doesn't know later on he's going to be

17   caught in these lies, that he's going to be challenged in

18   those lies, and he also doesn't know there are going to be

19   phone records that sort of support what he said earlier

20   about a guy named Red.  So once it comes into the

21   circumstances that he's got to, you know, say who the real

22   dealer is, the easy person to say that it was, was Red

23   because that's who Agent Sivert kept saying.  And I'm not

24   blaming Agent Sivert for believing that because the phone

25   records seemed to be pushing in that direction.  They seemed

1      to be pushing because of that -- that missed deal that was

2      going to take place at 12:34 on the -- on the 7th, pointing

3      in that direction.  So I don't even blame them for charging

4      him in state court and moving forward with the evidence.

13:55:41  5          But after the case was going to go federal -- and

6      excuse me, Special Agent Carty started looking into the

7      case.  He did further investigation, and my guess is that he

8      did this further investigation to make the case stronger

9      against Mr. Davis.  He wanted to make the case more

13:56:01 10    airtight.  He wanted to corroborate what this kid was

11     telling him because this kid had some credibility issues.

12     He had lied several times before.

13          What he wanted to do was to see if he could believe

14     him, if there was evidence to believe him instead of

13:56:18 15    believing him without evidence.

16          So he conducted his investigation.  And part of his

17     investigation was to do a Cellebrite analysis.  Part of his

18     investigation was to do a cell tower analysis.  And when he

19     did the cell tower analysis and when he did the Cellebrite

13:56:39 20    analysis, he got evidence.  And they looked at the evidence

21     and they didn't even show it to you during their opening

22     closing argument.  You know why?  Because their evidence

23     undercuts their main witness.

24          And I'll show you exactly how in a second because I'm

13:56:58 25    not going to hide from the evidence.  I want you to look at

1   all the evidence, whether it hurts my client -- and, of

2   course, especially if it helps my client.  I want you to

3   look at all the evidence but because when you do, it can

4   lead to some pretty amazing conclusions.

5          Collecting evidence in a way is like a developer

6   collecting pieces of a puzzle or threads to a tapestry or

7   looking at a thing or an incident -- an object and a wider

8   angled lens.  And when they begin their investigation,

9   they've had a lens that basically pointed at one person.

10  But when you got that Cellebrite information and when you

11  got that information from the CAST analysis, that lens

12  starts to widen.

13         And even when you have the evidence from the beginning

14  of texting, "Well, I could see if Erika has any for you."

15  You know if she has more to sell, Erika and others have more

16  to sell, happened literally the evening they then go out to

17  get drugs.  "I could see if Erika has more for you."  You

18  know, they had that from the beginning.  They have other

19  suspects from the beginning.  But, when they -- you widen

20  the evidence, when you collect more puzzle pieces, you get

21  Erika Matus' phone records like the Defense did, when you

22  get more evidence to look at, then you actually include that

23  evidence in your analysis of the evidence.  And that's the

24  difference between Defendant's Exhibit AA and the

25  Government's 14.

1           The Defense Exhibit AA contains a lot more evidence

2       and they're going to say oh, Corey and Erika are just

3       friends.  So they talk all the time.

4           Look at it in its proper context.  Yeah, they were

13:58:54  5       talking all the time from like mid February to Jake's death.

6       Then they talk like crazy right after Jake's death while the

7       cops were investigating the case.  They did all of that.

8       They did all of that, ladies and gentlemen, and it creates a

9       pattern.  The most important calls, however -- we'll go

13:59:12 10       through those calls as well -- are those calls that are

11       happening in the morning when people are discovering that

12       Jake passed away.  And when you look at that, ladies and

13       gentlemen it's like wait a minute, something else is going

14       on here.  They're not calling Russell Davis after the friend

13:59:28 15       dies and say, "Oh, my God.  What was in that shipment?  What

16       did you do?  They call him the next day, "Oh, Yo," like we

17       need to tell you something but the person's whose phones are

18       getting lit up right after they find out their friend is

19       actually dead is Erika Matus, Corey Stock, and Harry

13:59:47 20       Karaplis.  And to suggest that those individuals weren't

21       colluding -- I'll use that word.  I won't use the word

22       conspiring -- to try to protect Harry Karaplis is not in

23       keeping with the objective view of the evidence in this

24       case.

14:00:03 25           Of course, you can't deny that she sold the dope, but

1    even Corey Stock said -- the last thing I asked him is, "You

2    don't know who Harry and Jake bought from that night?  You

3    don't know because you weren't there, right?"  And he's like

4    right.  I said it could have been Erika Matus.  He said that

5    was a possibility.  That was a possibility because it was a

6    possibility, you know, from earlier in the evening, he even

7    offered her as a possibility for drugs.  And that person who

8    was a possibility became a probability when she was the

9    first person he called in the morning right after he found

10   out that Jake was dead.

11        I'm thrown off a little bit, but I want to get into

12   the evidence.  So it's all over there.

13        So the story we have to go by, to begin with, is the

14   story that we hear from Harry Karaplis.  Okay?  The one that

15   he told you in the courtroom during his trial, and his

16   story, even if there was no evidence to corroborate it,

17   isn't believable on its face, and it's not believable on its

18   face because some of the absurdities that he testified to

19   and some of the missing information that he couldn't

20   explain.  But, you've heard this story.  And obviously,

21   there's a lot of truth mixed in with lies, but there clearly

22   was an attempt to go to my client's house to secure drugs.

23        Now, Harry says that that happened.  Okay.  And they

24   got the drugs.  It actually says he first went -- and

25   there's a lot of truth in what he's saying, just not when it

1    comes to the important truth, that Jake picked them up from

2    Donny's house.  He was at his mother's house at the time.

3    They went south, down to the intersection, down by the

4    highway to get stuff at the gas station.  He said it was to

14:02:09  5    get green menthol Newports for Russell Davis, and maybe some

6    alcohol for himself.  And then they travel over toward

7    Russell Davis' house.  He claims they pulled up there.  They

8    park a couple houses down.  He gets out of the car, which to

9    me is the first alert because Corey Stock, who supposedly

14:02:31 10    grabbed from Russell Davis 90 percent of the time as

11    compared to Harry, he's 10 percent of the time, couldn't

12    just get up at 12:30 at night and walk up to this man's

13    house and knock on the door.

14          Corey Stock told Jake via text message, "I can't even

14:02:46 15    park in front of his house.  I'm not going to go knock on

16    his door," when Jake suggested to him to knock on the door.

17    So Harry says he does anyway.  Walks up there.  I don't know

18    if the massive chained to the side of the house was going

19    crazy.  I don't know what the pit bull that was in the

14:03:01 20    garage was doing, but according to Harry, he walks in and he

21    takes this -- takes the small amount of heroin, $50 worth,

22    which he testified was two and a half points, and went back

23    to the car, gave Mr. Davis his cigarettes, and got in the

24    car and drove away.  And they went first to Jacob

14:03:25 25    Castro-White's house.

1        And what's important about that detail is that wasn't

2    a detail he ever included in any of his stories he gave to

3    Detective Sivert in the first, second, or third interview.

4    He never included that detail.  In fact, even in the third

14:03:40  5    interview when they said, "You're cool all.  You have to do

6    is tell us where you got the dope from," he still didn't

7    include that detail.

8        I suggest to you, ladies and gentlemen, he didn't

9    include that detail because he had a guilty conscience.  He

14:03:52 10    knew he was at his friend's house.  Maybe he had fear they

11    were going to find evidence he was at his friend's house

12    before they supposedly went to his mother's condo.  So he

13    said these goofy things.  But, anyway it doesn't make sense.

14    So they're going to go to the kid's house where the mom is

14:04:09 15    home sleeping in the next bedroom rather than his own home

16    where the mom supposedly is not there.

17        He says oh, it was because he wanted to get his own

18    needles, even though you buy them in dozens in packages and

19    things like that.  He goes in and he goes to the basement.

14:04:24 20        Now, there's been no evidence presented whatsoever

21    that this young man kept a stash of his heroin in the

22    basement with his kit and everything else.  And he probably

23    says they went to the basement because he didn't want to

24    admit that he was in the bedroom where he saw his friend nod

14:04:38 25    off that night.  So they go to the basement and for whatever

1    reason, he's going to shoot up in the basement.  Okay.

2         So he takes a shot; that being Jake.  He doesn't say

3    how he prepared it.  He didn't say that, you know, he got

4    water from the bathroom downstairs or anything like that.

5    In fact, he couldn't recall any of those details, ladies and

6    gentlemen because, you know, he hadn't contrived them yet.

7    He had to contrive those details.  He couldn't really answer

8    them.

9         So then he says after Jake, you know, got to feeling

10   warm and fuzzy again, took the shot of this, "Deadly

11   heroin," he then goes to their house, his house at his

12   mother's house, and then 240-pound Harry Karaplis makes the

13   same exact heroin.  He takes a shot of it and gets up and is

14   all unsteady and falls to the ground and he wakes up later

15   and he's soaking wet.  Okay?

16        That's a nice story.  You know why that story's so

17   nice?  Because now it can explain all the crazy telephone

18   calls that he was making around 2:51 in the morning.  I was

19   so worried for my friend I got up from being, you know,

20   almost killed by heroin, and I had to find him real quick

21   before he got, went back home, and I don't know why you're

22   with a tiny powder that existed in two and a half points,

23   two-tenths and a half of a gram of heroin, that you're going

24   to be running all over with this tiny amount of heroin, but

25   anyway that's the story.  In fact, he said he used it three

1    times that night because he couldn't get a hold of Jake.  He

2    was so concerned about him, he took another shot of the

3    heroin so he could go back to sleep.  And he woke up in the

4    morning.

5        So you got two and a half points of heroin, two and a

6    half tenths of a gram, that's being used three times by the

7    240-pound kid, and at least one time.  So again, his story

8    isn't making sense, ladies and gentlemen.  That's -- on its

9    face, the story is incredible.  Okay?  It's all designed to

10   try to explain away what he learns later on, which is all

11   these crazy facts about him calling him over and over again.

12       The facts support, ladies and gentlemen, it's not just

13   a matter of, like I had said, quantitatively seeing the

14   facts; it's qualitatively evaluating them.  Circumstantial

15   evidence that the Judge was talking about is what do the

16   circumstances surrounding the facts seem to suggest?  Well,

17   the circumstances surrounding those facts seem to suggest

18   that this man's lying when he was testifying in front of

19   you.  And you know how we know he was lying?  Because on

20   that come-clean day, April Fool's Day, April 1st, 2016, when

21   he sits down with Buddy Sivert and Buddy Sivert says,

22   "You're not in trouble, son.  I just want to get this

23   scourge off the street.  All you have to do is tell me who,

24   who did this, you know, who sold you these drugs, and you're

25   going to be okay," and then they start talking about what

1    happened that night.

2         And Detective Sivert -- and you heard it right from

3    the witness stand and also a little bit was played, but he

4    admitted the other part of this.  "From what I've been

14:07:49  5    told," Detective Sivert, "From I've been told, you almost

6    overdosed that night.  Answer:  I don't know that I

7    overdosed.  I did go -- I guess I nodded out.  I did wake up

8    a couple hours later.

9         "Did you feel like different than before you fell

14:08:04 10    asleep?  Answer:  No.  I didn't feel any different.

11         "Question:  Okay.

12         "Answer.  I woke up, I was fine."

13         Well that sounds a heck of a lot different than a guy,

14    you know, only OD'd one time before, getting all

14:08:23 15    wobbly-kneed and falling on the floor and waking up a couple

16    hours later.

17         They've seen this evidence, too, ladies and gentlemen,

18    but they've become married to their opinions.  They're

19    filtering it.  They're ignoring it.  But you're the

14:08:37 20    objective fact finder.  You're the ones without the biases.

21    I'll admit I had a bias even, but that's why you sit there

22    and we sit over here.  That's why you're liberty's

23    gatekeeper and we're not.

24         But anyway, so what really happened that night, I

14:08:57 25    think it's pretty self evident from the Government's own

1    evidence.

2        If we could have the Elmo, please.

3        So these are the beginning of the trip.  Remember,

4    there's no thing for Donny Buchs, but they said he lived

14:09:30  5    over here near the lake.  And that's where Donny testified

6    he was with Jake smoking marijuana prior to Jake leaving.

7    And so Jake leaves to go pick up Harry at his mother's

8    condo, and they drive south.

9        We know that they probably drove south because well,

14:09:51 10    first of all, Harry said they drove south because they were

11    going down to the intersection to pick up the cigarettes and

12    whatever.  And so what you see is you see cell tower

13    activity that shows the phones are in that area at specific

14    times.  And you'll get these exhibits.  They're very helpful

14:10:07 15    actually.  And one of the towers that's hit is not only the

16    tower that's closest to them but the one over here.  This

17    will become a critical tower in this case over in Amherst.

18        And then they hop back on the highway.  My guess --

19    well, I guess I can't guess, but they make their way up to

14:10:27 20    Mr. Davis' house.  But if you look at the map, you can see

21    what sort of the shortest route would be, you know, maybe

22    hopping on the highway, getting off one of the main streets,

23    and shooting up Mr. Davis' way.  And now they're there for a

24    period of time.

14:10:42 25        And then we go to other exhibits.  And some of these

1    are provided by the Defense.  And so it's important to note

2    who was in that area at that time.  So Defendant's Exhibit

3    FF-1 is the analysis done on Erika Matus' cellphone that

4    night.  And Erika Matus was basically in the same sector,

14:11:15  5    cellphone sector as Mr. Davis' home.  I'm not saying she was

6    at Mr. Davis' home because we know her home is right over

7    here on West 20th street, okay, which is, as Corey would

8    say, right around -- you know, my people's place right

9    around the corner.

14:11:34  10    So she is over here on West 20th Street, and that's

11    where she was during these early morning hours, at least

12    that's where her phone was.  Okay.  And so then we have

13    additional data from the Government's exhibit -- I'll go

14    back to that -- which shows that Mr. Karaplis and Jacob

14:12:08  15    Castro-White are in that area, but that area covers both

16    Mr. Davis' residence and covers Erika Matus' residence.  And

17    from that area, and these are important, when you see these

18    LTE, this LTE means it was a data connection to the

19    Internet.

14:12:26  20    Now there's a lot of things we don't have.  There's a

21    lot of evidence that's missing in this case and I'll get to

22    that in a minute, but that would be something nice to have

23    because we could maybe see what the nature of that

24    connection was because I think the time of that connection

14:12:40  25    is kind of interesting because it comes after 12:34.  Yet,

1   there's still -- they're in that area that covers both the

2   sector for both Mr. Davis and the sector for Erika Matus.

3       So if they got dope from Mr. Davis at 12:34, it's like

4   less than a ten-minute drive back to Harry's mom's condo,

5   yet here, at 12:37, three minutes later, they're still in

6   the area, and there's some sort of data usage on Jacob's

7   phone.  Now that data usage could have been just the web

8   connecting to his phone.  We don't know, but it could have

9   been him using a web-based app to communicate to somebody

10  else, somebody who just lives around the corner from

11  Mr. Davis.

12      So what's also -- we also have an exhibit from our

13  expert that talks about that same time period as it relates

14  to Jacob Castor's phone, and he actually has two connections

15  to the LTE.  And one is at 3754 -- I know it's just a few

16  seconds apart, but the other one's at 12:38.

17      So 12:38, almost a full four minutes now after they

18  supposedly stopped at Mr. Davis' house, they're still in the

19  area, still in the sector and in the sector because Erika

20  Matus lives in the sector.  You look at all the evidence,

21  ladies and gentlemen, it's going to continue to focus on

22  that.

23      But, anyway, they're still in the area and then they

24  leave.  And then they claim, according to Harry, going back

25  to Jake's house first and then to Harry's and then to

1    Jake's, and Harry says -- remember he OD'd in his,

2    supposedly in his mother' home.  He claims that's where he

3    was when he woke up.

4         Well, the evidence supports something completely

5    different.  And I want to also now -- Shelly, if you can

6    bring up Defendant's Exhibit TT for that time period.  I

7    want to talk about why they missed each other when they went

8    over to Mr. Davis' house.

9         If we can scroll up a little bit.  Karaplis reaches

10   out to Corey saying, "You want to give me a ride to the gas

11   station?  I'm at Donny's.  Sorry, brother.  Were you trying

12   to throw down?"  And it's like, "Hey, dude, can I get" --

13   then he texts Mr. Davis at 11:48.  If we can go to the next

14   page.

15        Then you see a series of calls from Mr. Karaplis to

16   Mr. Davis.  And it's important to look at these, and you'll

17   have the actual call detail.  You'll be able to look at the

18   T-Mobile bills and look at the Sprint bills to see exactly

19   the seconds in all these calls.  But the seconds are just as

20   important as the minutes because they tell a story.  They

21   show overlap time when calls are being connected.

22        Now our expert didn't testify that saying here,

23   whatever.  Yeah, of course, that takes less than two

24   seconds, but that's not what this connection time is.  Our

25   expert testified that when you -- the connection time is

1    when you hit send on your cellphone, the clock starts to

2    run, when you hit the send button.  But, of course, the

3    person doesn't answer right away, but you still have a

4    running log.  It starts to ring on your phone, and then

5    while trying to search for -- again, this is happening in

6    relatively quick speeds.  It will start ringing on the

7    receivee's phone a couple seconds later, sometimes maybe

8    even multiple seconds later.  And you'll see that when you

9    look at these records in greater detail, that we know there

10   are a lot of missed calls yet they're showing up three

11   seconds, four seconds.  That's just connect time to the

12   network.  That's not conversation time.  Okay?

13        So if you move on forward to see these calls, he says,

14   "No answer.  I called, but he didn't pick up.  I'll let you

15   know if he answers."

16        Then they talk about hookers and hopefully, he's not

17   sleeping and all that kind of stuff.  If we can go to the

18   next page, please.

19        They're still talking about that.  And then Karaplis

20   he's -- he's calling again at Mr. Davis.  And again, the

21   note shows a two-second call on Karaplis' tolls.  No record

22   of the call on Davis' phone.  So according to Karaplis, he

23   thinks he's calling the guy but he's getting no connection.

24        So again, I don't know where the connection went, but

25   it didn't register in Mr. Davis' phone.  Maybe that's why

1    T-Mobile and Sprint are getting ready to merge.  They want

2    to try to make theirs systems a little better.  But you'll

3    see even in the records, you'll see calls being routed and

4    things like that in an effort to make a better connection.

5    And that helps explains some of this lag time in these

6    calls.

7        But, anyway, we not from the text messaging, the

8    context of this evidence, of 9235, I called three more

9    times, no answer.

10       And you can go and look at these calls and see what's

11   going on and see what's happening in Mr. Davis' phone when

12   he's making those calls.  One of the things you'll notice --

13   if we could go to the Elmo real quickly.

14       These are some of those calls, which Mr. Thompson

15   showed to Mr. Aguero yesterday.  You see -- you see the

16   number being called, and then you see other digits that are

17   being dialed.  Sort of like a routing number.  And this one

18   actually got routed to the voicemail.  So you see in

19   Karaplis' records, I don't have Karaplis' records up here,

20   but a missed call, one that got routed to the voicemail,

21   shows up as a 25-second duration in Mr. Davis' cellphone

22   record.

23       That's just how long his cellphone was connected to

24   his network.  It doesn't mean they were talking.  In fact,

25   we know it was a missed call because it got routed to the

1    voicemail.  And you'll have the records.  You can see those.

2    And we'll get back to there.  If we can go back to TT,

3    Shelly.

4         So they talk a little bit more.  You've all seen this.

14:19:25 5    "I called three more times."  Next page.

6         And they mention, "He's probably asleep," and then he

7    laughed, "I just got your sleeping text.  He woke up.  He

8    was asleep but he woke up."  We're talking about early

9    morning hours, a middle-aged, pot-smoking man, okay?  We'll

14:19:47 10   just be blunt about it.  Sleeping, phone, missing calls and

11   gets up and answers or whatever, talks to him.  And he says,

12   "You know, sooner, the better because he might fall back to

13   sleep."  If we can go to the next page.

14        I think it's important to point out Line 248, again,

14:20:10 15   there's a zero-second call that doesn't appear in Davis'

16   phone records.  So from Karaplis' perspective, he's trying

17   to call this guy and he's not getting in touch with him.

18   From Mr. Davis' perspective, he doesn't even know he's

19   trying to call him.  Okay.  Next page, please.

14:20:27 20        And I think --- and that was the call on direct

21   examination, they tried to suggest that Mr. Karaplis tried

22   to suggest well, he must have saw that missed call that's in

23   his phone records.  Well he couldn't see that missed call in

24   his phone records because it's not in Mr. Davis' records at

14:20:45 25   all.  He never saw the call.  But, this is the call we're

1    all talking about.  This call took place in Mr. Karaplis'

2    phone from 3447 A.M. to 3453 A.M.  And in Mr. Davis' phone,

3    it started ringing at least three seconds later, 3451 A.M.

4    but it went on to 3504 A.M.  And it doesn't really matter

14:21:09 5    that it went on in Mr. Davis' phone because it didn't go on

6    in Mr. Karaplis' phone, which shows an overlap of two

7    seconds of connect time in these phones.

8         That also supports that the phone may have started

9    ringing on Mr. Davis' end, but if you want to include a

14:21:28 10   ring, maybe two rings or something like that, you don't have

11   time to say "Here."  Right?  You have time to say, "Here.

12   Hurry up, come on, two minutes, two seconds."  No that's

13   just the phones that are connected.  So this is a missed

14   call as well, ladies and gentlemen.  That's what the

14:21:45 15   credibility of the evidence shows in this case.  That's what

16   the burden of proof the witness testified to in this case

17   demonstrates.

18        It was a two-second connect time but no conversation.

19   So Harry Karaplis lied when he said he had this, come over

14:22:01 20   here, we're here.

21        You objectively evaluate the evidence in this case,

22   ladies and gentlemen.  You may feel comfortable -- may feel

23   uncomfortable to you because this man is involved with some

24   bad things.  The only proper conclusion is the conclusion

14:22:18 25   we're suggesting.

1      So let's go back to the phone records on Mr. Davis'

2  phone records for that time period.  The Elmo.  In here, we

3  see that 12:34 call.  There's the time of it.  Okay?  You

4  see it's a number dialed by Mr. Karaplis, and then Mr.

14:22:46   5  Davis' phone, not Mr. Davis but the phone, the cellphone

6  company, it routes it to this number.  It's sort of a -- it

7  started routing the call.  You'll see other connect times

8  and calls where there aren't any routing.  Those are

9  probably quality calls, but for whatever reason, this number

14:23:05 10  represents, just like the one that was routed to the

11  voicemail, this one began a routing process, but then it

12  ended because Mr. Karaplis hung up, and then the routing

13  continued for the duration of the call.  Okay.  That's a

14  missed call, ladies and gentlemen.

14:23:23 15      And it's not just that, but we've got to look at the

16  circumstantial evidence in this case.  Right?

17  Circumstantially, the interpretation of the evidence in this

18  case, when you interpret the in evidence this case, what you

19  find is you find that there's really very little activity.

14:23:41 20  There's inbound activity but there's no outbound activity of

21  Mr. Davis' phone and it's three text messages that he sends

22  the following morning.

23      We know from the testimony that this 10:21 is 11:21

24  eastern time.  This is central time.  So at 10:21:03, wakes

14:23:58 25  up and Mr. Davis sends a text message to the 258 number, a

1    number that had texted him the night before.  258.

2        Looking further down, you know, the screen of his

3    phone, he sends another text message to the 714 number, a

4    number that had just -- that he missed the night before.

5    And then you look a little bit further down, you see the

6    text message to Mr. Karaplis' number.  And you don't know

7    what the -- we don't know what the content of that is from

8    the record, but thankfully, thankfully Special Agent Carty

9    was conducting a fuller investigation, and he sees

10   Mr. Davis' cellphone as part of that.

11       Now I don't think he ever believed that there was

12   going to be exonerating evidence on that cellphone, on

13   Mr. Davis' cellphone but I think it's a good place to stop

14   right here and talk about what could have been discovered if

15   a proper investigation was done.

16       I'm getting ahead of myself a little bit, but I'm also

17   watching my time.

18       The burden of proof that the Government didn't start

19   the day the trial began; it started the day Jacob died.  It

20   started with the quality of the investigation that the

21   agents were going to perform.  It started with how much

22   evidence they were going to collect.  It started with

23   looking at relevant suspects and properly interviewing them,

24   looking at relevant suspects and properly seizing evidence

25   from them.

1238

1      We don't -- every line that you read and he says, "You

2   don't see a pattern in Erika Matus' phone with Corey Stock.

3   You know, there's all this pattern of texting back and forth

4   and then Jake's in there, too, and Harry's in there, too.

5   You don't see a pattern like you have with Mr. Davis.  Well,

6   you don't see a pattern because there's no content

7   available.  Every line you see no content available that's

8   because didn't they secure an important piece of evidence in

9   this case.  The most important piece of evidence in this

10   case was Jacob Castro-White's phone.  He's the one that

11   died.

12      I don't blame Agent Carty for this because he's

13   a pretty good FBI agent.  He would never have given that

14   phone back to the mother.  He would have held -- no matter

15   how unpenetrable Apple products are, he would have held onto

16   that because that was the most critical evidence in the case

17   when this young man died, the contacts on his phone.  Three

18   days worth isn't enough to conduct a full, proper

19   investigation in this case, ladies and gentlemen.

20      And then we hear the mother testify that she went to

21   the store, got the phone wiped and was able to get the

22   pictures and contact information out of that, which

23   Mr. Aguero, I don't know if you heard his testimony, said

24   you couldn't do that without a password.  You couldn't do

25   that without a password.

1        So they got up there and said, "Well, we couldn't get

2    the password."  I think the evidence supports the notion

3    that Detective Sivert felt bad for the mom and wanted to

4    give her some kind of keepsake from her son because she just

14:27:21  5    purchased that phone for his birthday, but he gave it back.

6    He didn't preserve the evidence.

7        He didn't do it on purpose.  He did it, he did it out

8    of foolishness.  You preserve Jacob Castro-White's phone,

9    can you imagine the relevant evidence we could have gained

14:27:39 10    from his phone?  Well, we don't have his, but the person

11    that was his facilitator, grabber, whether he grabbed from

12    Mr. Davis or grabbed from Erika Matus or grabbed from Borrey

13    or grabbed from the guy whose stuff was better than most,

14    that person is Corey Stock.

14:27:58 15        They didn't secure his phone either.  But, you know

16    what?  They may not have been able to get anything anywhere

17    because Corey accidentally scratched the screen on his phone

18    just before he went to be interviewed by Detective Sivert on

19    the 22nd, after being visited on the 18th, after 22nd of

14:28:20 20    April.

21        Well, who was with him the night he died?  Harry

22    Karaplis.  Do you not think maybe there could be some

23    relevant information on his phone?  He's the man who's

24    coming clean.  I won't charge you with manslaughter.  I

14:28:37 25    won't charge you with obstructing my investigation.  Just

1    tell me who you got this from.  Couldn't collect his phone.

2        Oh, yeah, but he's the one who right before he goes in

3    to talk to Detective Sivert, drops his phone in the shower.

4    And to suggest that Jake, or excuse me, that Harry and

5    Corey, they weren't communicating during this time period

6    when they were potentially under investigation, at least

7    Harry thought he could be blamed for Jacob's death, that

8    they weren't communicating with one another?  To suggest

9    that -- that couldn't -- that doesn't meet with the common

10   sense test.

11       Of course, they are communicating with one another.

12   In fact, we brought a witness in to say that they were.

13   That was the purpose of Amanda Giovanazzo's testimony that

14   they continued to cooperate, but they lied and said that

15   they didn't.  They talked to them after that day.  All

16   right.  And when it comes to being able to talk to one

17   another, another reason why the cellphones are so important

18   is because not everything's in the cellphone records.

19       Harry Karaplis himself testified he used What's App,

20   Messenger and Instagrams and sends naked picture of himself

21   to Erika Matus, a person who Amanda Giovanazzo felt he may

22   have been messing around with.

23       She thought he may have been messing around with her

24   because they were together a lot.  Remember these are

25   people, Jake and Harry, who had double lives.  They had

1       lives where they were lifting weights and going out to

2       dinner, and going to movies with people who didn't use

3       heroin, and they had lives where they were going over to

4       people's houses and shooting up heroin and getting high

14:30:31  5    together.  And who did they share those lives with?  They

6       shared those lives with Corey Stock, Erika Matus, and all

7       the people they hung around with.

8              As much as Corey Stock said he was with -- in fact,

9       Corey Stock was honest.  He said Jake had been to Erika

14:30:48 10   Matus' house, and that they've used together at Erika Matus'

11      house.  As I said earlier, he also said it was possible they

12      went to Erika Matus' house that night.  He said that.  Corey

13      Stock.

14             Now, Erika Matus, of course, "Oh, no.  I used with

14:31:03 15   Corey everyday.  I spent all this time with Corey but I

16      never spent time with Jake, I never spent time with Harry.

17      Jake's with Corey every time Jake is using.  And Harry's

18      with Corey every time he's using.  How in the world are they

19      never crossing paths with Erika Matus?

14:31:22 20          Ladies and gentlemen, her saying that they didn't come

21      to her house that night just because she took the witness

22      stand isn't credible; not because of what she said from the

23      stand, but her -- actually it is because of what she said

24      from the stand.  It's because it doesn't make sense that

14:31:43 25   she -- and the reason she's saying she didn't see them, that

1     shows a guilty conscience. She's trying to distance herself

2     from them. She knows that she saw them so she denies that

3     they were there at all. More credible to say, "Yeah, I saw

4     them. They were part of my drug-using friends, but no, they

14:32:01 5     didn't show up that night," because we know that's what

6     happened.

7         We even -- I don't want to get bogged down with

8     records, but we have phone records on the 28th of February

9     that Jake called her and left voice messages or at least

14:32:14 10     connected with her voice message. Again, we don't know if

11     they communicated through apps because we don't have any of

12     that evidence. But, they knew each other, ladies and

13     gentlemen. For her to say they never came around the house

14     is a self preservation statement. That's not a statement

14:32:31 15     that's based in the facts when you look at all the facts in

16     this case.

17         Anyway; I got a little bit side tracked, but I was

18     talking about the text messages. What did that text message

19     say? That text message said, "Was sleep." I don't want to

14:33:06 20     dig through the records. You've seen it a million times. I

21     keep saying it, "was sleep," but that's how important it is.

22         Now the Government may get up and argue well, he just

23     thought he had a missed call or something. When you're in

24     your bed at 12:30 at night and sleeping, and you get up the

14:33:23 25     next morning and you see that someone called you, do you

1   always like text them, "Sorry was sleep"?  I mean isn't that

2   kind of understood that could be a time when you would be

3   asleep so you don't feel the need to explain to somebody

4   that sorry I was asleep?  But, if you had a plan to meet

14:33:43  5   somebody and you fell asleep on them and didn't meet with

6   them and you got up in the morning oh, shoot he called, and

7   I fell asleep.  You're going to text back to him, "Was

8   asleep"?  And we are not denying it.  They were going,

9   coming to grab from Mr. Davis that night, as uncomfortable

14:34:03 10   as it sounds, but they didn't.  They didn't.  That's what

11   the objective of evidence says in this case, ladies and

12   gentlemen.  They didn't.

13        And to suggest maybe oh, he heard about Corey's death

14   earlier and so he sent out like this alibi text, "Was

14:34:24 15   asleep," or whatever.  Where is the evidence of that?  Corey

16   said he told him about it the following day.  This is that

17   morning.  There's no evidence of that.  There's no evidence

18   of that whatsoever.

19        It can't be changed.  There's no other context for

14:34:40 20   that text message, other than he saying "Oops.  I saw I

21   missed your call.  Sorry, was asleep."  That's exactly what

22   that text message says.  And when it showed up in the

23   Cellebrite, it took a while to even figure out what that

24   meant.  "Was sleep," is just an innocuous text until you

14:35:02 25   plug it in, until you take that final puzzle piece, plug it

1    in, and the picture changes completely.

2        When you weed those final threads of the tapestry and

3    hang it on the wall, you're like oh, I thought it was going

4    to look like Russell Davis.  Oh, who does it look like now?

14:35:21  5    I'll show you who it looks like now.  If we can go to

6    Defendant's Exhibit AA.  And go to 44 of that exhibit.

7        You've seen this before.  This is Corey after he just

8    found out that -- not Corey, this is Jake after he just

9    found out from Corey and Jake talking.  Jake just found out

14:36:06 10    Corey went to grab around 7:30 about with a guy named Doug,

11    and Corey was upset because he's like why didn't you call

12    me.  Corey was like I didn't know you had another 50 to

13    spend.  He's like well, I didn't but I could have done 40

14    and all that.  He's like yeah, I would have felt that.

14:36:23 15        Erika Matus isn't a red herring.  She's in this case

16    because during the time that he's even talking about, you

17    know, feeling bad that he went out and grabbed without his

18    friend, he's thinking of a backup plan for him.  You know, A

19    was sort of a last resort, Harry said.  These aren't people

14:36:45 20    that just grab from one person all the time.  They grab from

21    whoever they can grab from, even if, you know the better

22    stuff, and we'll get to the, "Oh, I'll just wait for Red."

23    And we'll talk about that.

24        But, he says, "I can ask Erika if they have extra to

14:37:00 25    sell but you probably won't feel it at all.  I did a

1    two-point shout at the house yesterday but didn't feel a

2    thing."

3         I think what's interesting is that Corey -- they have

4    two and a half shots on the night, according to Harry, on

5    the night that Jacob died.  And Corey's doing two points at

6    that time.  I mean he may have a higher tolerance.  But go

7    forward to the next page, please.

8         He says, "Yeah, I'll just wait for next time with

9    Red," but you also know that he also was looking very much

10   forward to spending time with Donny because he hadn't spent

11   time with Donny in a while, talking about he went over to

12   Donny's house.  It was more worth it to him to go smoke

13   marijuana with Donny and hang out that way than to it was to

14   maybe go get some -- he'd rather go Donny's and Erika's at

15   this point.

16        And who can blame him?  Donny, he was another friend

17   that took the stand that was teary-eyed.  He went to one of

18   his -- you know, the other side of his life's friend.  He

19   was hanging out with him for awhile.  So he went to Donny's

20   instead.  Okay?

21        And then he says, you know, I'll let you know if I go

22   again or whatever, and then around an hour after Corey has

23   been -- or Jacob has been at Donny's.  He gets a text, not a

24   text from Harry saying, "You know, you want to give me a

25   ride to the gas station?"  And he says, "Yeah, I'm at

1      Donny's right now smoking.  I just got here a minute ago."

2          Now I'm not going to go through the whole thing that

3      happened after that because I already have, but then we fast

4      forward to the 9th at 2:51 A.M. if we can go to Page 50.

5          Now, I think the evidence supports what happened is

6      that they actually went to Corey's or Jake's house to use.

7      And I'm not going to show you all the photos again but

8      you'll have them as exhibits.  If we can go to the Elmo real

9      quick, Shelly.

10          That's the dresser in the corner where Jacob kept his

11      stuff.  That light was on, according to law enforcement --

12      well, the mother testified that the light was on.  So the

13      light was shining out from underneath the door.  This isn't

14      a case where somebody shot heroin, ladies and gentlemen, and

15      then crawled into bed and fell asleep and died.  The light

16      was left on.  The light was on, and mom -- that's what mom

17      said; she saw the light coming out from underneath the door.

18          And so as we approach that desk, you can see what was

19      on top of that.  And you know, there's a lot of missing

20      evidence in this case.  But, I'm going to be honest with the

21      evidence, too.  There's -- I thought that was the three

22      caps, but that actually could be the back side of a syringe.

23      I don't know.  But, there are other syringes in the drawer

24      here and if someone else was holding a syringe when

25      something happened, they could have dropped it or ran out.

1    If the Lorain police department saw the syringe, they would

2    have put it in the disposable, the biological disposable

3    anyway.  So the syringes were never going to be evidence

4    because of the Lorain police property, what to do with

5    assist.

6         But, anyway what was important about Harry's testimony

7    regarding this is when he used, they drew from the same

8    spoon.  They didn't draw from separate spoons.  They didn't

9    use separate spoons.  They used the same spoon.  And

10   obviously, they used their own needle but they may have a

11   needle for water.  I don't know if that's a needle for

12   water.  We'll talk more in a bit about the second half of

13   this case.

14        But, anyway, you know, this could be a needle used --

15   they pull out the plunger to stir the stuff, something like

16   that, but it is hard to say whether or not there was even a

17   use of what's there, but what is there is seven-tenths of a

18   gram.  So not seven-tenths, 700ths of a gram, less than a

19   gram.  That powder doesn't look chunky either.  This story

20   about we got the chunk and we didn't get the other stuff.

21   So they killed us instantly, which doesn't make sense

22   because obviously according to Harry, he shot in the

23   morning.  Shot first and drove him home.

24        But there's about applying.  If they split something,

25   you know, you split two and a half points, you got one and a

1248

1    quarter, something.  It doesn't really matter one way or

2    another.  But, that -- there is evidence of use on the

3    table.  And once -- it became a crazy fact in this case.  It

4    is right inside the drawer, appears to be a new pack of

14:42:29  5  Newport Reds.  I mean you can't say for sure it's a new pack

6    but it doesn't look like an old one.  It's not crumbled up.

7    Here's another picture of it.

8        He talked about, you know, taking -- he smoked, Harry

9    smoked Newports.  He didn't know whether Jake smoked them.

14:42:50 10  They bought some Newports.  Those Newports didn't go to Mr.

11   Davis.  In fact, they wouldn't have gone to Mr. Davis anyway

12   because, according to Harry, he's the menthol, the blue

13   pack.

14       Then look at Mr. Davis' drawer.  You don't see

14:43:06 15  menthols there either.  You just see lots of marijuana,

16   prescriptions drugs, a little bit of cocaine, and Switzer's

17   Sweets, some cigars.

18       But anyway, when you continue to look at the evidence

19   in the room, you see some other pictures that I submit to

14:43:24 20  you, ladies and gentlemen, don't show a natural scene of

21   somebody who went to bed and just fell sleep and died after

22   taking the last hit of heroin marijuana.

23       That's Government's Exhibit 4-F.  He was lying on

24   stuff.  This Nike bag, these magazines.  You're using and

14:43:44 25  you just sort of go to bed.  You don't -- you don't lie on

1249

1    your stuff.  But, if you nod off and you fall to the floor

2    and your 240-pound friend is sitting there with you, that

3    may scare him a little bit and he's probably going to pick

4    his friend up and put him back in bed.

14:44:05  5       We know from Dr. Young you don't die right away from

6    heroin.  You go into a coma.  You become nonresponsive.  You

7    can't wake up, but you're still breathing, and your

8    breathing becomes less and less.

9       So to Harry when he's looking at this, he's like oh,

14:44:19 10   he's just sleeping.  He's just going to sleep it off.  So

11   what he does then, he abandons his friend, who he's

12   concerned about, and that's demonstrated by the phone calls.

13   He abandons his friend right next to his sleeping mother

14   while he's in a coma, dying.  He's a young, dumb kid and

14:44:35 15   scared, too.  So he leaves the house.

16       If we could have Defendant's Exhibit AA, Page 50.

17       251, call.  253, text, "Yo, dude."  255, call.  256,

18   call.  256, call, next page.  257, call.  258, call.  259,

19   text, "Yo, please call me ASAP."  Call.  3:00, 3:02, call.

14:45:18 20   303, call.  304, call.

21       Ladies and gentlemen, we recognize that.  If I'm

22   concerned about my son and he hasn't checked in with me,

23   that's what my phone looks like when he's not calling me

24   back when I told him to call me back at a certain time.

14:45:33 25   Okay?

1        This isn't someone who thinks this story was, "Well, I

2   woke up, and I saw my wallet was moved, and $40 was

3   missing."  If you believe that, actually that's a defense.

4   But, I'm not going to be silly enough to raise that as a

14:45:47  5   defense because that means he went and bought drugs

6   somewhere else before he went home and died.

7        And I anticipate in the rebuttal, Mr. Katsaros might

8   say, "Well, it could have happened just like Mr. Bryan said

9   but that doesn't mean that they didn't grab from Red," sort

14:46:06 10   of hijacking the Defense.  If they try to hijack the

11   defense, ladies and gentlemen, don't let them do that

12   because they put that witness on the stand and said he was

13   being truthful about everything.  Now they're going to say

14   he lied about everything except the most important fact in

14:46:18 15   this case and that's who he bought the drugs from?  But you

16   have all the evidence to support beyond his lack of

17   credibility.  You can't support him beyond a reasonable

18   doubt but other evidence to support that they didn't grab

19   from Mr. Davis that night.

14:46:36 20        So who enters into the scene at this time at 6:25 in

21   the morning?  You have Matus and Stock texting back and

22   forth.

23        Next page, please?  6:41, Karaplis either wakes up

24   from the other drugs he took or he wakes up.  And I will

14:47:00 25   tell you where he woke up from and I'll show you that

1     exhibit in a minute but it doesn't lie, ladies and

2     gentlemen.  It can't lie.  It's a cellphone tower.

3         Anyway, you see these call durations?  You got a call

4     at 6:44, 11 seconds.  Text 6:46, "I need to talk, homie."

14:47:16 5     He's like ah, shoot; maybe he didn't just fall asleep.  He's

6     not responding.  And so then he texted, he tries to call

7     Stock and Stock's not answering at that time in the morning.

8     And then he tries to text Jacob again.  "I need to talk,

9     homie.  I need to talk, homie.  Call me up.  Yo, bro."  And

14:47:39 10     this is actually Stock.  I think this is Stock just waking

11     up on his own.  Well, he's waking up on his own, sending a

12     text which he does a lot.

13         So you have texting now with Stock and Matus and Matus

14     and Stock at 7:49 in the morning.  And then there's a call

14:47:56 15     finally, that goes through from Karaplis to Stock at 11:11.

16     He doesn't know he's dead yet.  If we could go to the next

17     page.

18         But what he does communicate with him, what else would

19     he talk about?  He's been calling him all night long.

14:48:17 20     "Corey, I left Jake in his bedroom.  And he was still

21     breathing, but he's not answering.  I'm getting concerned."

22         Circumstantial evidence, ladies and gentlemen.  Common

23     sense.  That's what would have happened then.  And we don't

24     even have to have a recording of that.  And so what happens

14:48:37 25     afterwards?  Now a Stock text.  Stock, Matus.  Matus, Stock.

1252

1    Stock, Matus.  Why aren't they texting Red?  They're not

2    texting Red because he's not the one they got the dope from

3    because all of the objective evidence in this case shows

4    that it was Matus.  That Red was sleep.  As silly as that

14:49:01 5    sounds, that's what the overwhelming evidence is starting to

6    support in this case.

7        They just don't want to believe because they're so

8    married to their opinion through their own bias at this

9    point in time.  We already charged this guy.  It's got to be

14:49:17 10    him.  It can't be here.  They can't be objective and fair.

11    But, you guys can, ladies and gentlemen.  You guys can.

12        So he lights up his phone again.  And you can see it.

13    I'm not going to go through every call.  Page 53, Page 54,

14    Page 55.  And then he gets the call from Brian Stoll.  They

14:49:52 15    hand the phone to the police and the police say, "Your

16    friend's dead, son."  And he talks to the police for four

17    minutes.  "We need you to come in and talk, son.  We know

18    you were the last one that was with him."

19        He shows up at 1:30 in the afternoon after he spends

14:50:10 20    all morning with Corey Stock.

21        So now he's starting -- who is he trying to call?

22    He's trying to call Corey Stock.  Next page.

23        Calls Corey Stock back and forth, back and forth.

24    Can't get a hold of him.  Calls his girlfriend.  Can't get a

14:50:38 25    hold of her.  Next page.

1253

1    Now he gets a hold of Corey Stock and Amanda.  Oh,

2    actually there's some texting first then he gets a hold of

3    Corey Stock and then Stock calls Matus, "Jake's dead."  They

4    talk for five minutes and Matus calls her best friend from

14:50:58 5    the sixth grade.  And I'm not going to go through all the

6    records, ladies and gentlemen.  I'm limited on time, but you

7    have them.  They're evidence in this case.  You can look at

8    them for yourselves.

9    But the circumstances surrounding this are clear.  I

14:51:14 10   don't care how much he calls him on average, Corey Stock.

11   What's relevant is who he called right after he found out

12   that his friend was dead.  He called the person that gave

13   him the dope the night before, and that's circumstantial

14   evidence.  And the Judge says in the instruction, the

14:51:30 15   circumstantial evidence is just as compelling as direct

16   evidence.  The fact is it's even more compelling because it

17   weaves those tapestry threads together, puts the puzzle

18   pieces all together.  It widens the focus.

19   And the Government's own evidence widens it even more

14:51:49 20   because when he was making all those calls -- can I have the

21   Elmo, please?

22   From 251, the 6:49 A.M., all those calls, remember

23   what he testified about?  Where does your dad live?  He

24   lives one exit over down in this area, and he pointed in

14:52:17 25   this area.  I drew an X there.

1254

1    Every call, we know from our cellphone expert that

2    every call during that time period hit this cell tower.  And

3    this cell tower, it didn't go back and forth to another cell

4    tower.  It went off this cell tower every time.  Never used

14:52:38  5    -- could have used the one by his mom's house.  There's a

6    T-Mobile site right up near his mom's house.  Didn't use all

7    that.

8    Ladies and gentlemen, the evidence is clear.  After he

9    abandoned his friend, he went to his father's house probably

14:52:54 10    with the car he got from Corey Stock earlier in the evening.

11    And these are important facts in this case.  Another puzzle

12    piece.  He needed his car back.  He's just so desperate to

13    have his car that he's going to ignore his car again another

14    night?

14:53:04 15    It's not hard to go to Corey Stock's house.  You'll

16    see from the map, Corey just lives right here.  He's just

17    down the street, too.  Of course, he went and got his car

18    back from Corey Stock.

19    So he got his car to go home.  If he didn't have

14:53:19 20    Stock's car, maybe he instant messaged his brother at home.

21    "Man, I need you to pick me up over at Castro's house."  He

22    didn't mention that, you know, his brother lived at that

23    house at that time, too.

24    As it relates to burden of proof, the Judge says the

14:53:45 25    Government has to prove beyond a reasonable doubt.  Proof

1    beyond a reasonable doubt is proof of such character that

2    you can act and rely upon it in the most important of your

3    own affairs.

4         These are the most important of our own affairs,

5    ladies and gentlemen.  And we're acting in these types of

6    cases.  I haven't even really had a chance to talk about the

7    medical evidence in this case but we didn't put doctor -- we

8    didn't put Dr. Young on the stand.  He billed by the hour.

9    We can thank a lot of people for why the bill wound up being

10   so high, but billing at $300 an hour by the hour, that had

11   nothing to do with buying his influence or anything like

12   that.  I believe his testimony was credible.  We put him on

13   here because of that reason.

14        You have to prove death beyond a reasonable doubt.

15   The County Coroner walked in here.  The Judge told him to be

16   sworn and he kept walking.  The Judge had to remind him

17   stop.  He just kept walking to the stand.  That's exactly

18   what he did in this case, ladies and gentlemen.  He

19   conducted a bogus investigation.  He walked in and saw a

20   huge foam cone and said oh, another opioid death, mark it

21   up.  Another statistic.

22        Ladies and gentlemen, all the other evidence suggests

23   that this fentanyl post-mortem redistribution, if you're

24   talking about a therapeutic amount being 1 to 3 nanograms

25   per milliliter in a live patient, and you know that after a

1    person's dies, post-mortem redistribution could take even 1

2    nanogram and shoot it up to 10 or 15 or 20 or whatever,

3    there's no way and even their own expert testified, Dr.

4    Shanks testified that you can't relate back to the time of

14:55:27  5    death of blood fentanyl level what it was at the time of

6    death.

7         So the only way to remove reasonable doubt as it

8    relates to the medical examination in this case, ladies and

9    gentlemen, is to rule out other reasonable causes, and

14:55:43 10    that's why Dr. Young testified.  He was honest.  He said his

11    haunch was it was a drug overdose but beyond a reasonable

12    doubt.  We don't convict people based on haunches.  It has

13    to be proof beyond a reasonable doubt.  And they can't proof

14    the death beyond a reasonable doubt.

14:56:02 15         There were other health problems here.  There was a

16    tremendous amount of other health problem here.  Just

17    because a kid on the surface looks fine, and you're abusing

18    steroids and diuretics and taking thyroid medication, you

19    may look fine on the surface, but you could be doing damage

14:56:20 20    to your body internally.

21         And I will correct Mr. Corts.  Dr. Young didn't say

22    that you wouldn't be able to tell a cerebral hemorrhage from

23    an autopsy.  Of course, you can.  He said you wouldn't be

24    able to tell if someone had a cerebral hemorrhage unless you

14:56:37 25    did an autopsy.  That was the answer to the question.  And

1    common sense tells you that he's not going to try to say you

2    can't see a cerebral hemorrhage from an autopsy.  Of course,

3    when you open up the head, you're going to see the

4    hemorrhaging.  But you can't tell it if he's lying there

5    because it's an internal injury.  It's not one that happens

6    from blunt force trauma.  It's something that happens

7    because of stroke or because of an aneurysm, because of

8    blood tissue and blood pressure issues and things like that.

9        We're going to deprive someone's liberty and say that

10    it's because they gave drugs to someone who killed them,

11    whether it's Erika Matus, Borrey, or any of these other

12    individuals who are other sources of supply, that if you

13    look at under the reasonable doubt umbrella, just as likely,

14    especially of Erika Matus to be part.

15       The only other thing I'll say about that is we don't

16    have the burden of proving that it was Erika Matus.  They

17    have the burden of proving beyond a reasonable doubt that it

18    was Russell Davis.  The fact that Erika Matus is so

19    intertwined in this case, we are allowed to argue that.  The

20    fact is that the instruction that talks about the guilt of

21    others is no defense, that just means you can't hold it

22    against the Government for not charging others and things

23    like that, but you can -- the responsibility of others is a

24    defense.

25       Mr. Davis denies that he sold the dope.  And talking

1258

1　　even about Mr. Davis' statements -- I'm getting a lot in

2　　here quickly -- they rely a lot on Mr. Davis' statements.  I

3　　would suggest that what he's trying to avoid is being found

4　　out that he was dealing drugs in general.

14:58:14 5　　　　　And I would also suggest to you, ladies and gentlemen,

6　　that you can't even believe his statements without evidence

7　　because of the facts of this case.  He wouldn't have known

8　　whether or not dope that he supplied on the 6th or on the

9　　5th, whatever, was the dope that they're talking about that

14:58:33 10　　resulted in this young man's death for sure.  He would only

11　　know for sure when he's able to see the evidence that he

12　　probably doesn't remember either.  A text message that says,

13　　"Was sleep, was sleep."

14　　　　　Now it's been my honor and our Defense team's honor

14:58:56 15　　and pleasure to be able to represent Mr. Davis in this case.

16　　But as we worked really hard on this case, I'm going to say

17　　something now that I don't know that I've ever admitted in

18　　another trial.  And that is -- and I may pay for this by

19　　saying this.  I felt like we were working on behalf of Jacob

14:59:19 20　　Castro-White as well to determine the true meaning behind

21　　how he died that night, the true evidence, where the

22　　evidence really led.  Of course, our goal was to do that in

23　　vigorous defense of our own client, but at the same time,

24　　when you see how his friends lie to protect themselves and

14:59:42 25　　to protect others, it really tarnishes the memory of his

1      death, and to try to put it on somebody else, as demon-ish

2      as he may seem, to put his death onto somebody else.

3           Ladies and gentlemen, the evidence is overwhelming.

4      The puzzle is complete.  The tapestry has been woven.  When

15:00:09  5      you look at the picture, the evidence shows the Government

6      cannot prove beyond a reasonable doubt that Mr. Davis sold

7      drugs on March 7th, 12:34 A.M. to Jacob Castro-White.  And

8      because of that, ladies and gentlemen, you cannot find

9      Mr. Davis guilty.

15:00:32  10           The only proper verdict in this case, based upon an

11      objective, non-biased, non-sympathy driven evaluation of the

12      evidence in this case, ladies and gentlemen, is a verdict of

13      not guilty.  And you may think well, he's a drug dealer

14      anyway.  Your dog in this fight just isn't for Mr. Davis.

15:01:00  15      It's for us, it's for all of us, because if one man's

16      liberty can be denied him on evidence that is less than

17      proof beyond a reasonable doubt, all of our liberty is in

18      jeopardy.

19           Thank you very much.

15:01:16  20           THE COURT:  Thank you, Mr. Bryan.

21           The Government's final close.  The Government has a

22      right to argue last, first and last since they bear the

23      burden.

24

25

<u>CLOSING ARGUMENTS ON BEHALF OF THE GOVERNMENT</u>

1

2          MR. KATSAROS:  I want you to focus on when you

3   go back there, and it's probably the most important thing in

4   this case, is those last few minutes and texts that we are

5   talking about on 3-7.  Okay?

6          Look at that text message, the phone call at 12:31.

7   At 12:31 A.M., there's a phone call between Harry Karaplis

8   and the Defendant that lasts for a minute.  Not a couple

9   seconds, just for a minute.  It's corroborated by what Harry

10  Karaplis testified, that he talked to Mr. Davis and he was

11  going to be there shortly.  He would be there.

12         Then we have a phone call at 12:34, 33 that we know

13  goes unanswered and we have another phone call, and we've

14  gone back and forth.  Did he say here, did he say I'm

15  outside.  That's when Mr. Karaplis testified under oath that

16  he was outside, they connected, he went and he met.

17         What I really want you to ask yourselves, though, is

18  if what the Government says isn't true, okay, or what the

19  Defense is telling you is true that they never connected,

20  why are there no other calls?

21         You've seen this case and you see how these guys are.

22  They keep calling and calling and calling.  You don't think

23  he would have kept calling and calling and calling Red if he

24  had fallen asleep within a three-minute interval?  That's

25  what we're talking about here.  They talked for a minute at

1    12:31.  Yet, he would have you believe that the evidence in

2    this case shows that Red fell asleep.

3         Why did they keep calling if he fell asleep?  That's

4    all they do.  They keep calling until they get where -- what

5    they need.  We see it.  It's outlined in everything you see

6    in this case.  We know that he sold twice to those guys on

7    3-5.  We know that he sold twice to them on 3-6.  And how do

8    we know that?  Because they kept calling him and calling him

9    and calling him until they got what they needed.  And then

10   they went about their way.

11        That's what we have here.  There's no calls after

12   12:34 to Red blowing up his phone to get what they need.

13   There's no calls to Erika Matus.  What the Defense does in

14   this case, what all Defense attorneys like to do is divert

15   your attention.  Look at this, look at that.

16                   MR. BRYAN:  Objection, your Honor.

17                   THE COURT:  Sustained in part.

18                   MR. KATSAROS:  Erika Matus is the dealer.

19   Okay?  Ask yourself when you look at the phone records,

20   okay, just look at the phone records.  Do they make any

21   connection to Erika Matus after that?  Is there any call

22   between Harry and Jacob to anybody else?  All the evidence

23   shows that after 12:34, their phones don't do anything.

24        They don't text anybody.  They don't call anybody.

25   The next time anybody in the case makes any communication

1    with anybody is Harry blowing up Jake.  Only.

2         The Defense talked about that Corey said he was a

3    credible witness.  Ask yourself what Corey Stock said to

4    you.  He said that the day after this happened, he sent a

15:04:40  5    text to Red saying, "I need to talk to you."  And it's in

6    the text messages.  Again, don't rely on what I say.  Rely

7    on the testimony that you heard from the witness stand and

8    what we see in those messages.  And I would submit to you if

9    we didn't have those text messages that we got from that

15:04:55 10    preservation letter, we wouldn't even have a case.  Okay?

11    Those content text messages, that's what created this case.

12    That's the only reason we have a case, or else we would be

13    just looking at phone calls, which the Defense has been

14    doing this whole trial, between Erika Matus and Corey saying

15:05:13 15    they all were conspiring against Mr. Davis.

16         Corey said, and it's shown in the text message,

17    there's a message from him to Red saying, "I need to talk to

18    you."  What did he do?  He went and talked to Red and he

19    told him, said listen, my buddy -- this is the day after --

15:05:31 20    my buddy passed.  What is Red's response?  "Well, I don't

21    know about your buddy.  I never met him.  I only -- I dealt

22    with Harry.  I sold to Harry."

23         And that -- and that statement is even corroborated by

24    what he says in his interview.  It's a confession.  Why

15:05:50 25    would he say that?  Did somebody else give it to him?

1263

1  Maybe.  He doesn't know the law.  He doesn't know when you

2  put poison, when you put fentanyl on the streets, I don't

3  need to just hand it to that person.  I'm only on hook for

4  that person.  If I'm going to deal in that junk, you're on

15:06:10  5  the hook if somebody dies, whether you gave it to them

6  directly or if you didn't give it to them directly.

7  Ask yourself another question.  And there's an

8  instruction.  It's inferring somebody's mental state.  Ask

9  yourself what Mr. Davis is thinking when he's talking to

15:06:26  10  Harry in that controlled call.  The Defense didn't even

11  bring it up.  Why is he asking Harry about the police and if

12  they're sweating him?  Why does he keep going on what's

13  going on with him.  What the hell does he care about?  Why

14  is he asking him that?

15:06:41  15  Think about what he's thinking in his mind.  Okay.

16  Him and Harry just had a conversation and it's supported by

17  the messages in there on 3-29 where they talked for a couple

18  minutes, where Harry basically had to tell him hey, Corey's

19  the guy snitching on you; I'm not snitching.  And you can

15:06:59  20  see in that conversation, that controlled call, he's sort of

21  pushing and prodding to see where he's at because he knows

22  he's -- he's got a lot, he knows what he did.

23  You can tell from the controlled call and you can tell

24  it from his statement, he knows.  And it's supported by the

15:07:17  25  evidence, by what we see that went on that night.  All these

1264

things that happened a week ago, February 28th, I submit to
you they don't matter.  These investigations, these cases
are about a specific period of time.  They talk -- we talk
about that all the time.  These guys do.  They have multiple
sources.  They have this.  They have that.

The only way, and the investigators talked about it.
We can determine -- is to look at those dates leading up to
it and the guy with the best stuff, and the guy that they
kept going to was Red.  And it wasn't once.  It wasn't
twice.  It was five times during that limited period of
time.  I think it's best summarized by when Jacob says well,
I'll just wait for Red.  The Defense says this is a
homicide.  This is not a homicide.  We're not alleging that
Mr. Davis intended to kill one of his -- you know, a
customer.  No drug dealer wants to kill a customer.  Okay?
This is simply about the fact that his drugs killed Jacob
Castro-White.

Let's talk about Erika Matus.  Erika Matus -- we
called Erika Matus in this case because we wanted you to see
her take the stand and use your tools of credibility that
you use in your everyday life to tell if somebody's telling
you the truth.  Okay?  Ask yourselves -- and that's for your
determination.  Ask yourself after listening to her whether
or not you actually believe the Defense's theory that she's
the one who sold that to them that night, and that these

1    addicts, Harry, Corey, and Erika, all got together then and

2    conspired to frame Red.  It's not supported --

3                    MR. BRYAN:  Objection, your Honor.

4                    MR. KATSAROS:  -- by any evidence in this case

15:09:13  5    when you look at the records.

6                    THE COURT:  Mr. Katsaros.  Stay away from the

7    conspiracy theory here.

8                    MR. KATSAROS:  That these individuals got

9    together and made up a story.  Look at the evidence that we

15:09:26 10    see in the phone records.  There are no communications,

11    none, between Erika Matus and Jacob Castro-White, other than

12    a text message -- a text message on February 28th, that's

13    it.  There's nothing within that time period that we're

14    talking about.

15:09:41 15     There's no communication between Harry and Erika

16    Matus.  Within any -- before or after.  Okay?  So they

17    grapple.  They hold on to all these calls between Corey, but

18    there's no connection between the three of them.  There's

19    nothing there.  If you look at that night in question,

15:10:05 20    there's no text message to Erika Matus or Corey that night.

21    You would think that we would see in those records that

22    Harry, if they went that night and couldn't get drugs, there

23    would have been a call from Harry or a text to Corey to say

24    hey can Erika hook us up.  There was nothing there.  Yet,

15:10:26 25    they accuse this young girl of being the dealer based upon a

1   text message that Corey said the day before he was at her

2   house, did a shot, and the shot sucked.  Okay.

3        The investigator can't follow every lead.  They go

4   where the evidence takes them.  Okay.  There's no rush to

15:10:50  5   judgment here.  Look at what Detective Sivert did.  He went

6   to Donny Buchs' house.  He didn't rule out anybody.  It

7   wasn't until he sat down and cut up those text messages and

8   laid them out for himself and looked and said uh-huh, who's

9   Red.  So when Harry went down there, he wants to know who

15:11:13 10   Red is.

11        He would have you believe that, the Defense would have

12   you believe that, you know, Harry made this all up and

13   basely did it to frame Red.  I submit to you he didn't do a

14   good job of it, or everything he did isn't indicative of

15:11:27 15   that.  He initially goes in, he lies, he uses the name Red.

16   The next interview, the Detective asked him who's Red.

17   "Some guy from Lorain.  I don't know his number.  Some guy

18   from Lorain."

19        If he really wanted to frame Red, he would have said,

15:11:47 20   "Hey, Red, he lives here, here, and here, here's his

21   number."  He didn't do that.  Ask yourself what Harry

22   Karaplis testified to.  Okay.  What the Defense is trying to

23   do in this case is basically make him the villain.  Okay.

24   Ask yourself if any evidence in this case supports the

15:12:05 25   theory that he left his friend for dead.  And then he was

1    calling him, blowing up his phone.  If he really wanted to

2    extricate himself from the situation, if he really wanted no

3    one to know he was part of it, why in the heck did he keep

4    calling him?  Why did he keep calling him?  If you're in a

15:12:28  5    bad situation with somebody else, if something happened to

6    someone, why in the heck do you keep calling him?  He called

7    him all morning, you know, from 2:51 to 3:10.  He called him

8    the next morning.  He put himself on the radar.

9        I submit to you, he was under the influence of a

15:12:46 10   powerful opioid that he had purchased from Red that night.

11   He was concerned for his friend, and he wanted to know if he

12   was all right.  Ask yourself if there's anything from that

13   that supports this theory that Harry was there, picked him

14   up and threw him on the bed.  I submit to you it's just pure

15:13:06 15   conjecture.

16       Let's talk a little bit more about Erika Matus.  Look

17   at the evidence in the case.  Look at what those phone calls

18   bear out.  There is no communication between Harry and

19   Erika, Erika and Jacob during the course of that -- days

15:13:29 20   leading up to -- they weren't going around -- what?  There's

21   nothing there.  But, the Defense would have you believe that

22   the relevant, the most important thing is that after Corey

23   talked to Harry, and Corey finds out that Jake said he

24   called Erika.  I submit to you that he called Erika and the

15:13:49 25   evidence has shown because they're best friends.  They're

1    drug users who have been dealing with an addiction, that

2    they're both relying on.  And the reason that they keep

3    calling each other and talking to each other is because

4    they're friends.  But, somehow they want to paint, as Mr.

15:14:06 5   Bryan called it, a tapestry, okay, that Erika's the dealer

6    and Harry left his friend for dead.

7         What we always ask you to do in these cases, and I ask

8    you to use your tools of credibility throughout this case.

9    Look at the testimony of the witnesses; specifically, too,

15:14:27 10  what Dr. Evans testified to.  He's been doing this for 30

11   years.  Think about all the factors that we talked about.

12   All the evidence that was there.

13        There was in that article, it says the most

14   significant finding in an opioid overdose is lung edema.  We

15:14:45 15  know there was lung edema here.  We know there was a high

16   level of fentanyl.  We know there was fentanyl at the scene.

17   We know this to be a young individual of 23 years old, never

18   had any history of seizure, stroke, anything.

19        Ask yourself, use your common sense, what killed this

15:15:03 20  boy.  What I'm going to ask you to do in this case -- and

21   again, I can't keep reiterating.  It's the most important

22   thing you need to do is use your common sense.  Those phone

23   records, the phone records are the key to this case.  And

24   again, I submit to you that if we didn't have the content of

15:15:27 25  those messages that Detective Sivert was able to retrieve,

1    we wouldn't even have a case.  We wouldn't even be here.

2         Those phone text messages content outline what was

3    going on in Jacob Castro-White's life on 3-5, 3-6, and 3-7.

4    They're a roadmap to this case.  Okay?  Use your common

15:15:49  5    sense.  Use your tools of credibility.  Ask yourselves what

6    the credible evidence is in this case, and specifically,

7    during that night, that 3-7.

8         Ask your yourselves, based upon everything we know

9    about these guys, if they really didn't get together that

15:16:07 10    night.  He didn't call again?  He calls him once.  It's

11    unanswered.  He calls him twice.

12         Now Harry said listen, I have phone indicators, and we

13    all have on our phone that show missed calls.  Maybe you get

14    up in the morning and you respond to it.  But, ask

15:16:26 15    yourselves, their phones are silent.  Okay?  Harry Karaplis

16    testified they bought drugs from Red that night.  That is --

17    I would submit to you that is corroborated by the phone

18    evidence.  It's corroborated by the tower locations where

19    they went and when they came back.

15:16:46 20         He testified that those drugs were similar to what

21    they had done that night.  He testified that those drugs --

22    he felt that he found them, he passed out that night.

23    Again, go back to the jury room.  I ask you to use your

24    tools of credibility and use your common sense in this case.

15:17:09 25    Apply the law to the facts, and come up with a verdict.

1        If you believe the Government has proven our case

2   beyond a reasonable doubt, then say so.  If you don't, then

3   find him not guilty.  Okay?

4        This -- you know this case isn't about, you know -- I

5   don't want you to go back there and say oh, I want justice

6   for Jacob, I want somebody to be on the hook.  I want you to

7   go back there and, based upon the evidence, be firmly

8   convinced that the Government has proved every element of

9   the offense, and based upon that finding, you return a just

10  verdict, the right verdict.

11       And I submit to you the right verdict in this case,

12  based upon the evidence, just the evidence, is that the

13  Defendant distributed drugs to those two boys -- excuse

14  me -- young men on March 7, 2017 and that Jacob Castro-White

15  used those drugs they had gotten from Mr. Davis, and he

16  passed.

17       I thank you for all your time and attention.

18            THE COURT:  Thank you, Mr. Katsaros.

19       Mr. Miller and Ms. LaForte, you are our alternates in

20  this case.  Looks like the jury members are healthy enough

21  to go back and start deliberating.  So we're going to excuse

22  you at this time with our thanks.  And please remember that

23  you still cannot discuss this case unless and until this

24  jury reaches a verdict.  But, you're welcome to stay in

25  touch with us to find out what's going on.

1        So we thank you for your service.  We'll dismiss you

2    at this time.  And all rise for these two jurors, please.

3        Ladies and gentlemen, let's pick up where we started,

4    where we left off.  Page 28 if you would.  And read along

15:19:29 5    with me.

6                        CHARGE OF THE COURT

7        THE COURT:  That concludes the part of my

8    instructions explaining the rules for considering some of

9    the testimony in evidence.  Now let me finish up by

15:19:39 10    explaining some things about your deliberations in the jury

11    room and your possible verdicts.

12        First thing that you should do in the jury room is

13    choose someone to be your foreperson.  This person will help

14    to guide your discussions and will speak through you here in

15:19:54 15    court.

16        Once you start deliberating, do not talk to the jury

17    officer or to me or to anyone else, except each other about

18    the case.  If you have any questions or messages, you must

19    write them down on a piece of paper, sign them, and then

15:20:07 20    give them to the jury officer.

21        The officer will give them to me, and I will respond

22    as soon as I can.  I may have to talk to the lawyers about

23    what you have asked.  So it may take me some time to get

24    back to you.  Any questions or messages normally should be

15:20:22 25    sent to me through your foreperson.

1    One more thing about messages.  Do not ever write down

2    or tell anyone, including me, how you stand on your votes.

3    For example, do not write down or tell anyone that you are

4    split 6/6 or 8/4 or whatever your vote happens to be.  That

5    should stay secret until you are finished.

6    Remember that you must make your decision based only

7    on the evidence that you saw and heard here in court.

8    During your deliberations, you must not communicate with or

9    provide any information to anyone by any means about this

10   case.  You may not use any electronic device or media such

11   as a telephone, cellphone, smart phone, iPhone, BlackBerry

12   or computer, the Internet, any Internet service or any text

13   or instant messaging service, any Internet chat roo, blog,

14   or website, such as Facebook, Google, Instagram, LinkedIn,

15   YouTube, or Twitter to communicate to anyone any information

16   about this case or to conduct any research about this case

17   until I accept your verdict.

18   In other words, you cannot talk to anyone on the

19   phone, correspond with anyone, or electronically communicate

20   with anyone about this case.

21   You can only discuss this case in the jury room with

22   your fellow jurors during deliberations.  I expect you will

23   inform me as soon as you become aware of another juror's

24   violations of these instructions.

25   You may not use these electronic means to investigate

1  or communicate about the case because it is important that

2  you decide this case based solely on the evidence presented

3  in this courtroom.  Information on the Internet or available

4  through social media might be wrong, incomplete, or

15:22:00  5  inaccurate.  You are only permitted to discuss the case with

6  your fellow jurors during deliberations because they have

7  seen and heard the same evidence you have.

8       In our judicial system, it is important that you are

9  not influenced by anything or anyone outside of this

15:22:16 10  courtroom.  Otherwise your decision may be based on

11  information known only by you and not your fellow jurors or

12  the parties in the case.  This would unfairly and adversely

13  impact the judicial process.

14       A juror who violates these restrictions jeopardizes

15:22:34 15  the fairness of these proceedings and a mistrial could

16  result, which will require the entire trial process to start

17  over.

18       Your verdict, whether guilty or not guilty, must be

19  unanimous.  To find the Defendant guilty, every one of you

15:22:49 20  must agree that the Government has overcome the presumption

21  of innocence with evidence that proves his guilt beyond a

22  reasonable doubt.

23       To find him not guilty, every one of you must agree

24  the Government has failed to convince you beyond a

15:23:02 25  reasonable doubt.  Either way, guilty or not guilty, your

1    verdict must be unanimous.

2        Now that all the evidence is in and the arguments are

3    completed, you are free to talk about the case in the jury

4    room.  In fact, it is your duty to talk with each other

15:23:16  5    about the evidence and to make every reasonable effort you

6    can to reach unanimous agreement.  Talk with each other.

7    Listen carefully and respectfully to each other's views, and

8    keep an open and as you listen to what your fellow jurors

9    have to say.  Try your best to work out your differences.

15:23:34 10    Do not hesitate to change your mind if you are convinced

11    that the other jurors are right and that your original

12    position was wrong.  But do not ever change your mind just

13    because other jurors see things differently or just to get

14    the case over with.

15:23:48 15        In the end, your vote must be exactly that; your own

16    vote.  It is important for you to reach unanimous agreement

17    but only if you can do so honestly and in good conscience.

18        No one will be allowed to hear your discussions in the

19    jury room and no record will be made of what you say.  So

15:24:06 20    you should all feel free to speak your minds.  Listen

21    carefully to what the other jurors have to say, and then

22    decide for yourself if the Government has proved the

23    Defendant guilty beyond a reasonable doubt.

24        If you decide the Government has proved the Defendant

15:24:22 25    guilty, then it will be my job to decide what the

1    appropriate punishment should be.  Deciding what the

2    punishment should be is my job, not yours.  It would violate

3    your oaths as jurors to even consider the possible

4    punishment in deciding your verdict.  Your job is to look at

15:24:37  5    the evidence and decide if the Government has proved the

6    Defendant guilty beyond a reasonable doubt.

7        Now, I've prepared a verdict form for Count 1 as

8    charged in the indictment that you should use to record your

9    verdict.  And let's take a look at that.

15:24:52  10        It's right before the stipulation of the parties.

11    Attached to the instructions here.  Count 1, verdict form.

12    Question 1:  "With respect to the charge in Count 1 of the

13    indictment, for distribution of a mixture or substance

14    containing a detectable amount of fentanyl, in violation of

15:25:10  15    Title 21 United States Code, Section 841(a)(1), and

16    (b)(1)(C), we find the Defendant, Russell Davis" -- and, of

17    course, you have your choice, either guilty or not guilty.

18    And then you have the signatures for all of you and the date

19    underneath, which your foreperson will fill in.

15:25:32  20        Go to the next page.  If you find the Defendant,

21    Russell Davis, guilty of Question 1, then proceed to answer

22    Question 1A which is:  "Do you unanimously find that the

23    Government proved beyond a reasonable doubt that death

24    resulted from the use of the fentanyl distributed by the

15:25:46  25    Defendant, Russell Davis; either yes or no?"  And again,

1       signature lines for all of you and the date by your

2       foreperson.  In other words, you only address Question 1A,

3       of course, if you find him guilty.  Excuse me.  Yes, 1A.

4       Okay.

15:26:04  5       That's the verdict forms for your consideration.

6       Let's go back to Page 34.  If you decide that the Government

7       has proved the charge against the Defendant beyond a

8       reasonable doubt, say so by having your foreperson mark the

9       appropriate place on the form.  If you decide that the

15:26:19 10      Government has not proved the charge against him beyond a

11      reasonable doubt, say so by having your foreperson mark the

12      appropriate place on the form.

13          Your foreperson and each of you should then sign the

14      form, put the date on it, and return it to me.

15:26:33 15         Remember that if you elected to take notes during the

16      trial, your notes should be used only as memory aids.  You

17      should not give your notes greater weight than your

18      independent recollection of the evidence.  You should rely

19      upon your own independent recollection of the evidence or

15:26:48 20      lack of evidence, and you should not be unduly influenced by

21      the notes of other jurors.  Notes are not entitled to any

22      more weight than the memory or impression of each juror.

23      Whether you took notes or not, each of you must form and

24      express your own opinion as to the facts of the case.

15:27:06 25         Now, let me finish up by repeating something that I

1277

1    said to you earlier.  Nothing that I have said or done

2    during this trial was meant to influence your decision in

3    any way.  You decide for yourselves if the Government has

4    proven -- proved the Defendant guilty beyond a reasonable

15:27:25 5    doubt.

6        Ladies and gentlemen, the exhibits, the verdict forms,

7    and the specific instructions of law that you have in your

8    hands, they'll be the only things that you'll have.  You

9    will not be given any other documents, including any

15:27:41 10    transcripts.  You'll have what you need.  If you do have any

11    questions, of course, I gave you the procedure for

12    submitting those to me.

13        In the beginning of this case, I told you how

14    important jury service is.  Having spent a week with us now,

15:27:55 15    I think you understand just how important this process is,

16    even before you start deliberating.  I think you'll surprise

17    yourselves on just how hard you will work on this case, and

18    we know that you will.

19        One of the things that goes unheralded during these

15:28:13 20    trials is the hard work of both sides.  I want to

21    acknowledge the hard work of Defense counsel, the

22    Government, the agents, the support staff, because what you

23    see is the culmination of the work, not all the hours and

24    the late nights and the missed sleep that goes into

15:28:34 25    preparing for trial and during the trial.  Because they have

1  to constantly go over the witness preparation, look at

2  what's happened, prepare for the next day, they're not

3  sleeping much.  And that's okay.  And they understand it.

4  That's part of the job.  It goes with it.  But, a lot of

15:28:49 5  times, people forget just how hard all of us work and all of

6  counsel and the support staff work to prepare this for you.

7  And I do want to acknowledge that because they're not only

8  good attorneys, they're good people.  And I want to say that

9  sincerely to all of you in this case.

15:29:05 10  So now you know how important this is.  I want to

11  thank you for paying really good attention, probably more so

12  than most juries do.  You were in the game; taking notes,

13  listening, asking questions.  I think we had a total of 34

14  questions in this case.  Doesn't set the record, but it's

15:29:24 15  pretty close, which means that you're really listening.  And

16  you had some really good questions, really good questions.

17  And sometimes the attorneys come to side bar and said, "Wish

18  I had asked that."

19  Twelve heads are always better than one, and that's

15:29:40 20  why I told you that none of the Judges are interested in any

21  way of getting rid of the jury system because you all have

22  great experiences in life.  You've all been through a lot of

23  things.  You can put your heads together and come to a

24  conclusion, and that's what we hope that you do.

15:29:57 25  With that in mind, again, thank you so much for all

1    your attention in this case.  It is now in your hands for a

2    verdict.

3         (Jury retired to deliberate at 3:32 p.m.)

4              THE COURT:  Guys, one more thing here.  I'm

15:31:58 5    going to send a note back to the jury.  I do not allow

6    jurors to have drugs on their own.  So, I'll say if they

7    want to see the drugs, they can request and I'll have maybe

8    the agent walk it back there.

9         Agent, if they want to see the drugs, the procedure

15:32:15 10   would be that you walk in there, hand the drugs, stay in the

11   corner silent.  Let them pass it around.  They won't be able

12   to talk while you're there, and then when they're done

13   looking at the drugs, you exit, and bring them back.

14             AGENT CARTY:  Yes, sir.

15:32:26 15            THE COURT:  Okay.  I'll send them a message to

16   that effect.  That's the procedure if they want to see the

17   drugs.  I don't let guns, bullets, or drugs go back with the

18   jury without some supervision.  Okay.

19        (Additional instruction written to the jury:)

15:36:00 20        "Ladies and gentlemen, if you want to see the drugs

21   admitted into evidence, send me a note.  I will have SA

22   Carty bring them in and stand there in silence as you pass

23   them around.  Stand there in silence as you pass them

24   around.  Do not speak in his presence.

15:36:26 25        "After you are done looking at the drugs, hand them

1    back to SA Carty and he will leave.

2         "Only then can you continue your discussions.

3    Respectfully, Judge Boyko."

4         (Recess at 3:30 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CHARGE OF THE COURT                                          1156

CLOSING ARGUMENTS ON BEHALF OF THE GOVERNMENT    1175

CLOSING ARGUMENTS ON BEHALF OF THE DEFENSE         1211

CLOSING ARGUMENTS ON BEHALF OF THE GOVERNMENT    1260

CHARGE OF THE COURT                                          1271

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

s/Shirle Perkins
Shirle M. Perkins, RDR, CRR
U.S. District Court - Room 7-189
801 West Superior Avenue
Cleveland, Ohio 44113
(216) 357-7106